**BRICKFIELD & DONAHUE**
70 Grand Avenue
River Edge, New Jersey 07661
(201) 488-7707

*New Jersey Liaison Counsel*
*For Plaintiffs in the Securities Action*

**MILBERG WEISS BERSHAD**
  **& SCHULMAN LLP**
 One Pennsylvania Plaza
New York, NY 10119-0165
(212) 594-5300

**STULL, STULL & BRODY**
 6 East 45th Street, 5th Floor
New York, NY 10017
(212) 687-7230

*Co-Lead Counsel for Plaintiffs*
*In the Securities Action*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE MERCK & CO., INC., SECURITIES, DERIVATIVE & "ERISA" LITIGATION | MDL No. 1658 (SRC) |
| THIS DOCUMENT RELATES TO: THE CONSOLIDATED SECURITIES ACTION | Case No. 3:05-CV-01151-SRC-TJB Case No. 3:05-CV-02367-SRC-TJB |

**CONSOLIDATED AND FOURTH AMENDED CLASS ACTION COMPLAINT**

**PRELIMINARY STATEMENT**

1.     Plaintiffs, on behalf of themselves and the Class they seek to represent (defined

below), for this Consolidated and Fourth Amended Class Action Complaint, make the following

allegations against Defendants based upon the investigation conducted by and under the supervision of their counsel, which included, among other things:

       i.      interviews of former employees of Merck & Co., Inc. ("Merck" or the "Company") and other persons with knowledge and information with respect to the matters alleged herein;

       ii.      review and analysis of the public filings of Merck and the other Defendants, including their filings with the Securities and Exchange Commission (the "SEC");

       iii.      review and analysis of press releases, reports to shareholders, and other public statements issued by Defendants;

       iv.      review and analysis of news articles and media reports relating to the matters alleged herein;

       v.      review and analysis of analyst reports relating to Merck;

       vi.      review and analysis of securities analyst conference call transcripts;

       vii.      review and analysis of documents and information obtained by Plaintiffs from the United States Department of Health and Human Services pursuant to the Freedom of Information Act;

       viii.      review and analysis of pertinent scientific and medical literature;

       ix.      review and analysis of pertinent documents issued by the United States Food and Drug Administration (the "FDA"), including official communications between the FDA and Merck;

       x.      consultations with experts;

       xi.      review and analysis of Congressional testimony and materials issued by the United States Congress;

xii.    review and analysis of internal Merck documents that are in the public domain;

xiii.    review and analysis of advertising and promotional materials that Defendants disseminated during the Class Period concerning VIOXX;

xiv.    review and analysis of VIOXX label leaflets; and

xv.    review and analysis of pleadings in other actions filed against Merck that arise out of the same core issues and facts alleged herein concerning VIOXX.

2.    Except as alleged herein, the underlying information relating to Defendants' misconduct and the particulars thereof, including millions of pages of documents produced in the VIOXX personal injury cases currently designated as confidential, as well as tens of thousands of pages of documents produced to United States government investigatory agencies and bodies, is not available to Plaintiffs and the public, and lies within the possession and control of Defendants and other Merck insiders.

3.    Based, among other things, on statements made by Defendants themselves, investigations commenced by multiple United States government agencies, Congressional hearings, and thousands of other actions filed against Merck that arise from Defendants' misstatements and failures to disclose the health risks of VIOXX, Plaintiffs believe that substantial additional evidentiary support will exist to prove the allegations set forth herein after a reasonable opportunity for discovery. As events continue to unfold day to day, more and more documents and information that further support Plaintiffs' claims alleged herein enter the public domain.

## CONFIDENTIAL SOURCES

4.    Confidential sources who provided information for Plaintiffs' counsel's investigation include former Merck employees who worked at the Company during the relevant

time period and dealt directly with VIOXX and other persons who have knowledge and information with respect to matters referred to herein. The sources include the following:

(a)        Former Merck Employee ("FME")-1 was a Merck sales representative from approximately April 1998 through November 2003, and sold VIOXX during the Class Period.

(b)        FME-2 was a Merck sales representative from approximately June 2, 2002 through April 2003, and sold VIOXX during the Class Period.

(c)        FME-3 was a Merck sales representative from approximately September 11, 2000 through September 21, 2003, who dealt with specialists and primary care physicians.

(d)        FME-4 was a Merck sales representative from approximately May 1999 through June 2002, and sold VIOXX during the Class Period.

(e)        FME-5 was a Merck sales representative from approximately 1980 through February 2003, and sold VIOXX during the Class Period.

(f)        FME-6 was a Merck sales representative from approximately June 2000 through July 2003, and sold VIOXX during the Class Period.

(g)        FME-7 was a Merck sales manager who worked at the Company from approximately April 1999 through May 2004, and who was involved with VIOXX during the Class Period. FME-7 worked in Merck's National Service Center (the "Service Center"), which tracked information about drugs developed by the Company's competitors. The Service Center also served as "an information providing tool" for Merck sales representatives. In addition, Merck employees who worked in the Service Center prepared reports for senior level Merck officials concerning, among other things, VIOXX.

(h)      FME-8 was a Merck clinical researcher who was a major participant in the VIGOR Study, which is discussed below.

## NATURE OF THE ACTION

5.      This is a class action on behalf of the purchasers of Merck securities between May 21, 1999 and October 29, 2004, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").   Plaintiffs also seek to pursue remedies under the Securities Act of 1933 (the "Securities Act") on behalf of Class members who purchased Merck common stock through the Merck Stock Investment Plan (the "MSIP"), pursuant to Merck's Registration Statement dated April 26, 2002 (the "Registration Statement") and the prospectuses for the MSIP dated April 26, 2002, April 30, 2002 (the "April 30, 2002 Prospectus"), and June 10, 2004 (the "June 10, 2004 Prospectus").

6.      During the Class Period, Defendants made a series of materially false and misleading statements and omissions concerning, among other things, the safety profile of Merck's prescription painkilling drug VIOXX, generically known as rofecoxib.   Defendants concealed from the market that patients taking VIOXX, which Defendants and the market touted as Merck's "savior" when it was introduced in 1999, had a significantly increased risk of having a heart attack or other cardiovascular event. ***A study led by an FDA official projects that the widespread use of VIOXX may have led to as many as 129,000 heart attacks and cardiac events, 30% to 40% of which resulted in death.***

7.      Merck describes itself as a global research-focused pharmaceutical products company, which discovers, develops, manufactures, and markets a broad range of products to improve human and animal health, directly and through its joint ventures.   On May 21, 1999, VIOXX was approved by the FDA for treating primary dysmenorrheal (severe menstrual

cramps), managing acute pain in adults, and relieving symptoms relating to osteoarthritis. During the Class Period, *VIOXX was Merck's second best selling drug*.

8.      In May 1999, Merck began vigorously marketing VIOXX to health professionals in the United States by conducting audio conferences, making sales presentations, and issuing press releases, and continued to do so throughout the Class Period.  Defendants' consistent representations that VIOXX possessed all of the beneficial effects of traditional nonsteroidal anti-inflammatory drugs ("NSAIDs"), such as aspirin, ibuprofen, and naproxen, without causing serious gastrointestinal side effects, led investors to believe VIOXX would be a "blockbuster" drug for Merck.

9.      However, unbeknownst to the public, by at least May 1999, Defendants were fully aware -- through, among other things, clinical studies Defendants were conducting with respect to VIOXX, as well as through the FDA's Adverse Event Reporting System, which collects information concerning adverse events associated with VIOXX, including cardiovascular events -- that their public statements concerning the safety profile of VIOXX, and its commercial viability and ability to continue generating substantial revenues over the life of Merck's patent were materially false and misleading, and that VIOXX caused a statistically significant increase in cardiovascular events.  Nevertheless, Defendants continued to promote VIOXX as being significantly safer than the class of NSAIDs, as well as other analgesic and anti-inflammatory therapies available for the management of pain.  Because (i) VIOXX is no more effective in treating inflammation and pain than traditional NSAIDs and (ii) traditional NSAIDs were sold to consumers at a fraction of the cost of VIOXX, the perception that VIOXX's safety profile was superior to traditional NSAIDs was critical to the drug's success and to investors' assessment of Merck's prospects.

10. Thus, throughout the Class Period, Defendants misrepresented the safety profile of VIOXX, including concealing and minimizing the significantly increased risk of heart attacks in patients taking the drug. As part of Defendants' scheme to conceal the serious cardiovascular risks associated with VIOXX, Defendants trained the Company's sales representatives to misrepresent the safety of VIOXX.

11. Defendants were motivated to protect sales of VIOXX, the Company's new "blockbuster drug," in part because Merck was facing the expiration of patent on a number of its most profitable drugs. *Every month* Defendants were able to keep VIOXX on the market by concealing the truth allowed Merck to realize *tens of millions of dollars in revenues*. In addition, Defendants' misrepresentations enabled Company insiders to profit personally *by selling almost 2.6 million shares of Merck stock for more than $265 million in proceeds*.

12. Defendants' materially false misrepresentations and omissions artificially inflated the trading price of Merck common stock to a Class Period high of almost $95. Merck stock now trades below $32.

13. During the Class Period, Defendants flatly rejected, or mischaracterized any report that suggested that there were cardiovascular risks posed by VIOXX. In at least one instance, Defendants took affirmative steps to dissuade the authors of a prospective article that reported an increased risk of adverse cardiovascular events in patients taking VIOXX from publishing the article.

14. Ultimately, Defendants were forced to withdraw VIOXX from the worldwide market. Thereafter, the public disclosure of internal Company documents made clear that Defendants not only were aware of the serious cardiovascular risks associated with VIOXX, but also had engaged in a willful scheme to suppress the truth through a pattern of deception and

intimidation. Dr. David Graham, Associate Director for Science and Medicine in the FDA's Office of Drug Safety, who testified on November 18, 2004 before the Senate Committee on Finance, referred to Defendants' scheme as "the single greatest drug catastrophe in the history of the world." As the truth became known, the trading price of Merck common stock plummeted. In fact, between the worldwide withdrawal of VIOXX on September 30, 2004, and the public confirmation of Defendants' awareness and cover-up of the serious, life-threatening risks posed by VIOXX on November 1, 2004, Merck's market capitalization fell by ***more than $37.2 billion***.

15.     Defendants instead denied reports concerning the increased risk of cardiovascular problems as inaccurate and inconclusive.

16.     On September 30, 2004, Defendants shocked the world by announcing that Merck was immediately withdrawing VIOXX from world markets after an independent data safety monitoring board, which had overseen a long-term study of VIOXX, recommended the study be halted because of an increased risk of serious cardiovascular events among members of the study group. The announcement was in stark contrast to Defendants' prior representations that assured the market about VIOXX's safety, as well as Defendants' efforts to suppress medical and scientific information that showed VIOXX is associated with significant and dangerous cardiovascular risks.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to §§ 11, 12(a)(2), and 15 of the Securities Act [15 U.S.C. §§ 77k, 77l(a)(2), and 77o], and under and pursuant to §§ 10(b), 20(a), and 20(A) of the Exchange Act [15 U.S.C. §§ 78j(b), 78t(a), 78t-1(a)] and Rule l0b-5 promulgated thereunder by the SEC.

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, § 22 of the Securities Act [15 U.S.C. § 77v], and § 27 of the Exchange Act [15 U.S.C. § 78aa.]

19.     Venue is proper in this District pursuant to § 27 of the Exchange Act, § 22 of the Securities Act, and 28 U.S.C. § 1391(b).  In addition, venue is proper in this District pursuant to the Order of the Judicial Panel for Multi District Litigation, dated February 23, 2005.

20.     In connection with the acts and transactions alleged in this Complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

21.     Court-appointed Lead Plaintiffs Richard Reynolds, Steven LeVan, Marc Nathanson, and Jerome Haber purchased Merck common stock at artificially inflated prices during the Class Period and have been damaged by Defendants' wrongful conduct.  The Lead Plaintiffs previously submitted certifications reflecting their transactions in Merck common stock during the Class Period, which are incorporated by reference herein.

22.     Plaintiff Union Asset Management Holding AG ("Union"), on behalf of its funds, UniSector; BioPharma; Uni21.Jahrhundert-net-; UniGlobalTitans 50; UniGlobal; UniGlobal-net- and UniSector: High Tech (the "Funds"), purchased Merck common stock during the Class Period at artificially inflated prices and has been damaged by Defendants' wrongful conduct. Union is a fund management company headquartered in Frankfurt am Main, Germany.  Union controls and manages and is attorney-in-fact for each of the Funds.  Plaintiff Union previously

submitted a certification reflecting the Funds' transactions in Merck common stock during the Class Period, which is incorporated by reference herein.

23.     Plaintiffs Loren Arnoff, Park East, Inc., Robert Edwin Burns, Jan Charles Finance S.A., Martin Mason, Frank H. Saccone, Charlotte Savarese, Joe Savarese, Joseph Goldman, Sherrie B. Knuth, Joseph S. Fisher, M.D., and Naomi Raphael purchased Merck common stock during the Class Period at artificially inflated prices and have been damaged by Defendants' wrongful conduct.  The aforementioned Plaintiffs previously submitted certifications reflecting their transactions in Merck common stock during the Class Period, which are incorporated by reference herein.

24.     Plaintiff Rhoda Kanter purchased shares of Merck common stock through Merck's Stock Investment Plan ("MSIP").  Those shares were sold by Merck pursuant to a shelf registration which became effective on April 26, 2002.  The MSIP, which was instituted in 1997, is a dividend reinvestment program that permits Merck shareholders automatically to reinvest cash dividends paid on Merck common stock towards the purchase of additional shares of Merck common stock.  Plaintiff Kanter previously submitted a certification reflecting her transactions in Merck common stock during the Class Period, which is incorporated by reference herein.

**Defendants**

25.     Defendant Merck is a global pharmaceutical company that develops, manufactures, and markets a broad range of human and animal health products.  As of September 30, 2004, the Company had approximately 2.2 billion shares of common stock outstanding, which were actively and efficiently traded on the New York Stock Exchange (the "NYSE").  Merck is a New Jersey corporation with its principal place of business located at One Merck Drive, Whitehouse Station, New Jersey.

26.     (a)  Defendant Raymond V. Gilmartin ("Gilmartin") was, during the Class Period, Merck's Chairman, President, and Chief Executive Officer.   Defendant Gilmartin became Merck's Chairman in November 1994.  Gilmartin was, at all relevant times, also a member of the Company's Management Committee.   According to Merck, the Board of Directors and the Management Committee are responsible for the Company's objectives and policies, and the stewardship of Merck's resources.  On May 6, 2005, approximately seven months after Merck withdrew VIOXX from the market, and ten months before his previously scheduled retirement, defendant Gilmartin was replaced as the Company's Chairman, President, and Chief Executive Officer with Richard Clark, who had been in charge of the Company's manufacturing operations.

(b)  As detailed herein, during the Class Period, defendant Gilmartin was Merck's most senior spokesperson, and he made public statements concerning VIOXX and Merck's financial condition, performance, and prospects that were materially false and misleading and omitted to state material facts.  Defendant Gilmartin signed at least the following documents that the Company filed with the SEC during the Class Period:  the 1999 Form 10-K; the 2000 Form 10-K; the 2001 Form 10-K; Registration Statement; the Second quarter 2002 Form 10-Q; the third quarter 2002 Form 10-Q; the 2002 Form 10-K; the first quarter 2003 Form 10-Q; the second quarter 2003 Form 10-Q; the third quarter 2003 Form 10-Q; the first quarter 2004 Form 10-Q; the 2003 Form 10-K; the second quarter 2004 Form 10-Q.  After the Sarbanes-Oxley Act of 2002 became effective in July 2002, defendant Gilmartin, pursuant to §302 of the Act, also signed certifications that were attached to Merck's Form 10-Ks and Form 10-Qs filed with the SEC.

(c)  As detailed herein, defendant Gilmartin was a direct, substantial, and primary participant in the misconduct alleged herein.  While in possession of materially adverse non-

public information regarding Merck, defendant Gilmartin personally profited from the sale of Merck stock at artificially inflated prices during the Class Period. During the Class Period, defendant Gilmartin sold 639,200 shares of Merck stock from his personal holdings, or 52% of his personal holdings, realizing more than $30.3 million in proceeds. In addition, defendant Gilmartin received substantial performance-based bonuses and other compensation based on, among other things, changes in Merck's earnings per share and sales compared to Merck's competitors.

27.    (a)    Defendant Edward Scolnick ("Scolnick") was Merck's Executive Vice President for Science and Technology and President for Merck Research Laboratories from the beginning of the Class Period through and including December 31, 2002, when he retired. During 1999, 2000, and 2001, defendant Scolnick was also a member of the Company's Management Committee. As the officer in charge of research and development, defendant Scolnick was intimately involved and fully conversant with the development, research, and testing of VIOXX, and was well aware of the risks and problems associated with the drug. Following his retirement, from January 1, 2003 through the end of the Class Period, Scolnick served as President Emeritus, Merck Research Laboratories.

(b)    As detailed herein, during the Class Period, defendant Scolnick was one of Merck's chief spokespersons in connection with information provided to the public about VIOXX and he made public statements concerning VIOXX and Merck's financial condition, performance and prospects that were materially false and misleading and omitted to state material facts. Defendant Scolnick signed at least the following documents filed with the SEC during the Class Period, all of which contained materially false and misleading statements and

omitted to state material facts: the 1999 Form 10-K; the 2000 Form 10-K; the 2001 Form 10-K; and the Registration Statement.

(c)    As detailed herein, defendant Scolnick was a direct, substantial, and primary participant in the wrongdoing alleged herein.  While in possession of materially adverse non-public information regarding Merck, defendant Scolnick personally profited from the sale of Merck securities at artificially inflated prices during the Class Period.  During the Class Period, Scolnick sold, at the very least, 381,200 shares of Merck stock from his personal holdings, or approximately 61% of his personal holdings, recognizing more than $32.4 million in proceeds. In addition, defendant Scolnick received substantial performance-based bonuses and other compensation based on, among other things, changes in Merck's earnings per share and sales compared to Merck's competitors.  Due to the fact that defendant Scolnick retired from the Company on January 1, 2003, he was no longer subject to public reporting requirements concerning the sale of Merck stock. Without the benefit of discovery, Plaintiffs are unable to ascertain whether defendant Scolnick sold any additional shares of Merck common stock during the Class Period.

28.    (a)    Defendant Kenneth C. Frazier ("Frazier") has been Merck's Senior Vice President and General Counsel since December 1999.  As General Counsel, Frazier is responsible for legal and public affairs functions for the Company.  Frazier was, at all relevant times, also a member of the Company's Management Committee.

(b)    As detailed herein, defendant Frazier made public statements concerning VIOXX and Merck's financial condition, performance, and prospects that were materially false and misleading and omitted to state material facts.  Defendant Frazier signed at least the following documents that the Company filed with the SEC during the Class Period:  the first

quarter 2000 Form 10-Q; the second quarter 2000 form 10-Q; the third quarter 2000 Form 10-Q; the first quarter 2001 Form 10-Q; the second quarter 2001 Form 10-Q; the third quarter 2001 Form 10-Q; the first quarter 2002 Form 10-Q; the second quarter 2002 Form 10-Q; the third quarter 2002 Form 10-Q; the First quarter 2003 Form 10-Q; the second quarter 2003 Form 10-Q; the third quarter 2003 Form 10-Q; and the second quarter 2004 Form 10-Q.

(c)    As detailed herein, defendant Frazier was a direct, substantial, and primary participant in the misconduct alleged herein. While in possession of materially adverse non-public information regarding Merck, defendant Frazier personally profited from the sale of Merck stock at artificially inflated prices during the Class Period. During the Class Period, Frazier sold 38,960 shares of Merck stock from his personal holdings, or approximately 76% of his personal holdings, recognizing more than $1.9 million in proceeds.

29.    (a)    Defendant Richard C. Henriques ("Henriques") was, at all relevant times, Merck's Vice President and Controller, and was responsible for the Corporate Controller's Group and for providing financial support for Merck's Human Health operations in various parts of the world, including the United States.

(b)    As detailed herein, during the Class Period, defendant Henriques was Merck's chief accounting officer, and he made or endorsed public statements concerning VIOXX and Merck's financial condition, performance, and prospects that were materially false and misleading and omitted to state material facts. Defendant Henriques signed at least the following documents that the Company filed with the SEC during the Class Period: the third quarter 1999 Form 10-Q; the 1999 Form 10-K; the first quarter 2000 Form 10-Q; the second quarter 2000 Form 10-Q; the third quarter 2000 Form 10-Q; the 2000 Form 10-K; the first quarter 2001 Form 10-Q; the second quarter 2001 Form 10-Q; the third quarter 2001 Form 10-Q;

the 2001 Form 10-K; the first quarter 2002 Form 10-Q; the Registration Statement; the second quarter 2002 Form 10-Q; the third quarter 2002 Form 10-Q; the 2002 Form 10-K; the first quarter 2003 Form 10-Q; the second quarter 2003 Form 10-Q; the third quarter 2003 form 10-Q; the 2003 Form 10-K; the first quarter 2004 Form 10-Q; and the second quarter 2004 Form 10-Q.

(c)     As detailed herein, defendant Henriques was a direct, substantial, and primary participant in the wrongdoing alleged herein.  While in possession of material adverse information regarding Merck, defendant Henriques personally profited from the sale of Merck securities at artificially inflated prices during the Class Period.  During the Class Period, Henriques sold 33,500 shares of Merck stock from his personal holdings, or approximately 94% of his personal holdings, recognizing more than $1.8 million in proceeds.

30.     (a)     Defendant Peter S. Kim ("Kim") joined the Company and became an executive officer in February 2001. He succeeded defendant Scolnick as President for Merck Research Laboratories on January 1, 2003, and held that position through the end of the Class Period.  As President for Merck Research Laboratories, defendant Kim reported directly to defendant Gilmartin, and was responsible for all of Merck's internal drug-discovery development activities, and external scientific initiatives.

(b)     As detailed herein, during the Class Period, defendant Kim was one of Merck's chief spokespersons in connection with information provided to the public about VIOXX and he made public statements concerning VIOXX and Merck's financial condition, performance, and prospects that were materially false and misleading and omitted to state material facts.

(c)     As detailed herein, defendant Kim was a direct, substantial, and primary participant in the wrongdoing alleged herein.  According to Merck's Class Period SEC filings,

defendant Kim received substantial performance-based bonuses and other compensation based on, among other things, changes in Merck's earnings per share and sales compared to Merck's competitors during the Class Period. Without the benefit of discovery, Plaintiffs are unable to determine whether defendant Kim, while in possession of material adverse information regarding Merck, profited from the sale of Merck securities at artificially inflated prices during the Class Period.

31. (a) Defendant Judy C. Lewent ("Lewent") was, at all relevant times, Merck's Senior Vice President and Chief Financial Officer, and was responsible for financial and corporate development functions, internal auditing, and the Company's joint venture relationships. She has been the Company's Chief Financial Officer since 1990. Defendant Lewent was, at all relevant times, also a member of the Company's Management Committee.

(b) As detailed herein, defendant Lewent made public statements concerning VIOXX and Merck's financial condition, performance, and prospects that were materially false and misleading and omitted to state material facts. Defendant Lewent signed at least the following documents that the Company filed with the SEC during the Class Period: the 1999 Form 10-K; the 2000 Form 10-K; the 2001 Form 10-K; the Registration Statement; the second quarter 2002 Form 10-Q; the third quarter 2002 Form 10-Q; the 2002 Form 10-K; the first quarter 2003 Form 10-Q; the second quarter 2003 Form 10-Q; the third quarter 2003 Form 10-Q; the 2003 Form 10-K; the first quarter 2004 Form 10-Q; the 2003 Form 10-K; the second quarter 2004 Form 10-Q; the third quarter 2004 Form 10-Q. After the Sarbanes-Oxley Act of 2002 became effective in July 2002, defendant Lewent, pursuant to §302 of the Act, also signed certifications that were attached to Merck's Form 10-Ks and Form 10-Qs filed with the SEC.

(c)    As detailed herein, defendant Lewent was a direct, substantial, and primary participant in the wrongdoing alleged herein. While in possession of material adverse information regarding Merck, defendant Lewent personally profited from the sale of Merck securities at artificially inflated prices during the Class Period.  According to Merck's Class Period SEC filings, defendant Lewent received substantial performance-based bonuses and other compensation based on, among other things, changes in Merck's earnings per share and sales compared to Merck's competitors.  During the Class Period, defendant Lewent sold 267,200 shares of Merck stock from her personal holdings, or approximately 52% of her personal holdings, recognizing more than $16.5 million in proceeds.

32.    (a)    Defendant Alise S. Reicin ("Reicin") was, at all relevant times, the Executive Director of Clinical Research at Merck Research Laboratories.  Defendant Reicin was responsible for overseeing research with regard to the safety and efficacy of Merck products, including VIOXX, and supervised the VIGOR Study.

(b)    As detailed herein, defendant Reicin was a direct, substantial, and primary participant in the wrongdoing.  As detailed herein, during the Class Period, defendant Reicin made public statements concerning VIOXX that were materially false and misleading and omitted to state material facts.

(c)    As defendant Reicin was not required to file information with the SEC concerning her transactions in Merck securities during the Class Period, without the benefit of discovery, Plaintiffs are unable to determine whether defendant Reicin, while in possession of material adverse information regarding Merck, profited from the sale of Merck securities at artificially inflated prices.

33.     Defendants Gilmartin, Scolnick, Frazier, Henriques, Lewent, Kim, and Reicin are collectively referred to herein as the "Individual Defendants."  Defendant Merck and the Individual Defendants are collectively referred to herein as the "Defendants."

34.     The Individual Defendants, because of their positions of control and authority as senior executive officers and directors of the Company, had access to the adverse undisclosed information about its business, operations, products, performance, and prospects through their access to internal corporate documents and information (including documents and information concerning VIOXX), conversations and associations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

35.     The Individual Defendants participated in drafting, preparing, and/or approving the public reports and other statements and communications complained of herein, and were aware of, or recklessly disregarded, the material misstatements contained therein, and omissions therefrom, and were aware of their materially false and misleading nature.

36.     The Individual Defendants, as senior executive officers and directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance, or had the ability and opportunity to prevent their issuance or cause them to be withdrawn or corrected.  As specified herein, the Company's SEC filings complained of herein were signed by the Individual Defendants, and after July 2002 included certifications by defendants Gilmartin and Lewent pursuant to §302 of the Sarbanes-Oxley Act of 2002.  Accordingly, the Individual Defendants

are responsible for the accuracy of the public reports, filings, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

37.    As senior officers and controlling persons of a publicly-held company whose securities were, during the relevant time, registered with the SEC pursuant to the federal securities laws, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's performance, operations, business, products, and prospects, and to withdraw or correct any previously issued statements that were or had become materially misleading or untrue, so that the public had access to true and correct information, and the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.  Under rules and regulations promulgated by the SEC, including Item 303 of Regulation S-K, the Individual Defendants also had a duty to report, among other things, all trends and uncertainties that were reasonably likely to affect Merck's net sales, revenues, or income.  Defendants' wrongdoing during the Class Period, as alleged herein, also violated this specific requirement and obligation.

38.    Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of Merck securities during the Class Period, which included the dissemination of materially false and misleading statements and concealment of material adverse facts.  The scheme:  (i) deceived the investing public regarding Merck's business, operations, performance, products, and prospects, and the true value of Merck  securities; and (ii) caused Plaintiffs and other members of the Class

to purchase Merck securities at artificially inflated prices, which fell as the truth concerning VIOXX, including its safety, commercial viability, and ability to generate substantial revenues over the life of Merck's patent, ultimately became known.

39.    In making the statements complained of herein, the Individual Defendants, who were all senior officers and controlling persons of Merck, were acting on behalf of the Company in the regular course of business.  Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

40.    The Individual Defendants are liable for the materially false and misleading statements pleaded herein that were issued by or in the name of the Company, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants, each of whom was intimately involved in the day-to-day operations of Merck.  The Individual Defendants acted with respect to the wrongdoing alleged herein as a group, and the public filings, press releases, and other public statements complained of herein, were the product of the collective actions of the narrowly defined group of Individual Defendants.  The Individual Defendants, by virtue of their high-level positions within Merck, directly and actively participated in the management and day-to-day operations of the Company, and were privy to confidential non-public information concerning the business, operations, performance, products, and prospects of Merck.  In addition, the Individual Defendants were involved in drafting, reviewing, approving, and/or disseminating the materially false and misleading statements issued by Merck and approved or ratified those statements, and, therefore, adopted them as their own.

41.    Defendant Lawrence A. Bossidy ("Bossidy"), at all times relevant hereto, served as a director of Merck.  Defendant Bossidy signed, among other things, the Registration

Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

42.     Defendant William G. Bowen ("Bowen"), at all times relevant hereto, served as a director of Merck.  Defendant Bowen signed, among other things, the Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

43.     Defendant Johnnetta B. Cole ("Cole"), at all times relevant hereto, served as a director of Merck.  Defendant Cole signed, among other things, the Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

44.     Defendant Niall FitzGerald ("FitzGerald"), at all times relevant hereto, served as a director of Merck.  Defendant FitzGerald signed, among other things, the Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

45.     Defendant William B. Harrison ("Harrison"), at all times relevant hereto, served as a director of Merck.  Defendant Harrison signed, among other things, the Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

46.     Defendant William N. Kelley ("Kelley"), at all times relevant hereto, served as a director of Merck.  Defendant Kelley signed, among other things, the Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

21

47.     Defendant Heidi G. Miller ("Miller"), at all times relevant hereto, served as a director of Merck.  Defendant Miller signed, among other things, the Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

48.     Defendant Thomas E. Shenk ("Shenk"), at all times relevant hereto, served as a director of Merck.  Defendant Shenk signed, among other things, the Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

49.     Defendant Anne M. Tatlock ("Tatlock"), at all times relevant hereto, served as a director of Merck.  Defendant Tatlock signed, among other things, the Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

50.     Defendant Samuel O. Thier ("Thier"), at all times relevant hereto, served as a director of Merck.  Defendant Thier signed, among other things, the Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

51.     Defendants Gilmartin, Lewent, Henriques, Bossidy, Bowen, Cole, FitzGerald, Harrison, Kelley, Miller, Scolnick, Shenk, Tatlock, and Thier are collectively referred to herein as the "Director Defendants."

52.     Defendant David Anstice ("Anstice") was, at all relevant times, President of Merck's Human Health Prescription Division, during all relevant times, which reasonably would have made him privy to information regarding the safety of VIOXX and its results.

53.     Defendant Richard T. Clark ("Clark") was President of Medco Health, then a wholly-owned subsidiary of Merck, from January 2000 through December 2002; President and CEO of Medco Health Solutions, Inc. from January 2003 through May 2003; and President of Merck Manufacturing Division from June 2003 through the Class Period, which reasonably would have made him privy to information regarding the safety of VIOXX and its results.

54.     Defendant Celia Colbert ("Colbert") was, at all relevant times, an assistant general counsel for Merck, which reasonably would have made her privy to information regarding the safety of VIOXX and its results.

55.     Defendant Linda M. Distlerath ("Distlerath") was Vice President of Global Health Policy and Vice President of Public Affairs during the Class Period, which reasonably would have made her privy to information regarding the safety of VIOXX and its results.

56.     Defendant Caroline Dorsa ("Dorsa") has been Vice President and Treasurer of Merck since September 1999, which would reasonably have made her privy to information regarding the safety of VIOXX and its sales.

57.     Defendant Bernard Kelly ("Kelly") was a senior executive in charge of manufacturing of drugs, which reasonably would have made him privy to information regarding the safety of VIOXX and its risks.

58.     Defendant Per G.H. Lofberg ("Lofberg") was President of Merck-Medco Managed Care, L.L.C. ("MMMC"), a wholly-owned subsidiary of Merck until January 2000, when he became Chairman of MMMC, which would reasonably have made him privy to information regarding the safety of VIOXX and its sales.

59.     Defendant Per Wold-Olsen ("Wold-Olsen") was , through the Class Period, President of Human Health Europe, Middle East & Africa and was responsible for the

Company's prescription drug business in Europe, the Middle East and Africa during the Class Period, which reasonably would have made him privy to information regarding the safety of VIOXX and its sales.

60.     Defendants Gilmartin, Scolnick, Frazier, Henriques, Lewent, Anstice, Cole, Clark, Colbert, Dorsa, Kelly, Kelley, Lofberg, Wold-Olsen are collectively referred to herein as the "Insider Trading Defendants."

61.     The following defendants, previously  named as "ABC Insurance Corporation", were, during the Class Period, Merck's directors' and officers' liability insurers, and each issued directors, officer and/or corporate securities liability policies that provide coverage for claims made herein for one or more of the defendants to this action, and each of the following defendant insurance carriers were timely put on notice of some or all of the claims set forth in this Complaint:

(a)     ACE American Insurance Company;

(b)     ACE Bermuda Insurance Ltd.;

(c)     Allied World Assurance Company, Ltd.;

(d)     American Alternative Insurance Corporation;

(e)     American Casualty Company of Reading, Pennsylvania;

(f)     Arch Insurance Company;

(g)     AXIS Insurance Company;

(h)     Axis Specialty Limited; Federal Insurance Company;

(i)     Gerling-Konzern Allegemeine Versicherungs A.G.;

(j)     Houston Casualty Company;

(k)     Max Re Ltd.;

      (l)         North Rock Insurance Company Limited;

     (m)        SR International Business Insurance Company Ltd.;

     (n)         Steadfast Insurance Company;

     (o)         The St. Paul Mercury Insurance Company;

     (p)         Twin City Fire Insurance Company;

     (q)         XL Insurance (Bermuda) Ltd.;

     (r)         XL Insurance Switzerland (as successor to Winterthur Swiss Insurance Company); and

     (s)         Zu American Insurance Company.

Collectively, the above defendants shall be referred to as the "Insurer Defendants." The Insurer Defendants are liable jointly and *in solido* with their insureds under La. R.S. 22:655, the "Direct Action" statute.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

62.    Plaintiffs bring this action as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities who purchased the securities of Merck during the period from May 21, 1999 through October 29, 2004, inclusive. Excluded from the Class are all defendants; the affiliates and subsidiaries of the Company; the officers and directors of the Company and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; the legal representatives, heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person or entity has or had a controlling interest.

63.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Merck had billions of shares of common stock outstanding, which were actively traded on the NYSE. The average daily trading volume during

the Class Period was more than 6.5 million shares.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are at least thousands of members of the proposed Class.  Members of the Class can be identified from records maintained by Merck or its transfer agent and can be notified of the pendency of this action by mail and publication using forms of notice similar to those customarily used in securities class actions.

64.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' wrongful conduct as complained of herein.

65.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that conflict with the interests of the Class.

66.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants' statements and omissions during the Class Period materially misrepresented the safety and commercial viability of VIOXX;

(b)    whether Defendants' acts and omissions as alleged herein violated the federal securities laws;

(c)    whether the Individual Defendants are personally liable for the alleged misrepresentations or omissions described herein;

(d)    whether Defendants' misrepresentations and omissions caused the price of Merck securities to be purchased by Class members at artificially inflated prices and whether Class members suffered a compensable loss caused by Defendants' alleged misconduct; and

(e)        whether the members of the Class have sustained damages and the proper measure of damages.

67.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  As the damages suffered by many individual Class members may be small relative to the expense and burden of individual litigation, it is practically impossible for most members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Traditional NSAIDs

68.     Musculosketal problems producing pain and inflammation are common.  Until 1998, NSAIDs, such as aspirin, ibuprofen, and naproxen, were the most common medications for treating musculoskeletal problems.  NSAIDs reduce inflammation and pain, and are widely used to treat persons suffering from arthritis and muscle pain.

69.     Gastrointestinal side effects limit the use of NSAIDs.  More than 100,000 patients are hospitalized and 16,500 die each year in the United States as a result of NSAID-associated gastrointestinal events.

70.     Most NSAIDs inhibit two enzymes -- cyclooxygenase-1 ("COX-1")   and cyclooxygenase-2 ("COX-2") -- that are involved in the synthesis of important chemical compounds that control a wide variety of physiological functions throughout the body.  Those compounds are known as prostaglandins or prostanoids.

71.     COX-1 is associated with the maintenance of gastrointestinal mucous and platelet aggregation.  COX-2 is associated with response to pain and inflammation.

72.     Traditional NSAIDs, such as aspirin, ibuprofen, and naproxen, operate non-selectively.  That is, traditional NSAIDs inhibit both COX-1 and COX-2 at the same time.  The

beneficial effects of traditional NSAIDs (*i.e.*, the reduction of inflammation and pain) are related to the inhibition of COX-2. The harmful gastrointestinal side effects are related to the suppression of COX-1. .

**Defendants Develop VIOXX**

73. VIOXX is the brand name of rofecoxib, a member of the NSAID class of anti-inflammatory drugs. Unlike aspirin, ibuprofen, and naproxen, VIOXX is a "selective" NSAID, which was designed to suppress COX-2 without materially affecting COX-1. The intent was to maintain all of the beneficial effects of traditional NSAIDs (the reduction of inflammation and pain) while avoiding the risk of serious gastrointestinal side effects.

74. Significantly, Merck did not represent that VIOXX was any more effective than traditional NSAIDs like ibuprofen and naproxen at treating inflammation and pain. The sole advantage of VIOXX over other NSAIDs was its purported improved safety profile.

**Merck's Financial Prospects Depended Upon The Success Of VIOXX**

75. Even prior to the commercial introduction of VIOXX to the market on May 21, 1999, Defendants knew that the success of VIOXX was crucial to Merck's future financial performance and success. Merck's 1998 Annual Report quoted Dr. Beth Seidenberg, Vice President, Clinical Research: **"'Everybody involved [in the VIOXX project] knew how extraordinarily important Vioxx is to patients with osteoarthritis and to Merck'"** (emphasis added).

76. As illustrated by the chart below, the patents for nine major drugs, accounting for more than 70% of the Company's pharmaceutical sales in 1999, and more than 65% of total pharmaceutical sales in 2000, were set to expire by 2007. This vanishing pipeline of pharmaceutical revenue created an immense amount of pressure on Defendants to ensure that VIOXX was the Company's next multi-billion dollar blockbuster drug.

| (All Figures in Millions Except %) | Patent Expiration | 2000 | | | | 1999 | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Sales | % Rx Sales | % Total Sales | Rx Sales Rank | Sales | % Rx Sales | % Total Sales | Rx Sales Rank |
| Zocor | 2006 | 5280 | 25.63 | 13.08 | 1 | 4495 | 25.72 | 13.74 | 1 |
| Vasotec | 2000 | 1790 | 8.69 | 4.43 | 3 | 2305 | 13.19 | 7.05 | 2 |
| Prilosec* | 2001 | 1355 | 6.58 | 3.36 | 5 | 1250 | 7.15 | 3.82 | 4 |
| Fosamax | 2007 | 1275 | 6.19 | 3.16 | 6 | 1045 | 5.98 | 3.19 | 5 |
| Prinivil | 2001 | 1075 | 5.22 | 2.66 | 7 | 815 | 4.66 | 2.49 | 7 |
| Singulair | 2003 | 860 | 4.17 | 2.13 | 8 | 500 | 2.86 | 1.53 | 11 |
| Pepcid | 2000 | 850 | 4.13 | 2.11 | 9 | 910 | 5.21 | 2.78 | 6 |
| Mevacor | 2001 | 520 | 2.52 | 1.29 | 12 | 600 | 3.43 | 1.83 | 9 |
| Proscar | 2006 | 470 | 2.28 | 1.16 | 13 | 450 | 2.57 | 1.38 | 13 |
| **Totals** | | **13475** | **65.41** | **33.38** | | **12370** | **70.77** | **37.81** | |

*\* Merck's SEC filings indicate that it receives supply payments on U.S. sales of Prilosec under an agreement with AstraZeneca (AZN).*

77.     Merck was encountering serious difficulties in the development of its new drug for depression, MK-869, thus jeopardizing the Company's pipeline of future, new drug revenues and intensifying the pressure on Defendants to ensure VIOXX was a success.  On January 22, 1999, Merck announced it would ***not*** begin Phase III trials for MK-869.  On January 25, 1999, analyst James P. Keeney of ABN Amro noted that the ***"setback imposes a severe burden on [Merck's] remaining major R&D hope, the VIOXX COX-2 drug, which now must be a spectacular-selling oral antiarthritic for the company to at least show double-digit EPS growth in the post-1999 period."***  [Emphasis added.]

78.     Adding to the pressure on Defendants that VIOXX be a success, Pfizer and Monsanto were already ahead of Merck in jointly developing Celebrex, another COX-2 inhibitor. On December 31, 1998, the FDA approved the New Drug Application ("NDA") for Celebrex. Immediately thereafter, and almost five months before the FDA approved the NDA for VIOXX,

Pfizer and Monsanto staged an extremely aggressive launch of Celebrex, including offering patients free trials.

79.     According to a January 28, 1999 Prudential analyst report, which was based, at least in part, on information and guidance provided by Defendants, in response to the aggressive launch of Celebrex, Merck expected to add 700 salespeople in the first half of 1999 to support the introduction of VIOXX and would counter with a major marketing campaign of its own.

80.     On April 14, 1999, *The Wall Street Journal* reported:  "VIOXX is already a step behind the competition in the huge, lucrative arthritis-relief market." *The Wall Street Journal* article noted that Celebrex already had become "one of the most successful new drugs in industry history."

81.     On May 21, 1999, the day Defendants introduced VIOXX to the market (and the first day of the Class Period), a *Dow Jones Newswire* report elaborated on the importance of VIOXX to Merck, and the anticipated competition between VIOXX and Celebrex:  "The battle for this summer's blockbuster may not occur in movie theaters, but instead in the corner drugstore."  The report quoted David Saks, a pharmaceutical analyst at Gruntal & Co.:  "***VIOXX to Merck is like the hot movie 'Star Wars' to the movie industry. . . . It's the biggest product for Merck.***"  [Emphasis added.]  That day, Merck common stock closed at $69.20 -- $2.47 higher than the previous day's closing price -- on heavy trading volume of 7,578,900, which was 53% greater than the previous day's trading volume.

82.     On January 10, 2001, *The Wall Street Journal*, in an article entitled "When Its Patent Expired Merck Didn't Merge -- It Found New Drugs," reported how the Company's fortunes were inextricably tied to the success of VIOXX:  "***Merck's success demonstrates that in the drug business, as in Hollywood, <u>one big hit can sway the fate of an entire company</u>***"

(emphasis added).  The article quoted defendant Scolnick, speaking about the two original compounds Merck had tested in developing VIOXX:

> "If those first two compounds had failed [in human trials] and we had by chance to rely on the fifth or sixth one" years later, he says "***we would be a very different company.***"  [Emphasis added.]

83.    During the Class Period, Merck was also experiencing problems with ARCOXIA, the Company's planned successor to VIOXX.  This further increased Merck's dependence on VIOXX, and further motivated Defendants to conceal VIOXX's serious adverse cardiovascular profile from the market, *i.e.*, Merck could continue to reap significant profits from its "blockbuster" drug VIOXX as long as the truth concerning its cardiovascular risks was concealed from the market.

84.    A November 14, 2004 *New York Times* article, entitled "Despite Warnings, Drug Giant Took Long Path to Vioxx Recall," quoted drug industry analyst Michael Krensavage at Raymond James & Associates: "***Vioxx was Merck's savior, it's as simple as that***" (emphasis added).

85.    Indeed, for the years VIOXX was marketed, as a result of Defendants' wrongful conduct, as detailed herein, VIOXX was Merck's second best selling drug:

- In 2000, sales of VIOXX were more than $2.1 billion, approximately 10.7% of Merck's pharmaceutical sales, and more than 5.3% of the Company's total sales.

- In 2001, sales of VIOXX were more than $2.3 billion, more than 11% of Merck's pharmaceutical sales, and more than 4.9% of the Company's total sales.

- In 2002, sales of VIOXX were more than $2.5 billion, approximately 11.7% of Merck's pharmaceutical sales, and almost 4.9% of the Company's total sales.

- In 2003, sales of VIOXX were more than $2.5 billion, approximately 12.5% of Merck's pharmaceutical sales, and more than 11.4% of the Company's total sales.

- During the first six months of 2004, the year VIOXX was withdrawn, sales of VIOXX were more than $1.3 billion.

Accordingly, by 2000, Merck was reaping more than $175 million in sales every month VIOXX remained on the market -- a number that increased during the Class Period.

**Even Prior To Introducing VIOXX To The Market**
**Defendants Knew Of VIOXX's Adverse Safety Profile**

86.     Notwithstanding defendant Gilmartin's representation on September 29, 2004, the day Merck withdrew VIOXX from the market, that the report of cardiovascular problems associated with VIOXX was "unexpected," according to *The Wall Street Journal* article (November 1, 2004), Defendants knew, at least *as early as 1996*, of the serious safety issues with VIOXX, which jeopardized its commercial viability and its ability to generate substantial revenues over the life of Merck's patent.

87.     The November 1, 2004, *Wall Street Journal* article reported, based on among other things, internal Merck documents, that Defendants had known about VIOXX's adverse safety profile, and had acted to suppress the truth since as early as 1996:

> When Merck & Co. pulled its big-selling painkiller Vioxx off the market in September, Chief Executive Raymond Gilmartin said the company was "really putting patient safety first." He said the study findings prompting the withdrawal, which tied Vioxx to heart-attack and stroke risk, were "unexpected." But internal Merck e-mails and marketing materials as well as interviews with outside scientists show that the company fought forcefully for years to keep safety concerns from destroying the drug's commercial prospects.
>
> Merck's first worry, in the mid-to-late 1990s, was that its drug would show greater heart risk than cheaper painkillers that were harsh on the stomach but were believed to reduce the risk of heart attacks. Several company officials discussed in e-mails how to design a study that would minimize the unflattering comparison, even while admitting to themselves that it would be difficult to conceal.

88.     *The Wall Street Journal* article described in detail a number of internal Company e-mails and other documents that evidence Defendants' awareness of the seriousness of the

safety issues affecting VIOXX well before the beginning of the Class Period.  According to *The Wall Street Journal*:

> A November 21, 1996 memo by a Merck official shows the company wrestling with this issue. They wanted to conduct a trial to prove Vioxx was gentler on the stomach than older painkillers. But to show the difference most clearly, the Vioxx patients couldn't take any aspirin.  In such a trial, "there is a substantial chance that significantly higher rates" of cardiovascular problems would be seen in the Vioxx group, the memo said. A similar view was expressed in a February 25, 1997 e-mail by a Merck official, Briggs Morrison.  He argued that unless patients in the Vioxx group also got aspirin, "***you will get more thrombotic events***" -- that is, blood clots -- "and kill [the] drug."  In response, [defendant] Reicin, now a Merck vice president for clinical research, said in an e-mail that the Company was in a "no-win situation."  Giving study subjects both Vioxx and aspirin, she wrote, could increase the "relative risk," apparently referring to gastrointestinal problems.  But, she added, "***The possibility of increased CV [cardiovascular] events is of great concern.***"  From the context, it seems Dr. Reicin meant "increased" relative to older drugs.  She added in parentheses:  "I just can't wait to be the one to present those results to senior management!"  She proposed that people with high risk of cardiovascular problems be kept out of the study so the difference in the rate of cardiovascular problems between the Vioxx patients and the others "would not be evident." [Emphasis added.]

### Extensive Pre-Class Period Testing Revealed to Defendants VIOXX's Serious Cardiovascular Risks

89.    Prior to VIOXX being approved by the FDA, Defendants conducted extensive studies and analyses of VIOXX, including clinical studies involving humans.  According to Merck's November 23, 1998 press release, which was issued more than six months prior to VIOXX being approved by the FDA:  "***[T]he [VIOXX NDA] application included results from 68 studies and nearly 10,000 patients that evaluated VIOXX***"  (emphasis added).

90.    According to Dr. Eric Topol, Chief of Cardiovascular Medicine at the Cleveland Clinic, a never-published 1998 internal Merck clinical trial entitled Study 090 revealed that, of 978 patients studied, serious cardiovascular events -- including ***heart attack and stroke*** --

***occurred six times more frequently in patients given VIOXX than in patients given a different arthritis drug or placebo***.  (Dr. Topol presented this information, after the Class Period, on the November 14, 2004 edition of CBS's *60 Minutes*.)  Merck never disclosed either the adverse findings of Study 090 or that those findings were independently replicated by a Merck-sponsored study announced in early 2000 called the VIOXX Gastrointestinal Outcomes Research Study (the "VIGOR Study")  The VIGOR Study included approximately 8,100 rheumatoid arthritis patients and was intended to demonstrate that VIOXX reduced the risk of serious gastrointestinal side affects associated with the use of other NSAIDs.

91.    In addition, *The New York Times*, in an article entitled "Evidence in VIOXX Suits Shows Intervention by Merck Officials," which was published after the Class Period (April 24, 2005), reported that even before the drug's introduction to the market, Defendants established a committee to review the numerous reports of cardiovascular events associated with VIOXX:

> In 1998, Merck had created a committee of academic researchers to review the case reports for many patients who had suffered suspected heart problems in clinical trials of Vioxx and Arcoxia, a Merck arthritis drug that has still not been approved.

As detailed herein, *The New York Times* article also reported how Defendants had distorted the results of a Class Period clinical study to hide the cardiovascular risks associated with VIOXX.

92.    Notwithstanding Defendants' knowledge, even before the beginning of the Class Period, of the serious cardiovascular risks posed by VIOXX, which jeopardized the drug's commercial viability, and the Company's financial prospects, Defendants falsely conditioned the market to believe VIOXX was safe, would be a commercial success, and would assure Merck a significant revenues stream from the drug throughout the life of Merck's patent.  Such materially false and misleading statements continued to affect the trading price of Merck securities during the Class Period.

93.    For example, on December 9, 1998, at Merck's annual analyst meeting, defendant Scolnick boasted:  "Short-term high dose, long-term low dose, it's a wonderful drug . . . VIOXX has lived up to our highest expectations."  Defendant Scolnick asserted his belief that VIOXX would get fast track approval from the FDA.  According to Scolnick, in one major trial, VIOXX's safety profile showed **"statistical equivalence"** to placebo (emphasis added).  Defendant Scolnick further represented that Merck has **"extensive data"** (emphasis added) documenting VIOXX's effectiveness in treating pain in different populations.

**Defendants' Wrongful Conduct During The Class Period**

94.    On May 21, 1999, the first day of the Class Period, Defendants issued a Company press release announcing that VIOXX "has received marketing approval from the U.S. Food and Drug Administration.  VIOXX has been approved for the relief of osteoarthritis (OA), management of acute pain in adults, and treatment of menstrual pain (primary dysmenorrheal)."  With respect to the drug's side effects, the press release noted:  "The most common side effects reported in clinical trials with VIOXX were upper respiratory infection, diarrhea and nausea."

95.    The May 21, 1999 press release was materially false and misleading in that, among other things, once Defendants chose to speak about the "side effects" of VIOXX, they had a duty to speak fully and truthfully, and to disclose the most significant side effects of the drug, namely the serious cardiovascular risks, which jeopardized VIOXX's commercial viability and its ability to generate substantial revenues over the life of Merck's patent.

96.    Defendants' misstatements concerning VIOXX's adverse safety profile, which jeopardized the commercial viability of the drug and its ability to generate substantial revenues over the life of Merck's patent, were not limited to the SEC filings, press releases, and conference calls with securities analysts detailed herein.  Defendants also made misstatements in VIOXX's labeling leaflet, which is the multi-page, small print pamphlet inserted in the box in

which a pharmaceutical product is sold (but not the "sticker" that is attached to the container of the product itself). For instance, during the Class Period, Defendants issued four different versions of the label leaflet for VIOXX which was included with every package, all of which misrepresented and omitted material facts concerning the cardiovascular risks attributable to VIOXX. Such labeling leaflet information with respect to a major product is regularly considered by analysts and other financial market participants in assessing a company's business, products, and prospects.

97.    FDA regulations require a drug label leaflet to "contain a summary of the essential scientific information needed for the safe and effective use of the drug." 21 C.F.R. § 201.56(a)(2004). The label leaflet must be "informative and accurate and neither promotional in tone nor false or misleading in any particular." *Id.* at § 201.56(b). The regulations also require that information concerning risks associated with the drug be set forth in the following form:

> *Contraindications*: ***Under this section heading, the labeling shall describe those situations in which the drug should not be used because the risk of use clearly outweighs any possible benefit***. These situations include administration of the drug to patients known to have a hypersensitivity to it; use of the drug in patients who, because of their particular age, sex, concomitant therapy, disease state, or other condition, have a substantial risk of being harmed by it; or continued use of the drug in the face of an unacceptably hazardous adverse reaction. Known hazards and not theoretical possibilities shall be listed . . . . [21 C.F.R. § 201.57(d) (v)(d)(j)) [emphasis added]; and

> *Warnings*:  Under this section heading, the labeling shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur. ***The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved*** . . . . 21 C.F.R. § 201.57(3) (v)(e) (emphasis added).

98.     Securities analysts who specialize in pharmaceutical companies are well aware of these requirements, and study product label leaflets as part of their analysis of a drug's commercial viability, long-term growth and revenue prospects, and potential for product liability exposure.  Thus, truthful labeling pursuant to FDA regulations is an essential component of the market's valuation of the performance and prospects of a pharmaceutical company, including but not limited to discounted cash flow, as well as the company's securities.

99.     As detailed below, Defendants recognized that including information about the cardiovascular risks in the VIOXX label leaflet -- particularly in the "Contraindications" and "Warnings" sections -- would adversely impact sales of VIOXX, especially because the Celebrex label leaflet only included general boilerplate language concerning possible cardiovascular risks, which was set forth at the very end of the label leaflet, after the "Contraindications" and "Warnings" sections.  Thus, it was no coincidence that none of the four different VIOXX label leaflets that were used when VIOXX was on the market contained any, yet alone truthful, language that adequately or properly disclosed VIOXX's cardiovascular risks in the "Contraindications" or "Warnings" sections.  Accordingly, all of the VIOXX labels wrongfully minimized VIOXX's serious cardiovascular risks.

100.    The initial VIOXX label leaflet (the "First VIOXX Label"), which was in use from May 21, 1999 through April 11, 2002, included the following materially misleading and general boilerplate language concerning "spontaneous events [that] occurred" in an Osteoarthritis Study:

> In the OA Studies, the following spontaneous events occurred in >0.1 to 1.9% of patients treated with VIOXX *regardless of causalty*.  [Emphasis added.]

101.    This general boilerplate language also listed ten different body systems, including, among others "Body as Whole," "Eyes, Ears, Nose, and Throat," as well as "Cardiovascular

System," which were then further broken down into more than 100 types of events, including "cough," "dry mouth," and "insect bite reaction". Thus, first VIOXX Label not only buried the threat of serious cardiovascular risks to VIOXX users, but was intended to, and did, lead the public to believe whatever adverse cardiovascular events had been experienced by users of VIOXX were statistically irrelevant and mere coincidence. Similarly, the second section contained the following general boilerplate language: "Other serious adverse reactions which occur rarely (<0.1%), *regardless of causality*," which was followed by a list of four body systems, including Urogenital, and more than 40 type events, including colitis and urolithiasis.

102. Accordingly, Defendants' statements in this VIOXX label were materially false and misleading because, among other things, they failed to disclose that there was a direct causal relationship between VIOXX and cardiovascular events *i.e.*, that the use of VIOXX significantly increased the risk of having a heart attack or other serious cardiovascular event, which jeopardized its commercial viability and its ability to generate substantial revenues over the life of Merck's patent.

103. Shortly after Defendants introduced VIOXX to the market in May 1999, Defendants were informed by Merck's own sales representatives that VIOXX was responsible for causing cardiovascular events. For example, in the summer of 1999, FME-1 was informed by one of Merck's customers, a neurologist, that two of his patients had died as a result of using VIOXX. ***That information was reported to Merck.***

104. On July 23, 1999, Defendants issued a Company press release announcing financial results for the second quarter 1999, the period ending June 30, 1999. Defendant Gilmartin commented on the Company's performance:

> Sales growth for the quarter and the first half of 1999 was led by the established major products, the newer products including the

> 1999 launch of Vioxx, as well as growth from the Merck-Medco
> Managed Care business . . . .  Solid volume gains in both our
> domestic and international operations as well as a 3 point benefit
> attributable to the restructuring of Astra Merck, Inc. (AMI)
> contributed to the second quarter results.

105.    In the press release, Defendants also elaborated on the purported success of

VIOXX, as well as additional clinical studies being conducted on the drug:

> Following a six-month priority review on May 20 the FDA cleared
> VIOXX, Merck's once-daily COX-2 specific inhibitor, for relief of
> the signs and symptoms of osteoarthritis, management of acute
> pain in adults, and treatment of menstrual pain.  Since then, more
> than 400,000 U.S. patients have taken the Product.  Merck has
> introduced VIOXX in nine other countries including the United
> Kingdom, Switzerland and Mexico.
>
> The Company is conducting additional clinical studies with
> VIOXX to determine whether it is useful in treating rheumatoid
> arthritis and in preventing and treating Alzheimer's disease.
> Studies will begin later this year to ascertain whether VIOXX
> might help to prevent colon cancer.

106.    The July 23, 1999 press release was materially false and misleading because,

among other things, once Defendants chose to speak about the purported success of VIOXX,

they had a duty to speak fully and truthfully, and to disclose the serious cardiovascular risks

attributable to the drug, which jeopardized VIOXX's commercial viability and its ability to

generate substantial revenues over the life of Merck's patent.

107.    On August 12, 1999, Defendants filed with the SEC Merck's Form 10-Q for the

second quarter 1999.  The Form 10-Q was signed by defendant Henriques, and repeated the same

materially false and misleading statements concerning the purported success of VIOXX that

were made in the July 23, 1999 press release referred to above.

108.    On October 19, 1999, Defendants issued a Company press release announcing the

findings of a paper by Dr. Morrison of Merck Research Laboratories, that "VIOXX relieved

menstrual pain as effectively as the most commonly used prescription treatment for that

condition, naproxen sodium (3), and better than placebo." Defendants further emphasized the purported success of VIOXX: "[S]ince its approval by the FDA in May, more than 2.2 million prescriptions have been written for VIOXX in the United States, making it one of the most successful product introductions in the pharmaceutical industry's history."

109.    Although Defendants chose to make much of Dr. Morrison's purported findings concerning the effectiveness of VIOXX in treating menstrual pain, they chose not to disclose his earlier warnings concerning the thrombotic events associated with VIOXX, which he had communicated to Defendants in 1997, but which were not revealed publicly until November 1, 2004 by *The Wall Street Journal*. The October 19, 1999 press release was materially false and misleading because, among other things, once Defendants chose to speak about the purported success and advantages of VIOXX, they had a duty to speak fully and truthfully and to disclose information concerning the serious cardiovascular risks, which jeopardized the drug's commercial viability and its ability to generate substantial revenues over the life of Merck's patent, and which, as evidenced by, among other things, Dr. Morrison's 1997 warning referred to above, were clearly known to Defendants, even before the commercial introduction of VIOXX.

110.    On October 21, 1999, Defendants issued a Company press release announcing Merck's financial results for the third quarter 1999, the period ending September 30, 1999. Commenting on the Company's performance, in that press release, defendant Gilmartin stated:

> ***Sales growth for the quarter and nine months of 1999 was led by*** the established major products, ***the newer products, including VIOXX***, and growth from the Merck-Medco Managed Care business . . . .   Solid volume gains in both our domestic and international operations contributed to the third quarter results. [Emphasis added.]

111.    In the press release, Defendants also stated:

> In just 20 weeks on the market in the United States, VIOXX has become the country's fastest growing prescription arthritis

medicine.   U.S. physicians have written more than 2 million prescriptions for Merck's newest medicine, which is used to relieve the signs and symptoms of osteoarthritis, manage acute pain in adults and treat menstrual pain.

Merck has introduced VIOXX in 22 other countries, including the United Kingdom, Switzerland and Mexico.   The Company is conducting extensive clinical studies with VIOXX to evaluate its efficacy in the treatment of rheumatoid arthritis and in the prevention and treatment of Alzheimer's disease.   Studies will begin later this year to ascertain whether VIOXX might help prevent colon cancer.

112.    The October 21, 1999 press release was materially false and misleading because, among other things, once Defendants chose to speak about the purported success of VIOXX, they had a duty to speak fully and truthfully and to disclose information concerning VIOXX's serious cardiovascular risks, which jeopardized its commercial viability and its ability to generate substantial revenues over the life of Merck's patent.

113.    Four days later, on October 25, 1999, Defendants issued a Company press release announcing the results of a new study that showed that osteoarthritis patients taking VIOXX "developed significantly fewer endoscopic ulcers than patients taking ibuprofen, a commonly used arthritis medicine."   Defendants also stated, as they had previously, that "[i]n other studies, the most common side effects reported in clinical trials with VIOXX were upper respiratory infection, diarrhea, nausea and high blood pressure."

114.    The October 25, 1999 press release was materially false and misleading because, among other things, once Defendants chose to speak about the side effects of VIOXX, they had a duty to speak fully and truthfully and to disclose the most significant side effects of the drug, namely the serious cardiovascular risks, which jeopardized VIOXX's commercial viability and its ability to generate substantial revenues over the life of Merck's patent.

115.    On or about November 1, 1999, Defendants publicly issued two promotional pieces, entitled "TEN REASONS WHY VIOXX IS BETTER THAN CELEBREX," and "VIOXX vs. Celebrex Poem," each of which stated, in part:

> "VIOXX HAS ENDOSCOPY STUDIES SHOWING A SAFER THAN PLACEBO INCIDENCE RATE OF GASTRODUO-DENAL ULCERS;"

> "Your patients in pain – they give you their grief; A Cox-II is the answer for their pain relief;"

> "VIOXX of course – the answer again, It's stronger, lasts longer, is faster, and then its safer. . . ."

116.    The promotional pieces referred to in the previous paragraph were each materially false and misleading because, as the FDA admonished Merck in the First Warning Letter referred to below, they misrepresented VIOXX's safety profile, and made "unsubstantiated comparative claims" that were "lacking in fair balance."  In addition, once Defendants chose to speak about the purported success and advantages of VIOXX, they had a duty to speak fully and truthfully and to disclose information concerning the serious cardiovascular risks, which jeopardized the drug's commercial viability and its ability to generate substantial revenues over the life of Merck's patent.

117.    On or about November 12, 1999, Defendants filed with the SEC Merck's Form 10-Q for the third quarter 1999.  The Form 10-Q was signed by defendant Henriques, and repeated the same materially false and misleading statements concerning the purported success of VIOXX that were made in the Company's October 21, 1999 press release referred to above.

118.    On November 23, 1999, Defendants issued a Company press release announcing the results of a study published in *Journal of the American Medical Association* ("*JAMA*")*,* which found that VIOXX "significantly reduced the risk of gastrointestinal (GI) side effects" compared to other commonly prescribed non-steroid anti-inflammatory drugs.  Defendants also

stated that "[c]ommon side effects reported in clinical trials with VIOXX were upper-respiratory infection, diarrhea, nausea and high blood pressure."

119.    The November 23, 1999 press release was materially false and misleading because, among other things, once Defendants chose to speak about the purported success and advantages of VIOXX and about its side effects, they had a duty to speak fully and truthfully and to disclose the most significant side effects of the drug, namely the serious cardiovascular risks, which jeopardized the drug's commercial viability and its ability to generate substantial revenues over the life of Merck's patent.

120.    On December 16, 1999, the FDA sent the First Warning Letter to Merck. Pursuant to FDA policy and practice, Warning Letters are sent only to address serious circumstances.  Although the First Warning Letter solely concerned Defendants' "violation of the Federal Food, Drug and Cosmetic Act (Act) and its regulations" with respect to promotional pieces touting VIOXX's purported beneficial GI benefits, the First Warning Letter was indicative of Defendants' willingness and common course of conduct throughout the Class Period of failing to disclose significant risks attributable to VIOXX, and to misrepresent its safety and superiority to competing products.

121.    The FDA, in the First Warning Letter, which was addressed to Ellen R. Westrick, Executive Director, Office of Medical/Legal, admonished Defendants that the marketing materials being used to promote VIOXX were deceptive.  Among other things, the First Warning Letter stated that the ***"promotional pieces . . . that promoted VIOXX . . . are false or misleading because they contain misrepresentations of VIOXX's safety profile, unsubstantiated comparative claims, and are lacking in fair balance"*** (emphasis added).

122.    The First Warning Letter commented, with respect to "misrepresentations of

VIOXX's safety profile," that:

> You present claims that misrepresent the safety profile for Vioxx,
> including but not limited to, "VIOXX HAS ENDOSCOPY
> STUDIES SHOWING A SAFER THAN PLACEBO INCIDENCE
> RATE OF GASTRODUODENAL ULCERS." [Emphasis in the
> original.]    However, ***this claim is in direct contrast with the
> approved product labeling (PI)*** that states, ". . . the studies cannot
> rule out at least some increase in the rate of endoscopic
> gastroduodenal ulcers when comparing Vioxx to placebo."
> Furthermore, this claim suggests that Vioxx is safer than placebo
> in regards to clinically significant gastroduodenal events. However,
> the PI states, "The correlation between findings of endoscopic
> studies, and the relative incidence of clinically serious upper GI
> events that may be observed with different products, has not been
> fully established."  Moreover, this claim minimizes the warning in
> the PI that states, "Serious gastrointestinal toxicity such as
> bleeding, ulceration, and perforation of the stomach, small
> intestine or large intestine, can occur at any time, with or without
> warning symptoms . . .," and omits material fact in the PI which
> states, "Serious clinically significant upper GI bleeding has been
> observed in patients receiving VIOXX in controlled trials . . ."
> Therefore, we object to this claim because it minimizes the GI
> warning associated with Vioxx and is inconsistent with the data in
> the PI.  [Emphasis added.]

123.    The FDA's First Warning Letter cited Merck's minimization of VIOXX's risks as

deceptive:

> Although these pieces contain numerous claims for the efficacy
> and safety of VIOXX, you have not presented any risk information
> concerning the contraindications, warnings, precautions, or adverse
> events associated with VIOXX's use.   Therefore, we consider
> these promotional pieces to be lacking in fair balance.
> Furthermore, these promotional pieces are in violation of the Act
> because the approved product labeling for VIOXX did not
> accompany them.  [Emphasis added.]

124.    The FDA's First Warning Letter also chastised Merck for making unfounded

claims that VIOXX was better than Celebrex:

> ***You also present several unsubstantiated comparative claims to
> Celebrex*** (celecoxib), including but not limited to, "VIOXX of

44

> course - the answer again, It's stronger, lasts longer, is faster, and then it's safer . . . ." [The FDA found that] this claim suggests VIOXX is more efficacious and has a superior safety profile compared to Celebrex, when such has not been demonstrated by substantial evidence. Therefore, this unsubstantiated comparative claim is misleading. [Emphasis added.]

125. Notably, the First Warning Label made no reference to the cardiovascular risks associated with VIOXX, or Defendants' failure to disclose those risks. Rather, Defendants had successfully concealed, distorted, and obscured the truth about VIOXX's significant cardiovascular risks not only from the public, patients, and the medical community, but from the FDA as well.

126. On January 26, 2000, Defendants issued a Company press release announcing Merck's financial results for the fourth quarter and full year 1999, the periods ending December 31, 1999. The press release quoted defendant Gilmartin as follows:

> Sales growth for the quarter and the year was led by the established major products, the newer products, including VIOXX, as well as growth from the Merck-Medco Managed Care business.
>
> ***VIOXX is the fastest growing prescription arthritis and pain medicine in the United States and represents one of the most successful product introductions in the pharmaceutical industry's history***. [Emphasis added.]

127. The January 26, 2000 press release also stated:

> Since its introduction almost eight months ago in the United States, more than 5 million prescriptions have been written for VIOXX. With its exceptional product profile VIOXX is the country's fastest growing prescription arthritis medicine.

128. The January 26, 2000 press release was materially false and misleading in that, among other things, once Defendants chose to speak about the purported success and advantages of VIOXX, they had a duty to speak fully and truthfully and to disclose the serious

cardiovascular risks attributed to VIOXX, which jeopardized the drug's commercial viability and its ability to generate substantial revenues over the life of Merck's patent.

129.    By early March 2000, Defendants were aware of the results of the VIGOR Study, which Merck commenced in January 1999, prior to the Class Period, and even prior to the FDA's approval of VIOXX, to investigate the purported gastrointestinal ("GI") benefits of VIOXX as compared to traditional NSAIDs.

130.    Participants in the VIGOR Study received a daily dose of VIOXX (50mg) or naproxen (1000mg).

131.    In designing the VIGOR Study, Merck took the exceptional step of including an "external *Vascular Event Committee* (VEC), containing three separate subspecialty committees (*cardiac*, cerebrovascular, and peripheral), [] for surveillance, monitoring, and adjudication of vascular events occurring in COX-2 inhibitor trials" (emphasis added).   As one prestigious medical journal, *The Lancet* later concluded with respect to Merck including a VEC as part of the VIGOR Study, Merck *"apparently was aware of possible myocardial toxicity before the [VIGOR] trial, because it set in place a separate adjudication procedure to study the event"* (emphasis added).

132.    Internal Company documents evidence that Defendants, recognizing the importance of the VIGOR Study to the continued success of VIOXX and its consequent importance to Merck's performance and prospects, engaged in a systematic effort to influence the Study's results.  For example, on February 11, 2000, prior to the VIGOR Study's final results (being announced to the public), defendant Scolnick sent an email to Deborah Shapiro, whom defendant Scolnick believed was the "unblinded statistician" for the VIGOR Study.  Defendant Scolnick's email attached a copy of a just-issued Salomon Smith Barney analyst report which

stated, among other things, that although "Vioxx stunned [Monsanto] (and marketing partner Pfizer) during the 2H99 . . . [i]n 2000 we expect the momentum to shift back to MTC/PFE," *i.e.*, to Celebrex.

133.    In his February 11, 2000 email to Deborah Shapiro, defendant Scolnick, in response to her Salomon Smith Barney analyst report, made the following request:

> Deborah.  Please read this story.  It is my understanding that you are the unblinded statistician in our Vigor study.  In the last few days we are being pounded by stories like this.  As with the key aggrastar when Snappin and i [sic] had to make a decision as soon as you know what the answer is I would like a confidential meeting with you.  ***The situation cannot simply follow the "book" ways of knowing.***  Please let me know when I can talk to you confidentially.  You can reach me when this time comes at work at home PRIVACY – by voice mail (private) or anywhere by email-I am the only one who listens to my voice mail or email.  Thanks I hope your lucky rabbit's foot is as good as it was with mevacor afcaps/Ed Scolnick.  [Emphasis added.]

134.    Commenting on the VIGOR Study results, the FDA concluded: "[e]valuation of safety by routine parameters showed no advantage of [VIOXX] rofecoxib over naproxen."   In fact, far from demonstrating an improved safety profile for VIOXX, as compared to naproxen, the VIGOR Study also evidenced that:

(a)    Patients on VIOXX were five times more likely to suffer a heart attack as compared to patients on naproxen;

(b)    Patients on VIOXX were 2.3 times more likely to suffer serious cardiovascular disease (including heart attacks, ischemic stroke, unstable angina, and sudden unexplained death) as compared to patients on naproxen; and

(c)    Patients on VIOXX actually suffered more cases of serious disease (either gastrointestinal or cardiovascular) than did naproxen users (61 and 57 cases respectively).

135.    According to a *New York Times* article, entitled "Despite Warnings, Drug Giant Took Long Path to VIOXX Recall," which was published after the Class Period (November 14, 2004), notwithstanding Defendants' representations to the market during the Class Period, Defendants were very aware of the devastating significance of the VIGOR Study results to VIOXX and the Company's financial dependence on the drug:

> Company executives and researchers say that from the moment they were told in March 2000 about the preliminary results from the Vigor trial, they sought every possible explanation for the signs of increased cardiovascular risk. ***And, they say, they were open to the possibility that VIOXX was at fault***.

> "We were stunned," by the findings, said [defendant] Dr. Alise S. Reicin, the Merck researcher who ran the VIGOR study. ***"It's fair to say that we were all concerned***."  [Emphasis added.]

136.    Defendants' internal concerns about the VIGOR Study results, evidencing VIOXX's adverse cardiovascular profile, and Defendants' desire to find an explanation to provide to the public for its results, were understandable.  Not only did the VIGOR Study ***replicate and confirm the results of the earlier, still secret Study 090***, but any suggestion that VIOXX was directly responsible for increased cardiovascular episodes jeopardized the drug's commercial viability and the substantial revenue stream it provided to Merck.  Nevertheless, contrary to Defendants' misrepresentation that they were "stunned" by the VIGOR Study results, internal Company documents demonstrate that the results ***confirmed what Defendants already knew***:  VIOXX increased the risk of heart attacks and cardiovascular disease, which jeopardized the drug's commercial viability and its ability to generate substantial revenues over the life of Merck's patent.  According to the November 1, 2004 *Wall Street Journal* article:

> In March 2000, the results of Vigor came in.  They showed that Vioxx patients suffered fewer stomach problems than the Naproxen group, but significantly more blood-clot-related problems -- precisely the sort of result anticipated in the 1996-97 internal documents.  The heart-attack rate in the Vioxx group

appeared to be four times as high as the Naproxen group. (Later analysis would show it to be five times as high.) The difference was so wide that Dr. Scolnick, the Merck research chief, appeared to recognize it couldn't come solely from Naproxen's protective effect but must involve some sort of risk inherent in Vioxx. *In a March 9, 2000, e-mail with the subject line "Vigor," Dr. Scolnick said the results showed that the cardiovascular events "are clearly there."* In an apparent acknowledgement that Vioxx's own mechanism was at least partially at fault for the heart data, he wrote: "*it is a shame but it is a low incidence and <u>it is mechanism based as we worried it was</u>.*" [Emphasis added.]

137. In his interview with *60 Minutes*, which was broadcast after the Class Period (on November 14, 2004), Dr. Topol discussed the significance of the VIGOR Study results:

Whenever you find a problem and you're thinking maybe it's not a problem, you want to see if there's independent replication. So if you have Study 090 and you want to discount that somehow, then you have VIGOR. *You've got two trials now. You have essentially lightning striking twice. That's independent replication. That's really serious confirmation. This is unequivocal. This is a problem.* [Emphasis added]

138. Rather than disclosing the cardiovascular risks of VIOXX, which jeopardized its commercial viability and its ability to generate substantial revenues over the life of Merck's patent, or that that they were "open to the possibility that VIOXX was at fault," Defendants continued to mislead the market by concealing, obscuring, and downplaying the risks, and instead touted VIOXX's purported success. For example, on March 24, 2000 -- just fifteen days after defendant Scolnick wrote that the VIGOR results showed that the cardiovascular events "are clearly there" and "it is mechanism based [*i.e.*, caused by VIOXX] as we worried it was" -- Defendants publicly issued Merck's 1999 Annual Report. The cover of the 1999 Annual Report proclaimed: *"Vioxx: Our biggest, fastest and best launch ever"* (emphasis added). Defendant Gilmartin stated in his letter to shareholders in the 1999 Annual Report:

*Vioxx is the fastest growing prescription arthritis medicine in the United States, and, by the end of 1999, Merck had successfully launched Vioxx in nearly 50 nations*. [Emphasis added.]

139.    Defendants' statements in Merck's 1999 Annual Report were materially false and misleading because, among other things, once Defendants chose to speak about the purported success of VIOXX, they had a duty to speak fully and truthfully and to disclose VIOXX's serious cardiovascular risks, which jeopardized its commercial viability and its ability to generate substantial revenues over the life of Merck's patent.

140.    On March 22, 2000, Defendants filed Merck's 1999 Form 10-K with the SEC. The 10-K was signed by, among others, defendants Gilmartin, Lewent, Henriques, and Scolnick. Defendants stated:

> In May 1999, following a six-month priority review, the FDA cleared VIOXX, Merck's once-daily agent that specifically inhibits COX-2, for relief of the signs and symptoms of osteoarthritis, management of acute pain in adults and treatment of menstrual pain. ***With its product profile for strength, safety and once daily simplicity, VIOXX remains the country's fastest growing prescription arthritis medicine.*** In the product's first seven months, U.S. physicians wrote more than five million prescriptions. VIOXX is also enjoying success in the 47 other countries in which it has been launched. [Emphasis added.]
>
> The company is conducting extensive clinical studies with VIOXX to evaluate its efficacy in the treatment of rheumatoid arthritis and in the prevention and treatment of Alzheimer's disease. Merck also has begun studies in patients with colon polyps -- a broad population at risk of developing colon cancer. Reducing the number of these polyps may reduce the incidence of colon cancer.

141.    The Company's 1999 Form 10-K was materially false and misleading because, among other things, once Defendants spoke about the purported safety, success, and advantages of VIOXX, they had a duty to speak fully and truthfully and to disclose VIOXX's serious cardiovascular risks, which jeopardized its commercial viability and its ability to generate substantial revenues over the life of Merck's patent.

142.    Faced with the significant threat to the commercial viability of Merck's multibillion dollar blockbuster drug, Defendants commenced a campaign of misrepresentations