CARELLA, BYRNE, BAIN, GILFILLAN,
  CECCHI, STEWART & OLSTEIN
5 Becker Farm Road
Roseland, NJ 07068
Tel.:  (973) 994-1700
Fax: (973) 994-1744

DECOTTIIS, FITZPATRICK, COLE & WISLER LLP
Glenpointe Centre West
500 Frank W. Burr Boulevard
Teaneck, NJ 07666
Tel.:  (201) 928-1100
Fax: (201) 928-0588

BRICKFIELD & DONAHUE
70 Grand Avenue
River Edge, NJ  07661
Tel.:  (201) 258-3984
Fax:  (201) 488-9559

*Co-Liaison Counsel for Plaintiffs*

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019
Tel.:  (212) 554-1400
Fax:  (212) 554-1444

MILBERG LLP
One Pennsylvania Plaza
New York, NY  10119-0165
Tel.:  (212) 594-5300
Fax: (212) 868-1229

BROWER PIVEN
  A PROFESSIONAL CORPORATION
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel.:  (212) 501-9000
Fax:  (212) 501-0300

STULL, STULL & BRODY
6 East 45th Street, 5th Floor
New York, NY 10017
Tel.:  (212) 687-7230
Fax:  (212) 490-2022

*Co-Lead Counsel for Plaintiffs*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE MERCK & CO., INC., SECURITIES, DERIVATIVE & "ERISA" LITIGATION | MDL No. 1658 (SRC) |
| THIS DOCUMENT RELATES TO:  THE CONSOLIDATED SECURITIES ACTION | Case No. 3:05-CV-01151-SRC-MF Case No. 3:05-CV-02367-SRC-MF |

## CONSOLIDATED FIFTH AMENDED
## CLASS ACTION COMPLAINT

TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ......................................................................1

II.   THE CLAIMS ASSERTED IN THIS COMPLAINT .....................................12

III.  JURISDICTION AND VENUE ....................................................................12

IV.   PARTIES .....................................................................................................13

      A.    The Plaintiffs.................................................................... 13

      B.    The Defendants ................................................................ 14

            1.    Merck & Co., Inc. .................................................. 14

            2.    The Officer Defendants.......................................... 15

            3.    The Insider Trading Defendants ............................. 23

            4.    The Director Defendants......................................... 24

V.    CLASS ACTION ALLEGATIONS ...............................................................26

VI.   EXCHANGE ACT ALLEGATIONS.............................................................27

      A.    Merck Develops VIOXX in an Attempt to Create a Blockbuster
            "Selective" NSAID with Reduced Gastrointestinal Side Effects ........................ 28

            1.    The Problems Associated With Traditional, Non-Selective
                  NSAIDs................................................................... 28

            2.    Discovery of the COX-2 Enzyme Raises Hopes that a Selective
                  NSAID Could be Developed Which Would Not Cause the
                  Gastrointestinal Problems Associated with Traditional NSAIDs............ 29

            3.    Merck Races to Develop and Stay Ahead of Its Competitors in
                  Developing a COX-2 Inhibitor ................................. 29

            4.    Merck's Huge Financial Stake in the Success of VIOXX ........................ 33

            5.    Merck's Successful VIOXX Product Launch in 1999.............................. 35

            6.    Merck's "Blockbuster" VIOXX Sales Grow From 2000 Through
                  Mid-2004................................................................ 36

            7.    Merck Shocks Investors By Pulling VIOXX From The Market ............. 36

B.      Unbeknownst to Investors, Merck Had Grave Concerns About VIOXX's Potential to Cause Heart Attacks and Strokes, Which Were Reinforced By Undisclosed Merck Data, Even Before It Launched VIOXX In May 1999 ........ 37

        1.      Merck Learns That VIOXX Upsets the Homeostatic Balance Between Prostacyclin and Thromboxane, and the Concerns Raised by Protocol 023 ................................................. 37

        2.      Merck Cancels a Large VIOXX Clinical Trial in August 1997 Over Undisclosed Concerns It Would Show That VIOXX Caused Serious Adverse Cardiovascular Problems ................................ 40

        3.      November 1997: Preeminent Medical Researcher and Merck Consultant Dr. John Oates Rejects Internal Merck Efforts To Rationalize the Adverse Implications of Protocol 023 ........................... 43

        4.      Merck's Undisclosed Internal Analysis of Osteoarthritis Clinical Data Shows That Women Taking VIOXX Have A Statistically Significant 216% Increased Risk of Serious Adverse Cardiovascular Events Compared To Women Taking A Placebo ........... 45

        5.      Merck Attempts to "Manage" Concerns About VIOXX's Cardiovascular Safety As It Nears Completion of Its New Drug Application for VIOXX in 1998 ................................................ 47

C.      May 21, 1999 (The First Day of the Class Period): Merck Heralds The FDA's Approval of VIOXX While Continuing To Conceal Its "Great Concern" And Related Adverse Information About VIOXX's Safety ................ 50

D.      March 2000: Merck Is Finally Forced To Undertake A Large Gastrointestinal Outcomes Trial (VIGOR), Which Confirms the Company's Belief That VIOXX Is Prothrombotic ................................ 50

E.      The "Naproxen Hypothesis": Merck Falsely Represents That It Believes That The Higher Incidence Of Adverse CV Events Among VIOXX Users in the VIGOR Trial Is Attributable To Purported Cardioprotective Properties Of Naproxen Rather Than Prothrombotic Properties Of VIOXX ....... 56

F.      Merck Wrongfully Changes Causes of Death In Its ADVANTAGE Trial To Minimize The Risk Of "Rais[ing] Concerns" About the "Naproxen Hypothesis" ........................................................................... 64

G.      2001: The Undisclosed Results of Merck's Studies of VIOXX In Alzheimer's Disease Patients Show that VIOXX Raises the Risk of Cardiac Mortality ................................................................. 67

H.      Defendants Successfully Keep Merck's Internal Conclusions About the True Significance of the VIGOR Results Off VIOXX's Label ........................... 75

I.     2003-2004: Merck And The Officer Defendants Continue To Vigorously Defend VIOXX's Safety ................................................................. 77

     1.    October 2003: Merck Disparages The Brigham Study Findings, and Again Reassures The Public That VIOXX Is Safe ........................ 77

     2.    August 2004: Merck Disparages The Kaiser Study Findings, and Again Reassures The Public That VIOXX Is Safe ................................ 81

VII.   THE FULL TRUTH EMERGES .................................................................82

     A.    The September 2004 Withdrawal of VIOXX ....................................... 82

     B.    The November 1, 2004 *Wall Street Journal* Article ............................. 86

VIII.  POST-CLASS PERIOD EVENTS ............................................................89

IX.   MATERIALLY FALSE AND MISLEADING STATEMENTS.....................91

     A.    Materially False and Misleading Statements Made In Connection With VIOXX's Introduction to the Market ................................................. 91

     B.    Materially False and Misleading Statements Made During the Second Half of 1999 ............................................................................................. 92

     C.    Materially False and Misleading Statements Made in Connection with Defendants' Discussions of Merck's Fourth Quarter and Year-End 1999 Results ............................................................................................... 97

     D.    Merck and the Officer Defendants' Spring 2000 Statements Announcing the VIGOR Trial Results and Proffering their Purported Belief in the Naproxen Hypothesis ...................................................................... 100

     E.    Materially False and Misleading Statements Made During the Second Half of 2000 ............................................................................................. 112

     F.    Materially False and Misleading Statements Made During the Second Half of 2000 ............................................................................................. 118

     G.    Materially False and Misleading Statements Made During the Second Half of 2001 ............................................................................................. 126

     H.    Materially False and Misleading Statements Made During the First Half of 2002 ............................................................................................... 135

     I.    Materially False and Misleading Statements Made During the Second Half of 2002 ............................................................................................. 145

J.      Materially False and Misleading Statements Made During the First Half of 2003 ............................................................................................................ 150

K.      Materially False and Misleading Statements Made During the Second Half of 2003 ............................................................................................................ 154

L.      Materially False and Misleading Statements Made During the First Half of 2004 ............................................................................................................ 159

M.      Materially False and Misleading Statements Made During the Second Half of 2004 ............................................................................................................ 163

X.      ADDITIONAL SCIENTER ALLEGATIONS .............................................. 168

A.      Defendant Gilmartin .................................................................................. 179

B.      Defendant Scolnick ................................................................................... 181

C.      Defendant Frazier ...................................................................................... 183

D.      Defendant Henriques ................................................................................. 184

E.      Defendant Kim ........................................................................................... 185

F.      Defendant Lewent ...................................................................................... 185

G.      Defendant Anstice ..................................................................................... 186

H.      Defendant Clark ......................................................................................... 188

I.      Defendant Kelley ....................................................................................... 189

J.      Defendant Wold-Olsen ............................................................................. 189

XI.     LOSS CAUSATION .................................................................................... 191

XII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .................. 194

XIII.   PRESUMPTION OF RELIANCE ............................................................... 194

XIV.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT .......................... 196

COUNT ONE ........................................................................................... 196

COUNT TWO ........................................................................................... 203

COUNT THREE ....................................................................................... 204

XV.     SECURITIES ACT ALLEGATIONS .......................................................... 207

iv

A.  The Securities Act Defendants' Liability ........................................................... 208

B.  Untrue Statements and Omissions of Material Fact Contained in the Offering Documents ........................................................................................... 208

XVI.  CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ......................................... 211

COUNT FOUR ......................................................................................................... 211

COUNT FIVE ........................................................................................................... 213

COUNT SIX ............................................................................................................. 214

XVII.  PRAYER FOR RELIEF ............................................................................................ 215

XVIII. JURY TRIAL DEMANDED .................................................................................... 216

Lead Plaintiffs, the Public Employees' Retirement System of Mississippi, Steven LeVan, Jerome Haber and Richard Reynolds (collectively, "Lead Plaintiffs"), and named plaintiffs Rhoda Kanter and Park East, Inc. (together, with Lead Plaintiffs, the "Plaintiffs") hereby bring this consolidated class action complaint for violation of the federal securities laws ("Complaint") against Merck & Co., Inc. ("Merck" or the "Company"), and certain current and former members of the Company's senior management (the "Officer Defendants") and Board of Directors (the "Director Defendants") (collectively, the "Individual Defendants") identified in § IV.B. Merck and the Individual Defendants are referred to collectively herein as "Defendants." The allegations against Defendants are based on personal knowledge as to Plaintiffs' own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of their counsel ("Lead Counsel"), the materials referenced in this Complaint, and Lead Counsel's extensive consultations with medical experts. Plaintiffs believe that formal discovery, including document discovery and depositions of relevant witnesses, will provide additional evidentiary support for their allegations. By and through their counsel, Plaintiffs, on behalf of themselves and the Class they seek to represent, allege as follows:

I.    **PRELIMINARY STATEMENT**

1.    Plaintiffs bring this federal securities class action on behalf of themselves and a proposed class of persons and entities (the "Class") who purchased or acquired Merck securities between May 21, 1999 and October 29, 2004, inclusive (the "Class Period").

2.    Throughout the Class Period, Merck and the Officer and Director Defendants made materially false and misleading statements of fact and belief concerning the safety profile and commercial viability of Merck's purported "blockbuster" drug VIOXX (a/k/a MK 966 or "rofecoxib"). As a result of Defendants' materially false and misleading statements, during the

Class Period the value of Merck securities was significantly inflated. When the truth concerning VIOXX's safety and commercial viability finally began to emerge, the value of Merck securities fell sharply, causing Plaintiffs and the Class members to suffer massive damages. In contrast, during the same period, the individual Defendants as a group sold millions of shares of their own personal holdings of Merck stock, reaping lucrative insider selling profits in excess of $94 million, including more than $20.9 million, $24.8 million and $20.85 million, respectively, reaped by Merck's CEO (defendant Raymond Gilmartin), its Executive Vice President for Science & Technology (defendant Edward Scolnick), and the President of Merck's Human Health Prescription Division (defendant David Anstice).

3.      VIOXX is a non-steroidal anti-inflammatory drug ("NSAID") intended for use in the treatment of arthritis and other acute pain. Traditional NSAIDs, such as aspirin, ibuprofen and naproxen, function by inhibiting two enzymes: cyclooxygenase-1 ("COX-1"), which is associated with the maintenance of protective gastrointestinal ("GI") mucus, and cyclooxygenase-2 ("COX-2"), which is associated with the response to pain and inflammation. Unfortunately, the inhibition of COX-1 (and resulting inhibition of protective gastrointestinal mucus) by traditional NSAIDs can cause serious GI side effects, which result in tens of thousands of serious injuries and deaths each year in the United States alone. In developing VIOXX, Merck sought to develop a drug that would selectively suppress only COX-2 (thereby suppressing pain and inflammation) *without* suppressing COX-1 (thereby *avoiding* the adverse GI side effects associated with traditional NSAIDs).

4.      There is an enormous worldwide market (estimated to be worth multiple billions of dollars *per year*) for a painkilling drug that lacks the adverse GI side effects of traditional NSAIDs, because patients suffering from diseases that cause chronic pain, such as arthritis,

would be inclined to take such a drug on a daily basis.  Consequently, Defendants and the market viewed VIOXX as a potential "blockbuster" drug.

5.    The importance of VIOXX's commercial success to Merck could hardly be overstated, because at all relevant times Merck desperately needed to be able to market a major new drug whose revenue would be sufficient to off-set the more than $5 billion in annual revenue that Merck would be losing as *five* of Merck's existing drugs (Vasotec, Pepcid, Mevacor, Prilosec and Prinivil) were all scheduled to go "off patent" (*i.e.*, lose their patent protection) between August 2000 and the end of 2001.  According to published reports, Merck's ability to survive as a separate company might even have been at risk if VIOXX failed to achieve and maintain blockbuster status.

6.    Beginning with its press release of May 21, 1999 (the first day of the Class Period), in which Merck trumpeted the news that the FDA had approved VIOXX for the treatment of osteoarthritis, throughout the Class Period the Defendants repeatedly touted VIOXX's safety profile, sales and commercial prospects in press releases, public statements, Merck-prepared medical journal articles, and filings with the SEC.  Defendants repeatedly claimed, *inter alia*,  that VIOXX was a "key growth driver" for Merck, that it had "robust" growth prospects for the treatment of arthritis and numerous other ailments, and that VIOXX sales would generate billions of dollars annually well into the future.  By 2003, VIOXX was Merck's second best-selling drug (with annual sales of $2.5 billion), and Merck readily acknowledged that without VIOXX Merck "would be a very different company."

7.    As set forth in detail below, however, Defendants' Class Period public statements concerning VIOXX were materially false or misleading, omitted to disclose numerous material facts necessary to make their statements not materially misleading, and/or misrepresented

3

Merck's and its senior officers' and scientists' actual beliefs concerning VIOXX's safety and, consequently, its commercial prospects.  Indeed, from the very start of the Class Period in May 1999, when Defendants first announced the news of the FDA's approval of VIOXX, unbeknownst to the public, Merck internally had grave concerns that VIOXX caused serious cardiovascular ("CV") side effects, including myocardial infarction ("MI") (*i.e.,* heart attacks) and strokes.  These serious concerns about VIOXX's CV risks were based on the research of one of Merck's own consultants (Dr. Garret FitzGerald) -- and the corroborating views privately provided to Merck by one of the Company's other prominent consultants (Dr. John Oates) -- which showed, based on urine analyses, that VIOXX upset one of the body's internal mechanisms by (a) suppressing prostacyclin (a chemical that occurs naturally in the body which *widens* blood vessels and *inhibits* blood clotting) while *simultaneously* (b) having *no* impact on the body's production of thromboxane (a chemical that *narrows* blood vessels and potently *promotes* blood clots).

8.     Accordingly, as confirmed in internal Merck emails from the late 1990's that were only disclosed after the Class Period, as a result of Merck's "great concern" that VIOXX increases the risk of adverse CV events -- and that any clinical findings to that effect would "kill [the] drug" -- Merck scientists discussed how to design Merck's major clinical trials of VIOXX to minimize the risk that they would call attention to the extent of VIOXX's adverse CV (or "prothrombotic") side effects.  Nonetheless, by no later than February 1998 Merck was in possession of a non-public internal analysis indicating that patients in its VIOXX clinical trials had significantly higher rates of serious adverse CV events compared to patients taking placebo, including a statistically significant ***216%*** increased risk for adverse CV events among women taking VIOXX.

4

9.      Although the FDA approved VIOXX in May 1999, Merck and the Officer Defendants knew that (a) the FDA would not allow it to market VIOXX with a label stating that VIOXX posed a significantly lower risk of adverse GI side effects than traditional NSAIDs unless and until Merck conducted a large scale gastrointestinal trial demonstrating that this was true, and (b) VIOXX's commercial prospects would be sharply curtailed if Merck failed to obtain an FDA-approved label affirming VIOXX's favorable GI safety.   Accordingly, even though Merck had put off conducting a large-scale GI trial in 1997 (primarily due to its fears that such a trial would highlight VIOXX's prothrombotic side effects), in January 1999 -- by which time Merck was reasonably confident that it would obtain initial FDA approval of VIOXX -- Merck commenced a large scale VIOXX Gastrointestinal Outcomes Research ("VIGOR") trial. The VIGOR trial compared the results of a large patient group taking VIOXX to a similarly large patient group taking naproxen (a traditional NSAID marketed in the U.S. under the brand names Aleve and Naprosyn).

10.      Merck designed the VIGOR study to minimize the likelihood that the results would show that VIOXX was prothrombotic, but the results of the VIGOR study nonetheless showed that patients taking VIOXX had a statistically significant higher incidence of adverse CV events (particularly heart attacks) than patients taking naproxen.  Reviewing these results, Merck and the Officer Defendants concluded that VIOXX was prothrombotic, as they had feared.  As defendant Edward Scolnick, Merck's Executive Vice President for Science and Technology and Merck's chief research scientist, acknowledged in a March 9, 2000 internal email to three other senior Merck scientists (including Merck's Executive Director of Clinical Research, defendant Alise Reicin):

> I just received and went through the [VIGOR] data…. **The [adverse] CV [cardiovascular] events are clearly there….  It is a**

> ***shame*** but it is a low incidence ***and it is mechanism based as we worried it was***. [Dr. John] Oates and [senior Merck scientists] Alan [Nies] and Barry [Gertz] were right about the metabolite meanings ie urine Pg [prostaglandin] data….[1]

Defendant Scolnick's reference to the cause of the cardiovascular events being "mechanism based as we worried it was," and his statement that Drs. Oates, Nies and Gertz "were right" about the meaning of the "urine Pg [prostaglandin] data," was an admission that he understood that it was VIOXX's inhibition of prostacyclin (which was anti-thrombotic), combined with VIOXX's lack of any effect on thromboxane (which was *pro*-thrombotic), that caused patients taking VIOXX to experience a significantly increased risk of serious adverse CV events.

11. On March 27, 2000, Merck issued a press release discussing VIGOR's results. The release emphasized that VIGOR's results showed that VIOXX had a superior GI safety profile than naproxen, while also noting the significantly higher incidence of adverse CV events among VIOXX users compared to naproxen users. However, rather than acknowledge their conclusion that the statistically significant difference in the number of heart attacks and other adverse CV events in the VIGOR trial was "mechanism based" (*i.e.*, attributable to the manner in which VIOXX upset the body's homeostatic balance of prostacyclin and thromboxane) -- an admission that the Officer Defendants knew would likely "kill the drug" and precipitate a financial crisis for Merck -- the Officer Defendants tried to explain away the difference in VIGOR's adverse CV data by manufacturing a hypothesis that attributed VIGOR's CV results to the alleged "cardioprotective" properties of naproxen (the "naproxen hypothesis"). For example, as Merck's March 27, 2000 press release represented:

> ***[S]ignificantly fewer thromboembolic events were observed in patients taking naproxen in this GI outcomes study, which is consistent with naproxen's ability to block platelet aggregation.***

---

[1] Unless otherwise stated, all emphases herein are added.

> This effect on these events had not been observed previously in any clinical studies for naproxen. ***VIOXX, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have similar effects.***

To further support their "naproxen hypothesis," the press release further falsely represented that "[a]n extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with VIOXX, showed no indication of a difference in the incidence of thromboembolic events between VIOXX, placebo and comparator NSAIDs."

     12.    The VIGOR results were widely reported. Market analysts understood that the higher rate of adverse CV events among VIOXX users in VIGOR could be due to either (a) purported cardioprotective properties of naproxen or (b) the prothrombotic effect of VIOXX. However, in the wake of Merck's repeatedly stated belief that the difference in the rate of adverse CV events between VIOXX and naproxen was likely due to and "consistent with" a cardioprotective effect of naproxen rather than a prothrombotic effect of VIOXX -- and in the wake of Merck's further assurances that there was no indication of a difference in the incidence of thromboembolic events between VIOXX, placebo and comparator NSAIDS in Merck's other clinical trial data -- virtually all members of the scientific, medical and Wall Street analyst communities either accepted or treated as plausible Merck's publicly stated view that the "naproxen hypothesis" was the "likeliest interpretation" of the VIGOR study results.

     13.    However, as defendant Scolnick's internal March 9, 2000 email confirms, unbeknownst to investors Merck actually believed that the increased CV events in VIGOR ***were caused by VIOXX,*** and as detailed below Merck concocted and advanced the "naproxen hypothesis" to protect VIOXX's commercial viability.

     14.    Over the weeks, months and years following the release of the VIGOR study results, Merck and the Officer Defendants (notably Scolnick and Reicin) continued to promote

the "naproxen hypothesis" and to tout VIOXX's purported safety and blockbuster commercial viability, even as additional evidence continued to mount internally at Merck that VIOXX caused heart attacks and other serious adverse CV events.

15.    For example, by no later than early April 2000 -- just a week after Merck first announced the results of the VIGOR study -- the preliminary results of another Merck study (the ADVANTAGE study, which also compared VIOXX to naproxen) became available internally at Merck.  In an email to defendant Scolnick, defendant Reicin noted that there were *seven* heart attacks in one treatment group compared to only *one* in the other group.  Although the two groups were still "blinded" at that time, there was little doubt that the former group was the VIOXX group and the latter group was the naproxen group.  Moreover, as shown by internal Merck emails produced after the Class Period, in November 2000 defendant Reicin pressured another Merck scientist to change the reported cause of death of at least one of the patients in the ADVANTAGE trial who was taking VIOXX from "heart attack" to "unknown cause of death" so as not to "raise concerns" about VIOXX's CV safety and the validity of Merck's "naproxen hypothesis."  Merck's manipulation of the ADVANTAGE data in this fashion was not publicly disclosed until April 2005, after the Class Period.

16.    By April 2001, Merck and the Officer Defendants were also in possession of non-public information concerning the results of two clinical trials (known as Protocol 078 and Protocol 091) that they had conducted to assess the effects of VIOXX on Alzheimer's disease. On both a standard "intention to treat" basis as well as a standard "on treatment" basis, these studies showed statistically significant increases in deaths (including a statistically significant increase in heart disease deaths) in patients being treated with VIOXX compared to those being

treated with placebo -- results that obviously would have been material to investors and medical professionals alike.

17.     However, Merck chose not to disclose to the public that its internally prepared analyses showed a statistically significant increase in mortality (including a statistically significant increase in heart disease deaths) for VIOXX patients whether using standard "intention-to-treat" or "on treatment" analysis.  Instead, Merck attempted to conceal these studies' statistically significant results by creating and then employing a non-standard "On Drug" methodology pursuant to which it reported substantially reduced -- and ***not*** statistically significant -- increased mortality risks for patients who used VIOXX in these two trials.  Merck's concealment of the true nature and extent of the safety risks of VIOXX from the institutional review boards ("IRB's") that were responsible for patient enrollment at the clinical test sites for these trials was sufficiently improper and outrageous that, when the relevant facts were finally disclosed in 2008, the authors of an article published in the *Journal of the American Medical Association ("JAMA")* characterized Merck's extraordinary misconduct as "violating the trust of [the] human participants who volunteered to participate" in the trials.

18.     Notwithstanding this growing body of additional, material non-public information in Merck's possession concerning VIOXX's association with increased CV risks and deaths, Merck continued to falsely downplay any concerns about VIOXX's safety or profit potential, and to falsely reaffirm its purported belief in the "naproxen hypothesis."  For example, on August 21, 2001 -- the day before *JAMA* published an article that expressed concerns about VIOXX's possible prothrombotic effects -- a Merck spokesman assured *Bloomberg News* that Merck had "additional data beyond what [the authors of the *JAMA* article] cite, and the findings are very, very reassuring.  VIOXX does not result in any increase in cardiovascular events compared to

placebo."  Approximately six weeks later, on October 9, 2001, *The New York Times* quoted defendant Scolnick reiterating (a) that Merck's belief that the "naproxen hypothesis" remained the "likeliest interpretation" of the VIGOR data, and (b) that Merck had found no evidence in other studies that VIOXX increased the risk of heart attacks.  Scolnick added that without the "theoretical question" raised by Dr. FitzGerald's early research concerning VIOXX's impact on prostacyclin "no one would have a question remaining in their mind that there might be an additional interpretation" (*i.e.*, that VIOXX caused increased CV risks).  Similarly, in an April 2002 conference call, a Merck spokesman reiterated the Company's "belief that the effects seen in VIGOR were [due to] the anti-platelet effect of naproxen" and that that was "a position that Merck has always had."

19.     In the fall of 2003, the results of a Merck-funded study at Brigham and Women's Hospital in Boston (the "Brigham Study") became public.  The Brigham Study, which looked at the records of almost 55,000 Medicare patients over the age of 65, found an increased risk of heart attack in patients taking VIOXX, compared with patients taking Celebrex (a rival COX-2 inhibitor that was VIOXX's main competitor) and with patients not taking any painkiller.  The results of the Brigham Study raised doubts about Merck's "naproxen hypothesis," but Merck aggressively countered the results of the study by arguing that epidemiological studies (such as the Brigham study) were not as significant as the results of clinical trials, and by vigorously reiterating its purported belief in the "naproxen hypothesis."   As a result of Merck's renewed public defense of its "naproxen hypothesis," investor concerns about VIOXX were substantially assuaged, and the market continued to be materially misled as to Merck's actual beliefs and the true extent to which VIOXX's commercial viability was in jeopardy.

20.    On September 30, 2004, Merck announced that it was withdrawing VIOXX from the market based on a new study showing an "increased risk of confirmed cardiovascular events beginning after 18 months of continuous therapy."  In response to this news, the price of Merck common stock plummeted more than $12 in heavy trading to close at $33.00, down approximately 27% from its closing price the previous day.  Securities analysts expressed shock and surprise at the sudden withdrawal of VIOXX.  Less than five weeks later, on November 1, 2004 (the last day of the Class Period), *The Wall Street Journal* disclosed that "internal Merck emails and marketing materials as well as interviews with outside scientists show that the company fought forcefully for years to keep safety concerns [from] destroying the drug's commercial prospects."  This news prompted one securities analyst to comment that "***new information indicates to us that the situation might not be as innocent as we thought***…  We recommend that investors sell Merck shares."  In response to these further revelations, Merck's stock price fell a further 9.7%.

21.    Since the end of the Class Period in November 2004, and as noted above and as further described below, significant information that was previously unknown to and/or concealed from Plaintiffs and investors has been obtained by Lead Counsel which details Merck's and the other Officer Defendants' knowing concealment and manipulation of VIOXX trial data, their lack of good faith belief in the Company's "naproxen hypothesis," their efforts to intimidate and discredit anyone who attempted to seriously challenge VIOXX's safety, and their knowingly (or at least recklessly) materially false and misleading public assurances throughout the Class Period that there was "no indication" that VIOXX caused adverse CV events, and that VIOXX would continue to generate billions of dollars in annual sales for Merck for years to come.  By this Complaint, Plaintiffs, on behalf of themselves and the other members of the

Class, seek a recovery for the massive financial losses that they and their fellow Class members have suffered as a result of Defendants' violations of the federal securities laws, as further set forth herein.

## II.    THE CLAIMS ASSERTED IN THIS COMPLAINT

22.    This Complaint sets forth claims under Sections 10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), against Merck and those Individual Defendants who are named as "Exchange Act Defendants" in ¶ 44 below, who were knowing or reckless participants in defrauding investors in connection with their material misrepresentations and omissions concerning VIOXX.

23.    This Complaint also sets forth separately certain non-fraud claims under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o against Merck and those individual defendants who are named as "Securities Act Defendants" in ¶ 56 below. Plaintiffs' Securities Act claims are not based on any knowing or reckless misconduct on the part of the Securities Act Defendants, and such claims do not allege fraud, do not sound in fraud and expressly disavow any fraud-related allegation set forth herein and instead are premised on the fact that Merck's Registration Statement dated April 26, 2002 (the "2002 Registration Statement"), the prospectus dated April 30, 2002 (the "April 2002 Prospectus"), and the prospectus dated June 10, 2004 (the "June 2004 Prospectus") for the Merck Stock Investment Plan ("MSIP") contained material misrepresentations and omissions (without regard to any defendant's state of mind) related to VIOXX.

## III.    JURISDICTION AND VENUE

24.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22 of the Securities Act, 15

U.S.C. § 77v.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

25.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22 of the Securities Act, 15 U.S.C. § 77v.  Defendant Merck at all relevant times was, and still is, headquartered in this District and many of the acts and transactions that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading statements, occurred in and/or issued from this District.  In addition, venue is proper in this District pursuant to the Order of the Judicial Panel on Multidistrict Litigation, dated February 23, 2005.

26.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of national securities exchanges.

IV.    **PARTIES**

A.    **The Plaintiffs**

27.     Court-appointed Co-Lead Plaintiff, the Public Employees' Retirement System of Mississippi ("Mississippi PERS") is a pension fund established for the benefit of the current and retired public employees of the State of Mississippi.  Mississippi PERS is responsible for the retirement income of employees of the State, including current and retired employees of the state's public school districts, municipalities, counties, community colleges, state universities, libraries and water districts.  Mississippi PERS provides benefits to over 60,000 retirees, and is responsible for providing retirement benefits to more than 250,000 current public employees. Mississippi PERS hereby submits as Exhibit A hereto a certification reflecting its transactions in Merck common stock.  Mississippi PERS purchased shares of common stock of Merck during

the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

28.     Court-appointed Co-Lead Plaintiffs Steven LeVan, Jerome Haber and Richard Reynolds purchased shares of common stock of Merck during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  Co-Lead Plaintiffs LeVan, Haber and Reynolds previously submitted certifications reflecting their transactions in Merck common stock during the Class Period, which are incorporated by reference herein.

29.     Plaintiffs Rhoda Kanter and Park East, Inc. ("Park East"), purchased shares of Merck common stock through the Merck Stock Investment Plan (the "MSIP").  Those shares were sold by Merck pursuant to the 2002 Registration Statement.  The MSIP, which was instituted in 1997, is a dividend reinvestment program that permits Merck shareholders automatically to reinvest cash dividends paid on Merck common stock towards the purchase of additional shares of Merck common stock.  The shares of Merck common stock are sold directly to participants in the MSIP by Merck.  Plaintiffs Kanter and Park East previously submitted certifications reflecting their transactions in Merck common stock during the Class Period, which are incorporated by reference herein.

**B.      The Defendants**

       **1.      Merck & Co., Inc.**

30.     Defendant Merck is a global pharmaceutical company that develops, manufactures, and markets a broad range of human and animal health products.  As of October 29, 2004, the Company had 2,217,584,609 shares of common stock outstanding, which were actively and efficiently traded on the New York Stock Exchange (the "NYSE").  Merck is a New

14

Jersey corporation with its principal place of business located at One Merck Drive, Whitehouse Station, New Jersey.

### 2.    The Officer Defendants

31.    (a)    Defendant Raymond V. Gilmartin ("Gilmartin") served, during the Class Period, as Merck's Chairman, President, and Chief Executive Officer.   Gilmartin became Chairman of Merck's Board of Directors in November 1994.   Gilmartin was, at all relevant times, also a member of the Company's Management Committee.   According to Merck, the Board of Directors and the Management Committee are responsible for the Company's objectives and policies, and the stewardship of Merck's resources.   On May 6, 2005, approximately seven months after Merck withdrew VIOXX from the market, and ten months before his previously scheduled retirement, Gilmartin was replaced as the Company's Chairman, President, and Chief Executive Officer by Richard Clark, who had been in charge of the Company's manufacturing operations.

(b)    As detailed herein, during the Class Period, defendant Gilmartin was Merck's most senior spokesperson, and made public statements concerning VIOXX and Merck's financial condition, performance, and prospects that were materially false and misleading and omitted to state material facts.   Gilmartin signed at least the following materially false and misleading documents that the Company filed with the SEC during the Class Period:  the 1999 Form 10-K; the 2000 Form 10-K; the 2001 Form 10-K; the 2002 Registration Statement; the 2002 Form 10-K and the 2003 Form 10-K.   After the Sarbanes-Oxley Act of 2002 became effective in July 2002, Gilmartin, pursuant to §302 of the Act, also signed certifications that were attached to Merck's Form 10-Ks and Form 10-Qs filed with the SEC from that point forward through the rest of the Class Period.

(c)     As detailed herein, defendant Gilmartin was a direct, substantial, and primary participant in the misconduct alleged herein.  While in possession of materially adverse non-public information regarding Merck, Gilmartin personally profited from the sale of Merck stock at artificially inflated prices during the Class Period.  During the Class Period, Gilmartin sold 639,200 shares of his personal holdings of Merck stock, realizing more than $20.9 million in insider selling profits.  In addition, during the Class Period, Gilmartin received substantial performance-based bonuses and other compensation based on, among other things, growth in Merck's earnings per share, Merck's sales compared to certain of Merck's competitors and the change in the Company's return on operating assets versus the prior year.

32.     (a)     Defendant Edward Scolnick ("Scolnick") was Merck's Executive Vice President for Science and Technology and President of Merck Research Laboratories from the beginning of the Class Period through and including December 31, 2002, when he stepped down. From January 1, 2003 through the end of the Class Period, Scolnick served as President *Emeritus*, Merck Research Laboratories.  During 1999, 2000, and 2001, Scolnick was also a member of the Company's Management Committee.  As the senior Merck officer in charge of Merck's research and development, Scolnick was intimately involved in and fully conversant with the development, research, and testing of VIOXX, and was well aware of the risks and problems associated with the drug.

(b)     As detailed herein, during the Class Period, defendant Scolnick was one of Merck's chief spokespersons in connection with information provided to the public about VIOXX, and he made public statements concerning VIOXX and Merck's financial condition, performance, and prospects that were materially false and misleading and omitted to state material facts.  In addition to making materially false and misleading oral statements to members

of the press, Scolnick signed at least the following materially false and misleading documents filed with the SEC during the Class Period, all of which contained materially false and misleading statements and omitted to state material facts: the 1999 Form 10-K; the 2000 Form 10-K; the 2001 Form 10-K; and the 2002 Registration Statement.

(c)     As detailed herein, defendant Scolnick was a direct, substantial, and primary participant in the wrongdoing alleged herein.  While in possession of materially adverse non-public information regarding Merck, Scolnick personally profited from the sale of his personal holdings of Merck securities at artificially inflated prices during the Class Period. During the Class Period, Scolnick sold at least 381,200 shares of his personal holdings of Merck stock, recognizing more than $24.8 million in insider selling profits.   In addition, from the beginning of the Class Period through his retirement, Scolnick received substantial performance-based bonuses and other compensation based on, among other things, growth in Merck's earnings per share, Merck's sales compared to certain of Merck's competitors and the change in the Company's return on operating assets versus the prior year.  From January 1, 2003 through the end of the Class Period, Scolnick was no longer subject to public reporting requirements concerning the sale of Merck stock. Without the benefit of discovery, Plaintiffs are unable to ascertain whether Scolnick sold any additional shares of his personal holdings of Merck common stock during the Class Period.

33.     (a)     Defendant Peter S. Kim ("Kim") joined the Company and became an executive officer in February 2001. He succeeded defendant Scolnick as President of Merck Research Laboratories on January 1, 2003, and held that position through the end of the Class Period.  As President for Merck Research Laboratories, Kim reported directly to defendant Gilmartin, and was responsible for all of Merck's internal drug development activities, and

external scientific initiatives.  During 2002, 2003 and 2004, Kim was also a member of Merck's Management Committee.

(b)     As detailed herein, during the Class Period, defendant Kim was one of Merck's chief spokespersons in connection with information provided to the public about VIOXX and he made public statements concerning VIOXX and Merck's financial condition, performance, and prospects that were materially false and misleading and omitted to state material facts.

(c)     As detailed herein, defendant Kim was a direct, substantial, and primary participant in the wrongdoing alleged herein.  According to Merck's Class Period SEC filings, during the Class Period, Kim received substantial performance-based bonuses and other compensation based on, among other things, growth in Merck's earnings per share, Merck's sales compared to certain of Merck's competitors and the change in the Company's return on operating assets versus the prior year.

34.     (a)     Defendant Alise S. Reicin ("Reicin") was, at all relevant times, the Executive Director of Clinical Research at Merck Research Laboratories.   Reicin was responsible for overseeing research with regard to the safety and efficacy of Merck products, including VIOXX, and supervised the VIGOR Study.

(b)     As detailed herein, defendant Reicin was a direct, substantial, and primary participant in the wrongdoing.  As detailed herein, during the Class Period, Reicin made public statements concerning VIOXX that were materially false and misleading and omitted to state material facts.

(c)     As defendant Reicin was not required to file information with the SEC concerning her transactions in Merck securities during the Class Period, without the benefit of

discovery Plaintiffs are unable to determine whether Reicin, while in possession of material adverse information regarding Merck, profited from the sale of Merck securities at artificially inflated prices.

35.    (a)    Defendant Judy C. Lewent ("Lewent") was, at all relevant times, Merck's Senior Vice President and Chief Financial Officer, and was responsible for financial and corporate development functions, internal auditing, and the Company's joint venture relationships.  She has been the Company's Chief Financial Officer since 1990.  Lewent was, at all relevant times, also a member of the Company's Management Committee.

(b)    As detailed herein, defendant Lewent made public statements concerning VIOXX and Merck's financial condition, performance, and prospects that were materially false and misleading and omitted to state material facts.  Lewent signed at least the following materially false and misleading documents that the Company filed with the SEC during the Class Period:  the 1999 Form 10-K; the 2000 Form 10-K; the 2001 Form 10-K; the 2002 Registration Statement; the second quarter 2002 Form 10-Q; the third quarter 2002 Form 10-Q; the 2002 Form 10-K; the first quarter 2003 Form 10-Q; the second quarter 2003 Form 10-Q; the third quarter 2003 Form 10-Q; the 2003 Form 10-K; the first quarter 2004 Form 10-Q; and the second quarter 2004 Form 10-Q.   After the Sarbanes-Oxley Act of 2002 became effective in July 2002, Lewent, pursuant to §302 of the Act, also signed certifications that were attached to Merck's Form 10-Ks and Form 10-Qs filed with the SEC from that point and throughout the rest of the Class Period.

(c)    As detailed herein, defendant Lewent was a direct, substantial, and primary participant in the wrongdoing alleged herein. While in possession of material adverse information regarding Merck, Lewent personally profited from the sale of Merck securities at

artificially inflated prices during the Class Period. According to Merck's Class Period SEC filings, Lewent received substantial performance-based bonuses and other compensation based on, among other things, changes in Merck's earnings per share and sales compared to Merck's competitors. During the Class Period, Lewent sold 267,200 shares of Merck stock from her personal holdings, recognizing more than $11.1 million in insider selling profits.

36.    (a)    Defendant Kenneth C. Frazier ("Frazier") was Merck's Senior Vice President and General Counsel from December 1999 until July 2007, at which time he became Merck's Executive Vice President and President of Global Human Health. As General Counsel, Frazier was responsible for legal and public affairs functions for the Company. Frazier was, at all relevant times, also a member of the Company's Management Committee.

(b)    As detailed herein, defendant Frazier made public statements concerning VIOXX and Merck's financial condition, performance, and prospects that were materially false and misleading and omitted to state material facts. Frazier signed at least the following documents that the Company filed with the SEC during the Class Period: the first quarter 2000 Form 10-Q; the second quarter 2000 Form 10-Q; the third quarter 2000 Form 10-Q; the first quarter 2001 Form 10-Q; the second quarter 2001 Form 10-Q; the third quarter 2001 Form 10-Q; the first quarter 2002 Form 10-Q; the second quarter 2002 Form 10-Q; the third quarter 2002 Form 10-Q; the first quarter 2003 Form 10-Q; the second quarter 2003 Form 10-Q; the third quarter 2003 Form 10-Q; the first quarter 2004 Form 10-Q, and the second quarter 2004 Form 10-Q.

(c)    As detailed herein, defendant Frazier was a direct, substantial, and primary participant in the misconduct alleged herein. While in possession of materially adverse non-public information regarding Merck, Frazier personally profited from the sale of Merck stock at

artificially inflated prices during the Class Period.  During the Class Period, Frazier sold 38,960 shares of Merck stock from his personal holdings, recognizing more than $1.9 million in insider selling proceeds.

37.    (a)    Defendant Richard C. Henriques ("Henriques") was, at all relevant times, Merck's Vice President and Controller, and was responsible for the Corporate Controller's Group and for providing financial support for Merck's Human Health operations in various parts of the world, including the United States.

(b)    As detailed herein, during the Class Period, defendant Henriques was Merck's chief accounting officer, and he made or endorsed public statements concerning VIOXX and Merck's financial condition, performance, and prospects that were materially false and misleading and omitted to state material facts.  Henriques signed at least the following materially false and misleading documents that the Company filed with the SEC during the Class Period:  the second quarter 1999 Form 10-Q; the third quarter 1999 Form 10-Q; the 1999 Form 10-K; the first quarter 2000 Form 10-Q; the second quarter 2000 Form 10-Q; the third quarter 2000 Form 10-Q; the 2000 Form 10-K; the first quarter 2001 Form 10-Q; the second quarter 2001 Form 10-Q; the third quarter 2001 Form 10-Q; the 2001 Form 10-K; the first quarter 2002 Form 10-Q; the 2002 Registration Statement; the second quarter 2002 Form 10-Q; the third quarter 2002 Form 10-Q; the 2002 Form 10-K; the first quarter 2003 Form 10-Q; the second quarter 2003 Form 10-Q; the third quarter 2003 form 10-Q; the 2003 Form 10-K; the first quarter 2004 Form 10-Q; and the second quarter 2004 Form 10-Q.

(c)    As detailed herein, defendant Henriques was a direct, substantial, and primary participant in the wrongdoing alleged herein.  While in possession of material adverse information regarding Merck, Henriques personally profited from the sale of Merck securities at

artificially inflated prices during the Class Period.  During the Class Period, Henriques sold 33,500 shares of Merck stock from his personal holdings, recognizing more than $1.8 million in proceeds.

38.     (a)     Defendant David Anstice ("Anstice") was, at all relevant times, President of Merck's Human Health Prescription Division.  As President of Merck's Human Health Prescription Division, Anstice was responsible for the development of sales training and marketing materials for VIOXX, including materials that materially misrepresented VIOXX's CV safety profile and falsely promoted the "naproxen hypothesis."

(b)     As detailed herein, defendant Anstice made public statements concerning VIOXX and Merck's financial condition, performance, and prospects that were materially false and misleading and omitted to state material facts.

(c)     During the Class Period, Anstice sold 432,019 shares of Merck stock from his personal holdings, recognizing more than $20.8 million in insider selling profits.

39.     (a)     Defendant Per Wold-Olsen ("Wold-Olsen") was, throughout the Class Period, President of Human Health Europe, Middle East & Africa and was responsible for the Company's prescription drug business in Europe, the Middle East and Africa as well as a member of Merck's Management Committee.

(b)     As detailed herein, defendant Wold-Olsen made public statements concerning VIOXX and Merck's financial condition, performance, and prospects that were materially false and misleading and omitted to state material facts.

(c)     During the Class Period, Wold-Olsen sold 178,650 shares of Merck stock from his personal holdings, recognizing more than $9.39 million in insider selling proceeds.

40.    Defendants Gilmartin, Scolnick, Kim, Reicin, Lewent, Frazier, Henriques, Anstice and Wold-Olsen are collectively referred to herein as the "Officer Defendants."

### 3.    The Insider Trading Defendants

41.    Defendant Richard T. Clark ("Clark") was President of Medco Health, then a wholly-owned subsidiary of Merck, from January 2000 through December 2002; President and CEO of Medco Health Solutions, Inc. from January 2003 through May 2003; and President of Merck Manufacturing Division from June 2003 through the end of the Class Period, which reasonably would have made him privy to information regarding the safety of VIOXX and its results.  During the Class Period, Clark sold 58,200 shares of Merck stock from his personal holdings, recognizing more than $1.8 million in insider selling profits.

42.    Defendant Bernard J. Kelley ("Kelley") was President of Merck Manufacturing Division and a member of Merck's Management Committee from the start of the Class Period through his retirement from Merck on January 1, 2003, which reasonably would have made him privy to information regarding the safety of VIOXX and its risks.  During the Class Period, B. Kelley sold 121,250 shares of Merck stock from his personal holdings, recognizing more than $7.97 million in insider selling profits.

43.    Defendants Clark and Kelley, as well as Officer Defendants Gilmartin, Scolnick, Frazier, Lewent, Anstice and Wold-Olsen are collectively referred to herein as the "Insider Trading Defendants."

44.    Defendant Merck, the Officer Defendants and the Insider Trading Defendants are collectively referred to herein as the "Exchange Act Defendants."  All Defendants other than the Exchange Act Defendants are sued for only non-fraud-based claims arising under the Securities Act.

### 4.    The Director Defendants

45.    Defendant Lawrence A. Bossidy ("Bossidy"), at all times relevant hereto, served as a director of Merck.  Bossidy signed, among other things, the 2002 Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

46.    Defendant William G. Bowen ("Bowen"), at all times relevant hereto, served as a director of Merck.  Bowen signed, among other things, the 2002 Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

47.    Defendant Johnnetta B. Cole ("Cole"), at all times relevant hereto, served as a director of Merck.  Cole signed, among other things, the 2002 Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

48.    Defendant Niall FitzGerald ("FitzGerald"), at all times relevant hereto, served as a director of Merck.  FitzGerald signed, among other things, the 2002 Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

49.    Defendant William B. Harrison ("Harrison"), at all times relevant hereto, served as a director of Merck.  Harrison signed, among other things, the 2002 Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

50.    Defendant William N. Kelley ("W. Kelley"), at all times relevant hereto, served as a director of Merck.  W. Kelley signed, among other things, the 2002 Registration Statement,

which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

51.     Defendant Heidi G. Miller ("Miller"), at all times relevant hereto, served as a director of Merck.  Miller signed, among other things, the 2002 Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

52.     Defendant Thomas E. Shenk ("Shenk"), at all times relevant hereto, served as a director of Merck.  Shenk signed, among other things, the 2002 Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

53.     Defendant Anne M. Tatlock ("Tatlock"), at all times relevant hereto, served as a director of Merck.  Tatlock signed, among other things, the 2002 Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

54.     Defendant Samuel O. Thier ("Thier"), at all times relevant hereto, served as a director of Merck.  Thier signed, among other things, the 2002 Registration Statement, which the Company filed with the SEC, and which contained materially false and misleading statements and omitted to state material facts.

55.     Defendants Bossidy, Bowen, Cole, FitzGerald, Harrison, W. Kelley, Miller, Shenk, Tatlock and Thier, as well as Officer Defendants Gilmartin, Scolnick, Henriques and Lewent are collectively referred to herein as the "Director Defendants."

56.     Defendant Merck and the Director Defendants are collectively referred to herein as the "Securities Act Defendants."

## V.     **CLASS ACTION ALLEGATIONS**

57.     Plaintiffs bring this action as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities who purchased or acquired the securities of Merck during the period from May 21, 1999 through October 29, 2004, inclusive.  Excluded from the Class are Defendants; Merck's affiliates and subsidiaries; the officers and directors of Merck and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; the legal representatives, heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person or entity has or had a controlling interest.

58.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Merck had billions of shares of common stock outstanding, which were actively traded on the NYSE.  The average daily trading volume during the Class Period was more than 6.5 million shares.  Although the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are at least thousands of members of the proposed Class.  Members of the Class can be identified from records maintained by Merck or its transfer agent, and can be notified of the pendency of this action by mail and publication using forms of notice similar to those customarily used in securities class actions.

59.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' conduct as complained of herein.

60.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that conflict with the interests of the Class.

61.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

     (a)     whether Defendants' statements and omissions during the Class Period materially misrepresented the safety and commercial viability of VIOXX;

     (b)     whether Defendants' acts and omissions as alleged herein violated the federal securities laws;

     (c)     whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

     (d)     whether Defendants' misrepresentations and omissions caused the Class members to suffer a compensable loss; and

     (e)     whether the members of the Class have sustained damages, and the proper measure of damages.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by many individual Class members will be small relative to the expense and burden of individual litigation, it is practically impossible for most members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.     EXCHANGE ACT ALLEGATIONS

63.     As discussed below, each of the Exchange Act Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Merck securities by disseminating materially false and misleading statements (including statements of opinion or belief) and/or concealing material adverse facts regarding VIOXX.  The scheme:  (i) deceived the investing public regarding the commercial viability of VIOXX and the intrinsic value of Merck securities; (ii) enabled Merck and the Officer Defendants to artificially inflate the price of Merck securities; (iii) enabled the Insider Trading

Defendants to sell over $136 million of their personal holdings of Merck shares; and (iv) caused Plaintiffs and other members of the Class to suffer damages as a result of the Exchange Act Defendants' misconduct.

    **A.**    **Merck Develops VIOXX in an Attempt to Create a Blockbuster "Selective" NSAID with Reduced Gastrointestinal Side Effects**

        **1.**    **The Problems Associated With Traditional, Non-Selective NSAIDs**

64.    Traditional NSAIDs reduce inflammation and pain, and are widely used to treat persons suffering from arthritis and muscle pain, and other inflammatory conditions. NSAIDs work by inhibiting the cyclooxygenase ("COX") enzyme, which catalyzes the formation of two prostaglandins in the body -- prostacyclin and thromboxane -- which play a central role in inflammation. Prostacyclin is a chemical that occurs naturally in the body that *widens* blood vessels and *inhibits* blood clotting. Thromboxane is a chemical that *narrows* blood vessels and potently *promotes* blood clotting. These two chemicals, which have opposite effects, exist in the body in a natural balance referred to as "homeostasis."

65.    Long-term use of traditional NSAIDs -- such as aspirin, ibuprofen and naproxen -- can cause gastrointestinal ("GI") and renal (kidney) problems. Adverse GI effects caused by traditional NSAIDs include nausea, indigestion, and, in more severe cases, gastric perforation, ulceration and bleeding. Adverse renal effects include salt and fluid retention, and high blood pressure. The risk of developing such problems increases with dosage and the duration of treatment.

2.     **Discovery of the COX-2 Enzyme Raises Hopes that a Selective NSAID Could be Developed Which Would Not Cause the Gastrointestinal Problems Associated with Traditional NSAIDs**

66.     For many years, scientists only recognized one form of the COX enzyme. This form, now known as COX-1, is naturally present in the stomach lining, where it helps play a protective role in preventing erosion of the stomach lining by the stomach's own acid.

67.     In the early 1990s, scientists discovered a second form of the COX enzyme, referred to as COX-2. COX-2 is not normally present in the stomach and only appears in the stomach when there is inflammation, and at the site of the inflammation. Following the discovery of COX-2, scientists concluded that COX-2, but not COX-1, was primarily involved with inflammation.

68.     Traditional NSAIDs inhibit both COX-1 and COX-2. In the wake of the discovery of COX-2, scientists realized that traditional NSAIDs relieved pain and inflammation by inhibiting COX-2, but caused GI problems by inhibiting COX-1. This new-found knowledge raised hopes that a drug could be developed that would inhibit COX-2 but not COX-1, and thereby provide the relief from pain and inflammation provided by traditional NSAIDs while simultaneously avoiding the GI problems associated with traditional NSAIDs.

3.     **Merck Races to Develop and Stay Ahead of Its Competitors in Developing a COX-2 Inhibitor**

69.     Shortly after the discovery of COX-2, Merck began work on trying to develop a novel NSAID that would inhibit COX-2 without inhibiting COX-1.

70.     Merck, like other pharmaceutical companies and Wall Street analysts, recognized that such a pill would have the potential for enormous commercial success because patients suffering from diseases that cause chronic pain and inflammation, such as arthritis, would be inclined to take a painkiller that lacked the adverse GI side effects of traditional NSAIDs on a

daily basis.  Merck also recognized that the first company to bring such a pill to market would have a tremendous competitive advantage.    For example, in a 1996 internal Product Development Plan for VIOXX, Merck projected that ***"the base case valuation for MK-966 [VIOXX] is expected to be $889MM assuming the product is first to market.  In a second to market scenario, the valuation falls to $278MM, implying a significant value ($611MM) to being first to market."***

71.    Merck scientists and executives, however, "feared they were in a race -- and running second" from the get-go, as reported in a January 10, 2001 *Wall Street Journal* article entitled "The Cure: With Big Drugs Dying, Merck Didn't Merge -- It Found New Ones" (the "January 2001 *Wall Street Journal* article").    As the article reported, in 1994 defendant Scolnick, the President of Merck Research Laboratories, "ordered researchers in [Merck's lab in] Montreal to pursue [this] work as fast as they could."    Underscoring this urgency, the article quoted Scolnick as stating that he would call the Montreal lab "every other day and say, 'Hey, is everybody working on this project?'"    Scolnick added that "they got the message that it was important."

72.    Defendant Scolnick and others at Merck recognized that G.D. Searle, a division of Monsanto Company, was their primary competition.  According to the January 2001 *Wall Street Journal* article, Scolnick and Merck were aware of rumors that Dr. Philip Needleman, a renowned pharmacologist at Washington University in St. Louis who had written articles on the creation of a COX-2 inhibitor, had "subsequently crossed town to join Monsanto Co. [and] was working on a similar drug for that company."

73.    By October 1994, Merck had developed two compounds that performed well in test-tube testing.  According to the January 2001 *Wall Street Journal* article, "Normally, Dr.

Scolnick would have chosen one of these to put through the expensive and risky process of testing in humans. ***But the project was so important – and Merck appeared to be in such a high-stakes competition with Monsanto – that he decided to put both compounds in clinical trials***."

74.     Only one of Merck's two compounds was found to inhibit COX-2 effectively. In 1995, Merck gave the successful compound the code name MK-966 (also known as "rofecoxib" and later marketed under the trade name "VIOXX") and began running it through further clinical trials. At about the same time, Monsanto/Searle selected a different compound, SC-58635 (also known as "celecoxib" and later marketed under the trade name "Celebrex"), as its lead compound in its efforts to develop a COX-2 inhibitor, and began running Celebrex through similar clinical trials.

75.     In Merck's 1996 internal Product Development Plan, Merck recognized that:

> ***Searle is seen as major competition in the area of highly selective COX-2 inhibitors.*** They have reported their targeted filing date for OA [osteoarthritis] as 4Q98. ***If they were to be the first entry in the market with the new class of compounds it would have a significant negative impact on our financial projections.*** To reduce the risk of MK-966 [VIOXX] as the second entry, an accelerated development strategy is proposed and the additional resources needed to achieve the stated objectives are being requested. Phase III will be initiated almost in parallel with Phase IIB and a GI outcomes study will be initiated prior to completion of Phase III. This strategy with its own attendant risks (see below)[2] is necessitated by the commercial implications of not being the first entry.

---

[2]  The risks identified "below" included (1) whether Merck's proposed clinical trials would be sufficient to obtain FDA approval for a drug label which would state that VIOXX had a lower incidence of significant GI complications than chosen comparator NSAIDs; (2) whether Merck would choose the right dosage of VIOXX for Phase III testing, recognizing that Phase III would "be initiated prior to completion of the Phase IIB dose finding study"; (3) whether Merck could secure an adequate supply of naproxen for its large scale gastrointestinal outcomes trial; (4) whether certain endoscopy studies Merck was planning to perform would be acceptable to the FDA; (5) whether the FDA would approve a proposed study comparing VIOXX with

76.     In order to achieve its marketing objectives, Merck needed to show not only that VIOXX was effective as a treatment for pain from arthritis and other ailments, but also that VIOXX was less likely to cause GI problems than traditional NSAIDs.  Before the FDA would allow Merck to make that claim, Merck needed to conduct a large-scale gastrointestinal outcomes trial.  Absent such a trial, the FDA would require the label for VIOXX (or any other COX-2 inhibitor) to carry the same GI warning that it required for all traditional NSAIDs.  (As discussed below, however, Merck found it expedient to defer performing such a GI outcomes trial until *after* it was reasonably assured that VIOXX would receive initial FDA approval.)

77.     In February 1998, Pfizer Inc., one of the world's largest pharmaceutical companies and a major competitor of Merck, reached an agreement with Monsanto/Searle to co-promote and develop Celebrex as well as a "next generation" COX-2 inhibitor.  On February 23, 1998, defendant Anstice, Merck's President of Human Health -- The Americas, sent a memo to his staff with the subject header "VIOXX," stating:

> ***Battle is now joined with Pfizer in another major therapeutic area and one which is CRITICAL to Merck from 2000 onwards.***  We should assume Pfizer will promote [Celebrex] everywhere.  ***We simply CANNOT LOSE in any single market in The Americas.***  We need to have superior marketing positioning and plans, and better execution.  We need to have opinion leaders with us, and we need to identify the correct resource needs.  Every Sales VP, every Sales BD, BM and Rep must <u>personally</u> accept the challenge of winning versus Searle/Pfizer, that is greater than 50% share of the COX-II Inhibitor market.  Let's start thinking this way from today.[3]

---

nabumetone; (6) whether the timeline for the large scale GI outcomes trial scheduled to begin in the third quarter of 1997 could be maintained; and (7) whether the FDA would accept one year patient exposure data from the large-scale GI outcomes trial with two year data to follow in a Safety Update Report.

[3] Upper case letters and underlining contained in original.

78.     To Merck's dismay, Monsanto/Searle completed its clinical trials first.  On June 29, 1998, Monsanto/Searle and Pfizer submitted a New Drug Application ("NDA") to the FDA for Celebrex.  Merck would not submit its NDA for VIOXX to the FDA until November 23, 1998 -- almost five months later.

79.     On December 31, 1998, Merck received further bad news when the FDA gave Pfizer and Monsanto/Searle approval to begin marketing Celebrex (albeit with the standard GI warning).   Pfizer and Monsanto/Searle launched Celebrex in February 1999 with massive marketing campaigns directed at both physicians and consumers.  Celebrex "quickly became the most successful drug launch in U.S. history" according to the January 2001 *Wall Street Journal* article.

80.     Several industry analysts predicted that Celebrex's successful launch would make it difficult for VIOXX to succeed.  As reported in an April 14, 1999 *Wall Street Journal* article entitled "Merck's Health Hinges on Sales Of Arthritis Pill" (the "April 1999 *Wall Street Journal* article"), certain analysts held the view that "Celebrex ha[d] taken off so fast with arthritis sufferers that there are comparatively few dissatisfied patients left for VIOXX to tap and thus it could be difficult for Merck to persuade recent Celebrex converts to switch to VIOXX."

### 4.      Merck's Huge Financial Stake in the Success of VIOXX

81.     The April 1999 *Wall Street Journal* article bluntly described Merck's dependence on the success of VIOXX:  "***Merck needs VIOXX to be a winner.  After years of rapid sales and profit growth, patents on some of its biggest sellers will soon expire, opening the door to less-expensive generic versions.  The company is also grappling with a slowdown in sales growth of its big cholesterol-drug franchise and was recently hit with a delay in developing a new antidepressant.***"

33

82.     The January 2001 *Wall Street Journal* article further detailed Merck's patent expiration problem, stating: "Merck's problem, which at times has infected almost every big pharmaceuticals company, was that patents on several of its best-selling drugs would be expiring.  Generic knock-offs would then eat deeply into market share and profits on drugs like Vasotec and Prinivil for hypertension, Mevacor for high cholesterol and Pepcid and Prilosec for ulcers."

83.     More specifically, patents for these five drugs, which together accounted for a staggering ***$5.875 billion*** (or approximately 18%) of Merck's world-wide sales in 1999, were set to expire in 2000 and 2001:

| Drug | 1999 Worldwide Sales | Patent Expiration |
|------|----------------------|-------------------|
| Vasotec | $2.3 Billion | August 2000 |
| Pepcid | $910 Million | October 2000 |
| Mevacor | $600 Million | June 2001 |
| Prilosec | $1.25 Billion | October 2001 |
| Prinivil | $815 Million | December 2001 |

84.     The January 2001 *Wall Street Journal* article also noted that "[e]ver since investors caught on to [Merck's impending patent expiration problem], Wall Street ha[d] been insisting that Merck join the merger rush sweeping the pharmaceuticals industry."  According to the article, ***defendant Scolnick had recognized this coming "crisis" for fifteen years and "secretly feared that Merck might not survive it as an independent company."***

## 5.    Merck's Successful VIOXX Product Launch in 1999

85.    On May 20, 1999, the FDA gave Merck approval to market VIOXX.  Desperate to catch up with Pfizer/Searle, Merck immediately set in motion an elaborate plan to get VIOXX onto the market and into the medicine cabinets of millions of Americans.  Within eleven days of approval, VIOXX was stocked in 40,000 pharmacies, a feat that the January 2001 *Wall Street Journal* article called "remarkable."

86.    Merck had also "girded for a marketing battle," having "hired 700 new sales representatives to push VIOXX and other new drugs," according to the April 1999 *Wall Street Journal* article.

87.    On May 21, 1999, a *Dow Jones Newswire* report elaborated on the importance of VIOXX to Merck, and the anticipated competition between VIOXX and Celebrex:  "The battle for this summer's blockbuster may not occur in movie theaters, but instead in the corner drugstore."  The report quoted David Saks, a pharmaceutical analyst at Gruntal & Co.:  ***"VIOXX to Merck is like the hot movie 'Star Wars' to the movie industry. . . . It's the biggest product for Merck."***  That day, Merck common stock closed at $69.20 -- up $2.47 from the previous day's closing price -- on heavy trading volume of 7,578,900, which was 53% greater than the previous day's trading volume.

88.    Despite Merck's all-out efforts, an early report on CNBC-TV suggested VIOXX's sales were disappointing.  A week after Merck launched VIOXX, CNBC reported that "Merck's Vioxx is not off to nearly as fast a start over its first seven days officially on the market as its main competitor in the same class, Celebrex."  Upon receipt of this report, defendant Scolnick urgently emailed Jan Weiner, Merck's executive director of public affairs, at 1:43 a.m. on June 4, 1999, stating "Before I have a heart attack, please tell me what is really happening."  After receiving reassurances from Weiner that the CNBC report was based on erroneous data, Scolnick

thanked her, stating "***I spent the last 2 months of my life doing everything I humanly could to get Vioxx through with a good label***."

89.    Weiner was correct in her assessment that CNBC's data was wrong.  As *The Wall Street Journal* later reported, "[w]ithin three months of its launch, the Merck drug gained nearly a third of the brand-new market for 'Cox-2 inhibitors' … and within a year it had nearly half." In addition, VIOXX was "dominant" in Europe, where it had "beaten Celebrex to market in most countries despite filing later."

### 6.    Merck's "Blockbuster" VIOXX Sales Grow From 2000 Through Mid-2004

90.    By 2000, Merck was reaping more than $175 million in sales from VIOXX every month, a number that continued to grow during the Class Period.  In total, Merck generated more than $2.1 billion from sales of VIOXX in 2000, which represented more than 10% of Merck's pharmaceutical sales.

91.    In 2001, Merck generated more than $2.3 billion from sales of VIOXX, more than 11% of Merck's pharmaceutical sales.

92.    In 2002, Merck generated more than $2.5 billion from sales of VIOXX, almost 12% of Merck's pharmaceutical sales.

93.    In 2003, Merck generated more than $2.5 billion from sales of VIOXX, approximately 12.5% of Merck's pharmaceutical sales.

94.    During the first six months of 2004, Merck generated more than $1.3 billion from sales of VIOXX.

### 7.    Merck Shocks Investors By Pulling VIOXX From The Market

95.    On September 30, 2004, Merck suddenly withdrew VIOXX from the market, after an external Data and Safety Monitoring Board overseeing a long-term Merck study to evaluate

whether VIOXX could prevent colon cancer (the "APPROVe" trial) recommended that the trial be halted because patients taking VIOXX were significantly more likely than patients taking placebo to suffer heart attacks and strokes.

96.    On the *PBS Nightly Business Report* that evening, defendant Gilmartin, Merck's then-CEO, claimed that APPROVe's results were "totally unexpected."  As shown below, however, this statement -- and numerous others made by Merck over the prior five years -- were materially false or misleading.

97.    On November 1, 2004, *The Wall Street Journal* published an article entitled "Warning Signs: E-mails Suggest Merck Knew Vioxx's Dangers at Early Stage."  The article described in detail a number of internal Company e-mails and other documents that confirmed Merck's and the Officer Defendants' grave concerns about VIOXX's CV safety risks from prior to the beginning of the Class Period and that, by March 2000, Merck had *internally* concluded that VIOXX *was* prothrombotic.

**B.    Unbeknownst to Investors, Merck Had Grave Concerns About VIOXX's Potential to Cause Heart Attacks and Strokes, Which Were Reinforced By Undisclosed Merck Data, Even Before It Launched VIOXX In May 1999**

**1.    Merck Learns That VIOXX Upsets the Homeostatic Balance Between Prostacyclin and Thromboxane, and the Concerns Raised by Protocol 023**

98.    In 1996, Merck consultants Dr. Garrett FitzGerald and Dr. Francesca Catella-Lawson conducted a two-week clinical trial ("Protocol 023") for Merck that compared the effects of VIOXX, indomethacin (a traditional non-selective NSAID) and a placebo on the kidneys.  They did this by measuring the urinary excretion of prostacyclin and thromboxane metabolites in thirty-six patients.  The quantity of such metabolites in the urine is a proxy for the levels of prostacyclin and thromboxane in the bloodstream.

99.    As discussed in ¶ 64 above, prostacyclin *widens* the blood vessels so that blood can flow more freely and potently *inhibits* blood clotting, whereas thromboxane *narrows* the blood vessels and potently *promotes* blood clots.  These chemicals, which have opposite effects, exist in the human body in a natural balance referred to as homeostasis.  An excess of prostacyclin inhibits the body's ability to form blood clots in the case of a wound.  An excess of thromboxane increases the risk of "thrombotic events" such as heart attacks and strokes, which occur as a result of blood clots forming in the body and obstructing blood vessels.

100.    As set forth in the article reporting on the results of Protocol 023,[4] Dr. FitzGerald, Professor of Cardiovascular Medicine and Chairman of the Department of Pharmacology at the University of Pennsylvania, and Dr. Catella-Lawson, Assistant Professor in the Department of Medicine at the University of Pennsylvania, were aware that traditional NSAIDs had been found to inhibit both COX-1 and COX-2 and to reduce significantly the synthesis of both prostacyclin and thromboxane.  Because they thought the synthesis of prostacyclin and thromboxane was related only to COX-1, however, they hypothesized that VIOXX -- which inhibited only COX-2 -- would have *no effect* on the urinary excretion of either prostacyclin or thromboxane metabolites.

101.    Drs. FitzGerald and Catella-Lawson found that the results of Protocol 023 were inconsistent with this hypothesis.  As they expected, VIOXX had no effect on urinary excretion of thromboxane metabolites but, contrary to their expectations, it *did* inhibit the urinary excretion of prostacyclin metabolites.  Their findings suggested that COX-2 played a role in prostacyclin formation, and that VIOXX (as a COX-2 inhibitor) upset the homeostatic balance by inhibiting

---

[4] The article, entitled "Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics, and Vasoactive Eicosanoids," was published in the May 1999 issue of the *Journal of Pharmacology and Therapeutics*.

synthesis of the chemical that reduces clotting, widens blood vessels and promotes the flow of blood in the body (prostacyclin), without having any corollary impact on the chemical that narrows blood vessels and promotes clotting (thromboxane).

102.    Senior Merck scientists were very concerned by these findings.  As noted above, an excess of thromboxane in the body could elevate the risk of thrombotic events such as heart attacks and strokes by causing blood clots to form and blood vessels to constrict, which together would increase the risk that the vital flow of blood to the brain or heart would be obstructed. Protocol 023 thus raised concerns that VIOXX might be "prothrombotic" -- *i.e.*, that it would cause thrombotic events such as heart attacks and strokes (and therefore have a safety profile that was worse than, or no better than, traditional NSAIDs, which were known to result in heightened incidence of a variety of gastrointestinal problems).

103.    The results of Protocol 023 were published in the May 1999 issue of the *Journal of Pharmacology and Therapeutics* ("*JPAT*").  The authors of the article included Merck scientists Drs. Briggs Morrison, Barry J. Gertz, and Hui Quan.  However, at Merck's insistence, the article downplayed the cardiovascular significance of Protocol 023's findings.  Drafts of the article submitted by Drs. FitzGerald and Catella-Lawson to Merck in January and February 1998 (which were not disclosed to the public until after the Class Period) unequivocally stated that the results of Protocol 023 showed that "*[s]ystemic* biosynthesis of prostacyclin … *was* decreased," and that "[i]nhibition of [prostacyclin metabolites] by MK 966 [VIOXX] implies a *major role* for Cox-2 in *systemic* biosynthesis of prostacyclin in humans."  An internal Merck memo dated February 18, 1998 from Dr. Morrison to his colleagues Drs. Nies, Gertz, Seidenberg, Quan and Bolognese (which also was not disclosed until after the Class Period) indicated Merck's "discomfort" with these conclusions, and proposed having a teleconference with Drs. FitzGerald

39

and Catella-Lawson to change them. The final version of the article published in the May 1999 *JPAT* shows that the statements that Merck wanted to change were in fact greatly softened or eliminated. The final article stated only that "COX-2 *may* play a role in the systemic biosynthesis of prostacyclin in healthy humans," and that "the implications of prostacyclin suppression *in vivo* are unclear." Consequently, publication of the May 1999 *JPAT* article did not cause analysts or investors to materially discount Merck's glowing statements about VIOXX's financial prospects.

> **2.    Merck Cancels a Large VIOXX Clinical Trial in August 1997 Over Undisclosed Concerns It Would Show That VIOXX Caused Serious Adverse Cardiovascular Problems**

104.    Though Merck was able to successfully downplay the significance of Protocol 023 in the May 1999 *JPAT* article, internal Merck emails from 1997 (which were not disclosed to the public until after the Class Period) confirm that Merck scientists were greatly concerned that VIOXX caused heart attacks and strokes. As noted in ¶¶ [75 and 76], Merck had planned to initiate a large gastrointestinal outcomes trial before it obtained FDA approval for VIOXX. Such a trial had the potential to provide Merck with a very significant marketing advantage: if the results demonstrated that VIOXX was significantly less likely to cause serious GI problems than traditional NSAIDs, Merck would be able to sell VIOXX without the GI warning that the FDA required for both traditional NSAIDs and other COX-2 inhibitors (*i.e.*, Celebrex) until Celebrex demonstrated that it was GI-protective when compared to traditional NSAIDs. In the wake of Protocol 023, however, Merck also realized that such a trial had the potential to confirm that VIOXX had prothrombotic qualities -- which had the potential to be a disaster for Merck.

105.    On February 23, 1997, defendant Reicin circulated a draft of the protocol for the proposed large scale VIOXX GI outcomes trial to her colleagues Drs. Briggs Morrison, Brian Daniels, Thomas Simon and Elliot Ehrlich. The proposed study protocol would have disallowed

use of low dose aspirin (a traditional NSAID that inhibits both COX-1 and COX-2 enzymes and that was known to be cardio-protective). On February 25, 1997 at 8:23 a.m., Dr. Morrison, a senior research and development executive at Merck who also was a co-author of the article that reported the results of Protocol 023, replied to all recipients of defendant Reicin's email, stating:

> [I] [w]ould allow low dose aspirin - I know this has been discussed to death but real world is everyone is on it so why exclude *AND without COX-1 inhibition [provided by aspirin] you will get more thrombotic events and <u>kill [the] drug</u>.*

106.    Data from a large scale GI outcomes trial showing that VIOXX users suffered "more thrombotic events" than naproxen users would indeed have likely "kill[ed] the drug" because VIOXX's commercial prospects rested entirely on the claim that it was safer to use than traditional NSAIDs, *i.e.*, on showing both that VIOXX was less likely to cause the GI problems associated with long-term use of traditional NSAIDs and that it did not cause other adverse side effects that outweighed its GI-protective qualities. If Merck generated data showing a reduction in adverse GI events but an increase in adverse CV events -- data which it would have to share with the FDA -- *before* the FDA had decided to approve VIOXX for marketing, the FDA almost certainly would have required Merck to undertake additional lengthy trials to establish VIOXX's cardiovascular safety (perhaps by a large scale trial against placebo) before the agency would allow VIOXX to be marketed.

107.    On February 25, 1997, approximately two hours after Dr. Morrison sent his email, defendant Reicin replied to all recipients of Dr. Morrison's email stating:

> Low Dose Aspirin – I HEAR YOU! This is a no win situation! The relative risk of [more adverse GI events if we allow] even low dose aspirin may be as high as 2-4 fold. *Yet, the possibility of increased CV [cardiovascular] events is of <u>great concern</u>- (I just can't wait to be the one to present those results to senior management!)*

41

In other words, although defendant Reicin was worried that allowing patients in the proposed large-scale GI outcomes trial to take aspirin would lead to more GI problems (because aspirin inhibits COX-1), she was "great[ly] concern[ed]" that excluding aspirin would lead to more adverse cardiovascular events (because without COX-1 inhibition, there would be an excess of thromboxane in the bloodstream) which, in the words of her colleague Dr. Morrison, would "kill the drug."[5]

108.    Accordingly, in the same email, defendant Reicin proposed that Merck design the gastrointestinal outcomes trial in a manner which would minimize the risk that it would generate significantly more adverse CV events among patients taking VIOXX in the study, and thereby hide the increased risk of heart attacks and strokes that VIOXX posed if it was prothrombotic by excluding from the trial patients who would be more vulnerable to its prothrombotic effects. Specifically, she stated:

> *What about the idea of excluding high risk CV patients-* ie those that have already had an MI [heart attack], CABG [coronary artery bypass grafting] or PTCA [angioplasty]? *This may decrease the CV event rate so that a difference between the two groups would not be evident.* The only problem would be –Would we be able to recruit any patients?

109.    The reply sent the next day, February 26, 1997, by Dr. Brian Daniels, another senior Merck executive, to all recipients of defendant Reicin's email reflected his appreciation of the dilemma Merck faced. He stated: "*It is clear to me that the program will be <u>severely hurt</u> if the megatrial shows a win in PUBs [i.e., serious GI problems] and a loss in MI/CVA [i.e., heart attacks/other adverse cardiovascular events].* That is what we are setting up by not allowing ASA [aspirin]."

---

[5]  Defendant Reicin's email also confirms that Merck's "senior management" was closely following developments relating to the testing of VIOXX and bringing it to market.

110.    As a result of these concerns, by no later than August 1997 Merck decided to *cancel* (or at least defer until FDA approval was already reasonably assured) its planned large-scale gastrointestinal outcomes trial.    On August 13, 1997, Kyra Lindemann, a Merck spokeswoman, circulated internally a draft press release and draft questions and answers concerning Merck's decision not to move forward with the gastrointestinal outcomes trial.  *Her email noted that these materials were "a bit awkward to write … because of the actual reasons for not proceeding with the study,"* and that she had tried to "put a positive spin" on the decision not to move forward with the study by "emphasiz[ing] the fact that [Merck is] conducting [other] outcome studies" and by "convinc[ing]ly express[ing] confidence that our Phase III program is large enough to support these studies."

> **3.    November 1997: Preeminent Medical Researcher and Merck Consultant Dr. John Oates Rejects Internal Merck Efforts to Rationalize the Adverse Implications of Protocol 023**

111.    While continuing to press forward with the development of VIOXX, Merck scientists were sufficiently concerned by the implications of Drs. FitzGerald and Catella-Lawson's Protocol 023 research, which suggested that VIOXX might be prothrombotic, that they searched high and low for "alternative" explanation of Protocol 023's results.

112.    For example, in the fall of 1997, Merck scientists Dr. Alan Nies (who was in charge of VIOXX's development) and Dr. Barry Gertz (who reported to Nies and was an author of the article reporting the results of Protocol 023) contacted Dr. John Oates, one of the world's foremost experts on prostacyclin and thromboxane, in the hopes of explaining away Protocol 023's results.  Drs. Nies and Gertz asked Dr. Oates (who was then Senior Professor of Medicine and Professor of Pharmacology at Vanderbilt University School of Medicine) whether Protocol 023's finding that VIOXX inhibited the amount of prostacyclin metabolites in the urine could be attributed to an effect VIOXX was having on the kidney, rather than an effect VIOXX was

having on the overall level of prostacyclin in the bloodstream.  If VIOXX's effects were so limited, it would mean that VIOXX did not throw off the overall homeostatic balance between prostacyclin and thromboxane in the bloodstream, and Merck's concerns that VIOXX was prothrombotic would be substantially alleviated.

113.    Merck scientists had previously posed this question privately to Drs. FitzGerald and Catella-Lawson, who had responded that they did *not* believe that Protocol 023's results could be attributed to an effect VIOXX was having solely on the kidneys.  By letter dated November 17, 1997, Dr. Oates gave a similar answer.  Specifically, Dr. Oates privately advised Drs. Nies and Gertz that it was "quite unlikely" that the decreased prostacyclin metabolites could be attributed to an effect of VIOXX on the kidneys, because the "major sources of prostacyclin are exterior to the kidney, and that even in the kidney a predominant source would be expected to arise from a renal vasculature."  Thus, Dr. Oates' opinion, rather than alleviating Merck's concerns about VIOXX's potential prothrombotic properties, only further supported Drs. FitzGerald and Catella-Lawson's conclusion that VIOXX disturbed the body's natural homeostasis between prostacyclin and thromboxane.

114.    Internal Merck emails from this period also reflect Merck's continuing concerns about VIOXX's potential prothrombotic properties.  For example, on January 13, 1998, defendant Scolnick emailed Tony Ford-Hutchinson, the head of Merck's team in Montreal that had developed the VIOXX molecule, and Bennett M. Shapiro, Merck's Executive Vice President of Basic Research, stating "***we all know what the issues are about MK 966 [VIOXX] and prostacyclin and thromboxane based on the urinary metabolite data***.  I assume we are working VERY hard to clarify this in montreal [sic]….The data on prostacyclin in man seems clear.  Can we try in animals?  If it is true we MUST find out how it works."

4.    **Merck's Undisclosed Internal Analysis of Osteoarthritis Clinical Data Shows That Women Taking VIOXX Have A Statistically Significant 216% Increased Risk of Serious Adverse Cardiovascular Events Compared To Women Taking A Placebo**

115.    In February 1998, Merck prepared an internal analysis comparing the incidence of serious cardiovascular problems in patients taking VIOXX in Merck's Phase IIb/III VIOXX osteoarthritis trials (conducted as of December 15, 1997) to the incidence of serious cardiovascular problems among patients taking a placebo in certain other large clinical trials that Merck had undertaken in connection with its PROSCAR and FOSAMAX drugs.[6]    In the Introduction and Background section of the analysis, Merck scientist Dr. Doug Watson (the lead author of the analysis) noted that the impetus for the analysis was Drs. FitzGerald and Catella-Lawson's findings in Protocol 023, which had "raised concern about the potential for VIOXX to predispose to thrombotic cardiovascular events," as well as the results of a small Merck clinical study (Protocol 010) in which patients taking VIOXX "had more clinical 'Cardiovascular' AEs [adverse events] than the placebo group."    The purpose of the internal February 1998 Merck analysis was to determine whether Merck needed to change the design of its clinical trials for VIOXX to provide for "more formal monitoring of the risk of thrombotic CV serious adverse events (SAEs) with VIOXX."

116.    Because Merck did not know at the time of analysis which patients in the Phase IIb/III VIOXX osteoarthritis trials were using VIOXX as opposed to a comparator NSAID or placebo, it included **all** patients in the VIOXX osteoarthritis trials in the VIOXX arm of the analysis.    The internal 1998 Merck analysis thus compared all patients in the Phase IIb/III VIOXX osteoarthritis trials (including those who were taking comparator NSAIDs or placebos

---

[6]    PROSCAR is used to treat enlarged prostate; FOSAMAX is used to treat or prevent osteoporosis.

rather than VIOXX) to all patients who were known to have taken only placebo in the PROSCAR and FOSAMAX trials. Consequently, if VIOXX users had higher rates of thrombotic events, such an increase would be reduced or perhaps even masked entirely by the inclusion of patients taking other NSAIDs or placebo in the "VIOXX arm" of the comparative analysis.

117. Nonetheless, as Dr. Gurkipal Singh, Adjunct Clinical Professor of Medicine at Stanford University School of Medicine, stated in public testimony before the United States Senate Committee on Finance on November 18, 2004 -- after Merck had withdrawn VIOXX from the market -- Merck's internal February 1998 analysis "concluded that men taking VIOXX had a 28% greater risk [of serious cardiovascular adverse events] (not statistically significant), *but in women, the risk was more than double (216%, statistically significant) compared to people not taking any drug in other Merck studies.*"[7] Dr. Singh added that "[t]o the best of my knowledge, these data were never made public" and that *"[t]his is when a public scientific discussion of the pros and cons of the medication should have started."*

118. The internal February 1998 Merck analysis did not become a starting point for a scientific debate about VIOXX's safety, however, because instead of making public these results that could have "kill[ed] the drug," Merck (which was under tremendous pressure to get VIOXX to market ahead of Celebrex) went out of its way -- and outside the bounds of accepted medical research practices -- to avoid disclosing the fact that Merck's own data indicated that VIOXX caused at least a 216% statistically significant increase in serious cardiovascular events among women compared to placebo. Merck attempted to rationalize the data by speculating that the rate

---

[7] For the reasons set forth in ¶ [116] above, it seems likely that it would have been more accurate for Dr. Singh to state that Merck had found that men had *at least* a 28% greater risk of serious cardiovascular adverse events, and that women had *at least* a statistically significant 216% greater risk of serious cardiovascular adverse events, compared to people taking a placebo.

of serious cardiovascular events among the large population of women taking placebo (over 4,400 women) was "atypically low," and that it was this "atypically low" rate of serious adverse cardiovascular events in women in the placebo group -- rather than a statistically significant increased cardiovascular risk from VIOXX -- that was responsible for the statistically significant difference in cardiovascular results obtained. Relying on this clearly unscientific, "heads I win, tails you lose" line of reasoning, the February 1998 internal Merck analysis purported to reach the astounding conclusion that the incidence rates of serious cardiovascular events in the VIOXX trials "appear roughly consistent with what would be expected in the general population," and that Merck therefore did not need to change its study protocols to provide for better monitoring of cardiovascular risks with VIOXX. This conclusion was so obviously flawed that no reasonable scientist could have relied upon it other than by recklessly disregarding the self-serving and non-scientific assumptions on which it was based. The results of Merck's internal February 1998 analysis did not become public until after the Class Period.

### 5.    Merck Attempts to "Manage" Concerns about VIOXX's Cardiovascular Safety as It Nears Completion of Its New Drug Application for VIOXX in 1998

119.    In April 1998, Dr. Alan Nies (the senior Merck scientist who had been corresponding with Dr. Oates about Protocol 023's problematic findings) prepared a report on VIOXX for Merck's Board of Scientific Advisors, a board comprised of external scientists that is supposed to act as an independent check on the biases of Merck scientists, and which was scheduled to hold its annual meeting in May 1998. Recognizing that its Board of Scientific Advisors might put the brakes on Merck's rush to have VIOXX beat Celebrex to market, the internal and non-public report prepared by Dr. Nies did not disclose the serious concerns that Merck scientists and executives had about VIOXX's potential to cause thrombotic events such as heart attacks and strokes. Indeed, the Merck report prepared by Dr. Nies made no mention of

47

any issues concerning cardiovascular safety until page 10 of the 11 page report, in a section entitled "Prostacyclin Metabolism." That section discussed Protocol 023's findings that VIOXX inhibited prostacyclin but not thromboxane, but represented that Merck's internal February 1998 analysis of VIOXX osteoarthritis data did not suggest any cause for concern. However, Dr. Nies' report did ___**not**___ disclose to the Board of Scientific Advisors the data from Merck's February 1998 internal analysis showing a ***statistically significant 216%*** greater chance of suffering a serious cardiovascular event among female patients in osteoarthritis trials involving VIOXX and a 28% greater chance of suffering such an event among male patients, nor did it disclose the clearly unscientific assumption on which Dr. Watson had concluded that this data was not significant, even though members of the Board of Scientific Advisors would have certainly found such information highly relevant in assessing VIOXX's alleged safety.

120.   Nonetheless, Merck's external Board of Scientific Advisors was still troubled by VIOXX's potential cardiovascular effects given its impact on prostacyclin. Indeed, more than half of the Board's internal and non-public Programmatic Review of the VIOXX program (7 out of 13 pages) was addressed to Protocol 023's findings that VIOXX inhibited prostacyclin but not thromboxane, and the potential implications of those findings. Noting that "[p]rostacyclin is the most potent endogenous inhibitor of platelet aggregation [clotting]" and that "it also potently inhibits the development of ischemic ventricular fibrillation [cardiac arrest]," the Board emphasized that Protocol 023's finding that VIOXX reduces the urinary excretion of the prostacyclin metabolite raised the possibility that ***"[b]y removing this potent inhibitor of platelet aggregation, the probability that a coronary plaque rupture would lead to myocardial infarction [heart attack] or ischemic ventricular fibrillation [cardiac arrest] is enhanced.*** " Accordingly, contrary to the recommendation contained in Merck's internal February 1998

analysis (which was never shown to the Board), Merck's external advisory Board "proposed that coronary events be predetermined endpoints [*i.e.*, a primary focus of the data being collected] in all future controlled trials with Vioxx" and "that these endpoints be assessed by a uniform set of criteria so that meta-analysis of coronary and cerebrovascular events from all of these trials can be performed."

121.    Actively exploring whether VIOXX in fact caused thrombotic events, with the attendant risk that it might "kill the drug," was not something that Merck wanted to do.  Instead, Merck continued to rush forward with its efforts to get VIOXX on the market in an effort to keep pace with Celebrex, and Merck effectively shrugged off the serious concerns raised by Dr. Oates and Merck's Board of Scientific Advisors.  Thus, in a September 29, 1998 handwritten memo, Dr. Nies informed his Merck colleagues Drs. Barry Gertz and Reynold Spector (head of clinical sciences at Merck) that he had spoken to Dr. Oates -- who had proposed studying VIOXX in patients with atherosclerosis and elevated thromboxane metabolite excretion -- and had told him that Merck "would not be doing any [such] clinical studies at this time."

122.    As noted in ¶ 78 above, Merck submitted its New Drug Application for VIOXX to the FDA on November 23, 1998.  In the months before its approval, Merck officials publicly spoke of VIOXX only in glowing terms.  For example, on December 9, 1998, at Merck's annual analyst meeting, defendant Scolnick boasted:  "Short-term high dose, long-term low dose, it's a wonderful drug . . . VIOXX has lived up to our highest expectations."  Merck and the Officer Defendants thus conditioned the market to believe that VIOXX would be a blockbuster hit, never disclosing the Company's "great concern" about VIOXX's potential to cause thrombotic events such as heart attacks and strokes, or the growing body of internal clinical data that fueled those concerns.

49

**C.    May 21, 1999 (The First Day of the Class Period): Merck Heralds the FDA's Approval of VIOXX While Continuing to Conceal Its "Great Concern" And Related Adverse Information about VIOXX's Safety**

123.    On May 21, 1999, the first day of the Class Period, the Officer Defendants caused Merck to issue a press release announcing that VIOXX "has received marketing approval from the U.S. Food and Drug Administration.    VIOXX has been approved for the relief of osteoarthritis (OA), management of acute pain in adults, and treatment of menstrual pain (primary dysmenorrheal)."  With respect to the drug's side effects, the press release stated:  "The most common side effects reported in clinical trials with VIOXX were upper-respiratory infection, diarrhea and nausea."

124.    Merck and the Officer Defendants did not disclose to investors their "great concern" that VIOXX caused serious side effects, such as heart attacks and strokes.  Although this concern had led Merck to cancel its large-scale GI outcomes study in 1997, Merck and the Officer Defendants decided not to disclose this concern or that it was based on their knowledge that (a) VIOXX upset the homeostatic balance between prostacyclin and thromboxane by inhibiting prostacyclin but not thromboxane; and (b) Merck's internal February 1998 analysis, which was not disclosed to the public until after the Class Period, showed that patients in VIOXX clinical trials had higher rates of serious adverse cardiovascular events compared to patients taking placebo, including a ***statistically significant  increase of at least 216% among women***.

**D.    March 2000: Merck Is Finally Forced to Undertake a Large Gastrointestinal Outcomes Trial (VIGOR), Which Confirms the Company's Belief That VIOXX Is Prothrombotic**

125.    In January 1999, with FDA approval of VIOXX within sight, Merck had finally begun its long-delayed large gastrointestinal outcomes trial, entitled VIOXX Gastrointestinal Outcomes Research ("VIGOR") -- the trial that Merck knew was necessary to obtain a label

stating that VIOXX had a lower incidence of significant GI complications than comparator NSAIDs, but which Merck had previously cancelled in August 1997 out of concern that it would confirm that VIOXX was prothrombotic.  By early 1999, Merck had been effectively forced to undertake such a study by news that Pfizer and Monsanto/Searle had already begun a similar study with respect to Celebrex, entitled Celebrex Long-Term Arthritis Safety Study ("CLASS"). If CLASS could establish that Celebrex caused significantly fewer serious GI problems than traditional NSAIDs and Merck could not produce similar study results in a comparable large-scale trial, VIOXX's competitive position vis-à-vis Celebrex would be severely jeopardized.

126.     Moreover, because the results of the large scale GI outcomes trial would not be reported to the FDA until *after* VIOXX was approved for marketing, a post-FDA approval finding that VIOXX users incurred a significantly higher rate of heart attacks would not pose nearly as big a danger to Merck.  More particularly, as long as Merck could proffer some plausible alternative explanation for such results -- such as an alleged cardioprotective effect of the comparator drug naproxen -- the FDA would have to go through a burdensome regulatory process before it could *remove* VIOXX from the market. In other words, by delaying the start of its large GI outcomes trial so that its results would not become available until after initial FDA approval was secured, Merck was able to reduce substantially the risk that the results, even if they suggested that VIOXX might be prothrombotic, would "kill the drug."

127.     Moreover, Merck also intentionally designed VIGOR to minimize the likelihood that the results would show that VIOXX was prothrombotic.  Consistent with defendant Reicin's 1997 proposal that Merck exclude patients at high risk of suffering a serious cardiovascular event so as to minimize the odds of producing adverse study results, Merck excluded from VIGOR all patients who were taking low-dose aspirin to prevent cardiovascular problems -- the very class of

predominantly older patients who suffer from osteoarthritis and were most likely to experience adverse cardiovascular events if VIOXX were prothrombotic. Merck also initially chose not to gather data about adverse cardiovascular events as a designated endpoint (primary focus) of this trial -- contrary to the recommendation of Merck's Board of Scientific Advisors that "coronary events be predetermined endpoints in all future controlled trials with Vioxx." Merck also chose not to name a cardiologist to VIGOR's Data and Safety Monitoring Board ("DSMB"), which was the panel established to monitor the unblinded results of VIGOR in order to protect the safety of trial participants.

128. Merck enrolled more than 8,000 patients in VIGOR, with 4,047 being given VIOXX and 4,029 being given naproxen (a traditional NSAID). It appointed to the DSMB Drs. Michael Weinblatt, David Bjorkman, James Neaton, Alan Silman, Roger Sturrock, and Deborah Shapiro.

129. Contrary to the customary practice of naming to a DSMB only unbiased outside scientists, at least half of the members of VIGOR's DSMB had substantial Merck-related conflicts of interest. As later revealed on National Public Radio's June 8, 2006 *All Things Considered* program, Dr. Weinblatt, the head of the DSMB, and his wife owned Merck stock worth $73,000. Dr. Bjorkman served as a Merck consultant during the period that VIGOR was ongoing. And Dr. Shapiro, who filled the critically important role of VIGOR's *unblinded* statistician, was the most conflicted of all, as she was a full-time Merck scientist who reported to defendant Scolnick.

130. By the beginning of September 1999, patients in the VIGOR study who were taking VIOXX had, compared to patients taking naproxen, suffered substantially more serious cardiovascular events in general (36 in VIOXX users, 16 in naproxen users), substantially more

cardiovascular events leading to discontinuation of treatment (*i.e.*, patients quitting the study) (32 in VIOXX users, 17 in naproxen users), and almost twice as many deaths (11 in VIOXX users, 6 in naproxen users).

131.    By the beginning of November 1999, these trends had continued and, in the case of serious adverse cardiovascular events leading to discontinuation or death, gotten significantly worse for VIOXX.  For example, by November 1999, patients taking VIOXX had substantially more serious cardiovascular events (52 in VIOXX users, 29 in naproxen users), more than twice as many cardiovascular events leading to discontinuation (40 in VIOXX users, 17 in naproxen users) and almost three times as many deaths (16 in VIOXX users, 6 in naproxen users).  The minutes of the DSMB's November 17, 1999 meeting reflect that these "differences between the treatment groups were … significant beyond the level of chance."  Nonetheless, the supposedly independent VIGOR DSMB, in consultation with Merck scientist Shapiro, decided not to stop the VIGOR study -- a result which would have been devastating to Merck.  Rather, the DSMB noted its concern about this data and scheduled a special interim meeting for December 20, 1999 at which it would "focus on deaths and cardiovascular AEs [adverse events]."

132.    The minutes of the DSMB's December 20, 1999 meeting state that "[t]he members noted that the trends previously observed [concerning deaths and cardiovascular adverse experiences] continued."  Nonetheless, the VIGOR DSMB once again decided not to stop the VIGOR study.

133.    The minutes of the DSMB's December 20, 1999 meeting further reflect that members of the DSMB were surprised to learn that Merck had not yet prepared a data analysis plan for adverse cardiovascular events despite the fact that "the VIGOR Data Analysis Plan states that a data analysis plan would be developed for these events."  The DSMB resolved to

write a letter to defendant Reicin requesting "that an analysis plan be developed to analyze serious cardiovascular events in the VIGOR trial separately from any other planned analyses of these data," and that "these events be adjudicated blinded" to avoid any bias in interpretation. The DSMB noted that it was "not recommending a change to the trial conduct, simply that a prespecified plan be accomplished."

134.    Merck's failure to develop a data analysis plan for adverse cardiovascular events was not an innocent oversight but the product of *a conscious decision by senior management*. In a January 14, 2000 email, Dr. Watson, the Merck scientist who had prepared Merck's internal February 1998 analysis of serious adverse cardiovascular events among osteoarthritis patients who had used VIOXX, wrote:

> [T]he plan approved by [Merck's] CDOC [Clinical Development Oversight Committee] was to include VIGOR with other blocks of studies for an analysis later.  [Dr.] Jim [Bolognese] had the assignment to develop a DAP [Data Analysis Plan] for the analysis.  *Since then we (Jim and I) have been instructed by CDOC and senior management to not do so, and that comparisons with other treatments are not to be made.*

135.    On January 21, 2000, Merck scientist and VIGOR DSMB member Dr. Shapiro informed her fellow DSMB members that Merck had declined their request to perform a separate analysis of VIGOR's cardiovascular data.  Dr. Weinblatt, on behalf of the DSMB, pushed back against Merck's refusal to perform such an analysis.  By letter dated January 24, 2000 to defendant Reicin, Dr. Weinblatt wrote that "An analysis of these cardiovascular data must be provided separately for VIGOR as part of the study report."

136.    On February 7, 2000, Merck reluctantly agreed to analyze VIGOR's cardiovascular data, but to include only events reported through February 10, 2000 -- a cut-off date that was one month earlier than the cut-off date for GI data -- in its initial analyses.  Dr. Weinblatt, on behalf of the DSMB, accepted Merck's proposal to use different cut-off dates for

cardiovascular and GI data even though use of different cut-off dates was inconsistent with customary scientific practice.  Shortly thereafter, Dr. Weinblatt accepted Merck's offer to pay him $5,000 a day to sit on a Merck Advisory Board.  Over the next two years, Merck paid him $60,000 pursuant to that agreement.

137.     Reports of the DSMB's insistence on an analysis of VIGOR's cardiovascular data had filtered through Merck, increasing concerns that the data would show precisely what Merck most feared: that VIOXX caused thrombotic events.  Indeed, on February 11, 2000, one day after Merck's cut-off date for inclusion of cardiovascular adverse event data (and just a month before the cut-off date for the inclusion of GI adverse event data), defendant Scolnick sent his subordinate Dr. Shapiro -- the unblinded statistician for the VIGOR trial -- an email which attached a copy of a Wall Street analyst report suggesting that momentum was swinging toward Celebrex in its battle with VIOXX.  The email, which clearly suggests that Scolnick intended to try to influence Dr. Shapiro's analysis of VIGOR's cardiovascular data, reads as follows:

> Deborah  Please read this story.  It is my understanding that you are the unblinded statistician in our Vigor study.  In the last few days we are being pounded by stories like this.  As with the key issue with aggrastat when Snappin and I had to make a decision *as soon as you know what the answer is I would like a confidential meeting with you.  This situation cannot simply follow the 'book' ways of my knowing.*  Please let me know when I can talk to you confidentially.  You can reach me when this time comes at work at home [redacted] by voicemail (private) or anywhere by email- I am the only one who listens to my voice mail or email. Thanks I hope your lucky rabbit's foot is as good as it was with mevacor afcaps/ Ed Scolnick

138.     On March 9, 2000, defendant Scolnick was informed of the preliminary results of the VIGOR trial.  The data showed that patients taking VIOXX suffered *significantly* more heart attacks and deaths than the patients taking naproxen.  In response, on March 9, 2000, Scolnick emailed Shapiro, Nies, and defendant Reicin as follows:

> To all: I just received and went through the data. … ***The CV [cardiovascular] events are clearly there***. … It is a shame but it is a low incidence and ***it is mechanism based as we worried it was. [Dr. John] Oates and Alan [Nies] and Barry [Gertz] were right about the metabolite meanings ie urine Pg [prostaglandin] data.***

Defendant Scolnick's reference to the cause of the cardiovascular events being "mechanism-based as we worried it was," and his statement that Drs. Oates, Nies and Gertz "were right" about the meaning of the urine prostaglandin data, was an admission that he believed that VIOXX was prothrombotic, and that the reason it was prothrombotic was because it inhibited prostacyclin without inhibiting thromboxane.

E.     **The "Naproxen Hypothesis": Merck Falsely Represents That It Believes That the Higher Incidence of Adverse CV Events among VIOXX Users in the VIGOR Trial Is Attributable To Purported Cardioprotective Properties of Naproxen Rather Than Prothrombotic Properties of VIOXX**

139.    Although the VIGOR results confirmed Merck's and its senior scientists' belief that VIOXX was prothrombotic, Merck and the Officer Defendants also knew that publicly admitting this fact would precipitate a financial disaster for Merck, resulting in the loss of its investment in VIOXX and billions of dollars in potential revenue from VIOXX.

140.    Thus, rather than acknowledge their belief that the statistically significant difference in the number of heart attacks in the VIGOR trial was "mechanism based" and attributable to VIOXX's prothrombotic properties, Merck and the Officer Defendants decided to attempt to lead both the medical and Wall Street investor communities to believe that the VIGOR CV results were most likely attributable to some cardioprotective effect of naproxen (*i.e.*, the "naproxen hypothesis").

141.    In the days that followed the internal distribution of VIGOR's results within Merck, senior Merck scientists and consultants worked around the clock to try to find

meaningful support for the theory that naproxen was cardioprotective.  They failed.  On March

13, 2000 at 1:20 a.m., defendant Reicin emailed defendant Scolnick and Dr. Nies:

> Alan and Ed:
>
> Below is attached the abstract for the ***only study*** I could find which
> assessed the potential cardioprotective effects of an NSAID.
>
> Alise

The abstract was for a seven year old article from the July 1993 issue of *European Heart Journal*

entitled "Evaluation of Flurbiprofen for Prevention of Reinfarction and Reocclusion After

Successful Thrombolysis or Angioplasty in Acute Myocardial Infarction."

142.    The 1993 *European Heart Journal* article reported that a small-scale study (464

patients in total) in France among patients who had been successfully treated for a heart attack

within six hours of its onset showed that patients who had taken flurbiprofen, a traditional

NSAID, had lower risks of suffering a second heart attack or needing a coronary angioplasty or

bypass graft than patients who took a placebo.  The article speculated that flurbiprofen might

offer advantages over aspirin, but cautioned that comparable efficacy needed to be established.

***The article had nothing to say about naproxen, as naproxen was not used in that study.***

143.    Over the next two weeks, Merck continued to search for any support for its

naproxen hypothesis.  In a March 24, 2000 email, Dr. FitzGerald (the Merck consultant who had

conducted Protocol 023) sent Dr. Alan Nies (the Merck scientist who was in charge of

developing VIOXX) "the best comparative clin[ical] data on MI [heart attack] and NSAIDs" of

which he was aware.   That same day, Dr. Nies forwarded Dr. FitzGerald's email to defendant

Reicin and fellow senior Merck scientist Dr. Gertz.

144.    Dr. FitzGerald's March 24, 2000 email provided data from an unpublished non-

Merck study, involving an analysis of more than 164,000 patients, which sought to estimate and

compare the effects of aspirin and non-aspirin NSAIDs in preventing heart attacks.  FitzGerald's email contained specific data for aspirin, naproxen, ibuprofen, and diclofenac individually, as well as data for naproxen, ibuprofen and diclofenac combined.  As Dr. FitzGerald's email went on to point out, although the data confirmed that aspirin significantly reduced the risk that patients might suffer a first, nonfatal heart attack, *the other NSAIDs, including naproxen, "had no significant effect," either individually or combined, on the risk of suffering a heart attack.*  Dr. FitzGerald noted that "amongst these INSIGNIFICANT effects [capital letters in original], naproxen looked best," but reiterated that "there were no sig[nificant] diff[erence]s between the nsaids."

145.    Dr. FitzGerald's non-public March 24, 2000 email therefore failed to provide any reasonable basis for Merck to claim that naproxen was cardioprotective, and in fact *undercut* that claim.  Indeed, Merck knew, based on Dr. FitzGerald's email, that the best scientific evidence available showed that naproxen "had no significant effect" in preventing a heart attack.

146.    The data on naproxen contained in Dr. FitzGerald's March 24, 2000 email were not disclosed to the market.  The results of the study referenced in this email were later published in the July 2000 issue of *Epidemiology* in an article entitled "Differential Effects of Aspirin and Non-Aspirin Nonsteroidal Antiinflammatory Drugs in the Primary Prevention of Myocardial Infarction in Postmenopausal women."  However, unlike Dr. FitzGerald's email, which contained the specific data for naproxen, ibuprofen, and diclofenac individually, the *Epidemiology* article reported only the *aggregate* data for a group of *unspecified* non-aspirin traditional NSAIDs.  The article did not even mention that naproxen was one of the traditional NSAIDs considered in the study.  Thus, Merck had data on naproxen (which Dr. FitzGerald's

March 24, 2000 email indicates he privately received from the study's author) that was not available in the published version of the study.

147.    Notwithstanding its failure to find any meaningful scientific support for its "naproxen hypothesis" (and notwithstanding the non-public information in its possession that contradicted that hypothesis), on March 27, 2000 the Officer Defendants caused Merck to issue a press release designed to lead the public to believe that the "naproxen hypothesis" was the most likely explanation for VIGOR's CV results, and that VIOXX did not cause heart attacks or strokes.  After lauding VIGOR's GI results, Merck's press release stated:

> In addition, significantly fewer thromboembolic events were observed in patients taking naproxen in this GI outcomes study, *which is consistent with naproxen's ability to block platelet aggregation*.  This effect on these events had not been observed previously in any clinical studies for naproxen.  *VIOXX, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have similar effects.*

The press release further stated:

> An extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with VIOXX, showed no indication of a difference in the incidence of thromboembolic events between VIOXX, placebo and comparator NSAIDs.  Further analyses are ongoing, and final results of the GI outcomes study with VIOXX will be presented at peer-reviewed medical meetings this year.

148.    Merck's March 27, 2000 press release was intentionally designed to mislead investors, patients and doctors into believing that it clearly was more likely than not (a) that VIOXX had no impact on a user's risk of suffering a heart attack, stroke or other adverse CV event and (b) that the results of VIGOR did not impair VIOXX's commercial prospects and viability.  However, as set forth above, in fact Merck and the Officer Defendants (a) had concluded that VIOXX was prothrombotic, and (b) in searching for information that might

support the "naproxen hypothesis" had found only additional, non-public information that undercut their hypothesis.

149.    Merck's March 27, 2000 press release was widely reported and analyzed in the press and by securities analysts.  In the wake of this press release, market analysts and members of the press understood that, in the absence of more definitive studies, it was still possible that VIOXX was prothrombotic, but most repeated and adopted Merck's "naproxen hypothesis," which was propped up by Merck's false representation that there was "no indication" from Merck's other clinical data that VIOXX might be prothrombotic.

150.    Although it was widely reported that Merck's "naproxen hypothesis" was the most likely explanation for the CV events in VIGOR, some financial analysts and journalists suggested that the alternative explanation -- that VIOXX was prothrombotic -- might be equally plausible.  In response to "speculative news reports," on April 28, 2000 Merck issued a press release entitled "Merck Confirms Favorable Cardiovascular Safety Profile of VIOXX" that stated:

> Extensive review of data from the completed osteoarthritis trials and on-going clinical trials with VIOXX, as well as post-marketing experience with VIOXX, have shown no difference in the incidence of cardiovascular events, such as heart attack, among patients taking VIOXX, other NSAIDs and placebo.

Merck also reaffirmed its professed belief in its "naproxen hypothesis," stating that the difference in the rate of heart attacks found in VIGOR was "consistent with naproxen's ability to block platelet aggregation."  As was the case with Merck's March 27, 2000 press release, however, the April 28, 2000 press release was materially false and misleading not only because it failed to disclose Merck's lack of good faith belief in its naproxen hypothesis, and the totality of the information upon which its actual belief was based, including, *inter alia*, the results of

Merck's internal February 1998 analysis (which showed at least a statistically significant 216% greater risk of serious adverse cardiovascular events among women taking VIOXX as compared to women taking placebos in other Merck studies) and the results of Protocol 023.

151.    On May 24, 2000, Merck gave a formal presentation of the VIGOR study data at a major digestive disease medical conference.  At that conference, Merck again reiterated its naproxen hypothesis and touted VIOXX's purported safety.  Market analysts again reacted favorably to these further reassurances, while still acknowledging that the naproxen hypothesis was not proven.

152.    Throughout the Class Period, Merck continued to offer the naproxen hypothesis as the most likely explanation for VIGOR's cardiovascular results.  For example, in a February 2001 presentation before the FDA's Arthritis Advisory Committee concerning Merck's request to amend the label for VIOXX to reflect the positive GI results from the VIGOR study, defendant Reicin reiterated that it was Merck's belief that "the decreased cardiovascular events with naproxen in VIGOR is consistent with [naproxen's] potent anti-platelet effects."

153.    On August 22, 2001, the *Journal of the American Medical Association* ("*JAMA*") published an article, authored by cardiologists Eric J. Topol, Steven E. Nissen, and Debabrata Mukherjee of the Cleveland Clinic, entitled "Risk of Cardiovascular Events Associated With Selective COX-2 Inhibitors," which reported the results of a study of VIOXX and Celebrex (the "Cleveland Clinic Study").  The *JAMA* article stated that "[c]urrent data would suggest that use of selective COX-2 inhibitors might lead to increased cardiovascular events," and further noted: "The available data raise a cautionary flag about the risk of cardiovascular events with COX-2 inhibitors."

154.    On August 21, 2001, the day before the *JAMA* article was published, *Bloomberg News* reported that, in anticipation of the publication of the Cleveland Clinic Study findings, Merck, through its Senior Director of Cardiovascular Clinical Research, Laura Demopoulos, had commented:  "We already have additional data beyond what they cite, and the findings are very, very reassuring.  VIOXX does not result in any increase in cardiovascular events compared to placebo."  Merck's August 21, 2001 statement was intended to, and did, reassure the market concerning VIOXX's purported lack of cardiovascular risks.

155.    On August 23, 2001, the day after the release of the *JAMA* article, the Officer Defendants caused Merck to issue a Company press release stating that "the Company stands behind the overall and cardiovascular safety profile . . . of VIOXX."  Immediately after the publication of the *JAMA* article, Merck also sent, by Federal Express, "Dear Doctor" letters to physicians throughout the country disparaging the article as "not based on any new clinical study" and assuring the physicians that Merck "stands behind the overall and cardiovascular safety profile" of VIOXX.

156.    News and analyst reports following the release of the *JAMA* article reinforced the "naproxen hypothesis" as the most likely interpretation of the VIGOR CV data and disparaged the *JAMA* article.  For example, on August 22, 2001, Credit Suisse First Boston reported that:

> The JAMA researchers themselves point out several significant limitations in their study . . . .We note that the VIGOR trial did not include low-dose aspirin, and that the control drug (naproxen) is known to possess a cardio-protective, anti-platelet effect. This makes it extremely difficult to determine whether the difference in cardiac events seen in VIGOR results from a naproxen "benefit" or a Vioxx "liability."

157.    On September 21, 2001, the FDA posted on its website a warning letter that its Division of Drug Marketing, Advertising, and Communications ("DDMAC") had sent to Merck four days earlier regarding its marketing and promotion of VIOXX.  The DDMAC Letter stated:

> You have engaged in a promotional campaign for VIOXX that minimizes the potentially serious cardiovascular findings that were observed in the [VIGOR] study, and thus, misrepresents the safety profile for VIOXX. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on VIOXX were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).
>
> Although the exact reason for the increased rate of MIs observed in the VIOXX treatment group is unknown, your promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs. You assert that VIOXX does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin. ***That is a possible explanation***, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that VIOXX may have pro-thrombotic properties.

The DDMAC Letter targeted only an imbalance in some of Merck's promotional efforts; it did not contend that the "naproxen hypothesis" was wrong or that Defendants did not believe it to be true. All of the information in the DDMAC Letter concerning the CV safety of VIOXX was based on the VIGOR results themselves or on information publicly discussed following the release of the VIGOR results and at the February 8, 2001 AAC meeting.

158.    The DDMAC Letter received widespread coverage by the media and securities analysts.  Nevertheless, securities analysts continued to project that VIOXX would generate blockbuster revenues for Merck.  For example, on September 25, 2001, Credit Suisse First Boston issued an analyst report that concluded: "[w]e retain our Buy rating on Merck. . . ."  That same day, Lehman Brothers issued a report that maintained its "Strong Buy" recommendation and a $90 price target for Merck.  The Lehman report noted that "[w]arning letters of this nature are certainly not unusual and in fact [are] almost a staple of the pharmaceutical industry today. As pointed out in the [DDMAC Letter], DDMAC does not dispute Merck's claims."

159.     In an October 9, 2001 *New York Times* article entitled "For Pain Reliever, Questions of Risk Remain Unresolved," defendant Scolnick again falsely reiterated his and Merck's purported belief in the "naproxen hypothesis." Scolnick stated that Merck's position throughout was that "the likeliest interpretation of the data is that naproxen lowered the thromboembloic event rate," and that Merck had "found no evidence that VIOXX increased the risk of heart attacks." Scolnick added that without the theoretical questions raised by Dr. FitzGerald (based on the results of Protocol 023), "no one would have a question remaining in their mind that there might be an additional interpretation."

F.     **Merck Wrongfully Changes Causes of Death in Its ADVANTAGE Trial to Minimize the Risk of "Rais[ing] Concerns" About the "Naproxen Hypothesis"**

160.     Merck's and the Officer Defendants' claims concerning the "naproxen hypothesis" were further undermined when Merck and the Officer Defendants learned the results of another trial, known as ADVANTAGE, which concluded just days after Merck had issued its first materially false and misleading press release concerning the VIGOR CV results.[8]

161.     ADVANTAGE was a so-called "seeding" trial undertaken at the behest of Merck's marketing division (rather than Merck's medical research division). The term "seeding trial" refers to a pharmaceutical study whose purpose is not to further medical knowledge of the drug but rather to introduce it to a large number of doctors and to compensate them for their participation in the trial in the hope that they will continue to prescribe that drug in the future.

162.     The purported goal of the ADVANTAGE seeding trial was to demonstrate that VIOXX was less likely to pose GI problems than naproxen -- which had also been the goal of the VIGOR study. Compared to VIGOR, ADVANTAGE was shorter in duration (three months),

---

[8] ADVANTAGE is an acronym for "Assessment of Differences Between VIOXX and Naproxen to Ascertain Gastrointestinal Tolerability and Effectiveness."

involved a lower dosage of VIOXX (only 25 mg compared to 50 mg in VIGOR), and had fewer patients (5,557 as compared to VIGOR's 8,076).

163.     ADVANTAGE had one key difference from VIGOR, however.  Although the Merck scientists who had designed VIGOR had intentionally tried to exclude from the trial all patients who took low dose aspirin to prevent cardiovascular problems in order to eliminate the patients who were most likely to be vulnerable to VIOXX's prothrombotic properties (and thereby to minimize the number of heart attacks and strokes reported in that trial), the marketing executives who designed ADVANTAGE did *not* require the physicians who administered the trial to exclude patients taking low dose aspirin.  Accordingly, in contrast to the VIGOR study population, approximately 13% of the patients in each treatment group in ADVANTAGE were taking low dose aspirin.  Because a larger percentage of higher-risk patients participated in ADVANTAGE, it was more likely that adverse CV events would be observed in ADVANTAGE and that ADVANTAGE's CV results would be even worse, from Merck's point of view, than those in VIGOR.

164.     By no later than early April 2000, just one week after Merck released its initial press release concerning VIGOR's results, all ADVANTAGE patients had completed their treatment and the preliminary results of the trial had become available internally at Merck.

165.     In an April 3, 2000 email exchange, defendants Reicin and Scolnick, and Merck scientist Dr. Shapiro, discussed the preliminary results of the ADVANTAGE trial.  Defendant Reicin noted that there were *seven* heart attacks in one treatment group, compared to only *one* in the other group.  Although the two treatment groups were still "blinded" at that time, there could have been little doubt among Reicin, Scolnick and Shapiro that the first group was the VIOXX group and the second group was the naproxen group.

166.    These results triggered an angry internal response from defendant Scolnick.  As reported after the Class Period in an April 24, 2005 *New York Times* article entitled "Evidence in VIOXX Suits Shows Intervention by Merck Officials," Scolnick asserted in an internal email that ADVANTAGE served "no scientific purpose" (because VIOXX had already been tested against naproxen in VIGOR) and that "***Small marketing studies which are intellectually redundant are extremely dangerous***."

167.    Senior Merck scientists did more than simply complain about ADVANTAGE, however.  Unbeknownst to the public, to make the ADVANTAGE results appear less damaging for VIOXX, Merck scientists ***improperly changed the initially reported causes of patient deaths in the study to "improve" the study's results***.  For example, on November 8, 2000, Merck scientist Eliav Barr emailed defendant Reicin concerning the death of a 73 year old woman who had been taking VIOXX in the ADVANTAGE trial.  Dr. Barr wrote:

> ***Common things being common, the clinical scenario is likely to be MI [heart attack].***  Certainly it is not definitive.  I just used my clinical judgment.  ***If it is easier to call this an unknown cause of death, I could be persuaded to say that as well.***

In response, defendant Reicin wrote to Barr: "***I would prefer unknown cause of death so that we don't raise concerns***."  In this fashion, Merck "adjudicated" two of the seven heart attacks reported in the preliminary ADVANTAGE results into "sudden/unknown" cardiac events and transformed the study's statistically significant 700% difference in the rate of heart attacks (seven heart attacks in patients taking VIOXX compared to only one taking naproxen) into a 500% difference which -- because of the size of the sample -- was ***not*** statistically significant.

168.    Approximately three years later, Merck finally published the purported "results" of ADVANTAGE in the *Annals of Internal Medicine* ("*Annals*") on October 7, 2003.  The

*Annals* article was principally drafted by Merck scientists.  The article published the manipulated cause of death numbers.

169.    Merck's improper tampering with the ADVANTAGE results was not revealed until April 24, 2005 in a *New York Times* article, entitled "Evidence in VIOXX Suits Shows Intervention by Merck Officials," which reported:

> In 2000, amid rising concerns that its painkiller VIOXX posed heart risks, Merck overruled one of its own scientists after he suggested that a patient in a clinical trial had probably died of a heart attack.  In an email exchange about VIOXX, the company's most important new drug at the time, a senior Merck scientist repeatedly urged the researcher to change his views about the death "so that we don't raise concerns."  In reports to the Food and Drug Administration and in a paper published in 2003, Merck listed the cause death as "unknown" for the patient, a 73-year-old woman.

**G.    2001: The Undisclosed Results of Merck's Studies of VIOXX In Alzheimer's Disease Patients Show that VIOXX Raises the Risk of Cardiac Mortality**

170.    Merck also continued to propagate its "naproxen hypothesis" and to tout VIOXX's commercial prospects in the face of the adverse results of two other major VIOXX clinical trials.

171.    Specifically, from April 2001 through the end of the Class Period, Merck and the Officer Defendants were privy to the unfavorable results of two clinical trials conducted by Merck to assess the effects of VIOXX on the occurrence and progression of Alzheimer's disease (known as Protocol 078 and Protocol 091).  These two studies showed significantly higher mortality rates among patients who took VIOXX, including a sharply higher rate of deaths from heart disease.[9]

---

[9] Protocols 078 and 091 showed that VIOXX did not have any beneficial impact on the occurrence and progression of Alzheimer's disease.  Merck began a third Alzheimer's trial known as Protocol 126, but according to published reports, discontinued it in March 2001 after Protocol 091 showed no benefit.

172.    At the time Merck began Protocols 078 and 091 in 1998, some studies suggested that inflammatory mechanisms were associated with Alzheimer's disease and that the COX-2 enzyme might aggravate such inflammation.  This led Merck to hypothesize that treatment with a selective COX-2 inhibitor such as VIOXX might retard the development or progression of Alzheimer's disease.

173.    Merck designed Protocol 078 to study whether treatment with VIOXX could delay the onset of Alzheimer's disease (the "Prevention Trial").  A total of 1,457 patients over the age of 65 with mild cognitive impairment took part in the Prevention Trial, with 725 receiving VIOXX (only 25 mg, once daily) and 732 patients receiving a placebo.  The trial was initially scheduled to last two years.

174.    Merck designed Protocol 091 to assess the effect of VIOXX in slowing the progression of dementia in patients with established Alzheimer's disease (the "Treatment Trial").  A total of 692 patients over the age of 50 who met standard research criteria for possible or probable Alzheimer's disease and had mild or moderate dementia participated in the Treatment Trial, with 346 receiving VIOXX (25 mg once daily) and 346 receiving placebo.[10]

175.    According to Merck, both the Prevention Trial and the Treatment Trial were conducted on an "intention-to-treat" (also known as an "intent-to-treat") basis.  In an intention-to-treat study, data is collected and reported based on the initial treatment intent, and not on the duration of the treatment that is actually administered.  Thus, participants in the Prevention and Treatment Trials who discontinued treatment were asked to return to the clinic for all remaining visits and assessments during the full time period that researchers had intended for them to

---

[10]  Of the patients initially assigned to the VIOXX group, thirty-five patients received 25 mg of VIOXX for 15 months, and 311 patients received VIOXX 25 mg only for 12 months and then received a placebo for three months.

receive treatment (even though they might have already stopped taking the medication). Intention-to-treat analysis is considered the "gold standard" in clinical trials because it helps to avoid bias and other errors that can arise due to treatment discontinuation.

176. Merck also planned to perform an "on-treatment" analysis of the Alzheimer's Prevention and Treatment Trials. In an on-treatment analysis, data is reported only through the time period during which patients are actually taking the treatment (or through a short time thereafter). Merck's data analysis plan for the Prevention and Treatment Trials called for data to be reported through fourteen days after patients discontinued the treatment.

177. In April 2001, consistent with its proposed data analysis protocols, Merck conducted internal "intention-to-treat" and "on-treatment" analyses of the results of the Prevention and Treatment Trials. An April 8, 2001 internal Merck memorandum, authored by Joshua Chen, Ph.D., a Merck statistician, entitled "MK-0966 [VIOXX] Combined Mortality Analysis Protocol 091 + Protocol 078," summarized the overall mortality data from the Prevention and Treatment Trials that Merck had collected up to that time.[11] This April 2001 memorandum, which did not become public until after the Class Period, included separate intention-to-treat and on-treatment analyses of the Prevention and Treatment Trials and analyses of the two trials combined.[12]

178. ***All three of the intention-to-treat analyses prepared in April 2001 found a statistically significant increased risk of mortality in patients taking VIOXX compared to patients taking placebo.*** The intention-to-treat analysis for the Prevention Trial data available up

---

[11]  As of April 2001, the Treatment Trial had been completed and the Prevention Trial was still in progress. The cut-off date used for the Prevention Trial data was March 23, 2001.

[12]  For the intention-to-treat analysis, the memorandum included events occurring during the study period of Protocol 091 plus 14 days and the last follow-up for patients in Protocol 078 plus 14 days. For the on-treatment analysis, the memorandum included events which occurred during treatment with the drug or within 14 days after discontinuation of the study drug.

to that point showed that there were twenty-one deaths in patients treated with VIOXX compared to only nine deaths in patients treated with placebo -- *a statistically significant 257% increase in the risk of death among VIOXX patients in the Prevention Trial*.    The intention-to-treat analysis for the Treatment Trial showed that there were thirteen deaths in patients treated with VIOXX compared to only three deaths in patients treated with placebo -- *a statistically significant 467% percent increase in the risk of death among VIOXX patients in the Treatment Trial*.  Merck's internal aggregated intention-to-treat analysis, which combined both the Prevention and Treatment Trials, further showed that VIOXX was associated with a *statistically significant 287% increase in total mortality in VIOXX patients in the aggregated Prevention and Treatment Trials* (thirty-four deaths in patients treated with VIOXX compared to only twelve deaths in patients treated with placebo.)  These statistically significant differences in mortality would plainly have been considered material by analysts and investors had they been disclosed to the market.

179.    *The on-treatment analyses of the Treatment Trial, and of the combined Prevention and Treatment Trial data, also found statistically significant increased risks of mortality in patients taking VIOXX*.  On an "on treatment" basis, in the Prevention Trial there were thirteen deaths in patients treated with VIOXX compared to only seven deaths in patients treated with placebo, resulting in a highly elevated 217% increase in the risk of death among VIOXX patients that fell slightly short of being statistically significant.    However, notwithstanding the relatively small sample size, the on-treatment analysis for the Treatment Trial showed that there were nine deaths in patients treated with VIOXX compared to only two deaths in patients treated with placebo -- *a statistically significant 500% increase in the risk of death among patients who took VIOXX*.  Merck's internal aggregated on-treatment analysis,

combining both the Prevention and Treatment Trials, showed that VIOXX was associated with *a statistically significant 283% increase in total mortality in VIOXX patients in the combined Prevention and Treatment Trials* (twenty-two deaths in patients treated with VIOXX compared to only nine deaths in patients treated with placebo.)

180.    Also unbeknownst to the public, these statistically significant increased risks of mortality in patients taking VIOXX were fueled in large part by statistically significant increased risks of heart disease deaths among patients taking VIOXX.  In April 2008, Dr. Bruce Psaty, a Professor of Medicine and Epidemiology and a member of the Cardiovascular Health Research Unit at the University of Washington School of Medicine, and Richard A. Kronmal, Ph.D., a Professor of Statistics and Biostatistics at the University of Washington School of Public Health and Community Medicine who served as an expert for plaintiffs in VIOXX product liability litigation and thus had access to previously-undisclosed materials, published their own independently prepared mortality analysis of Merck's internal Prevention and Treatment Trial data files in an article in *JAMA* entitled "Reporting Mortality Findings in Trials of Rofecoxib for Alzheimer Disease or Cognitive Impairment."  In that article, Dr. Kronmal revealed that there were approximately *3.5 times* more heart disease-related deaths in the Prevention and Treatment Trials among patients taking VIOXX than among those taking placebo, and that the difference was statistically significant.[13]

181.    Although this adverse information was plainly in Merck's and the Officer Defendants' possession throughout the Class Period, these Defendants continued to tout the "naproxen hypothesis" and VIOXX's commercial prospects without disclosing any of this

---

[13]  Dr. Kronmal classified the causes of death in those studies based on data presented in the July 2001 SUR that Merck had submitted to the FDA for the Treatment Trial, and in the Clinical Study Report that Merck filed with the FDA in July 2003 for the Prevention Trial.

statistically significant adverse Alzheimer's trial data to the public.  Indeed, it appears that these Defendants also failed to disclose accurate and complete data for the Alzheimer's studies to the FDA.  For example, in July 2001, Merck filed a Safety Update Report ("SUR") with the FDA that misrepresented its April 2001 mortality findings from the Prevention and Treatment Trials by failing to provide the FDA with either its intention-to-treat data (which would have shown statistically significant increased mortality rates in the Prevention and Treatment Trials separately, as well as on a combined basis) or its on-treatment data (which would have shown statistically significant increased mortality rates in the Treatment Trial and the aggregated Prevention and Treatment Trial data).  Instead, Merck improperly (and retrospectively) concocted a new definition for "mortality events" for the data it presented to the FDA in its SUR.  Utilizing this specially crafted definition for mortality events -- dubbed by Merck "On Drug – SUR" -- Merck reported to the FDA substantially reduced, and non-statistically significant, increased risks of mortality in the Prevention and Treatment Trials.

182.    As described in an October 31, 2001 internal Merck memorandum from Raymond Bain, Merck's Vice-President for Biostatistics and Research Decision Sciences, to Drs. Nies and Gertz, Merck's post hoc "On Drug – SUR" definition included not only deaths that occurred during the period that the patient was taking treatment (either VIOXX or placebo) or through fourteen days after discontinuation, but also deaths that happened after that period so long as Merck determined that the death was "linked" to an event that happened while the patient was taking the drug or in the fourteen days after the patient discontinued treatment.  This October 2001 internal Merck memorandum shows that Merck did not begin to employ this mortality event definition until the time approached when Merck had to provide data on the Alzheimer's Prevention and Treatment Trials to the FDA.

183.    Utilizing this new "mortality event" definition, Merck told the FDA in July 2001 that fifteen patients taking VIOXX had died in the Prevention Trial as compared to nine patients taking a placebo -- a ***non***-statistically significant 187% increase in the risks of death among VIOXX users.  Merck also told the FDA that fourteen patients taking VIOXX had died in the Treatment Trial as compared to eight patients taking placebo -- a ***non***-statistically significant 209% increase in the risk of death among VIOXX users.  On the basis of these numbers, Merck made the materially false and misleading representation to the FDA that "review of the deaths does not identify a specific increased risk with rofecoxib," and that "the profile of serious clinical adverse experiences with rofecoxib is generally similar to that of placebo in a large cohort of patients, most of whom were older than 65 years of age."  Merck's misrepresentations misled the FDA regarding the magnitude and significance of the VIOXX mortality risk, and were part of Merck's and the Officer Defendants' fraudulent effort to keep the truth about VIOXX's safety concealed from investors.

184.    Although Merck had materially misrepresented the rates of deaths among patients using VIOXX in the Alzheimer's disease trials in its submissions to the FDA, the FDA still privately expressed concern about the number of deaths observed in the Treatment Trial.  On December 5, 2001, the FDA sent a non-public letter to Merck asking whether the Prevention Trial, which was still ongoing, should continue based on the reported excess mortality (which Merck had understated) observed in the Treatment Trial:  "Please clarify whether the safety monitoring board and the IRB [institutional review board] overseeing these studies are aware of the excess in total cause mortality in the Vioxx 25 mg group as compared to placebo (p=0.026) and the trend against Vioxx 25 mg on CV mortality compared to placebo. . . .  ***Have these oversight groups commented on the ethics of continuing study 078 in light of the mortality***

*data?*" The FDA's letter to Merck assumed that Merck had DSMBs in place for the Prevention and Treatment Trials, but in fact those trials did ***not*** have DSMBs in place. Merck had avoided the independent oversight and monitoring that a DSMB provides by simply not creating DSMBs for its Alzheimer's disease trials. Instead, the only human-subject protections available to the study participants were those provided by (i) the investigators, who were blinded both to the treatment allocation (*i.e.*, blinded as to whether a patient was in the VIOXX arm or the placebo arm) and to the findings for study-wide adverse events, and (ii) the Merck reviewers, who were obviously conflicted and ultimately chose to ignore and misrepresent serious safety issues.

185.    The planned duration of the Prevention Trial was two years, but in 2002, instead of discontinuing the Prevention Trial, Merck extended it beyond its original cut-off date even though the data indicated that Alzheimer's disease was progressing more rapidly in the patients taking VIOXX than in those taking placebo and that there was a statistically-significant increased risk of death in Alzheimer's study participants who took VIOXX. However, Merck failed to disclose those facts to the public, to the Institutional Review Boards ("IRBs") overseeing the trials, or to study participants themselves -- even as Merck was asking those cognitively impaired study participants to give their consent to continue to participate in the Prevention Trial for an additional two years.

186.    In the words of the two authors of the post-class period April 2008 *JAMA* article discussing Merck's conduct with respect to the Alzheimer's disease studies, the mortality findings and the Alzheimer's disease findings known to Merck in 2002 "would, in [our] judgment, have prompted a DSMB, if it had existed, to stop the trial early." But a decision to stop an ongoing Merck study due to VIOXX's increased mortality risk would have been a

devastating blow to Merck at a time when it was committed, for compelling financial reasons, to continue to falsely reassure the market that VIOXX was safe.  So Merck continued the study.

187.    Merck's and the Officer Defendants' decisions to conceal the truth and extend the Prevention Trial unfortunately took a predictable human toll on participants in the study.  Indeed, during the additional duration of the Prevention Trial, there were approximately eight excess deaths among those randomly assigned to receive VIOXX (twenty additional deaths among those assigned to VIOXX compared to only twelve among those assigned to placebo).  In the words of the authors of the April 2008 *JAMA* article:  "[The] failure of [Merck] to inform IRBs of a safety issue violate[d] the trust of those human participants who volunteered to advance science, medicine, and public health."

188.    Merck never publicly revealed the adverse facts concerning the Alzheimer's studies during the Class Period.  Their disclosure would have severely jeopardized VIOXX's commercial viability and the financial health of Merck as a whole.

**H.    Defendants Successfully Keep Merck's Internal Conclusions about the True Significance of the VIGOR Results off VIOXX's Label**

189.    According to a May 5, 2005 memorandum (the "Congressional Memorandum") issued after the Class Period by the minority members of the United States House of Representatives Government Reform Committee (the "House Government Reform Committee"), there was a two-year delay between the time that Merck filed a request (on June 29, 2000) to change the initial VIOXX label to reflect the purported beneficial GI findings in the VIGOR Study and the time that the initial VIOXX label was changed to "include cardiovascular data from VIGOR."  According to the Congressional Memorandum, which was based on non-public documents obtained or subpoenaed by Congress after the Class Period:

> The extended delay resulted, in part, from FDA's need to convene an advisory committee meeting and conduct extra analyses.  It also

was due to a series of disputes between the agency and the company. Under the Food, Drug and Cosmetic Act, FDA and manufacturers must agree on label changes. For approximately six months, Merck resisted a variety of FDA's proposals, leading to an extended series of conference calls to negotiate differences.

190.     The Congressional Memorandum further reported that the "FDA initially requested [in a non-public communication] that the label warn physicians that VIOXX could cause heart attacks and other cardiovascular problems." To that end, the FDA proposed that the VIOXX label include the following information in the "Warning" section:[14]

> ***Vioxx should be used with caution in patients at risk of developing cardiovascular thrombotic events such as those with a history of myocardial infarction and angina and in patients with pre-existent hypertension and congestive heart failure.***
>
> ***The risk of developing myocardial infarction in the VIGOR study was five fold higher in patients treated with Vioxx 50 mg (0.5%) as compared to patients treated with naproxen (0.1%)***….This finding was consistent with a smaller and shorter study using Vioxx 25 mg that allowed the use of low dose ASA [aspirin.] Prospective, well powered, long-term studies required to compare the incidence of serious CV events in patients taking Vioxx versus NSAID comparators other than naproxen have not been performed.

191.     According to the Congressional Memorandum, the FDA's proposed warning "***was unacceptable to Merck.***" In fact, although the Merck believed that VIOXX was prothrombotic, the Officer Defendants recognized that such a warning would have a material adverse impact on

---

[14] FDA regulations require that information concerning risks associated with a drug be set forth on the label according to the seriousness of the risk. For example, the "Contraindications" heading (the most serious of the "headings") would indicate "situations in which the drug should not be used because the risk of use clearly outweighs any possible benefit." 21 C.F.R. § 201.57(d) (v)(d)(j)). The "Warning" section would indicate that there is reasonable evidence of an association of a serious hazard [or risk] with a drug; a causal relationship need not have been proved. 21 C.F.R. § 201.57(3) (v)(e). The "Precautions" section merely reflects "information regarding any special care to be exercised by the practitioner for safe and effective use of the drug." 21 C.F.R. § 201.57(3)(v)(f).

VIOXX sales and thus refused to agree to the FDA's proposed language, in form or substance, in the "Warnings" section of any of VIOXX's drug labels during the Class Period.

192.    Indeed, as discussed below, even when the VIOXX label was changed in April 2002 to reflect the VIGOR results (including the favorable GI findings), Merck only agreed to inclusion of the adverse CV results from VIGOR in the "Precautions" section of the label.  In addition, the April 2002 VIOXX label included watered-down language to the effect that "the significance of the cardiovascular findings of these three studies (VIGOR and 2 placebo-controlled studies) is unknown."

193.    In an April 2002 conference call with analysts and investors addressing the labeling changes for VIOXX, Merck spokesperson Mark Stejbach falsely reiterated that it was Merck's "belief that the [CV] effect seen in VIGOR were the results of the anti-platelet effect of naproxen," and added that "I think that's a position Merck has always had and now its quite clearly laid out in the labeling."

I.    **2003-2004: Merck and the Officer Defendants Continue To Vigorously Defend VIOXX's Safety**

1.    **October 2003: Merck Disparages the Brigham Study Findings, and Again Reassures the Public That VIOXX Is Safe**

194.    In September 2003, abstracts of papers to be presented at an upcoming meeting of the American College of Rheumatology began to circulate.  An abstract for one of these papers, entitled "The Relationship Between COX-2 Inhibitors and Acute Myocardial Infarction," reported that in a "matched case-control study of 54,475 patients ≥ 65 years of age," stated that "current rofecoxib [VIOXX] use was associated with an increased adjusted relative risk of acute myocardial infarction [heart attack] compared with celecoxib [Celebrex] use and with no NSAID use [placebo]."   In other words, the abstract reported that a large epidemiological study

(supported by Brigham and Women's Hospital in Boston (the "Brigham Study")) had found that VIOXX was associated with a greater risk of heart attack than either Celebrex or placebo.

195.    As early as September 17, 2003, an internal Merck document shows that Merck was briefing its sales force concerning ways to mitigate the effect of this study on VIOXX sales. Nonetheless, as later reported by *Reuters News Service* on October 22, 2003, word of the Brigham Study led to a decline in sales of VIOXX in the third quarter of 2003.  As the article, entitled "Merck to Cut 4,400 Jobs, Posts Flat Earnings," stated:

> Merck & Co. Inc. said on Wednesday it would cut 4,400 jobs and reported disappointing earnings, hurt by falling sales of arthritis medicine VIOXX and a paucity of profitable new drugs. . . .Sales of VIOXX fell 32 percent in the period to $510 million.  ***The arthritis drug is suffering from clinical trial data suggesting it might slightly raise the risk of heart attacks***, and the growing perception that its pain-fighting capabilities are no better than traditional painkillers.

196.    On October 28, 2003, the results of the Brigham Study were formally presented at the annual meeting of the American College of Rheumatology.  Two days later, on October 30, 2003, *The Wall Street Journal* published an article, entitled "VIOXX Study Sees Heart-Attack Risk," which revealed the results of the Brigham Study to the broader public.  The article stated:

> Brigham & Women's Hospital rheumatologist and epidemiologist Daniel H. Solomon headed the study, which looked at records of 54,475 Medicare patients, all of them over 65.
>
> Researchers found that the apparent cardiac risk was greatest in the first 90 days in which a patient is taking VIOXX, which generically is known as rofecoxib.  ***In the first 30 days, the researchers found, VIOXX was linked to a 39% increased heart-attack risk compared with Celebrex.  Between 30 and 90 days, that increased relative risk was 37%***.

* * *

Eric J. Topol, chairman of cardiovascular medicine at the Cleveland Clinic and one of the authors who first raised the issue two years ago, called the research "the best study to date."

\* \* \*

The new study, Dr. Topol said, "greatly substantiates our concerns about the cardiac side effects."   He observed that the possible cardiac effects of VIOXX appear "worse with the higher doses."

197.    Merck and the Officer Defendants immediately moved to counter the data generated by the Brigham Study and to discount the study's conclusions. For example, in the October 30 *Wall Street Journal* article and again in an article published in *American Health Line* on October 31, 2003, defendant Reicin publicly disparaged the study, stating that: "Randomized clinical trials are the gold standard and this isn't such a trial...In our placebo-controlled randomized trials, we have found no significant difference between Vioxx and placebo." Defendant Reicin's falsely reassuring statements helped prevent Merck's stock from experiencing any significant decline in response to the public release of the Brigham Study findings.

198.    On May 4, 2004, the Brigham Study was published in the American Heart Association journal *Circulation*, reiterating the results that were first made public in October 2003.

199.    However, not only did the Officer Defendants cause Merck to publicly disparage and attempt to discredit the results of the Brigham Study, but according to a May 18, 2004 *Wall Street Journal* article, entitled "Merck Takes Author's Name Off VIOXX Study," Merck had ordered the name of one of its epidemiologists removed from the list of authors of the Brigham Study in an effort to distance itself from the Study's adverse findings concerning VIOXX's safety profile:

Stepping into thorny ethical territory, drug titan Merck & Co. ordered the name of one of its epidemiologists purged from the list of authors on a research paper -- after the study produced an unflattering portrait of a blockbuster drug Merck happens to make.

* * *

"It's an enormous disservice to the reader," says Drummond Rennie, deputy editor of the Journal of the American Medical Association. "If the people up there in the list of authors aren't responsible for everything in the article, something's wrong. *It's completely unethical.*"

* * *

"Merck disagreed with the conclusions and didn't think it was appropriate to have a Merck author," company spokeswoman Mary Elizabeth Blake said.

* * *

The eighth [author] was Carolyn C. Cannuscio, a Merck epidemiologist.

When the article appeared, its conclusion -- that Vioxx "was associated with an elevated relative risk of acute myocardial infarction [heart attack]" -- was the same as before. So was the methodology. But this time, Dr. Cannuscio's name was missing.

* * *

*For Merck, maintaining Vioxx sales is essential*. With $2.55 billion in 2003 sales, it is among Merck's top drugs. The company is under considerable pressure these days, with some promising experimental drugs having failed and the cholesterol drug Zocor facing patent expiration in 2006.

* * *

JAMA editor Catherine DeAngelis is disappointed that Merck didn't see this as a chance to show that sponsors of research can willingly publish findings that run contrary to their own interests. *"They missed a wonderful opportunity to get some good publicity for the pharmaceutical industry," she says. "Aren't they seeking truth?"*

80

200.    Merck and the Officer Defendants were not, in fact, seeking the truth.  As alleged herein, Merck and the Officer Defendants consistently misrepresented and concealed their actual beliefs concerning the safety of VIOXX and the totality of the information that caused them to have that belief, and as a result investors continued to be misled as to the enormous risk that disclosure by Merck of VIOXX's true safety profile would jeopardize VIOXX's commercial viability and its ability to generate substantial revenues for the Company.  To ensure sales of VIOXX remained strong, however, the Officer Defendants continued to suppress, obscure, and distort the truth about VIOXX.  In an article titled "Coxibs, Science, and the Public Trust," that appeared in the January 24, 2005 edition of *Archives of Internal Medicine*, Daniel Solomon and Jerry Avorn, two of the authors of the Brigham Study, commented on Merck's scheme to conceal the truth about VIOXX: ***"[E]ven after funding and agreeing with the design of the Study, Merck publicly discredited our findings***."

### 2.    August 2004: Merck Disparages the Kaiser Study Findings, and Again Reassures the Public That VIOXX Is Safe

201.    On August 25, 2004, *Bloomberg News* reported that a study funded by the FDA, involving almost 1.4 million Kaiser Permanente health care members (the "Kaiser Study"), found that "[t]he difference in heart risk was statistically significant between a recommended dose of VIOXX, 25 mg a day or less, and Celebrex."  Specifically, the Kaiser Study, which was led by Dr. David Graham of the FDA, found that patients taking VIOXX had a 50% greater chance of heart attack and sudden cardiac death than patients taking Celebrex.  The Kaiser Study also found that VIOXX, at a dose of 25 mg a day, more than tripled the risk of heart attack compared with patients who had not taken any painkiller within the past two months.

202.    On August 26, 2004, Merck and the Officer Defendants, through the *Business Wire*, moved immediately to refute and discredit the Kaiser Study so as to allay any investor concerns by announcing:

> ***Merck strongly disagrees with the conclusions of an observational analysis by Graham et al, presented at an international medical meeting this week, which evaluated the rate of cardiovascular events in patients taking COX-2 specific inhibitors VIOXX (rofecoxib) and Celebrex (celecoxib) and in patients taking non-selective NSAIDs.*** This analysis is a retrospective database analysis -- not a clinical trial. Observational analyses have limitations, often conflict with each other, and must be interpreted within the context of data from large, randomized, controlled clinical trials.

203.    The August 26, 2004 press release also quoted defendant Kim as stating:

> This retrospective analysis is based only on a database review. Observational analyses do not have the rigor of randomized, controlled clinical trials. The robust clinical trial data available support the safety of VIOXX. ***Based on all of the data that are available from our clinical trials, Merck stands behind the efficacy and safety, including cardiovascular safety, of VIOXX . . . . Nothing is more important to Merck than the safety of our medicines***.

## VII.    THE FULL TRUTH EMERGES

### A.    The September 2004 Withdrawal of VIOXX

204.    On September 30, 2004, just over a month after publicly reaffirming the "safety, including cardiovascular safety" of VIOXX, Merck shocked the market by announcing that, "effective immediately," it was withdrawing VIOXX worldwide.  Merck stated that its decision was based on the recommendation of an independent External Safety Monitoring Board (the "ESMB"), which was overseeing the APPROVe trial.  According to Merck, the ESMB recommended that the APPROVe trial be halted because of "an increased risk of confirmed cardiovascular events beginning after 18 months of continuous therapy."

205.    That same day, the Officer Defendants also held a conference call for analysts to further discuss the withdrawal.  Defendant Gilmartin stated:

> We are taking this action because we believe it serves the interests of patients . . . We believe it would have been possible to continue to market VIOXX with labeling that would incorporate these new data.  However, given the availability of alternative therapies and the questions raised by the data, we concluded that a voluntary withdrawal is the responsible course to take.

206.    Securities analysts and market professionals were plainly stunned by the news of VIOXX's withdrawal.  For example, the next day, on October 1:

(a)    Cummins Catherwood, who helps manage $900 million at Walnut Assets Management in Philadelphia, commented in a Bloomberg News article entitled "Merck To Withdraw VIOXX Because of Heart Risks":  "*This is just like an avalanche coming out of nowhere*."

(b)    A Morgan Stanley report stated:  "Yesterday, MRK announced the *surprise withdrawal* of Vioxx."

(c)    A Cathy Financial report stated:  "In a surprising move, Merck announced that it is voluntarily withdrawing its COX-II inhibitor VIOXX from worldwide markets. . . . *This announcement came as a shock and is a major blow to Merck's already weak business fundamentals* reflected by Zocor's expected patent expire in mid-2006 and its limited pipeline."

(d)    A Bear Stearns report stated:  "*Stunningly, Merck withdraws VIOXX from worldwide markets* due to new colorectal study which unexpectedly showed Vioxx has twice the cardiovascular risk versus placebo after 18 months of continuous use."

207.    In response to the September 30 disclosures, the price of Merck securities plummeted, as Merck's shares fell almost 27%, or more than $12 per share, to close at $33 per share.  The decline was the greatest one-day percentage price decline of Merck stock since January 1990.  The reported trading volume was 145,048,600 shares, more than 426% greater than the next highest reported trading volume since January 1990.  The $0.50 to $0.60 decrease

in earnings per share that Merck announced on September 30, 2004, represented the loss of at least $1.1 billion in annual earnings. The one day decline wiped out a staggering *$27 billion* of the total market capitalization of the Company. Merck was by far the worst performing stock on September 30 in the three stock indexes of which it is a member, the Dow Jones 30 Industrial Average, the S&P 500 Index, and the S&P Pharmaceuticals Index.

208. However, Merck and the Officer Defendants continued their wrongful scheme by falsely assuring the market that, prior to receiving word of the high number of heart attack deaths in the APPROVe trial, they were unaware of the serious dangers posed by VIOXX that ultimately forced them to withdraw it from the market. For example, in the evening of September 30 on the *PBS Nightly Business Report*, defendant Gilmartin falsely stated:

> [The APPROVe results] was ***totally unexpected***. But my instinctive reaction when Doctor Peter Kim called me to inform me of this was to say to him immediately, Peter, we're going to make this decision based on patient safety.

209. Defendant Gilmartin's September 30, 2004 statement on the *PBS Nightly Business Report* that the APPROVe results were "totally unexpected" and the further implication that Merck's decisions at all times were fundamentally premised on "patient safety" were materially false and misleading because, *inter alia*, they failed to disclose that Merck's senior scientists had actually believed for years that use of VIOXX caused serious adverse CV events. As a result, investors remained unaware of the fact that (a) Merck's and the Officer Defendants' "newly found" belief that VIOXX was probably prothrombotic effects was not "newly found" at all; (b) Merck's and the Officer Defendants' belief that VIOXX was prothrombotic was based not just on APPROVe but on additional undisclosed information and analysis dating back years (rather than unexpectedly triggered by the APPROVe results); (c) the truth concerning the nature and extent of Merck's and the Officer Defendants' deceit would almost certainly doom any

efforts to restore VIOXX to the market to any meaningful degree in the foreseeable future; and

(d) Merck faced the risk of becoming vulnerable to substantial awards of punitive damages if and when its cover-up of the dangers posed by VIOXX became known.

210.    On October 6, 2004, *The Wall Street Journal* reported that:

> A study led by a Food and Drug Administration safety official projects that the widespread use of Vioxx may have led to more than 27,000 heart attacks and sudden cardiac deaths before the drug's abrupt withdrawal last week by Merck & Co.  The number is in comparison to how many similar incidents would have occurred had the same patients been taking Celebrex, the Pfizer Inc. drug that competed with Merck's blockbuster arthritis treatment.  The analysis specifically found that from Vioxx's approval in 1999, through 2003, an estimated 27,785 heart attacks and sudden cardiac deaths "would have been avoided" had Celebrex been used instead of Vioxx.

> * * *

> The study found that people taking a high dose of Vioxx were 3.69 times as likely to have a serious cardiac event as people taking Celebrex, while the ratio for people taking a low dose of Vioxx was 1.5. It concluded that there was no evidence of a "substantial benefit with the high-dose strength" of Vioxx that would "counter-balance the level of cardiovascular risk" shown in various studies of the drug.

211.    In response, Merck again sought to protect VIOXX.  *The Wall Street Journal* reported that:

> A Merck spokesman said in a statement that the company "cannot comment on the full study, as we have not yet had the opportunity to review it." He added that Merck believed that controlled clinical trials are "the best way to evaluate the safety of medicines," while "epidemiology studies are limited in their ability to understand effects" because researchers can't fully control for differences between different groups of patients.

212.    Merck's statements, reported in *The Wall Street Journal*, were materially false and misleading as Defendants continued to conceal the fact that Merck had actually believed that VIOXX was prothrombotic since March 2000.

B.    The November 1, 2004 *Wall Street Journal* Article

213.    Not until the morning of November 1, 2004 -- the first trading day after the end of

the Class Period -- when *The Wall Street Journal* published its article, entitled "Warning Signs:

E-mails Suggest Merck Knew Vioxx's Dangers at Early Stage," did investors finally learn that

Merck and the Officer Defendants -- contrary to their public statements over the past five years --

had actually believed all along that VIOXX was prothrombotic, and learned (a) the full extent to

which (particularly in light of Merck's manipulations and concealment of past data) VIOXX's

previously touted safety profile was grievously flawed and crippled by revelations of Merck's

lack of good faith in its prior statements concerning VIOXX, and (b) the full extent to which, as

a result of the foregoing, (i) there was little to no chance that Merck could ever convince the

FDA to restore VIOXX to the market in the foreseeable future, and (ii) VIOXX's commercial

viability and ability to generate substantial revenue for the Company had been permanently

impaired and effectively destroyed.  In that article, *The Wall Street Journal* reported that:

> When Merck & Co. pulled its big-selling painkiller Vioxx off the
> market in September, Chief Executive Raymond Gilmartin said the
> company was "really putting patient safety first."  He said the
> study findings prompting the withdrawal, which tied Vioxx to
> heart-attack and stroke risk, were "unexpected." ***But internal
> Merck e-mails and marketing materials as well as interviews with
> outside scientists show that the company fought forcefully for
> years to keep safety concerns from destroying the drug's
> commercial prospects.***
>
> Merck's first worry, in the mid-to-late 1990s, was that its drug
> would show greater heart risk than cheaper painkillers that were
> harsh on the stomach but were believed to reduce the risk of heart
> attacks.  Several company officials discussed in e-mails how to
> design a study that would minimize the unflattering comparison,
> even while admitting to themselves that it would be difficult to
> conceal.

214.    The November 1, 2004 *Wall Street Journal* article also described in detail a

number of internal Company e-mails and other documents that confirmed the Officer

Defendants' awareness of the seriousness of the safety issues affecting VIOXX from prior to the beginning of the Class Period, including Merck scientist Dr. Morrison's February 1997 email expressing concern that the large scale GI outcomes trial would "kill the drug," defendant Reicin's response proposing to design the large scale GI outcomes trial to preclude patients with a high risk of cardiovascular problems so that the difference in the rate of heart attacks between VIOXX patients and others "would not be evident," and defendant Scolnick's March 9, 2000 email stating the CV events seen in the VIGOR study was "mechanism-based as we worried it was."

215.    The November 1, 2004 *Wall Street Journal* article also revealed the tactics that Merck had instructed its salespersons to use to "dodge" questions from physicians about VIOXX's cardiovascular safety:

> A Merck internal marketing document reviewed by *The Wall Street Journal*, addressed to "all field personnel with responsibility for Vioxx," provided an "obstacle handling guide."  If a doctor said he was worried that Vioxx might raise the risk of a heart attack, he was to be told that the drug "would not be expected to demonstrate reductions" in heart attacks or other cardiovascular problems and that it was "not a substitute for aspirin."  This wasn't a direct answer.

> One training document is titled "Dodge Ball Vioxx" and consists of 16 pages.  Each of the first 12 pages lists one "obstacle," apparently representing statements that might be made by a doctor. Among them are, "I am concerned about the cardiovascular effects of Vioxx" and "The competition has been in my office telling me that the incidence of heart attacks is greater with Vioxx than Celebrex."  The final four pages each contain a single word in capital letters:  "DODGE!"

216.    The November 1, 2004 *Wall Street Journal* article also revealed how Merck and the Officer Defendants "also went on the offensive against academic researchers who began to question VIOXX's safety."

217.    On this same day, November 1, 2004, another negative press report about Merck came out: *Fortune* magazine featured the VIOXX scandal as its cover story, entitled "Will Merck Survive VIOXX?; Looming Lawsuits, Angry Investors, Declining Profits:  The Vioxx Debacle Is Just The Latest Setback For The Proud Pharmaceutical Giant."   In the article, defendant Gilmartin conceded that the withdrawal of VIOXX would impair Merck's profits. The *Fortune* article also reported:

> In the time the drug was on the market, Merck spent more than $500 million on commercials trumpeting its virtues, according to the health-care industry research firm Verispan. By the time it was withdrawn, some 20 million Americans had taken it, and Vioxx was generating $2.5 billion in annual sales, making it the second-best-selling COX-2 inhibitor.

218.    In response to the shocking disclosures of November 1, 2004, Merck stock fell another $3.03, or about 9.7%, from the previous trading day's closing price to close at just $28.28 per share, on heavy trading volume of 66,606,200 shares.   Excluding September 30, 2004, the one-day percentage decline and trading volume were the greatest since 1990.  Between September 30, 2004 and November 1, 2004, Merck's market capitalization fell by more than $37.2 billion.  On November 1, 2004, Merck was by far the worst performing stock in the Dow Jones 30 Industrials Average, the S&P 500 Index, and the S&P Pharmaceuticals Index, each of which it is a member.

219.    Reviewing the extraordinary disclosures of November 1, as an analyst report issued by Crowell, Weedon & Co. stated, "new information indicates to us that the situation might not be as innocent as we thought. . . . We recommend that investors sell Merck shares"

## VIII.   POST-CLASS PERIOD EVENTS

220.   In the wake of Merck's September 30, 2004 withdrawal of VIOXX from the market and the November 1, 2004 *The Wall Street Journal* article, additional details of Merck's wrongdoing and fraudulent scheme have become public, including but not limited to:

a.    Dr. Gurkipal Singh's November 18, 2004 revelation in testimony before the Senate Finance Committee that Merck had performed an internal analysis in February 1998 that showed that women in the VIOXX trials had a statistically significant 216% increased risk of suffering an adverse cardiovascular event than patients in other Merck trials taking a placebo (as discussed in ¶ 117);

b.    The *New York Times'* April 24, 2005 revelations that defendant Reicin had improperly caused a Merck scientist to change the cause of death of a patient who had been taking VIOXX in the ADVANTAGE trial so as not to "raise concerns," and that the "lead author" of the published ADVANTAGE study had actually not written the ADVANTAGE report and had been unaware of defendant Reicin's misconduct (as discussed in ¶ 167);

c.    National Public Radio's *All Things Considered* June 8, 2006 program, which revealed that half the members of VIGOR's DSMB had substantial conflicts of interest (as discussed in ¶ 129);

d.    The November 9, 2007 announcement that Merck had agreed to pay *$4.85 billion* to settle state and federal myocardial infarction (heart attack) and ischemic stroke claims filed against the Company in the United States.  Notably, unlike Merck's Class Period SEC filings, which characterized the smattering of VIOXX product cases filed during the Class Period as being "normal to its business" and "completely without merit," such language was conspicuously absent from

89

Merck's post-Class Period SEC filings that described the tens-of-thousands of actions commenced after the Company withdrew VIOXX and after information concerning Defendants' wrongdoing was revealed to the market; and

e.   Dr. Psaty's and Dr. Kronmal's April 2008 article in the *Journal of the American Medical Association* ("*JAMA*"), which revealed Merck's misconduct in concealing statistically significant mortality data in the Alzheimer's Trials from the FDA and publishing false and misleading statements to the public indicating that its data showed that VIOXX was "generally well tolerated" (as discussed in ¶ 180).[15]

221.   In Merck's Form 10-Q for the third quarter 2008 (the period ending September 30, 2008), the Company stated that it was "cooperating" with various national and foreign entities concerning their various investigations, which were commenced as early as November 2004, with respect to VIOXX:

> As previously disclosed, in November 2004, the SEC informed Merck that it was commencing an informal inquiry concerning *Vioxx*. On January 28, 2005, Merck announced that it received notice that the SEC issued a formal notice of investigation.  Merck has also received subpoenas from the U.S. Department of Justice . . .  requesting information related to the Company's research, marketing and selling activities with respect to *Vioxx* in a federal health care investigation under criminal statutes. In addition, investigations are being conducted by local authorities in certain cities in Europe in order to determine whether any criminal charges should be brought concerning *Vioxx*. In its SEC filings, Merck has stated that it "is cooperating with these governmental entities in their respective investigations.
>
> The Company cannot predict the outcome of these inquiries; however, they could result in potential civil and/or criminal dispositions.

---

[15] The internal Merck documents and emails referenced herein have become publicly available, largely as a result of governmental investigations of Merck's conduct and private litigation.

## IX.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

222.    As described in detail above and summarized below, Merck's and the Officer Defendants' statements of belief in VIOXX's purported safety and the "naproxen hypothesis" were materially false and misleading because, unbeknownst to investors, such statements were made in bad faith, and misrepresented and/or concealed that Merck and its senior scientists actually believed that VIOXX was prothrombotic (and that it was VIOXX's prothrombotic "mechanism based" characteristics, and not the "naproxen hypothesis," that was the likeliest explanation for VIGOR's CV results). The paragraphs set forth below: (i) identify each of Merck's and the Officer Defendants' Class Period statements alleged to be materially false and misleading under Section 10(b) of the Exchange Act; (ii) set forth when, where, and by whom they were made, and (iii) summarize how and why they were materially false and misleading.

### A.    Materially False and Misleading Statements Made In Connection With VIOXX's Introduction to the Market

223.    On May 21, 1999, the first day of the Class Period, the Officer Defendants caused Merck to issue a press release which announced that VIOXX "has received marketing approval from the U.S. Food and Drug Administration," and that "VIOXX has been approved for the relief of osteoarthritis (OA), management of acute pain in adults, and treatment of menstrual pain (primary dysmenorrheal)." With respect to VIOXX's side effects, the press release represented that: "The most common side effects reported in clinical trials with VIOXX were upper respiratory infection, diarrhea and nausea."

224.    By having chosen to speak about VIOXX's "side effects," Merck and the Officer Defendants had a duty to speak fully and truthfully on that subject. However, in violation of that duty, the above-referenced statements from the May 21, 1999 Merck press release were materially false and misleading because they failed to disclose the "great concern" on the part of

Merck and the Officer Defendants that VIOXX was prothrombotic, and the totality of the facts on which that "great concern" was based, including, *inter alia*, (a) their awareness of the initial manuscripts of the results of Protocol 023, in which Drs. FitzGerald and Catella-Lawson had expressed their view that the results "implie[d] a *major role* for Cox-2 in *systemic* biosynthesis of prostacyclin in humans" and thus upset the natural balance between prostacyclin and thromboxane in the body; (b) their private conversations with preeminent medical researcher Dr. Oates, who supported Drs. FitzGerald and Catella-Lawson's views of the Protocol 023 data; and (c) Merck's internal February 1998 analysis, which showed that female patients in the VIOXX trials had at least a statistically significant 216% increase in the risk of suffering an adverse cardiovascular event compared to patients taking a placebo and that male patients taking had a 28% increase in the risk of such an event. As a result, investors were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

### B. Materially False and Misleading Statements Made During the Second Half of 1999

225. On July 23, 1999, the Officer Defendants caused Merck to issue a press release announcing the Company's results for the second quarter 1999 (the quarter ending June 30, 1999). The July 23 press release stated as follows:

> ***Sales growth for the quarter and the first half of 1999 was led by the established major products, the newer products including the 1999 launch of Vioxx***, as well as growth from the Merck-Medco Managed Care business . . . .
>
> \*   \*   \*
>
> Following a six-month priority review on May 20 the FDA cleared VIOXX, Merck's once-daily COX-2 specific inhibitor, for relief of the signs and symptoms of osteoarthritis, management of acute pain in adults, and treatment of menstrual pain. Since then, more than 400,000 U.S. patients have taken the Product. Merck has

introduced VIOXX in nine other countries including the United Kingdom, Switzerland and Mexico.

226.    By having chosen to speak about VIOXX's worldwide commercial success, Merck and the Officer Defendants had a duty to speak fully and truthfully on that subject. However, in violation of that duty, the above-referenced statements from the July 23, 1999 press release were materially false and misleading because they created the materially false and misleading impression that VIOXX's commercial success would likely continue into the future, but failed to disclose the "great concern" on the part of Merck and the Officer Defendants that VIOXX was prothrombotic, and the totality of the facts on which that "great concern" was based, including, *inter alia*, the information referenced in ¶ 224.  As a result, investors were materially misled as to the enormous risk that VIOXX's safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

227.    On or about August 12, 1999, the Officer Defendants caused Merck to file the Company's Form 10-Q for the second quarter 1999 with the SEC.  The Form 10-Q was signed by defendant Henriques, and repeated the same materially false and misleading statements concerning VIOXX that were made in the Company's July 23, 1999 press release referred to above.

228.    On October 21, 1999, the Officer Defendants caused Merck to issue a press release announcing Merck's results for the third quarter 1999 (the quarter ending September 30, 1999).  Commenting on Merck's performance, defendant Gilmartin stated in the press release that:

> *Sales growth for the quarter and nine months of 1999 was led by the established major products, the newer products, including VIOXX,* and growth from the Merck-Medco Managed Care business . . . .

The press release further stated that:

> ***In just 20 weeks on the market in the United States, VIOXX has
> become the country's fastest growing prescription arthritis
> medicine***. U.S. physicians have written more than 2 million
> prescriptions for Merck's newest medicine, which is used to
> relieve the signs and symptoms of osteoarthritis, manage acute
> pain in adults and treat menstrual pain.
>
> Merck has introduced VIOXX in 22 other countries, including the
> United Kingdom, Switzerland and Mexico.

229.    The above-referenced statements from the October 21, 1999 Merck press release
were materially false and misleading because they created the materially false and misleading
impression that VIOXX's commercial success would likely continue into the future, but failed to
disclose the "great concern" on the part of Merck and the Officer Defendants that VIOXX was
prothrombotic, and the totality of the facts on which that "great concern" was based, including,
*inter alia*, the information referenced in ¶ 224 above. As a result, investors were materially
misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least
significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for
the Company.

230.    On October 25, 1999, the Officer Defendants caused Merck to issue a press
release announcing the results of a new study that showed that osteoarthritis patients taking
VIOXX "developed significantly fewer endoscopic ulcers than patients taking ibuprofen, a
commonly used arthritis medicine." The press release also stated that "[i]n other studies, the
most common side effects reported in clinical trials with VIOXX were upper respiratory
infection, diarrhea, nausea and high blood pressure."

231.    By having chosen to speak about VIOXX's "side effects," Merck and the Officer
Defendants had a duty to speak fully and truthfully on that subject. However, in violation of that
duty, the above-referenced statements from the October 25, 1999 Merck press release were

materially false and misleading because they failed to disclose the "great concern" on the part of Merck and the Officer Defendants that VIOXX was prothrombotic, and the totality of the facts on which that "great concern" was based, including, *inter alia*, the information referenced in ¶ 224 above.  As a result, investors were materially misled as to the enormous risk that VIOXX's safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

232.    On or about November 12, 1999, the Officer Defendants caused Merck to file with the SEC the Company's Form 10-Q for the third quarter 1999 (the quarter ending September 30, 1999).  The Form 10-Q was signed by defendant Henriques, and repeated the same materially false and misleading statements concerning the purported success of VIOXX that were made in the Company's October 21, 1999 press release referred to above.

233.    On November 23, 1999, the Officer Defendants caused Merck to issue a press release announcing the results of a study published in *JAMA*, which found that VIOXX "significantly reduced the risk of gastrointestinal (GI) side effects" compared to other commonly prescribed NSAIDs.  The press release further stated that "[c]ommon side effects reported in clinical trials with VIOXX were upper-respiratory infection, diarrhea, nausea and high blood pressure."

234.    The above-referenced statements from the November 23, 1999 Merck press release concerning VIOXX's side effects were materially false and misleading because they failed to disclose the "great concern" on the part of Merck and the Officer Defendants that VIOXX was prothrombotic, and the totality of the facts on which that "great concern" was based, including, *inter alia*, the information referenced in ¶ 224.  As a result, investors were materially misled as to the enormous risk that VIOXX's safety profile would jeopardize (or at

least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

235.    On December 9, 1999, the Officer Defendants caused Merck to issue a press release that was attached to a Merck Form 8-K filed with the SEC on December 16, 1999.  The press release quoted defendant Gilmartin as telling 300 securities analysts at an annual business briefing conference that: "Strong sales of several key products, including Vioxx, are fueling Merck's growth, and growth rates are expected to remain competitive with those of the leading health care companies through the year 2002."  The press release also quoted defendant Anstice as lauding the growth and prospects for VIOXX:

> After only 28 weeks on the U.S. market, *Vioxx,* the once-a-day, anti-inflammatory COX-2 specific inhibitor (a coxib*) to treat the signs and symptoms of osteoarthritis and relieve acute pain, *is Merck's "biggest, fastest and best prescription drug launch ever,"* Mr. Anstice said.  *Vioxx is gaining ground as the "coxib of choice," achieving more than 40% of new U.S. prescriptions in its class. To date, Merck has launched Vioxx in more than 30 countries and it was the first coxib to receive mutual recognition approval for marketing in all the European Union countries.* The initial uptake of Vioxx in the United Kingdom, Sweden and Germany -- the only E.U. countries where the product has been launched -- has been excellent. Within 14 weeks on the market in Switzerland, Vioxx achieved more than a 50% share of the coxib class.   Merck is also evaluating Vioxx for the treatment of rheumatoid arthritis and the prevention and treatment of Alzheimer's disease, and will be studying the medicine's ability to help prevent colon cancer.

236.    The above-referenced statements from the December 9, 1999 Merck press release concerning VIOXX's commercial success were materially false and misleading because they failed to disclose the "great concern" on the part of Merck and the Officer Defendants that VIOXX was prothrombotic, and the totality of the facts on which that "great concern" was based, including, *inter alia*, the information referenced in ¶ 224.  As a result, investors were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or

at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

      C.      **Materially False and Misleading Statements Made in Connection with Defendants' Discussions of Merck's Fourth Quarter and Year-End 1999 Results**

     237.    On January 26, 2000, the Officer Defendants caused Merck to issue a press release announcing the Company's results for the fourth quarter and full year 1999 (the quarter and year ending December 31, 1999). The press release quoted defendant Gilmartin as follows:

> ***Sales growth for the quarter and the year was led by the established major products, the newer products, including VIOXX,*** as well as growth from the Merck-Medco Managed Care business.
>
> VIOXX is the fastest growing prescription arthritis and pain medicine in the United States and represents one of the most successful product introductions in the pharmaceutical industry's history.

The January 26, 2000 press release also stated:

> Since its introduction almost eight months ago in the United States, more than 5 million prescriptions have been written for VIOXX. With its ***exceptional product profile*** VIOXX is the country's fastest growing prescription arthritis medicine.

     238.    By having chosen to speak about VIOXX's worldwide commercial success and "exceptional product profile," Merck and the Officer Defendants had a duty to speak fully and truthfully on those subjects. However, in violation of that duty, the above-referenced statements from the January 26, 2000 Merck press release were false and materially misleading because they failed to disclose the "great concern" on the part of Merck and the Officer Defendants that VIOXX was prothrombotic, and the totality of the facts on which that "great concern" was based, including, *inter alia*, the information referenced in ¶ 224. As a result, investors were materially misled as to the enormous risk that VIOXX's safety profile would jeopardize (or at

least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

239.    On March 9, 2000, the VIGOR study results were forwarded to Merck's chief scientist, defendant Scolnick.   Later that same day, defendant Scolnick wrote his email to defendant Reicin and other senior Merck scientists who were overseeing Merck's VIOXX's research programs, in which he acknowledged that the "[adverse] CV events are clearly there" in the VIGOR study results, and that

> It is a shame but it is a low incidence and it is mechanism based as we worried it was.  [Dr.] Oates and [senior Merck scientists] Alan [Nies] and Barry [Gertz] were right about the metabolite meanings ie urine Pg [prostacyclin] data…"

(*See* ¶ 138 above).

240.    On March 22, 2000 -- just thirteen days after defendant Scolnick's March 9, 2000 email, the Officer Defendants caused Merck to file the Company's 1999 Form 10-K with the SEC.   Defendants Gilmartin, Lewent, Henriques, and Scolnick signed the 1999 Form 10-K, which stated as follows:

> ***With its product profile for*** strength, ***safety*** and once daily simplicity, ***VIOXX remains the country's fastest growing prescription arthritis medicine***.   In the product's first seven months, U.S. physicians wrote more than five million prescriptions.  VIOXX is also enjoying success in the 47 other countries in which it has been launched.

241.    By having chosen to speak about VIOXX's "profile for …safety" and worldwide commercial success, Merck and the Officer Defendants had a duty to speak fully and truthfully on those subjects.  However, in violation of that duty, the above-referenced statements from Merck's 1999 Form 10-K were materially false and misleading because they failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter*

*alia*, (a) their awareness of the initial manuscripts of the results of Protocol 023, in which Drs. FitzGerald and Catella-Lawson had expressed their view that the results "implie[d] a *major role for Cox-2 in systemic* biosynthesis of prostacyclin in humans" and thus upset the natural balance between prostacyclin and thromboxane in the body; (b) their private conversations with preeminent medical researcher Dr. Oates, who supported Drs. FitzGerald and Catella-Lawson's views of the Protocol 023 data; (c) Merck's internal February 1998 analysis, which showed that female patients in the VIOXX trials had at least a statistically significant 216% increase in the risk of suffering an adverse cardiovascular event compared to patients taking a placebo and that male patients taking had a 28% increase in the risk of such an event; and (d) their awareness of non-public data from a study involving more than 164,000 patients -- which Dr. FitzGerald considered to be the "the best comparative clin[incal] data on MI and NSAIDs" -- and which showed that naproxen (like ibuprofen and diclofenac, but unlike aspirin) "had no significant effect" on reducing the risk of suffering a heart attack.  As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

242.    On March 24, 2000, the Officer Defendants caused Merck to issue the Company's Annual Report for 1999.  The cover of the 1999 Annual Report proclaimed:  "Vioxx: Our biggest, fastest and best launch ever."  In his letter to shareholders contained in the 1999 Annual Report, defendant Gilmartin stated:

> ***Vioxx is the fastest growing prescription arthritis medicine in the United States,*** and, by the end of 1999, Merck had successfully launched Vioxx in nearly 50 nations.

243.    By having chosen to speak about VIOXX's worldwide commercial success, including, *inter alia*, VIOXX's "successful product introduction" and "exceptional product profile," Merck and the Officer Defendants had a duty to speak fully and truthfully on that subject.  However, in violation of that duty, the above-referenced statements from Merck's 1999 Annual Report were materially false and misleading because they failed to disclose that Merck and the Officer Defendants believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 241.  As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

**D.    Merck and the Officer Defendants' Spring 2000 Statements Announcing the VIGOR Trial Results and Proffering their Purported Belief in the Naproxen Hypothesis**

244.    On March 27, 2000, the Officer Defendants caused Merck to issue a press release that purported to summarize the findings of the VIGOR study.  The press release emphasized that those who took VIOXX had significantly fewer adverse gastrointestinal events than those who took naproxen in the VIGOR study.  Although the press release also acknowledged that those who took VIOXX experienced significantly more thromboembolic events than those who took naproxen in the study, the press release was designed to lead investors and the public to believe that it was the purported cardioprotective effect of naproxen that was the most likely explanation for VIGOR's CV results (the "naproxen hypothesis"), and that VIOXX was not prothrombotic.  As the press release stated:

> [S]ignificantly fewer thromboembolic events were observed in patients taking naproxen in this GI outcomes study, which is **consistent** with naproxen's ability to block platelet aggregation. This effect on these events had not been observed previously in any clinical studies for naproxen. VIOXX, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have similar effects.

The press release also stated:

> *An extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with VIOXX, showed no indication of a difference in the incidence of thromboembolic events between VIOXX, placebo and comparator NSAIDs.* Further analyses are ongoing, and final results of the GI outcomes study with VIOXX will be presented at peer-reviewed medical meetings this year.

245. However, the statements in Merck's March 27, 2000 press release, which sought to attribute the difference in thromboembolic events in VIGOR to naproxen's purported cardioprotective characteristics (the "naproxen hypothesis"), were materially false and misleading because (a) they constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis (rather than VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and that it was the "mechanism based" effect of VIOXX in suppressing prostacyclin (without suppressing thromboxane) -- rather than the "naproxen hypothesis" -- that explained VIGOR's results, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 241. As a result, investors were affirmatively misled as to, and remained unaware of, Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least

significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

246.    In addition, Merck's and the Officer Defendants' further statements in the March 27, 2000 press release to the effect that "[a]n extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with VIOXX, showed no indication of a difference in the incidence of thromboembolic events between VIOXX, placebo and comparator NSAIDs" were also materially false and misleading because, at the time the statement was made, Merck and the Officer Defendants were in possession of the results of Merck's non-public internal February 1998 analysis, which showed, *inter alia,* that women taking VIOXX had *at least* a 216% (statistically significant) greater risk of experiencing serious adverse cardiovascular events compared to women not taking any drug in other Merck studies.  As a result of these further materially false and misleading statements in the March 27 press release, investors were further materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

247.    In the wake of Merck's March 27, 2000 press release, market analysts and members of the press understood that thromboembolic events could be a side effect of VIOXX, but repeated Merck's representations concerning the naproxen hypothesis and statements that there was no evidence from Merck's other clinical data that VIOXX was prothrombotic.  For example:

(a)     On April 12, 2000, an article in *Biotech Week* entitled "Merck & Co., Inc.: Preliminary Results of Gastrointestinal Outcomes Study Presented" reported that:

Vioxx, like all COX-2 selective medicines, does not block platelet aggregation and would not be expected to have similar effects. Medicines like aspirin and naproxen that significantly inhibit COX-1 block platelet aggregation and therefore have the potential to provide cardioprotection.

and

(b)    On April 17, 2000, an analyst report issued by JP Morgan reported that:

Celebrex showed no statistical difference for NSAIDs on any of a variety of [CV] risk factors.  This contrasts to Merck's VIOXX in the VIGOR study, which did show that VIOXX patients experienced more thromboembolic events (*i.e.*, strokes, heart attacks) than NSAID patients.  ***This may have been due to the anti-clotting benefits of NSAIDS and the fact that VIGOR did not allow background aspirin therapy***….

While Celebrex showed no disadvantage on thromboembolic events, it narrowly failed to show statistical significance on the primary GI endpoint, while it did demonstrate statistical advantage on a variety of other GI endpoints….  ***For VIOXX, although medical intuition implies that the thromboembolic event issue is an "NSAID-issue," the theoretical [CV] protective benefits of naproxen (the VIGOR comparator NSAID) has not been clinically proven, and the non-aspirin using cut of CLASS did not show the same problem for Celebrex.  [However,] In our view, the GI superiority of both Celebrex and VIOXX is the primary issue and should be evident to the FDA.***  We expect meaningful modifications of the standard NSAID GI warning for both products after these data are reviewed.

248.    On April 27, 2000 CNBC and *Reuters* reported that some analysts were increasingly concerned that VIGOR's CV data would attract heightened FDA scrutiny. However, in response to what Merck characterized as "speculative news reports," Merck and the Officer Defendants responded with a renewed public relations campaign to emphasize their purported belief in the "naproxen hypothesis" as the likeliest explanation for the VIGOR results, and to reassure the public that VIOXX was safe.  For example, on April 27, 2000, *Reuters* reported that Merck spokesperson Jan Weiner had told *Reuters* "that there was no evidence that

VIOXX actually put patients at higher risk of adverse [cardiovascular] events" and that "it was likely that naproxen had conferred protection to patients taking that drug."

249.    Similarly, on April 28, 2000, the Officer Defendants caused Merck to issue a Company press release entitled "Merck Confirms Favorable Cardiovascular Safety Profile of VIOXX," which reaffirmed Merck's purported belief in the "naproxen hypothesis" and reiterated the purported safety profile of VIOXX.  As the April 28 press release stated:

> In response to speculative news reports, Merck & Co. today confirmed the **favorable cardiovascular safety profile of Vioxx**.
>
> In preliminary findings from Merck's large gastrointestinal (GI) study that compared Vioxx in patients with rheumatoid arthritis, significantly fewer heart attacks were observed in patients taking naproxen (0.1 percent) compared to patients taking Vioxx (0.5 percent).  ***This result is consistent with naproxen's ability to block platelet aggregation.***  This is the first time this effect of naproxen to reduce these events has been demonstrated in a clinical study.  ***Vioxx, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have these effects in reducing these events***.
>
> Extensive review of data from the completed osteoarthritis trials and on-going clinical trials with Vioxx, as well as post-marketing experience with Vioxx have shown ***NO DIFFERENCE*** [emphasis in original] in the incidence of cardiovascular events, such as heart attacks, among patients taking Vioxx, other NSAIDs and placebo.

250.    The statements in the April 27, 2000 *Reuters* article and Merck's April 28, 2000 press release, which sought to attribute the difference in heart attacks in VIGOR to naproxen's purported cardioprotective characteristics (the "naproxen hypothesis"), were materially false and misleading because (a) they constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the "naproxen hypothesis" (rather than VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and that it was the "mechanism based" effect

of VIOXX in suppressing prostacyclin (without suppressing thromboxane) -- rather than the "naproxen hypothesis" -- that explained VIGOR's results, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 241.  As a result, investors were affirmatively misled as to, and remained unaware of, Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were further materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

251.    In addition, the statements in the April 28, 2000 press release that an "[e]xtensive review of data from the completed osteoarthritis trials and on-going clinical trials with Vioxx, as well as post-marketing experience with Vioxx had shown "no difference" in the incidence of cardiovascular events, such as heart attacks, among patients taking Vioxx, other NSAIDs and placebo" were also materially false and misleading because, at the time the statement was made, Merck and the Officer Defendants were in possession of the results of Merck's non-public internal February 1998 analysis, which showed, *inter alia,* that women taking VIOXX had *at least* a 216% (statistically significant) greater risk of experiencing serious adverse cardiovascular events compared to women not taking any drug in other Merck studies.  As a result of these further materially false and misleading statements in the March 27 press release, investors were further materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

252.    That the market continued to be misled by Merck's and the Officer Defendants' false assurances in April 2000 concerning the safety of Vioxx, and the continuing strong

commercial prospects and viability of the drug is evidenced by the comments of securities

analysts who followed Merck.  For example:

> (a)  On April 28, *Dow Jones*' news wire service reported that perhaps

Wall Street's most influential Merck analyst, PaineWebber's Jeff Chaffkin,

credited Merck's renewed assurances of VIOXX's "favorable" safety profile.  As

Dow Jones reported:

>> [A]t least one analyst – and the company – said there's **little to worry about.  "This whole thing has been overblown and taken out of context,"** says Wall Street Journal All-Star analyst Jeff Chaffkin of PaineWebber.  "We had this data over four weeks ago.  This is nothing new."

> (b)  On April 28, 2000, Lehman Brothers issued an analyst report

which stated:

>> Concerns have been **circulated** in the press that Merck's Cox-2 inhibitor drug, VIOXX, may be associated with increased risk of stroke or heart attack.  These concerns are not supported by the clinical data publicly known. In our March 27 note, we wrote that Merck's preview of the VIGOR study results included a statistically significant differential in thromboembolic events between VIOXX and Naproxen users.   Merck attributes the difference to Naproxen's platelet blocking characteristics.

> (c)  On April 28, 2000, Merrill Lynch issued an analyst report, which stated:

>> Detailed data from the [VIGOR] study has not been released.  [However,] *[w]e have no reason to believe Vioxx would cause a greater rate of [CV] events than would be seen without treatment.  It may be that Naprosyn [a/k/a naproxen] (which is known to inhibit platelet aggregation and thus blood clot formation) reduces the rate of [CV] events."*

>> Our estimates and rating [accumulate] are unchanged.

> (d)  On April 28, 2000, Ryan, Beck, & Co. issued an analyst report that

commented, with regard to Merck's reassurances that VIOXX was safe, that "[t]here is

no credibility problem for Merck."

(e)    On May 1, 2000, Bernstein Research Call issued an analyst report that

stated:  "We'd be shocked if [the] FDA gave this a second glance, much less re-labeled

VIOXX to suggest greater risks of vascular events.  *It's not VIOXX increasing events,*

*it's Naproxen reducing them.*"

(f)    On May 2, 2000 Goldman Sachs issued an analyst report that stated:

> VIGOR study of rheumatoid arthritis shows a lower rate of heart
> attacks among patients receiving naproxen compared to Vioxx
> users (0.1% for naproxen vs. 0.5% for Vioxx). *Merck assures that
> its review of all completed and ongoing studies of Vioxx fails to
> find any difference in the incidence of [CV] events between
> Vioxx and other anti-inflammatory drugs (such as naproxen)
> and placebo.* We maintain our 2000 sales estimate of $1.7 billion

*   *   *

> This data will be submitted to FDA to support removal of the NSAID class
> labeling that warns of the potential for [GI] toxicity.

> What has attracted more attention is the finding that there were
> significantly fewer thromboembolic events in the Naproxen group.
> *While naproxen is known to* inhibit *platelet aggregation (or
> "clumping" that can lead to the formation of clots in arteries), it
> has never been shown clinically that naproxen prevents heart
> attacks the way that aspirin, another platelet inhibitor, does.  We
> do not find this lack of data surprising as outcomes studies were
> never conducted on these older off-patient NSAIDs. It is well
> known, however, that Cox -2 inhibitors do not inhibit platelet
> aggregation to any significant degree and would not be expected
> to prevent heart attacks.*

*   *   *

> If a label change were to be considered by the [FDA], we would
> not expect either drug, Vioxx or Celebrex, to be given preferential
> labeling over the other with respect to [CV] safety…*However, we
> believe the more conclusive GI safety achieved in Merck's
> VIGOR study could plausibly result in a preferential safety label
> for Vioxx relative to Celebrex*

253.    Meanwhile, on April 24, 2000, the Officer Defendants caused Merck to issue a

press release announcing the Company's results for the first quarter 2000 (the quarter ending

March 31, 2000).  Commenting on the Company's performance, defendant Gilmartin stated in

the press release that:

> ***Sales growth for the quarter was led by VIOXX, the fastest growing prescription arthritis medicine in the United States,*** other newer and established products and growth from the Merck-Medco Managed Care business.
>
> Five key products – VIOXX [and four other products -- led Merck's growth, and account for more than 50% of Merck's worldwide human health sales.

The April 24 press release also stated:

> ***VIOXX remains the fastest growing prescription arthritis medicine in the United States***.  More than 9 million prescriptions have been written for VIOXX since its U.S. introduction 10 months ago.  In addition, it is the only medicine specifically inhibiting COX-2 that is indicated both for treatment of osteoarthritis and for relief of acute pain, such as pain following knee, hip replacement and dental surgery.  VIOXX is enjoying strong success in the European countries where it has been launched, including the United Kingdom, Germany and Spain.  In all, VIOXX has been launched in more than 50 countries.

254.  Also on April 24, 2000, the Officer Defendants held a conference call for

analysts, money and portfolio managers, institutional investors, and large Merck shareholders.

During the April 24 call, Laura Jordan, Merck's Senior Director of Investor Relations,

commented on VIOXX's purported success as follows:

> Vioxx is currently the fastest growing prescription arthritis medicine on the market in the US.  On a weekly basis, approximately 200,000 new prescriptions are written for VIOXX in the US.  That's up from the approximately 160,000 weekly new prescriptions that I reported to you in last quarter's call.  Total prescriptions on a weekly basis currently running about 350,000 per week, total prescriptions.  That's up from the approximately 260,000 weekly total prescriptions I reported to you on our last call.  Looking at our cumulative U.S. VIOXX prescription since we launched, looking at it through the end of last week, nearly 10 million prescriptions had been written for VIOXX in the U.S. and of course, that number continues to grow on a daily basis.

> So as you can see the Vioxx launch **continues to meet the very robust expectations** that we had for the product....

255.    By having chosen to speak about VIOXX's worldwide commercial success and its continuing to meet Merck's "very robust expectations," Merck and the Officer Defendants had a duty to speak fully and truthfully on that subject.  However, in violation of that duty, the above-referenced statements from the April 24 Merck press release and conference call were materially false and misleading because they failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 241.  As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

256.    On or about May 12, 2000, the Officer Defendants caused Merck to file with the SEC the Company's Form 10-Q for the first quarter of 2000.  The Form 10-Q was signed by defendants Frazier and Henriques.  The Form 10-Q repeated the same materially false and misleading statements concerning the purported success and safety of VIOXX that were made in Merck's April 24, 2000 press release referred to above.

257.    On May 24, 2000, Merck gave a formal presentation of the VIGOR study data at a major digestive disease medical conference.  At that conference, Merck again reiterated its "naproxen hypothesis" and touted VIOXX's purported safety.  Market analysts again reacted favorably to these further reassurances, while still acknowledging that the "naproxen hypothesis" was not proven.  For example:

(a)    On May 24, 2000 J.P. Morgan issued an analyst report stating:

We believe that for both VIOXX and Celebrex, most physicians already believe that the drugs are safer and that the next level of marketing is to take that message directly to consumers…. We continue to be enthusiastic about the COX-2 inhibitors (total class forecast of $13 billion in 2004) ….

…. For both drugs, the safety trials, while *very impressive*, also present challenges. For VIOXX, there is the increased risk of heart attacks for patients on VIOXX versus naproxen (*probably* but not conclusively *due to the anti-platelet effect of naproxen*)….

(b)    On May 25, Morgan Stanley Dean Witter issued an analyst report,

entitled "Positive Clinical Outcomes Studies Presented at DDW," that stated:

This week, we attended a number of presentations on the [GI] safety of COX-2 inhibitors at the annual Digestive Disease Week conference. The full data from these clinical outcomes trials have been anticipated since Celebrex and VIOXX were introduced last year, because of the potential that the data could lead to a revision of the labels or even removal of the standard NSAID GI warning. Additionally, the partial release of data last month led to some confusion and speculation about the relative safety of the products in the GI and cardiovascular systems.

*In our opinion, both of these major studies successfully achieved their goals of differentiating the long-term safety profile of the COX-2 inhibitors from those of comparator NSAIDS.* Though there were some differences in study designs and the results of the CLASS and VIGOR trials, one product does not emerge as clearly superior to the other, in our opinion.

(c)    On June 13, 2000, Bernstein Research Call issued a research

report, entitled "COX-2 GI Safety Data Will Positively Effect COX-2 Demand;

VIOXX Benefits More Than Celebrex, Improving MRK's Near Term Outlook,"

which stated:

Our proprietary survey of the arthritis market shows that the pending addition of GI safety data into COX-2 marketing messages will expand demand for the class, contrary to our expectation. We see a near term (6-12 month) gain for the COX-2

110

class of an additional 5-8% of arthritis category scripts; COX-2's at present have a 38% share.

Merck's VIOXX is the primary beneficiary of this potential inflection point in demand; the 220 physicians surveyed were 20 percent more likely to prefer VIOXX than Celebrex….   Our market simulation changes our mind on VIOXX; we now see the potential for continued growth, and have raised our '00 number by $300M, and our '04 number by $1.1B.  VIOXX accounts for one-sixth of our '00 Merck EPS, and almost a fourth of our '04 EPS.

….   Active physicians that saw the VIGOR data including the mention of higher incidence of MI in VIOXX patients not only wrote more COX-2 [prescriptions] than controls for MI-risk only patients, they wrote more VIOXX for these patients than did their control counterparts.  GI risk matters more than MI risk in this market, and physicians have apparently taken the view that more VIGOR/VIOXX patients VIGOR/traditional NSAID patients had MI's because no VIGOR patients were allowed aspirin, and traditional NSAIDS block platelet aggregation where COX-2's don't….

…   With VIOXX's outlook improved, our view of the stock improves as well….

258.   Merck's statements at the May 24, 2000 digestive disease medical conference, which sought to attribute the difference in heart attacks in VIGOR to naproxen's purported cardioprotective characteristics (the "naproxen hypothesis"), were materially false and misleading because (a) they constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the "naproxen hypothesis" (rather than VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and that it was the "mechanism based" effect of VIOXX in suppressing prostacyclin (without suppressing thromboxane) -- rather than the "naproxen hypothesis" -- that explained VIGOR's results, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 241.  As a result,

investors were affirmatively misled as to, and remained unaware of, the Merck's and the Officer

Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were further

materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or

at least significantly limit) VIOXX's commercial viability and ability to generate substantial

revenue for the Company.

259.    Indeed, by vociferously touting VIOXX's purported safety profile during the

Class Period, Merck and the Officer Defendants were able to win further acceptance for the

"naproxen hypothesis" as the most likely explanation for the VIGOR CV results.  For example,

on May 25, 2000, Merck marketing executive Margie McGlynn emailed defendants Reicin and

Scolnick.  The email forwarded two analyst reports "which most clearly demonstrate the success

of our efforts to defuse the CV risk issue for VIOXX," and "personally thank[ed them] for all of

[their] efforts and the tremendous support you provided [to] the marketing organization."  The

analyst reports supported Merck's hypothesis that the difference in rates of heart attacks in

VIGOR was consistent with naproxen's ability to block platelet aggregation.

260.    On June 29, 2000, Merck issued a press release announcing that Merck "today

had submitted a Supplemental New Drug Application for VIOXX" to the FDA seeking to

"request labeling changes based on the recently completed 8,000-patient gastrointestinal

outcome study called VIGOR."  The following day, Merck common stock increased more than

$2.50 to close at $76.63 on June 28, compared to its closing price of $74.11 the previous day.

**E.      Materially False and Misleading Statements Made During the Second Half of
          2000**

261.    On July 24, 2000, the Officer Defendants caused Merck to issue a press release

announcing Merck's results for the second quarter 2000 (the period ending June 30, 2000). In the

press release, defendant Gilmartin boasted about VIOXX's commercial success: "[s]ales growth

for the quarter and the first half of 2000 was led by VIOXX, the other newer and established

products and growth from the Merck-Medco Managed Care business." In addition, defendant

Gilmartin also commented on VIOXX's commercial prospects:

> The five products [including VIOXX] provide a strong platform
> for *growth*. . . . Each is a successful . . . medicine, *offering a*
> *unique competitive advantage in the market*, and we are
> conducting additional clinical studies that will potentially *extend*
> each franchise to even more patients.

The press release even cited to the GI events observed in VIGOR, which, according to Merck

and the Officer Defendants, provided a basis for *expanding* its accepted uses:

> In May, Merck presented results from the 8,000 patient VIOXX
> Gastrointestinal Outcomes Research (VIGOR) study in which
> VIOXX reduced the incidence of serious gastrointestinal side
> effects, such as ulcers and bleeding, by more than 50 percent
> compared to the nonsteroidal anti-inflammatory drug Naproxen.
> In June, Merck submitted a Supplemental New Drug Application
> for VIOXX to the U.S. Food and Drug Administration (FDA) to
> request labeling changes based on the study.

262.    Also on July 24, Merck held an earnings conference call for analysts, money and

portfolio managers, institutional investors, and large Merck shareholders.  During the July 24

call, Laura Jordan, Merck's Senior Director of Investor Relations, commented on VIOXX's

purported continued growth in sales:

> Let's start with VIOXX, Merck's Cox-2 inhibitor for osteoarthritis
> and pain, second quarter sales on a worldwide basis for VIOXX
> were $475 million and VIOXX has now become one of Merck's
> largest selling products.  In fact, we sold more VIOXX this quarter
> than we've sold in all of 1999.
>
> *[T]he VIOXX launch continues to meet the very robust*
> *expectations that we've had for the product.  We continue to be*
> *extremely pleased with this uptake in the marketplace in*
> *countries throughout the world.  We're extremely pleased with*
> *the acceptance by physicians, patients and payors, and we are*
> *<u>very bullish</u> on the product's future growth and prospects*.

263.     However, the statements made in Merck's July 24, 2000 press release and during the following conference call concerning VIOXX's worldwide commercial success and "unique competitive advantages," and Merck being "very bullish" on VIOXX's "future growth and prospects," were materially false and misleading because they created the materially false impression that VIOXX's commercial success would likely continue into the future, but failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 241.  As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

264.     Based on the state of the information publicly available in the summer of 2000, the market continued to anticipate strong growth for VIOXX.  For example, a July 25, 2000 Sutro & Co. analyst report stated:

> We are upgrading our rating from Hold to Accumulate and increasing our price target from $80 to $85.  ***VIOXX is doing much better than we had anticipated and this has caused us, along with the rest of the Street to raise EPS estimates***.

265.     On August 10, 2000, the Officer Defendants caused Merck to file the Company's Form 10-Q for the second quarter 2000 (the period ending June 30, 200), which was signed by defendants Frazier and Henriques.  The Form 10-Q substantially repeated the materially false and misleading statements Defendants made in the July 24, 2000 press release, as set forth above.

266.    On or about October 20, 2000, the Officer Defendants caused Merck to issue a press release announcing the Company's results for the third quarter 2000 (the period ending September 30, 2000).   The October 20 press release stated as follows:

> We are proud of the achievements of our newest medicine VIOXX which, together with ZOCOR, COZZAAR/HYZAAR*, FOSAMAX, and SINGULAIR are driving Merck's strong performance.
>
> More than 15 million prescriptions in the United States alone have been written for VIOXX, our new medicine for osteoarthritis, since its extraordinarily successful launch last year, and it continues as the world's fastest growing prescription arthritis medicine. VIOXX has now achieved nearly $1.5 billion in sales so far this year -- more than $600 million in this quarter alone.

In addition, the press release also stated:

> In June, Merck submitted a Supplemental New Drug Application for VIOXX to the FDA to request labeling changes based on the results of the 8,000-patient VIOXX Gastrointestinal Outcome Research (VIGOR) study.   In this study, VIOXX reduced the incidence of serious gastrointestinal side effects, such as ulcers and bleeding, by more than 50% compared to the nonsteroidal anti-inflammatory drug Naproxen.

267.    Also on October 20, 2000 Merck held a conference call for analysts, money and portfolio managers, institutional investors, and large Merck shareholders.  During the October 20 call, Laura Jordan, Merck's Senior Director of Investor Relations, commented on VIOXX's purported success, noting that "Vioxx has quickly become Merck's second largest selling product," and that it was "the only Cox-2 inhibitor now on the market in virtually every country, every market in the world, excluding Japan."

268.    However, the statements made in Merck's October 20, 2000 press release and during the following conference call concerning VIOXX's purported worldwide commercial success were materially false and misleading because they created the materially false impression that VIOXX's commercial success would likely continue into the future, but failed to

115

disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 241.  As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

269.    On or about November 13, 2000, the Officer Defendants caused Merck to file the Company's Form 10-Q for the third quarter 2000 (the period ending September 30, 2000), which was signed by defendants Frazier and Henriques.  The Form 10-Q repeated substantially the same materially false and misleading statements concerning VIOXX made in the October 20, 2000 press release, as set forth above.

270.    Further evidencing the success of Merck's and the Officer Defendants' effort to mislead the market with respect to the safety and success of VIOXX, Merck common stock reached a Class Period high closing price of $94.88 on November 29, 2000.

271.    In a December 12, 2000 press release that the Officer Defendants caused to be attached to a Form 8-K filed with the SEC, the following summary of statements made by defendants Anstice and Wold-Olsen at Merck's Annual Business Briefing were made:

> *David Anstice and Per Wold-Olsen highlighted the outstanding performance of VIOXX, Merck's newest product*, along with Zocor, Fosamax, Singulair and Cozaar/Hyzaar.  Mr. Anstice and Mr. Wold-Olsen said that strong sales growth was driven by a focus on targeted audiences with compelling messages and effective use of sales forces….
>
> VIOXX, Merck's once-a-day medicine for osteoarthritis and for acute pain, has become the world's fastest growing prescription arthritis medicine, and it is already Merck's second-largest selling medicine.

The same December 12, 2000 Form 8-K also attached "Remarks by Raymond V.

Gilmartin" presented at the Annual Business Briefing, which quoted defendant Gilmartin as

stating:

> VIOXX has achieved approximately 50 percent of the new prescriptions in the COX-2 class in the U.S. ***Combined with its strong leadership in Europe, VIOXX is firmly positioned for outstanding worldwide growth***.
>
> Merck research has given the Company five powerful medicines [including VIOXX] around which we have built a series of strong competitive successes. Each of these medicines has unique performance characteristics that are helping to separate us from the competition.
>
> … Since its extraordinarily successful launch last year, VIOXX, Merck's once-a-day medicine for osteoarthritis and for acute pain, has become the world's fastest growing prescription arthritis medicine, and it is already our second-largest selling medicine. Among its unique advantages, VIOXX is the only COX-2 indicated [drug] in the U.S. both for osteoarthritis and acute pain, such as pain following knee or hip replacement and dental surgery. As I said earlier, VIOXX has achieved approximately 50 percent of new prescriptions in the COX-2 class in the U.S. Combined with strong performance in Europe, VIOXX is well positioned globally for long-term market leadership.

272. The statements by defendants Anstice, Wold-Olsen and Gilmartin referenced in

Merck's December 12, 2000 Form 8-K concerning VIOXX's purported worldwide commercial

success were materially false and misleading because they created the materially false

impression that VIOXX's commercial success would likely continue into the future, while

failing to disclose that Merck and the Officer Defendants actually believed that use of VIOXX

caused serious adverse CV events, and the totality of the facts on which their belief was based,

including, *inter alia*, the information referenced in ¶ 241. As a result, investors remained

unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's

prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true

safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

### F.    Materially False and Misleading Statements Made During the Second Half of 2000

273.    On January 23, 2001, the Officer Defendants caused Merck to issue a press release announcing Merck's results for the fourth quarter and full year 2000 (the period ending December 31, 2000).   In the January 23 press release, defendant Gilmartin spoke of the purported success of VIOXX, as well as Merck's efforts to expand its approved uses:

> *Our five key products, VIOXX, ZOCOR, COZAAR/HYZAAR\*, FOSAMAX and SINGULAIR, drove Merck's performance for the year and created a powerful platform for growth.*
>
> *Each of the five medicines offers unique competitive advantages.* . . . VIOXX, a once-a-day medicine, is the only COX-2 indicated in the United States both for osteoarthritis and acute pain.  Since its extraordinarily successful 1999 launch, VIOXX has become the world's fastest growing branded prescription arthritis medicine, and it is already Merck's second largest-selling medicine.   In the United States, VIOXX now accounts for approximately 50 percent of new prescriptions in the COX-2 class.  VIOXX achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter.

274.    However, the statements made in Merck's January 23, 2001 press release concerning VIOXX's purported worldwide commercial success, "platform for growth," and "unique competitive advantages" were materially false and misleading because they created the materially false impression that VIOXX's commercial success would likely continue into the future, while failing to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 241 above.  As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true

safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

275.    Also on February 8, 2001, the Officer Defendants caused Merck to issue a Company press release announcing, among other things, that the FDA Arthritis Advisory Committee had met that day to review Merck's application to modify the prescribing information for VIOXX to reflect results of the VIGOR Study.  Commenting on the data that Merck had submitted to the FDA Advisory Committee, Eve Slater, M.D., Merck's Senior Vice President for Clinical and Regulatory Development, stated: "Merck is confident that the data presented today support the excellent safety profile of VIOXX."

276.    During the February 8, 2001 public hearing before the FDA Arthritis Advisory Committee ("AAC"), defendant Reicin made the following public statements to the panel: "when you review the results of VIGOR in isolation you don't know whether the imbalance of cardiovascular events [in VIGOR] was caused by a decrease in events on a platelet-inhibiting NSAID, naproxen, or an increase in events on a COX-2 selective inhibitor," *i.e.*, VIOXX. However, Reicin reiterated that it was Merck's belief that "the decreased cardiovascular events with naproxen in VIGOR is consistent with [naproxen's] potent antiplatelet effects."  Defendant Reicin's remarks reassured the members of the AAC; for example, a February 8, 2001 report by *Bloomberg News* quoted Dr. Nigel Harris, the chair of the AAC, as stating "Differences in cardiac risk between VIOXX and naproxen appeared to result from a beneficial effect of naproxen, not a danger from VIOXX."  Similarly, defendant Reicin's remarks reinforced what a contemporaneous J.P. Morgan analyst report of February 2, 2001 characterized as "the commonly accepted view that [VIGOR's CV findings are] likely due to the anti-platelet (*i.e.*, anti-clotting) benefits of naproxen (an NSAID) rather than any risk of VIOXX."

277.    The statements contained in Merck's February 8, 2001 press release, as well as defendant Reicin's statements reiterating the "naproxen hypothesis" before the FDA Arthritis Advisory Committee, were materially false and misleading because (a) they constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 241.  As a result, investors remained unaware of Merck's actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

278.    On March 30, 2001, the Officer Defendants caused Merck to issue the Company's 2000 Annual Report, which stated that "[a]ll the vital information about how your Company fared in 2000 is in your hand," or accessible on Merck's website (the Annual Report provided the "link address" for this additional information).  Merck's 2000 Annual Report commented on the purported success of VIOXX and its ability to generate substantial revenues over the life of the drug as follows:

> When we find a molecule that holds promise of becoming a commercially viable medicine capable of bringing real value to patients, it receives significant company resources.  *VIOXX* and *Cancidas* are just two of our more recent drugs to spring from this approach. ***VIOXX is a blockbuster with global sales topping $2 billion in a mere 20 months.***

In the 2000 Annual Report, defendant Scolnick also made the following comments:

> The number of compounds brought into development over the past three years far exceed the total in any preceding three-year period.

*And those compounds possess better qualities than any of their predecessors brought forward in a like time span because we have been able to analyze and test them in more detail.*

\* \* \*

*The result of [Merck's] behavior is a vibrant company delivering to shareholders the returns they expect with an ethic that always puts patients first.*

279.    However, the statements made in Merck's 2000 Annual Report concerning VIOXX's worldwide commercial success and the compounds making up VIOXX were materially false and misleading because they created the materially false impression that VIOXX's commercial success would likely continue into the future, while failing to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, (a) their awareness of the initial manuscripts of the results of Protocol 023, in which Drs. FitzGerald and Catella-Lawson had expressed their view that the results "implie[d] a *major role* for Cox-2 in *systemic* biosynthesis of prostacyclin in humans" and thus upset the natural balance between prostacyclin and thromboxane in the body; (b) their private conversations with preeminent medical researcher Dr. Oates, who supported Drs. FitzGerald and Catella-Lawson's views of the Protocol 023 data; (c) Merck's internal February 1998 analysis, which showed that female patients in the VIOXX trials had at least a statistically significant 216% increase in the risk of suffering an adverse cardiovascular event compared to patients taking a placebo and that male patients taking had a 28% increase in the risk of such an event; (d) their awareness of non-public data from a study involving more than 164,000 patients -- which Dr. FitzGerald considered to be the "the best comparative clin[incal] data on MI and NSAIDs"-- and which showed that naproxen (like ibuprofen and diclofenac, but unlike aspirin) "had no significant effect" on reducing the risk of suffering a heart attack; (e) the non-public final results from Merck's

Alzheimer's Treatment Trial (Protocol 091), which showed that VIOXX patients had a statistically significant higher rate of deaths than patients treated by placebo on an ITT basis, on treatment basis, and combined ITT/on treatment basis; (f) the non-public interim results of Merck's Alzheimer's Prevention Trial (Protocol 078), which showed that VIOXX patients had a statistically significant higher rate of deaths than patients being treated by placebo on an "intention to treat" basis and combined ITT/on treatment basis; and (g) the non-public aggregated results of Merck's Alzheimer's trials, which showed that patients taking VIOXX had a statistically significant higher rate of heart disease death.  As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

280.    On April 10, 2001, the Officer Defendants caused Merck to issue a press release, which reported that Merck had received an "approvable letter" from the FDA relating to the Company's application for changes to the prescribing information for VIOXX, *i.e.*, to include the so-called positive GI findings observed in VIGOR.[16]  Merck again expressed its confidence ***"in the comprehensive data that support the excellent gastrointestinal and overall safety profile of VIOXX."***

281.    However, the statements in the April 10, 2001 press release concerning Merck's receipt of the approvable letter and VIOXX's safety profile were materially false and misleading because (a) they constituted an affirmatively false representation that Merck and the Officer

---

[16] An "approvable letter" is defined by the FDA as a written statement that the FDA will approve the application if specific additional information or material is submitted or specific conditions are met.  An approvable letter is a first necessary step in the process for obtaining approval of a label change application.

Defendants believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's

prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and

(b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX

caused serious adverse CV events, and the totality of the facts on which their belief was based,

including, *inter alia*, the information referenced in ¶ 279.   As a result, investors remained

unaware of Merck's actual beliefs concerning VIOXX's prothrombotic effects, and were

materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or

at least significantly limit) VIOXX's commercial viability and ability to generate substantial

revenue for the Company.

282.    On April 11, in response to Merck's April 10, 2001 Company press release,

Lehman Brothers issued an analyst report commenting on the approvable letter.

> [I]t is our interpretation from the FDA Advisory committee
> meeting that we attended this past February and yesterday's receipt
> of the approvable letter, that Vioxx will achieve an expanded label
> inclusive of its GI safety over naproxen....***While some language
> may also go into the precaution section of the label regarding the
> fact that Vioxx (or perhaps COX-2's in general) is not
> cardioprotective, we expect that the expanded [GI] safety labeling
> fro Vioxx will be the key***. *** Additionally, another major topic of
> discussion with the panel concerned [CV] risks associated with
> Vioxx use....While the panel agreed it was unclear what the source
> of this increased risk associated with Vioxx use was due to, the
> separation between naproxen and Vioxx was deemed significant
> enough to be highlighted in some context.****We want to reiterate
> our belief that this is a strong positive for Vioxx and MRK.***

283.    On April 20, 2001, the Officer Defendants caused Merck to issue a press release

announcing Merck's results for the first quarter 2000 (the period ending March 31, 2001).  In the

April 20 press release, defendant Gilmartin commented on the Company's performance:

> Income growth for the quarter reflects strong worldwide sales
> volume gains led by our five key growth drivers -- ZOCOR,
> VIOXX,   COZAAR   and   HYZAAR*,   FOSAMAX   and

SINGULAIR -- which combined had increased sales of 30% over first quarter 2000 sales.

The press release also stated:

> *"Because of the benefits they offer patients and prescribers, each of our five key growth drivers are performing well in the global marketplace," Mr. Gilmartin said. "Together, they have created a powerful platform for growth for our company. And it is this growth that allows Merck to continue its strong investment in research and development, which remains the cornerstone of our success."*

> VIOXX, a once-a-day medicine, is the only COX-2 selective agent indicated in the United States for both osteoarthritis and acute pain. *Since its successful 1999 launch, VIOXX has become the world's fastest-growing branded prescription arthritis medicine, and it is already Merck's second largest selling medicine. VIOXX achieved $485 million in sales for the first quarter 2001*.

284. However, the above-referenced statements from the April 20, 2001 Merck press release concerning VIOXX's purported worldwide commercial success and role as a "key growth driver" were materially false and misleading because they created the materially false impression that VIOXX's commercial success would likely continue into the future, while failing to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based including, *inter alia*, the information referenced in ¶ 279. As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

285. On or about May 10, 2001, the Officer Defendants filed with the SEC Merck's Form 10-Q for the first quarter 2001, which was signed by defendants Frazier and Henriques.

The Form 10-Q contained the same materially false and misleading statements that were made in the Company's April 20, 2001 press release referred to above.

286.    On May 22, 2001, the Officer Defendants caused Merck to issue a Company press release, which stated, among other things:  "In response to news and analyst reports of data the Company first released a year ago, Merck & Co., Inc. today reconfirmed the favorable cardiovascular safety profile of VIOXX."

287.    On May 29, 2001, the Officer Defendants caused Merck to issue another Company press release, which again "reconfirmed the favorable cardiovascular safety profile of VIOXX."

288.    However, Merck's and the Officer Defendants' statements in the May 22 and 28, 2001 press releases concerning the "favorable cardiovascular safety profile of VIOXX" were materially false and misleading because (a) they constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279. As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

289.    On June 13, 2001, the Officer Defendants caused Merck to issue a press release announcing, among other things:  "In a new meta-analysis combining data from 19 clinical

125

studies with VIOXX (rofecoxib) involving more than 28,000 patients, the relative risks of serious cardiovascular events were similar with VIOXX and placebo, and with VIOXX and the widely prescribed non-steroidal anti-inflammatory drugs (NSAIDs) ibuprofen, diclofenac and nabumetone." The press release quoted defendant Reicin as stating:

> Results seen in the meta-analysis with VIOXX vs. naproxen are consistent with the ability of naproxen to block platelet aggregation, and, therefore, to act as an anti-platelet agent.

290. However, the statements in the June 13, 2001 press release concerning the "naproxen hypothesis" were materially false and misleading because (a) they constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279. As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

**G.    Materially False and Misleading Statements Made During the Second Half of 2001**

291. On July 20, 2001, the Officer Defendants caused Merck to issue a press release announcing the Company's results for the second quarter 2001 (the period ending June 30, 2001). In the July 20, 2001 press release, defendant Gilmartin commented on the Company's performance:

Income growth for the first six months reflects strong worldwide sales volume gains led by our five key growth drivers [ZOCOR, VIOXX, COZAAR/HYZAAR, FOSAMAX and SINGULAIR], which combined increased 28% over the first six months 2000 sales.

*"These five products now account for more than 60% of Merck's worldwide human health sales, and they remain a powerful platform for growth for our company."*

The press release also stated:

Since its 1999 launch, Vioxx has become the world's fastest grown branded prescription arthritis medicine, and it is already Merck's second largest medicine. In 2001, Vioxx achieved new-prescription leadership within the coxib market in the United States, *demonstrating that physicians continue to recognize the medicine's benefits to the patients*.

*New scientific data supporting the efficacy and overall safety profile of VIOXX were presented at medical meetings during the quarter. These data included the results of the ADVANTAGE trial, presented at the Digestive Diseases Week conference in May*.

292.    On July 20, 2001, subsequent to the release of Merck's results for the second quarter of 2001, Merck held a conference call for analysts, money and portfolio managers, institutional investors, and large Merck shareholders. During the call, Laura Jordan, Merck's Senior Director of Investor Relations, commented on VIOXX's purported continued growth in sales:

Second quarter 2001 sales of VIOXX on a worldwide basis were $725 million, up 53% over second quarter last year and year-to-date Vioxx sales were $1.2 billion, that's up 43% six months year-to-date this year over six months year-to-date last year.

* * *

*Vioxx continues to show strong growth*. As we talked about many times in the past, it's prescriptions that reflect the true underlying demand of a product and the fundamental business or the prescription trends for Vioxx remain quite healthy. In fact, total prescriptions year-to-date through June for Vioxx are up 41%

and new prescriptions are up nearly 25%. All of this is clearly in line with the year-to-date sales growth for the product in the US of +33%. Hoping to fuel this growth in Vioxx are the additional sales reps that I mentioned earlier. We now have 1,000 more voices describing the product's benefits to the marketplace and clearly that's helping to continue to fuel the growth. In terms of future sales of Vioxx, the worldwide growth sales forecast that was provided on June 22nd, of $3 billion to $3.5 billion still holds.

293.    The above-referenced statements from the July 20, 2001 Merck press release and conference call concerning VIOXX's worldwide commercial success were materially false and misleading because they created the materially false impression that VIOXX's commercial success would likely continue into the future, while failing to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279.    As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

294.    On or about August 10, 2001, the Officer Defendants caused Merck to file with the SEC Merck's Form 10-Q for the second quarter 2001, which was signed by defendants Frazier and Henriques.    The Form 10-Q contained the same materially false and misleading statements concerning VIOXX that were made in the Company's July 10, 2001 press release referred to above.

295.    On August 22, 2001, *JAMA* published the findings of the Cleveland Clinic Study, which concluded that VIGOR's CV results could be explained by either a prothrombotic effect

of VIOXX or an antithrombotic effect of naproxen, but which stated no conclusion as to which theory was most likely. *See also* ¶ 153 above.

296.    On August 21, 2001, *Bloomberg News* quoted Merck's Senior Director of Cardiovascular Clinical Research, Laura Demopoulos, as stating, in anticipation of the publication of the *JAMA* article, that:  ***"We [Merck] already have additional data beyond what they cite, <u>and the findings are very, very reassuring</u>.  VIOXX does not result in any increase in cardiovascular events compared to placebo."***

297.    Similarly, on August 23, 2001, the day after the release of the *JAMA* article, the Officer Defendants caused Merck to issue a press release reaffirming that ***"the Company stands behind the overall and cardiovascular safety profile . . . of VIOXX."***  Immediately after the publication of the *JAMA* article, Merck also sent, by Federal Express, "Dear Doctor" letters to physicians throughout the country that disparaged the *JAMA* article as "not based on any new clinical study," and that assured the physicians that Merck ***"stands behind the overall and cardiovascular safety profile"*** of VIOXX.

298.    However, the reassuring statements by Merck concerning VIOXX's cardiovascular safety contained in the August 21, 2001 *Bloomberg News* article and its August 23, 2001 press release were materially false and misleading because (a) they constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279.  As a result, investors remained unaware of Merck's and the

Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

299.    Subsequent news and analyst reports following the release of the *JAMA* article reflected Merck's efforts to downplay and disparage the *JAMA* article and to reinforce the "naproxen hypothesis" as the correct interpretation of the VIGOR data.  For example, on August 22, 2001, Credit Suisse First Boston reported that:

> ***The JAMA researchers themselves point out several significant limitations in their study*** . . . .***We note that the VIGOR trial did not include low-dose aspirin, and that the control drug (naproxen) is known to possess a cardio-protective, anti-platelet effect***. This makes it extremely difficult to determine whether the difference in cardiac events seen in VIGOR results from a naproxen 'benefit' or a Vioxx 'liability.'"

300.    On September 24, 2001, a *Bloomberg News* report about the September 17, 2001 letter from the FDA's Division of Drug Marketing, Advertising and Communications (the "DDMAC Letter") (*see* ¶¶ 157-158) quoted Merck's spokeswoman Christine Fanelle as stating: "***We continue to stand behind the overall safety and the cardiovascular safety of the product***, but our immediate priority is to discuss our response'' with the FDA.

301.    However, the statement set forth above in the September 24, 2001 *Bloomberg News* article, which was intended to, and did, reassure the market concerning VIOXX's cardiovascular safety, was materially false and misleading because (a) it constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results and/or failed to correct a prior false

representation; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279. As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

302.   On October 9, 2001, *The New York Times* published an article about COX-2 inhibitors, entitled "The Doctor's World, For Pain Reliever, Questions of Risk Remain Unresolved." The article reported on the continued popularity of VIOXX and Celebrex, but also noted that questions had been raised as to whether "VIOXX may have an unexpected side effect -- a very slight increase in the risk of heart attack. The risk is hypothesized, not proved." The article, among other things, also quoted defendant Scolnick as stating: "[T]here are two possible interpretations [for the CV results from VIGOR]. . . [n]aproxen lowers heart attack rate, or VIOXX raises it. . . Either COX-2 inhibitors shift the clotting balance, or naproxen, which can impede blood clotting has a positive effect. According to the article, defendant Scolnick added that: "while the Company announced the heart attack findings to doctors and the public, it looked back at its data from studies using different drugs or dummy pills [placebos] in comparison to Vioxx. It found no evidence that Vioxx increased the risk of heart attacks." In addition, the article quoted defendant Scolnick as stating that, ***the company decided that "the likeliest interpretation of that data is that naproxen lowered the thrombotic event rate,*** " and that without the theoretical question raised by Dr. Fitzgerald, "no one would have a question remaining in their mind that their might be an additional interpretation."

303. However, defendant Scolnick's statement to *The New York Times*, which sought to attribute the difference in thromboembolic events in VIGOR to naproxen's purported cardioprotective characteristics (*e.g.*, "the likeliest interpretation of that [VIGOR] data is that naproxen lowered. . . the thrombotic event rate") were materially false and misleading because (a) it constituted an affirmatively false representation that defendant Scolnick believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and (b) it failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279. As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

304. In addition, defendant Scolnick's statement in the October 9 *New York Times* article to the effect that Merck had "found no evidence that Vioxx increased the risk of heart attacks" was also materially false and misleading because, at the time the statement was made, Merck and the Officer Defendants were in possession of the results of (a) Merck's non-public internal February 1998 analysis, which showed, *inter alia,* that women taking VIOXX had *at least* a 216% (statistically significant) greater risk of experiencing serious adverse cardiovascular events compared to women not taking any drug in other Merck studies; (b) the non-public final results from Merck's Alzheimer's Treatment Trial (Protocol 091), which showed that VIOXX patients had a statistically significant higher rate of deaths than patients treated by placebo on an

intention-to-treat basis, on treatment basis, and combined intention-to-treat/on treatment basis;

(c) the non-public interim results of Merck's Alzheimer's Prevention Trial (Protocol 078), which

showed that VIOXX patients had a statistically significant higher rate of deaths than patients

being treated by placebo on an "intention to treat" basis and combined intention-to-treat/on

treatment basis; and (d) the non-public aggregated results of Merck's Alzheimer's trials, which

showed that patients taking VIOXX had a statistically significant higher rate of heart disease

death. As a result, investors were further materially misled as to the enormous risk that

VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's

commercial viability and ability to generate substantial revenue for the Company.

305. On October 18, 2001, the Officer Defendants caused Merck to issue a press

release announcing Merck's results for the third quarter 2001 (the period ending September 30,

2001). In the press release, defendant Gilmartin commented on the Company's performance,

stating:

> Our five key growth drivers [ZOCOR, VIOXX,
> COZAAR/HYZAAR, FOSAMAX and SINGULAIR], which had
> increased sales of nearly 30% over the first nine months of 2001
> and now account for two-thirds of Merck's worldwide human
> health sales, continue to lead Merck's income growth.

The press release also stated:

> VIOXX, a once-a-day medicine, is the only COX-2 selective agent
> approved in the United States for both osteoarthritis and acute
> pain. Available in more than 70 countries, VIOXX is Merck's
> second largest-selling medicine. In the third quarter, VIOXX
> continued new prescription leadership within the coxib market in
> the United States and in many European and Latin American
> countries. VIOXX became the first and only coxib approved for
> acute pain in a European Union country when it launched with that
> indication in the United Kingdom in September. *In the third
> quarter, VIOXX achieved $795 million in sales, an increase of
> 29% over the same quarter last year.*

306.     The above-referenced statements from the October 18, 2001 Merck press release concerning VIOXX's worldwide commercial success and role as a "key growth driver" were materially false and misleading because they created the materially false impression that VIOXX's commercial success would likely continue into the future, but failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279.   As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

307.     On or about November 13, 2001, Defendants filed with the SEC Merck's Form 10-Q for the third quarter 2001, which was signed by defendants Henriques and Frazier.   The Form 10-Q substantially repeated the same materially false and misleading statements concerning VIOXX that were made in Merck's October 18, 2001 press release referred to above.

308.     On December 11, 2001, *Bloomberg News* reported that Defendants had announced that Merck was planning a study of heart risks associated with VIOXX.   According to the *Bloomberg News* article, Defendant Scolnick explained that Merck will conduct more research on VIOXX so it can be "100 percent sure" of VIOXX's safety.   Defendant Scolnick additionally falsely reassured the market:   "Whatever the answer is in these studies, we will report it to the world."

309.     By having chosen to speak about VIOXX's cardiovascular safety, Merck and the Officer Defendants had a duty to speak fully and truthfully on that subject.   However, in

violation of that duty, the above-referenced statements from the December 11, 2001 Merck press release were materially misleading because (a) it constituted an affirmatively false representation that defendant Scolnick believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results and/or failed to correct a previous representation; and (b) it failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279. As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

**H.    Materially False and Misleading Statements Made During the First Half of 2002**

310.    On January 22, 2002, the Officer Defendants caused Merck to issue a press release announcing the Company's results for the full year 2001. Defendant Gilmartin commented on the Company's performance:

> Our five key growth drivers, which also are our five largest products, now account for 68% of Merck's worldwide human health sales and continue to lead Merck's income growth. These medicines are true breakthroughs -- they offer novel approaches to disease treatment, help large, underserved patient populations and are effective, well-tolerated and convenient. ***The market-growth potential for these medicines remains strong***.

In the press release, defendants further stated:

> VIOXX was the product leader in 2001 within the coxib class for new prescription volume growth in the United States. Pain relief and gastrointestinal safety continue to be the primary needs in the arthritis and pain market. In December, VIOXX was approved for

135

relief of acute pain and pain from dysmenorrheal in 13 member
states of the European Union and in Norway and Iceland.  For the
year, VIOXX achieved $2.6 billion in sales, an increase of 18%
with $550 million in the fourth quarter.

311.    However, the above-referenced statements from the January 22, 2002 Merck press

release concerning VIOXX's worldwide commercial success and its "market-growth potential"

were materially misleading because they created the materially false impression that VIOXX's

commercial success would likely continue into the future, while failing to disclose that Merck

and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV

events, and the totality of the facts on which their belief was based, including, *inter alia*, the

information referenced in ¶ 279.  As a result, investors remained unaware of Merck and the

Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were

materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or

at least significantly limit) VIOXX's commercial viability and ability to generate substantial

revenue for the Company.

312.    On March 15, 2002, Merck and the Officer Defendants were forced to withdraw

the original NDA for ARCOXIA, thereby putting further pressure on Defendants to conceal their

beliefs about the adverse cardiovascular profile of its blockbuster drug VIOXX.  As result,

Merck's dependence on VIOXX for its future revenues significantly increased.

313.    In March 2002, Merck and the Officer Defendants secretly halted the

cardiovascular clinical study it previously announced to blunt criticism of VIOXX's health risks,

which defendant Scolnick stated would have provided "100 percent" assurance of VIOXX's

safety. *The New York Times,* in an article entitled "Merck Canceled an Early Study of VIOXX,"

which was published after the Class Period (on February 8, 2005), reported that "previously

undisclosed company documents show that the drug maker was poised to begin a major

cardiovascular study of [VIOXX] in 2002, and abruptly dropped the project before it was set to

start."

314.    The *New York Times* reported:

> [M]erck has never disclosed how extensively it planned that study, which was known inside the company as the Valor trial, or how close it came to starting it. ***By early 2002, the drug maker had already contacted outside researchers to oversee the test, had approached a competing drug maker to obtain anti-ulcer drugs to ease the possibility of side effects, and had prepared a 70-page protocol that spelled out how the test was to be conducted***, ***according to documents reviewed by The New York Times***.
>
> One planning document, for example, shows that the first patients were supposed to enter the study in June 2002 and the last patient was to leave it in January 2004.  But in mid-March 2002, just days before company researchers had planned to submit the study's protocol to the F.D.A., top executives of the drug maker ordered work on the project halted.  It was never revived.
>
> "I have the unpleasant task of having to inform you that the VIOXX CV Outcomes Study has been placed on hold," a memo dated March 13, 2002, and sent to dozens of Merck employees worldwide, stated.  "***At this time we do not have any of the details that led to this decision, however, we have been informed that upper management is in the process of reviewing the various study options***."
>
> * * *
>
> Asked to provide a copy of a document from March 2002 which summarized the decisions given at the time for not going forward with the study, [a Merck spokeswoman] said that no such document existed.

315.    The timing of Defendants' decision to call off the Valor Study is also significant.

*The New York Times* reported:

> Work on the Valor trial was halted at the same time that officials from Merck and the F.D.A. were concluding lengthy and heated negotiations over how Vioxx's label would reflect data from an earlier trial, known as the Vigor study, which indicated that the widely used painkiller posed potential cardiovascular risks.

316.    On March 21, 2002, the Officer Defendants caused Merck to file with the SEC

Merck's Form 10-K for 2001.  The Form 10-K, which was signed by defendants Gilmartin,

Lewent, Scolnick, and Henriques, stated:

> Vioxx, Merck's second largest-selling product, continued its strong
> growth in 2001 and was the product leader within the COX-2 class
> for new prescription volume growth in the United States.   It
> exceeded the $2 billion sales mark faster than any other product in
> Merck's history.  Pain relief and gastrointestinal safety continue to
> be the primary needs in the arthritis and pain market.  Vioxx is
> now available in 68 markets around the world as a once-a-day
> treatment for osteoarthritis, acute pain and dysmenorrheal and, in
> some countries outside the United States, rheumatoid arthritis.
> Physicians are responding favorably to the Company's pain studies
> in which Vioxx 50 mg was compared to acetaminophen in
> combination with either codeine 60 mg or oxycodone 5 mg, which
> are commonly prescribed narcotics.  In addition, an initiative with
> U.S. hospitals resulted in a favorable formulary status for Vioxx at
> more than 3,000 major hospitals.  In November 2001, Vioxx was
> approved for symptomatic relief in the treatment of adult
> rheumatoid arthritis in all EU member states through the mutual
> recognition procedure.  In December 2001, Vioxx, under the trade
> names Ceoxx or Vioxx Acute, was also approved for relief of acute
> pain and pain from dysmenorrheal in 13 member states of the EU.

317.    The above-referenced statements from Merck's Form 10-K for 2001 concerning

VIOXX's worldwide commercial success were materially false and misleading because they

created the materially false impression that VIOXX's commercial success would likely continue

into the future, while failing to disclose that Merck and the Officer Defendants actually believed

that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their

belief was based, including, *inter alia*, the information referenced in ¶ 279.  As a result, investors

remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's

prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true

safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability

and ability to generate substantial revenue for the Company.

318.    On April 3, 2002, the Officer Defendants caused Merck to issue Merck's 2001

Annual Report, which included a letter to shareholders, signed by defendant Gilmartin, which

stated:

> Dear Shareholder:  **All the vital information about how your
> Company fared in 2001 is in this report**.  However, when you see
> this "more" icon that's an indication there's additional information
> you may find of interest on the web. You can access that
> information in the accompanying URL or by turning to
> www.anrpt.2001.com.

Defendant Gilmartin's letter to shareholders in the Company's 2001 Annual Report also stated:

> **Our five key drivers of growth** -- Zocor, **Vioxx**, Cozaar/Hyzaar,
> Fosamax and Singulair -- now represent more than two-thirds of
> our worldwide pharmaceutical sales.  **In addition, they have
> significant remaining growth potential based on key studies**. . . .

319.    The above-referenced statements from Merck's 2001 Annual Report concerning

Merck's worldwide commercial success and "significant remaining growth," and the alleged

availability on Merck's website of "[a]ll the vital information about how your Company fared in

2001," were materially false misleading because they created the materially false impression that

VIOXX's commercial success would likely continue into the future, while failing to disclose that

Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse

CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the

information referenced in ¶ [277].  As a result, investors remained unaware of Merck and the

Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were

materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or

at least significantly limit) VIOXX's commercial viability and ability to generate substantial

revenue for the Company.

320.    On April 11, 2002, the Officer Defendants caused Merck to issue a press release

announcing that the FDA had "approved changes to the prescribing information [*i.e.*, the label

leaflet] for VIOXX . . . to include results from the landmark 8,000 patient [VIGOR] Study."
Merck also stated that "[t]he prescribing information also has been revised to include
cardiovascular data from VIGOR."  The press release, however, also went on to falsely assure
investors once again that VIOXX was safe, quoting defendant Scolnick as stating that:  "*Merck
is confident in the . . . safety profile of VIOXX.*"

321.    However, the statement in the April 11, 2002 Company press release, which
reassured investors concerning VIOXX's purported lack of cardiovascular risks, was materially
false and misleading because (a) it constituted an affirmatively false representation that Merck
and the Officer Defendants believed in good faith that it was the naproxen hypothesis (as
opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's
adverse CV results and/or failed to correct a prior false representation; and (b) failed to disclose
that Merck and the Officer Defendants actually believed that use of VIOXX caused serious
adverse CV events, and the totality of the facts on which their belief was based, including, *inter
alia*, the information referenced in ¶ 279.  As a result, investors remained unaware of Merck's
and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were
materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or
at least significantly limit) VIOXX's commercial viability and ability to generate substantial
revenue for the Company.

322.    Merck's numerous materially false and misleading statements of opinion or belief
concerning VIOXX's adverse safety profile, which jeopardized the commercial viability of the
drug and put the franchise at risk, were not limited to the SEC filings, press releases, and
conference calls with securities analysts detailed herein.  Instead, Merck also included materially
false or misleading statements in VIOXX's labeling leaflet (which is the multi-page, small print

140

pamphlet inserted in the box in which a pharmaceutical product is sold, as opposed to the "sticker" that is attached to the container of the product itself).

323.    Labeling leaflet information with respect to a major product is regularly considered by analysts and other financial market participants in assessing a company's business, products, and prospects. Securities analysts who specialize in pharmaceutical companies study product label leaflets as part of their analysis of a drug's commercial viability, long-term growth and revenue prospects, and potential for product liability exposure. Thus, truthful labeling is an essential component of the market's valuation of the performance and prospects of a pharmaceutical company, including but not limited to discounted cash flow, as well as the company's securities.

324.    The label leaflets for VIOXX did not include any reference whatsoever to any possible cardiovascular side effects attributable to VIOXX in the "Precautions" section (let alone in the more serious "Contraindications" or "Warnings" sections) prior to the release of a new label on or about April 12, 2002. Those pre-April 2002 label leaflets were materially false and misleading because they failed to disclose that Merck's senior scientists actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which that belief was based.

325.    Moreover, even after the VIOXX label was changed on April 12, 2002 "to include cardiovascular data from VIGOR" (as well as VIGOR's purported beneficial GI findings), that label (the "April 12, 2002 Label") contained materially false and misleading statements concerning VIOXX's safety profile. Among other things, the April 12, 2002 Label stated the following:

The information below should be taken into consideration and caution should be exercised when VIOXX is used in patients with a medical history of ischemic heart disease:

In VIGOR, a study in 8076 patients (mean age 58; VIOXX n=4047, naproxen n=4029) with a median duration of exposure of 9 months, the risk of developing a serious cardiovascular thrombotic event was significantly higher in patients treated with VIOXX 50 mg once daily (n=45) as compared to patients treated with naproxen 500 mg twice daily (n=19). In VIGOR, mortality due to cardiovascular thrombotic events (7 vs 6, VIOXX vs naproxen, respectively) was similar between the treatment groups. (See CLINICAL STUDIES, Special Studies, VIGOR, Other Safety Findings: Cardiovascular Safety.)  In a placebo-controlled database derived form 2 studies with a total of 2142 elderly patients (mean age 75; VIOXX n-1067, placebo n=1075) with a median duration of exposure of approximately 14 months, the number of patients with serious cardiovascular thrombotic events was 21 vs 35 for patients treated with VIOXX 25 mg once daily versus placebo, respectively.  In these same 2 placebo-controlled studies, mortality due to cardiovascular thrombotic events was 8 vs 3 for VIOXX versus placebo, respectively.  The significance of the cardiovascular findings from these 3 studies (VIGOR and 2 placebo-controlled studies) is unknown.  Prospective studies specifically designed to compare the incidence of serious CV events in patients taking VIOXX versus NSAID comparators or placebo have not been performed (emphasis added).

326.    The April 12, 2002 Label was materially false and misleading because it failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279.  As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

327.    On April 18, 2002, the Officer Defendants caused Merck to issue a press release announcing the Company's results for the first quarter 2002 (the period ending March 31, 2002).

In the April 18, 2002 press release, defendant Gilmartin commented on the Company's performance:

> With the continued growth of our five key franchises -- ZOCOR, VIOXX, COZAAR/HYZAAR, FOSAMAX and SINGULAIR -- along with our plans to file or launch 11 new medicines by 2006, we expect the core pharmaceutical business to deliver double-digit earnings per share growth in 2003 and ***top-tier performance over the longer term***.

The press release also stated:

> ***VIOXX, the Company's second-largest-selling medicine, continues to gain acceptance among physicians and patients worldwide. Global sales for the quarter were $650 million***. Last week, Merck announced that the FDA has approved changes to the prescribing information for VIOXX, under the gastrointestinal (GI) warning section, to include results from the landmark VIOXX Gastrointestinal Outcomes Research (VIGOR) study. The FDA also approved VIOXX 25 mg for the relief of the signs of rheumatoid arthritis in adults. VIOXX is now the first and only medicine that selectively inhibits the COX-2 enzyme that is proven to reduce the risk of developing clinically important gastrointestinal (GI) side effects in patients with or without risk factors for such GI side effects compared to the non-steroidal anti-inflammatory drug (NSAID) naproxen.

328. The above-referenced statements from the April 18, 2002 Merck press release concerning VIOXX's worldwide commercial success were materially misleading because they created the materially false impression that VIOXX's commercial success would likely continue into the future, while failing to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279. As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

329.    On April 18, 2002, subsequent to the release of the results for the first quarter of 2002, Merck held a conference call for analysts, money and portfolio managers, institutional investors, and large Merck shareholders.  During the call, Merck spokesman Mark Stejbach commented on the "new labeling changes" to VIOXX, which purportedly included the results from VIGOR:

> **[I]mportantly there was a change to the precautions, again not the warnings, but the precautions regarding cardiovascular language and two effects there, there were the results of the VIGOR study that had been disclosed for some time that you all know about.**  And that showed a lower cardiovascular event rate for naproxen vs. VIOXX in the VIGOR Study.  And importantly, also in the label now are the results of the safety results of two large placebo control studies in a large elderly population.  And in that study we saw essentially no difference between VIOXX and placebo on the rate of cardiovascular.  **In fact, numerically VIOXX is even a little lower.  But this is very reassuring and we think its part of the body of evidence that supports our belief that the effect seen in VIGOR were the results of the anti-platelet effect of naproxen**.  Of course, VIOXX does not have an effect on platelets consistent with its selective inhibition and that's reflected in the label.  And so appropriate patients should be given anti-platelet therapy.  **So, I think that's a position Merck has always had and now its quite clearly laid out in the labeling**.

330.    However, the statements made during Merck's April 18, 2002 conference call, which sought to attribute the difference in thromboembolic events in VIGOR to naproxen's purported cardioprotective characteristics (the "naproxen hypothesis"), were materially false and misleading because (a) it constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results and/or failed to correct a prior false representation; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the

144

information referenced in ¶ 279.  As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

331.    On or about May 13, 2002, the Officer Defendants caused Merck to file with the SEC Merck's Form 10-Q for the first quarter 2002, which was signed by defendants Frazier and Henriques.  The Form 10-Q contained substantially the same materially false and misleading statements concerning the purported success and safety of VIOXX that were made in the Company's April 18, 2002 press release referred to above.

**I.      Materially False and Misleading Statements Made During the Second Half of 2002**

332.    On July 19, 2002, the Officer Defendants caused Merck to issue a press release announcing Merck's results for the second quarter 2002 (the period ending June 30, 2002).  In the July 19, 2002 press release for the second quarter 2002, defendant Gilmartin was quoted as follows:

> ***Merck is pleased with the performance of our five key growth drivers, [VIOXX and four other drugs] and believes that bolstered with new data from clinical outcome trials, these medicines continue to have significant growth potential***.

The press release also stated:

> Global sales of VIOXX, the company's second-largest selling medicine, were $845 million this quarter.  In April, the FDA approved the changes to the prescribing information to include results from the landmark [] (VIGOR) Study and new indication with VIOXX 25 mg for the relief of signs and symptoms of rheumatoid arthritis in adults.  ***VIOXX now is the only COX-2 specific inhibitor with a label demonstrating the proven risk reduction in clinically important gastrointestinal events compared to the non-steroidal anti-inflammatory drug (NSAID)***

*naproxen and the only COX-2 specific inhibitor to offer once-*
*daily 24-hour relief for osteoarthritis, rheumatoid arthritis and*
*acute pain*.

\*    \*    \*

MERCK REMAINS COMFORTABLE WITH 2002 EARNINGS
PER SHARE ESTIMATES.

\*    \*    \*

Merck also confirmed that it expects its core pharmaceutical
business to deliver double-digit earnings-per-share-growth in 2003.

333.    The above-referenced statements from the July 19, 2002 Merck press release
concerning VIOXX's worldwide commercial success and its role as a "key growth driver" were
materially misleading because they created the materially false impression that VIOXX's
commercial success would likely continue into the future, while failing to disclose that Merck
and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV
events, and the totality of the facts on which their belief was based, including, *inter alia*, the
information referenced in ¶ 279.    As a result, investors remained unaware of Merck and the
Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were
materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or
at least significantly limit) VIOXX's commercial viability and ability to generate substantial
revenue for the Company.

334.    On or about August 13, 2002, the Officer Defendants filed with the SEC Merck's
Form 10-Q for the second quarter 2002, which was signed by defendants Frazier and Henriques.
The Form 10-Q contained substantially the same materially false and misleading statements
concerning VIOXX that were made in the Company's July 19, 2002 press release referred to
above.

335.    On October 18, 2002, the Officer Defendants caused Merck to issue a press release announcing the Company's results for the third quarter 2002 (the period ending September 30, 2002).  In the October 18, 2002 press release, Defendants commented on the Company's performance:

> ***Merck's five key growth drivers*** -- ZOCOR, ***VIOXX***, COZAAR and HYZAAR(a) and SINGULAIR -- collectively had increased sales of 8% for the quarter and drove Merck's human health sales performance.
>
> VIOXX, the company's second-largest selling medicine, achieved $755 million in worldwide sales in the third quarter. Gastrointestinal (GI) safety remains an important consideration when physicians are choosing a medication for the treatment of arthritis**. *Since the GI outcomes data from the landmark 8,000-patient VIOXX Gastrointestinal Outcomes Research (VIGOR) study were added to the labeling for VIOXX, the number of key managed care accounts with VIOXX in an advantaged position among coxibs continues to grow. More than 20 million people now have exclusive or preferred access to VIOXX through their managed care plans.***
>
> Outside the United States, VIOXX maintains its leadership position as the most widely prescribed COX-2 inhibitor in Latin America, Canada and Europe, where it is the coxib with the broadest range of indications, including acute pain (VIOXX ACUTE).

Defendant Gilmartin also stated:

> ***The potential of our five largest medicines continues to be demonstrated by results of key clinical outcome studies.  By focusing on what we do best -- discovering and developing important new medicines that improve and save people's lives -- Merck's growth potential remains strong***.

336.    The above-referenced statements from the October 18, 2002 Merck press release concerning VIOXX's worldwide commercial success and the results of Merck's "key clinical studies" were materially misleading because they created the materially false impression that VIOXX's commercial success would likely continue into the future, while failing to disclose that

147

Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279.  As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

337.    Also on October 18, 2002, subsequent to the release of its results for the third quarter of 2002, Merck held a conference call for analysts, money and portfolio managers, institutional investors, and large Merck shareholders.  During the call, a participant asked the Merck spokesperson the following question: "Ed Scolnick last December had basically told us there would be a VIOXX cardiovascular safety study performed, what's the status of beginning that trial or have those plans been abandoned?"  In response, the Merck spokesperson stated:

> In terms of the cardiovascular outcome studies, you're right that we discussed doing those studies and we have not abandoned them, in fact, we're continuing to make progress on those, it's a very complex area as you all know and we're researching this area . . . . [S]o we'll continue with some of these ongoing things, continue to update the scientific community, but I know… we are still planning cardiovascular outcome studies for Vioxx and look forward to, hopefully soon, be able to discuss that in more detail and in a comprehensive manner across the products.  Okay, so with that I apologize, we've run over. . . .

338.    Defendants' statements during the third quarter 2002 conference call that Merck was "continuing to make progress" on the cardiovascular outcome studies was materially false and misleading because Merck had already cancelled its cardiovascular study, as set forth in ¶ 314-315 above, and because, also unbeknown to investors, Merck had cancelled the aforementioned studies.

339.   On or about November 13, 2002, the Officer Defendants caused Merck to file with the SEC the Company's Form 10-Q for the third quarter 2002, which was signed by defendants Frazier and Henriques.  The Form 10-Q contained substantially the same materially false and misleading statements concerning VIOXX that were made in the Company's October 18, 2002 press release referred to above.[17]

340.   On December 10, 2002, the Officer Defendants caused Merck to issue a press release entitled, "Broadened Portfolio of Breakthrough Medicines Will Drive Merck's Growth." The press release, which discussed comments made by defendant Gilmartin at Merck's Annual Business Briefing, stated among other things:

> "Our large in-line franchises - ZOCOR, **VIOXX**, FOSAMAX, COZAAR/HYZAAR and SINGULAIR - are successful because we have demonstrated their clinical benefits to physicians, patients and payors," Mr. Gilmartin added. "Together, **these products will drive our growth in 2003**. Moving forward, we plan to broaden our portfolio of medicines by expanding our current franchises and moving into new therapeutic categories."

The press release also contained remarks specific to VIOXX:

> VIOXX, Merck's once-a-day COX-2 selective medicine, is the No. 1 prescribed arthritis pain medication in many markets worldwide. VIOXX offers powerful relief with once-a-day dosing and is the only coxib proven to reduce the risk of clinically important gastrointestinal (GI) side effects compared to naproxen. VIOXX has achieved exclusive formulary status covering an additional 15 million lives since the GI outcomes data from the landmark 8,000-patient VIOXX Gastrointestinal Outcomes Research (VIGOR) study were added to its label. The label also was revised to include cardiovascular data from VIGOR. Merck will gain additional

---

[17] In addition, the third quarter 2002 Form 10-Q contained certifications, signed by defendants Gilmartin and Lewent, as required pursuant to §302 of the Sarbanes-Oxley Act of 2002, which falsely represented, among other things:  "Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

cardiovascular data with VIOXX through ongoing and new clinical trials.

341.    The above-referenced statements from the December 10, 2002 Merck press release concerning VIOXX's worldwide commercial success were materially misleading because they created the materially false impression that VIOXX's commercial success would likely continue into the future, while failing to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279.  As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

**J.    Materially False and Misleading Statements Made During the First Half of 2003**

342.    On January 28, 2003, the Officer Defendants caused Merck to issue a press release announcing Merck's results for the fourth quarter and full year 2002 (the periods ending December 31, 2002).   In the January 28, 2003 press release, defendant Gilmartin was quoted as follows:

> *Merck's five largest-selling products – ZOCOR, FOSAMAX, COZAAR   and   HYZAAR*,   SINGULAIR   and   VIOXX – collectively had increased sales of 18% for the fourth quarter of 2002 and drove Merck's human health sales performance.*
>
> Vioxx . . . remains the largest and most prescribed arthritis pain medication across many markets worldwide, including Europe, Canada and Latin America.  *For the year, VIOXX sales grew 8% over 2001, achieving $2.5 billion in sales*.   Excluding the estimated impact of wholesaler buying patterns the year-on-year growth of VIOXX approximated 1%.   *In 2003, worldwide expected sales . . . of VIOXX . . . [is] expected to approximate $2.6 billion.*

> New data released in October with respect to VIOXX underscores the proven gastrointestinal (GI) safety profile of VIOXX. An updated analysis combining data from 20 trials of more than 17,000 arthritis patients presented at the American College of Rheumatology meeting showed that VIOXX significantly reduced by 62 percent the incidence of confirmed upper-GI perorations, ulcers and bleeds compared to four widely used non-selective, non-steroidal anti inflammatory drugs (NSAIDs). The analysis is consistent with the significant reduction of clinically important GI events vs. naproxen seen in the landmark 8,000 patient . . . (VIGOR) study.

343. The above-referenced statements from January 28, 2003 Merck press release concerning VIOXX's worldwide commercial success and expected 2003 sales were materially misleading because they created the materially false impression that VIOXX's commercial success would likely continue into the future, while failing to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279. As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

344. On or about March 21, 2003, the Officer Defendants caused Merck to file with the SEC the Company's Form 10-K for 2002, the year ended December 31, 2002, which was signed by defendants Gilmartin, Henriques, and Lewent. The Form 10-K contained the same materially false and misleading statements concerning VIOXX that were made in the Company's January 28, 2003 press release referred to above.[18]

---

[18] In addition, the 2002 Form 10-K contained certifications, signed by defendants Gilmartin and Lewent as required pursuant to §302 of the Sarbanes-Oxley Act of 2002, which falsely

345.    On March 24, 2003, the Officer Defendants caused Merck to issue its 2002 Annual Report.  The 2002 Annual Report included defendant Gilmartin's letter to shareholders, which stated:

> *[W]e conduct our business with the highest standards of ethics and integrity.  And finally, we develop strong, principled leaders who focus not only on results, but on how those results are achieved*.

The Annual Report also stated:

> Vioxx, Merck's once-a-day coxib, remains the largest and most prescribed arthritis pain medication across many markets worldwide, including Europe, Canada and Latin America.  *For this year, Vioxx sales grew 8% over 2001, achieving $2.5 billion in sales in 2003, worldwide sales of VIOXX and Arcoxia, are expected to be approximately $2.6 billion to $2.8 billion.*

346.    The above-referenced statements from Merck's 2002 Annual Report concerning VIOXX's worldwide commercial success, as well as defendant Gilmartin's statement to the effect that Merck and the Officer Defendants "conduct our business with the highest standards of ethics and integrity," were materially misleading because they created the materially false impression that VIOXX's commercial success would likely continue into the future, while failing to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, , *inter alia*, the information referenced in ¶ 279.  As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true

---

represented, among other things:  "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability
and ability to generate substantial revenue for the Company.  Indeed, the statement in the 2002
Annual Report that Merck and the Officer Defendants conducted their business with the "highest
standards of ethics and integrity" was an outright lie.

347.    On April 21, 2003, the Officer Defendants caused Merck to issue a press release
announcing the Company's results for the first quarter 2003 (the period ending March 31, 2003).
The April 21, 2003 press release stated:

> ZOCOR, FOSAMAX, COZAAR and HYZAAR, SINGULAR,
> and VIOXX collectively had increased sales of 19% for the first
> quarter of 2003, compared to the first quarter of 2002, and drove
> Merck's pharmaceutical sales performance.
>
> *      *      *
>
> MAJOR PRODUCTS BOOSTED BY NEW INDICATIONS,
> STRONG PERFORMANCE
>
> Merck's major in-line franchise continued to perform well in the
> first quarter of 2003.  Each of the franchises ranks either No. 1 or 2
> in its class worldwide.
>
> Merck's once-a-day coxib, VIOXX, has been launched in 77
> countries worldwide.  In the United States, VIOXX is the most
> widely prescribed and frequently preferred coxib on managed care
> formularies.  VIOXX is the leading coxib outside the United
> States.  Global sales for the quarter were $527 million.

348.     The above-referenced statements from the April 21, 2003 Merck press release
concerning VIOXX's worldwide commercial success were materially misleading because they
created the materially false impression that VIOXX's commercial success would likely continue
into the future, while failing to disclose that Merck and the Officer Defendants actually believed
that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their
belief was based, including, *inter alia*, the information referenced in ¶ 279.  As a result, investors
remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's

prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

349.    On or about May 14, 2003, the Officer Defendants caused Merck to file with the SEC the Company's Form 10-Q for the first quarter 2003, which was signed by defendants Frazier and Henriques.  The Form 10-Q substantially repeated the same materially false and misleading statements contained in the April 21, 2003 referred to above.[19]

### K.    Materially False and Misleading Statements Made During the Second Half of 2003

350.    On July 21, 2003, the Officer Defendants caused Merck to issue a press release announcing the Company's results for the second quarter 2003 (the period ending June 30, 2003).  The July 21, 2003 press release stated:

> ***Merck continues to focus on maximizing the growth of its key products while broadening its portfolio of breakthrough medicines***.    Sales of ZOCOR, FOSAMAX, COZAAR and HYZAAR, SINGULAR, and ***VIOXX*** collectively increased 7% for the second quarter of 2003, compared to the second quarter of 2002, and drove Merck's pharmaceutical sales performance, representing 64% of total pharmaceutical sales.
>
> ***Global sales of Merck's first once-a-day coxib, VIOXX, were $801 million during the second quarter***. In the United States, VIOXX is the most widely prescribed and frequently preferred coxib on managed care formularies. VIOXX is also the leading coxib outside the United States. Mail-order-adjusted prescription levels in the United States for VIOXX decreased by approximately 7 percent for the quarter. In June, the company increased the price

---

[19] In addition, the First Quarter 2003 Form 10-Q contained certifications, signed by defendants Gilmartin and Lewent, as required pursuant to §302 of the Sarbanes-Oxley Act of 2002, which falsely represented, among other things:  "Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

of VIOXX in the United States. ***In the aggregate, estimated wholesaler buy-in for VIOXX had a favorable impact of $160 million for the quarter. This is expected to have an unfavorable impact on wholesaler purchases for VIOXX in the remaining quarters of 2003. Estimated wholesaler inventory levels for VIOXX remained within a range customary for Merck products.***

\*    \*    \*

***MERCK ON TRACK FOR FULL-YEAR EPS GUIDANCE***

Merck & Co., Inc. anticipates full-year 2003 consolidated earnings per share (EPS) of $3.40 to $3.47. For the third quarter, the Company expects a growth rate generally consistent with growth in the first half of 2003. The full-year guidance reflects the company's continued expectation for double-digit EPS growth in the core pharmaceuticals business on a stand-alone basis and includes a full year of net income from Medco Health Solutions, Inc.

351.    The above-referenced statements from the July 21, 2003 Merck press release concerning VIOXX's worldwide commercial success were materially misleading because they created the materially false impression that VIOXX's commercial success would likely continue into the future, while failing to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279.  As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

352.    On or about August 13, 2003, the Officer Defendants caused Merck to file with the SEC the Company's Form 10-Q for the second quarter 2003, which was signed by

defendants Frazier and Henriques.  The Form 10-Q contained substantially the same materially false and misleading statements contained in the July 21, 2003 press release referred to above.[20]

353.    On or about August 15, 2003, Merck issued a new VIOXX label that included a brief description of an aspirin endoscopy study.    The new label, however, was otherwise substantively unchanged, and was therefore materially false and misleading for the same reasons as set forth above in ¶ 326 above.

354.    On October 22, 2003, the Officer Defendants caused Merck to issue a press release announcing the Company's results for the third quarter 2003 (the period ending September 30, 2003).  The October 22, 2003 press release stated:

> ***Merck anticipates reported earnings per share from continuing operations for 2003 of $2.90 to $2.95 as a result of*** workforce reductions, implementation of the new distribution program for U.S. wholesalers, and ***product sales trends for its major in-line products.***  In the aggregate, the major in-line products have not met the company's challenging revenue targets that it believed were achievable.  Overall, they are growing and competing well in their respective categories.

The press release also stated:

> ***Global sales of Merck's first once-a-day coxib, VIOXX, were $510 million during the third quarter and $1.8 billion for the first nine months.  In the United States, VIOXX remains the most-widely prescribed and frequently preferred coxib on managed care formularies.***  More than 85 million prescriptions have been written in the United States since VIOXX was first introduced in 1999.

---

[20]  In addition, the Second Quarter 2003 Form 10-Q contained certifications, signed by defendants Gilmartin and Lewent, as required pursuant to §302 of the Sarbanes-Oxley Act of 2002, which represented, among other things:  "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

355.    The above-referenced statements from the October 22, 2003 Merck press release concerning VIOXX's commercial success were materially misleading because they created the materially false impression that VIOXX's commercial success would likely continue into the future, while failing to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279.  As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

356.    As previously discussed in ¶¶ 194-196 above, during the fall of 2003 there were published reports of new data suggesting that VIOXX "might slightly raise the risk of heart attacks" and might "not have any greater efficacy than traditional NSAIDS," followed by an October 30, 2003 *Wall Street Journal* article which reported that the Brigham Study had found an increased risk of heart attack in patients taking VIOXX compared to patients taking Celebrex or placebo.

357.    On November 2, 2003, in response to the October 30, 2003 *Wall Street Journal* article, defendant Reicin publicly stated that "In [Merck's] placebo-controlled randomized trials, we have found no significant difference between VIOXX and placebo."  Defendant Reicin also sought to disparage the Brigham Study results by stating: "Randomized clinical trials are the 'gold standard,' and this isn't such a trial."

358.    Similarly, in a letter to the editor of *The Wall Street Journal* entitled "Merck Stands Behind The Safety of VIOXX" which was published on November 5, 2003, defendant

Kim, the President of Merck Research Laboratories, also sought to disparage the Brigham study

results while reaffirming Merck's purported belief that VIOXX was safe and was not

prothrombotic.  As defendant Kim stated in his letter to the editor:

> ***Nothing is more important to Merck than the safety of its
> medicines. Your Oct. 30 story about an observational analysis of
> Vioxx was incomplete***.  The article discussed only the findings
> from this analysis where Vioxx appeared to have an unfavorable
> risk profile, but failed to report other findings from the same
> analysis that showed no statistically significant difference in the
> risk of heart attack for Vioxx compared with other commonly used
> anti-inflammatory drugs.
>
> The story also failed to report that another observational analysis
> presented at the same scientific meeting also showed no
> statistically significant difference in heart attacks between Vioxx
> and two widely used anti-inflammatory drugs, ibuprofen and
> diclofenac. ***A complete reporting of the data presented might have
> remedied the mistaken impression left by the story***.
>
> Observational methods lack the rigor of randomized, controlled
> clinical trials, and have led the scientific community astray before.
> For example, decades of observational analyses suggested that
> hormone replacement therapy reduced heart disease risk in post-
> menopausal women, but the landmark Women's Health Initiative,
> a randomized, controlled trial, found the opposite with an estrogen
> progestin combination.  That is why observational studies must be
> interpreted with caution.  ***Merck stands behind the safety of Vioxx
> based on the results of numerous randomized, controlled clinical
> trials.***
>
> Finally, it should be noted that Merck has previously announced it
> is conducting large prospective, randomized placebo-controlled
> clinical trials that, when added to the extensive data from clinical
> trials already available, will provide an even more comprehensive
> picture of the cardiovascular safety profile of Vioxx.

359.    However, defendant Reicin's November 2, 2003 statements and defendant Kim's

November 5, 2003 statements, were materially false and misleading because (a) they constituted

affirmatively false representations that Merck and the Officer Defendants believed in good faith

that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the

158

most likely explanation of VIGOR's adverse CV results and/or failed to correct a prior false representation; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279. As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

360.    On or about November 13, 2003, the Officer Defendants caused Merck to file with the SEC the Company's Form 10-Q for the third quarter 2003 (the period ending September 30, 2003), which was signed by defendants Frazier and Henriques. The Form 10-Q contained substantially the same materially false and misleading statements referred to in the October 22, 2003 press release referred to above.[21]

## L.    Materially False and Misleading Statements Made During the First Half of 2004

361.    On January 27, 2004, the Officer Defendants caused Merck to issue a press release announcing Merck's results for the fourth quarter 2003 and full year 2003 (the periods ending December 31, 2003), which stated:

> *Global sales of VIOXX, Merck's first once-a-day coxib, reached $731 million for the fourth quarter and $2.5 billion for the year. Full-year 2003 sales represented a 2% increase over 2002.*

---

[21] In addition, the third quarter 2003 Form 10-Q contained certifications, signed by defendants Gilmartin and Lewent, as required pursuant to §302 of the Sarbanes-Oxley Act of 2002, which represented, among other things: "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

*****

*VIOXX continues as the most-widely available coxib on managed care formularies in the United States*.…  Supplemental NDAs are under review with the FDA for additional indications for migraine and juvenile rheumatoid arthritis*.*  If approved, these uses are expected to enhance the efficacy profile of this product.

362.    The above-referenced statements from the January 27, 2004 Merck press release concerning VIOXX's commercial success and potential new uses as a painkiller were materially misleading because they created the materially false impression that VIOXX's commercial success would likely continue into the future, while failing to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279 above.  As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

363.    On or about March 10, 2004, the Officer Defendants caused Merck to file with the SEC the Company's Form 10-K for 2003, which was signed by, among others, defendants Gilmartin, Lewent, and Henriques.  The 2003 Form 10-K contained substantially the same false and misleading statements made in the January 27, 2004 press release referred to above.[22]

---

[22] In addition, the 2003 Form 10-K contained certifications, signed by defendants Gilmartin and Lewent, as required pursuant to §302 of the Sarbanes-Oxley Act of 2002, which represented, among other things:  "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

364.    Also on March 10, 2004, *Bloomberg News* reported that a study funded by Pfizer, which examined possible risks posed by various painkillers, found that VIOXX was linked to a higher risk of heart attack for patients with high blood pressure.  Continuing Merck's and the Officer Defendants' effort to negate, minimize, and discredit any link between VIOXX and increased cardiovascular risk, according to the *Bloomberg News* report, Merck spokeswoman Mary-Elizabeth Blake stated that "***the company disagrees with the findings***" and that "the study wasn't designed well."

365.    However, the statements in Merck's March 10, 2004 press release, which reassured the market concerning VIOXX's purported lack of cardiovascular risks, were materially false and misleading because (a) they constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results and/or failed to correct a prior false representation; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279 above.  As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

366.    On or about April 6, 2004, Merck issued a new VIOXX label that stated VIOXX had been approved for the acute treatment of migraines for adults.  The new label, however, was

otherwise substantively unchanged, and was therefore materially false and misleading for the same reasons as set forth above in ¶ 326 above.

367.    On April 22, 2004, the Officer Defendants caused the Company to issue a press release announcing Merck's results for the first quarter 2004 (the period ending March 31, 2004). The press release stated that "Merck's largest products, which continue to benefit from ongoing clinical studies and new treatment options, drove the company's sales." The press release further stated that:

> *Worldwide sales of VIOXX, Merck's arthritis and pain medicine, reached $661 million for the first quarter of 2004.* U.S. mail-order-adjusted prescription levels for VIOXX decreased by 3% during the quarter. *In markets outside of the United States, VIOXX continues to be the best-selling arthritis and pain medicine.*

368.    The above-referenced statements from the April 22, 2004 Merck press release concerning VIOXX's commercial success and potential new uses as a painkiller were materially misleading because they created the materially false impression that VIOXX's commercial success would likely continue into the future, while failing to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279. As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

369.    On or about May 7, 2004, the Officer Defendants caused the Company to file with the SEC Merck's Form 10-Q for the first quarter 2004, which was signed by defendants Frazier

and Henriques.  The Form 10-Q substantially repeated the same materially false and misleading statements contained in the April 22, 2004 press release referred to above.[23]

  **M.**  **Materially False and Misleading Statements Made During the Second Half of 2004**

  370. On July 21, 2004, the Officer Defendants caused the Company to issue a press release announcing Merck's results for the second quarter 2004 (the period ending June 30, 2004).   In addition to reporting worldwide VIOXX sales were $653 million for the second quarter and $1.3 billion for the first six months of 2004, the press release stated:

> Following FDA approval for the acute treatment of migraine in late March, VIOXX is now approved for treating more types of painful conditions than any other coxib in the United States and remains the only coxib approved to relieve migraine pain and associated migraine symptoms.  ***Merck continues to seek new uses for VIOXX to extend the clinical benefits of the product to new populations.  A supplemental NDA for VIOXX is under review by the FDA for the treatment of juvenile rheumatoid arthritis.***
>
> ***Outside of the United States, VIOXX continues to be the best-selling arthritis and pain medicine.  Indications for VIOXX for migraine and juvenile rheumatoid arthritis also are being sought outside of the United States.***

  371. The above-referenced statements from the July 21, 2004 Merck press release concerning VIOXX's commercial success and potential new uses as a painkiller were materially misleading because they created the materially false impression that VIOXX's commercial success would likely continue into the future, while failing to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the

---

[23] In addition, the first quarter 2004 Form 10-Q contained certifications, signed by defendants Gilmartin and Lewent, as required pursuant to §302 of the Sarbanes-Oxley Act of 2002, which represented, among other things:  "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279 above.  As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

372.    On or about August 6, 2004, the Officer Defendants caused the Company to file with the SEC Merck's Form 10-Q for the second quarter 2004, which was signed by defendants Frazier and Henriques.  The Form 10-Q contained substantially the same materially false and misleading statements contained in the July 21, 2004 press release referred to above.[24]

373.    On August 25, 2004, *Bloomberg News* reported the results of the "Kaiser Study," which found that there was a statistically significant difference in heart risk between users of VIOXX and users of Celebrex.

374.    On August 26, 2004, the Officer Defendants caused Merck to move immediately to refute and discredit the Kaiser Study and to reassure investors as to VIOXX's safety by issuing a statement on the *Business Wire*.  The August 26 statement averred as follows:

> ***Merck strongly disagrees with the conclusions of an observational analysis by Graham et al, presented at an international medical meeting this week, which evaluated the rate of cardiovascular events in patients taking COX-2 specific inhibitors VIOXX (rofecoxib) and Celebrex (celecoxib) and in patients taking non-selective NSAIDs.***  This analysis is a retrospective database analysis -- not a clinical trial. Observational

---

[24] In addition, the second quarter 2004 Form 10-Q contained certifications, signed by defendants Gilmartin and Lewent, as required pursuant to §302 of the Sarbanes-Oxley Act of 2002, which represented, among other things:  "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

> analyses have limitations, often conflict with each other, and must be interpreted within the context of data from large, randomized, controlled clinical trials.

The August 26, 2004 statement also quoted defendant Kim as stating:

> This retrospective analysis is based only on a database review. Observational analyses do not have the rigor of randomized, controlled clinical trials. The robust clinical trial data available support the safety of VIOXX. ***Based on all of the data that are available from our clinical trials, Merck stands behind the efficacy and safety, including cardiovascular safety, of VIOXX . . . . Nothing is more important to Merck than the safety of our medicines***.

375.    The August 26, 2004 statements reported by *Business Wire,* including defendant Kim's statement that "Merck stands behind the efficacy and safety, including cardiovascular safety, of VIOXX," were materially false and misleading because they (a) constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results and/or failed to correct a prior false representation; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279 above.  As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

376.    On August 27, 2004, the *San Jose Mercury News* quoted Merck spokesperson Mary Elizabeth Blake responding to the Kaiser Permanente study by stating:  "***We are certainly***

***confident in the efficacy and safety of VIOXX."***  This statement was also materially false and misleading for the same reasons as stated in the immediately preceding paragraph.  .

377.    On September 30, 2004, the Officer Defendants caused Merck to issue a press release announcing that, "effective immediately," the Company was withdrawing VIOXX worldwide in light of the recommendation of the External Safety Monitoring Board for the APPROVe study that the study be stopped based on the increased risk of confirmed cardiovascular events they found in patients taking VIOXX.

378.    That same day, the Officer Defendants also held a conference call for analysts to further discuss the withdrawal.  During the call, defendant Gilmartin stated:

> We are taking this action because we believe it serves the interests of patients . . . We believe it would have been possible to continue to market VIOXX with labeling that would incorporate these new data.  However, given the availability of alternative therapies and the questions raised by the data, ***we concluded that a voluntary withdrawal is the responsible course to take***.

379.    However, Merck and the Officer Defendants continued their wrongful scheme by falsely assuring the market that, prior to the APPROVe trial, they were unaware of the serious problems that ultimately forced them to "voluntarily" withdraw.  For example, in the evening of September 30 on the *PBS Nightly Business Report*, defendant Gilmartin falsely stated:

> [The APPROVe results] was ***totally unexpected***.  But my instinctive reaction when Doctor Peter Kim called me to inform me of this was to say to him immediately, Peter, we're going to make this decision based on patient safety.

380.    Defendant Gilmartin's September 30, 2004 statement on the *PBS Nightly Business Report* that the APPROVe results were "totally unexpected" and the further implication that Merck's decisions at all times were fundamentally premised on "patient safety" were materially false and misleading because they (a) constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis

(as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results and/or failed to correct a prior false representation; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 279 above.  As a result, investors remained unaware of the fact that (1) Merck's and the Officer Defendants' "newly found" belief that VIOXX was probably prothrombotic effects was not "newly found" at all, that (2) Merck's and the Officer Defendants' belief was actually based on additional undisclosed information and analysis dating back years (rather than triggered by the APPROVe results alone), and that (3) the truth concerning the nature and extent of Merck's and the Officer Defendants' deceit would almost certainly doom any efforts to restore VIOXX to the market to any meaningful degree in the foreseeable future.  For the same reasons, as a result of defendant Gilmartin's September 30 statements, investors continued to be materially misled as to the full extent of the risk that VIOXX's commercial viability and ability to generate substantial revenue for the Company would be permanently impaired (and indeed effectively destroyed)..

381.    Accordingly, it was not until November 1, 2004, when *The Wall Street Journal* published its article, entitled "Warning Signs: E-mails Suggest Merck Knew Vioxx's Dangers at Early Stage," that investors finally learned that Merck and the Officer Defendants -- contrary to their public statements over the past five years -- had actually believed all along that VIOXX was prothrombotic, and learned (a) the full extent to which (particularly in light of Merck's manipulations and concealment of past data) VIOXX's previously touted safety profile was grievously flawed and crippled by revelations of Merck's lack of good faith in its prior statements concerning VIOXX, and (b) the full extent to which, as a result of the foregoing, (i)

167

there was little to no chance that Merck could ever convince the FDA to restore VIOXX to the market in the foreseeable future, and (ii) VIOXX's commercial viability and ability to generate substantial revenue for the Company had been permanently impaired and effectively destroyed.

## X.    ADDITIONAL SCIENTER ALLEGATIONS

382.    As alleged herein, Merck and the Officer Defendants acted with scienter in that they knew, or recklessly disregarded with deliberate recklessness, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

383.    For example, the following allegations strongly support a finding that Merck and the Officer Defendants acted with scienter:

(A)    Merck and the Officer Defendants reviewed and/or had access to the unpublished original version of Drs. Garrett FitzGerald and Francesca Catella-Lawson's article reporting on the results of Protocol 023, and thereafter pressured Drs. FitzGerald and Catella-Lawson to "tone down" their conclusions in the published 023 version. *See* ¶¶ 102-103.

(B)    In a February 1997 email, Merck scientist Dr. Briggs Morrison, an author of the article reporting the results of Protocol 023 and one of the Merck scientists who pressured Drs. FitzGerald and Catella-Lawson to "tone down" their conclusions, wrote defendant Reicin and other senior Merck scientists warning them that their proposed design for the planned GI outcomes trial was faulty because "without

COX-1 inhibition, you will get more thrombotic events and kill the drug." *See* ¶ 105.

(C)     Defendant Reicin, in a February 1997 email, admitted that "the possibility of increased CV events is of great concern" and remarked on her reluctance to "be the one to present those results to senior management." *See* ¶ 107.

(D)     Defendant Reicin, in the same February 1997 email, proposed that Merck design the GI trial to "exclude[e] high risk CV patients" in the hopes of "decreas[ing] the CV event rate so that a difference between the two groups would not be evident." *See* ¶ 107.

(E)     The Officer Defendants were senior officers of Merck and, as evidenced by defendant Reicin's February 1997 email that she couldn't "wait to be the one to tell management" about the serious concerns of those in Merck Research Laboratories about VIOXX's prothrombotic characteristics (which would "kill the drug"), closely monitored the production and development of the Company's blockbuster drug. *See* ¶ 107.

(F)     Merck and the Officer Defendants cancelled two GI outcome studies for fear that they would show VIOXX to be prothrombotic and "kill the drug." *See* ¶ 110.

(G)     The Officer Defendants reviewed and/or had access to the Company's internal February 1998 analysis showing that women in the VIOXX osteoarthritis trials had a statistically significant 216% increase in serious adverse cardiovascular events. *See* ¶¶ 115-118.

(H)     The Officer Defendants chose not to share the Company's internal February 1998 analysis with either Merck's Board of Scientific Advisors or the public.  *See* ¶¶ 119-120.

(I)     The Officer Defendants intentionally designed the VIGOR trial to exclude patients at high risk of a heart attack in order to minimize the risk that the results would show that VIOXX was prothrombotic.  *See* ¶ 127.

(J)     The Officer Defendants ordered that Merck scientists stop working on creating a data analysis plan for cardiovascular events in VIGOR, and not make comparisons between VIOXX and other comparator drugs, despite the fact that Merck's Board of Scientific Advisors had recommended that this be done for all VIOXX trials and that the protocol for VIGOR called for such a data analysis plan.  *See* ¶ 134.

(K)     The Officer Defendants deliberately staffed at least half of the VIGOR DSMB with a combination of physicians who had financial conflicts of interest with Merck and a full-time Company employee who reported to defendant Scolnick.  *See* ¶ 129.

(L)     The Officer Defendants deliberately chose not to assign a cardiologist to VIGOR's DSMB.  *See* ¶ 127.

(M)     The Officer Defendants took efforts to avoid complying with the DSMB's request that Merck analyze the cardiovascular events in VIGOR as provided for in the trial protocol.  *See* ¶ 135.

(N)     Defendant Scolnick, Merck's President of Merck Research Laboratories, requested a confidential meeting with the purportedly "blinded" statistician for

VIGOR (Merck Scientist Deborah Shapiro) *the day after* the premature cardiovascular (as opposed to GI) cut-off for VIGOR because, as he emphasized in his March 2001 email to her that attached a securities analyst report, "this situation cannot simply follow the 'book' ways of my knowing."  *See* ¶ 137.

(O)    Defendant Scolnick acknowledged, *albeit* solely within the confines of the Company's walls, that VIOXX was the cause of the increased rate of adverse cardiovascular events in VIGOR -- *i.e.*, that it was "mechanism-based as we worried it was."  *See* ¶ 138.

(P)    Defendants Scolnick and Reicin, and other senior Merck scientists, conceded to one another that their frantic efforts to find support for the naproxen hypothesis following their receipt of the VIGOR cardiovascular results were unsuccessful. *See* ¶ 141.

(Q)    The Officer Defendants, unlike the market, were in possession of and had access to "the best comparative clin[ical] data on MI [heart attack] and NSAIDs," which confirmed that aspirin significantly reduced the risk that patients might suffer a first, nonfatal heart attack, but that naproxen, ibuprofen, and diclofenac (*i.e.*, other traditional NSAIDs) "had no significant effect," either individually or combined, on the risk of suffering a heart attack.  *See* ¶¶ 143-145.

(R)    Defendant Reicin pressured Merck scientists to reclassify the "cause of death" for at least one patient in the ADVANTAGE study so it would not "raise concerns." *See* ¶ 167.

(S)    Merck changed the pre-announced (and customary) "intention-to-treat" and "on treatment" methodologies for analyzing data from the Alzheimer's trials after they

171

determined that the (non-public) statistically significant results highlighted the fact that VIOXX was unsafe. *See* ¶¶ 170-188.

(T)    Merck and the Officer Defendants failed to disclose the statistically significant mortality data from its Alzheimer's trials to investors. *See* ¶¶ 170-188.

(U)    Merck and the Officer Defendants attempted to have the name of a Merck scientist secretly removed from the publication of the Brigham Study, in order to try to distance Merck from the study's adverse cardiovascular finding. *See* ¶¶ 199-200.

384.    In addition, the fact that Merck and the Officer Defendants pressured and/or attempted to intimidate academics and others who were critical of VIOXX (as first made public by the media in November 2004) further supports a strong inference of scienter. From the outset of the Class Period, Merck sought to either co-opt (through offers of research grants, paid memberships on advisory boards, etc.) or silence critics of VIOXX. For example, an internal Merck email dated April 29, 1999 from Merck marketing manager Susan Baumgartner to colleagues in Merck's marketing department, which was not disclosed to the public until after the Class Period, provides a "list of 'problem' physicians that we must, at a minimum, neutralize."

385.    Similarly, a July 23, 1999 internal Merck email from Ms. Baumgartner to Merck's Regional Managing Directors references on Merck's efforts to sway the "most challenging (and also some of the most vocal and influential) national and regional physicians for VIOXX." As the email notes, these physicians "have [been] identified as being 1) Important from a business perspective in terms of influence and/or prescribing, and 2) Not as supportive of Merck and/or VIOXX as we would like." Baumgartner proceeded to note that "some of these

physicians have already been 'neutralized.'"  While Baumgartner's email focused on ways to co-opt physicians who were "not as supportive of Merck and/or VIOXX as [Merck] would like," through means such as giving them grants, employing them to do research, and other funding mechanisms, Merck also engaged in far more nefarious tactics with academics and physicians for whom Merck's efforts were unsuccessful.  As first revealed in the November 1, 2004 *New York Times* article, Merck repeatedly attempted to intimidate, pressure and/or outright threaten academic researchers who began to question VIOXX's safety.

386.    In addition, as revealed in an April 16, 2008 *JAMA* article entitled "Guest Authorship and Ghostwriting in Publications Related to Rofecoxib," Merck routinely and repeatedly authored drafts of manuscripts of scientific articles or contracted with vendors to draft review articles, and then sought out external academics (*i.e.,* ghost writers) who were willing to be identified as lead authors for these articles, for the purpose of misleading the medical community and investors into believing that these external academics had done research that supported Merck's "naproxen hypothesis."  For example, the April 2008 *JAMA* article noted that the article presenting the results of the Prevention Trial (in Alzheimer's patients) -- which had been designed and conducted principally by Merck scientists --  was largely written by Merck scientists and not the attributed first author.  Indeed, in an internal Merck email dated January 27, 2004, Merck scientist Eric Yuen told fellow Merck scientist Christopher Lines that "I think you should be the first author since you have done virtually all of the writing."  In response, Lines stated "I'm just wondering whether, given the nature of the results and target journal, it's more appropriate to have someone who's a neurologist as first author?"  The authors of the April 2008 *JAMA* article noted that a neurologist from the University of California San Diego was recruited to be the "lead author" of the final article -- and the final article "authored" by this neurologist

contained only "minor differences in language and organization between the draft and final versions of the manuscript (particularly in the abstract as opposed to the text)" and that" the trial itself and the analyses were complete before the academically affiliated investigators were involved in the manuscript."

387.    As the "lead author" of the October 2003 *Annals* article, which published the results of ADVANTAGE, told *The New York Times* in 2005:

> Merck designed the trial, paid for the trial, ran the trial … Merck came to me after the study was completed and said, 'We want your help to work on the paper.'  The initial paper was written at Merck, and then was sent to me for editing.

When this "first author" was later confronted about Merck's improper adjudication of causes of patient deaths in ADVANTAGE, he responded that he was unaware of any such conduct and that "*Basically, I went with the cardiovascular data that was presented to me*."

388.    In addition to all of the foregoing, Merck and the Officer Defendants each had powerful motives and the opportunity to perpetrate the fraudulent scheme and course of business described herein. For example:

(A)    The central importance of VIOXX to the overall performance and prospects of the Company gave the Officer Defendants a powerful motive to suppress the truth to avoid any adverse impact on VIOXX's commercial viability and prospects.

(B)    That the patents on a number of Merck's best selling products were set to expire made the success of VIOXX all the more critical to Merck and the Officer Defendants.  Specifically, Merck was set to lose $5 billion in annual revenue as *five* of Merck's best-selling drugs (Vasotec, Pepcid, Mevacor, Prilosec and Prinivil) were all scheduled to lose patent protection between August 2000 and

174

the end of 2001. Disclosure of adverse facts concerning VIOXX would have further threatened VIOXX's drug pipeline.

(C)     VIOXX was Merck's second best selling pharmaceutical product in 2000, 2001, 2002, and 2003, generating billions of dollars in worldwide sales for the Company. The Officer Defendants themselves described VIOXX as a "driving force" behind the Company's performance. VIOXX accounted for between 10% and 12.5% of Merck's pharmaceutical sales during the Class Period. Accordingly, the Officer Defendants had an obvious motive to delay as long as possible their true beliefs about VIOXX's safety and commercial prospects to avoid jeopardizing its sales, which were so critical to the Company's performance.

(D)     The Officer Defendants were also motivated to conceal their true beliefs concerning VIOXX's prothrombotic characteristics from the market because of problems that the Company was experiencing with ARCOXIA, the Company's planned successor to VIOXX. On March 15, 2002, the Officer Defendants were forced to withdraw the NDA for ARCOXIA. Thus, again, Merck and the Officer Defendants had a clear motive to keep the market in the dark for as long as possible with respect to their true beliefs concerning VIOXX's safety profile so that Merck could continue to reap profits from VIOXX.

(E)     Because naproxen and other traditional NSAIDs sell for a fraction of the price of VIOXX, and because VIOXX is no more effective than traditional NSAIDs at treating inflammation and pain, the disclosures of the serious safety risks

associated with VIOXX would have significantly jeopardized its commercial prospects.

(F)     Similarly, any disclosure of the Officer Defendants' true beliefs about VIOXX's safety profile would have put it at a strong disadvantage with respect to Celebrex, which was being actively promoted by Pfizer and Monsanto and had the advantage of being approved by the FDA approximately six months before VIOXX was approved.

(G)     As detailed below, the Officer Defendants and the Insider Trading Defendants profited personally from the wrongdoing alleged herein by selling more than 2.15 million shares of Merck stock at artificially inflated prices, as detailed below, for total proceeds of more than $136.2 million.

(H)     The Officer Defendants clearly had the opportunity to commit the fraudulent conduct alleged herein. The Officer Defendants were all members of Merck's senior management who controlled the Company's public statements during the Class Period.

389.    In addition, during the Class Period, a number of the Officer Defendants and other Merck insiders (collectively, the "Insider Trading Defendants"), sold substantial amounts of Merck common stock from their personal holdings while in possession of adverse non-public information about VIOXX's safety profile and its commercial prospects. The Insider Trading Defendants' insider sales often immediately followed the exercise of options to purchase Merck common stock. Stock options provide the grantee with the right to purchase the company's stock at the exercise price and then sell those shares in the open market at the then-prevailing market price. Thus, option holders benefit most from exercising options and selling their shares when

they believe the market value of the stock (*i.e.*, the price they will receive when selling the stock in the open market) is at a high point, or when they believe that subsequent events or disclosures will lower the value of their shares.  As discussed below, the Insider Trading Defendants' sales occurred at relative high points during the Class Period at prices as high as $90 per share (near the Class Period high closing price of $94.88) and all prices at which these insiders sold exceeded the closing price of Merck stock on the day the Company disclosed the worldwide withdrawal of VIOXX (*i.e.*, $33.00 on September 30, 2004) and on the day *The Wall Street Journal* exposed the extent of the Officer Defendants' knowing misconduct (*i.e.*, $28.28 on November 1, 2004). The Insider Trading Defendants' insider sales resulted in instantaneous net profits, **in one day**, of as much as **$20.9 million**.

390.    The Insider Trading Defendants' stock sales were unusual because of the:  (i) numbers of shares sold; (ii) dollar amounts of the transactions, and (iii) percentages of their holdings sold, which were very large and far exceeded prior trading patterns.  Moreover, these individuals made very small amounts of open market purchases of Merck stock during the Class Period, particularly in comparison to the vast shareholdings they sold.[25]

391.    Merck's Compensation and Benefits Committee maintained important guidelines regarding the number of Merck shares the Company's Chief Executive Officer and other key executives were expected to hold.  Those guidelines significantly narrowed the percentages of

---

[25]   Certain of the Insider Trading Defendants' holdings in Merck stock options increased during the Class Period through option grants by the Compensation and Benefits Committee of the Merck Board of Directors.  These option grants increased each Insider Trading Defendant's motive to increase Merck's stock price.  However, since none of the Insider Trading Defendants was a member of Merck's Compensation and Benefits Committee during the Class Period, the Insider Trading Defendants did not control the option grants, and the acquisition of those options by the Insider Trading Defendants cannot support an inference the Insider Trading Defendants believed Merck had a positive outlook for the future.

stock the executives could sell at any given moment.  As the Company's Proxy Statements filed

in 1999, 2000 and 2001 all stated, in sum and substance:

> The [Compensation and Benefits] Committee expects the CEO to
> *hold 70%* and the other executive officers named in the Summary
> Compensation Table to *hold 60% of the shares which may be*
> *purchased from the gain on stock option exercise after deducting*
> *option price, taxes and transaction costs*.

In the Company's Proxy Statements filed in 2002 and 2003, the wording was changed to read, in

sum and substance:

> The [Compensation and Benefits] Committee expects the CEO and
> other executive officers named in the Summary Compensation
> Table to *hold Merck Common Stock in an amount representing a*
> *multiple of base salary.  For the CEO, the multiple is ten; for the*
> *other executive officers, the multiple is five*.  The Committee
> further expects that, until such multiples are reached, the CEO and
> the other executive officers *hold a proportion of shares that may*
> *be purchased from the net gain on stock option exercise, after*
> *deducting exercise price, taxes and transaction costs*.  For the
> CEO, the proportion is *70%*; for the other executive officers, the
> proportion is *60%*.

392.    In the Company's Proxy Statement filed in 2004, the wording was further

changed to read:

> The [Compensation and Benefits] Committee expects senior
> management globally (about 200 employees), including the Chief
> Executive Officer and other executive officers named in the
> Summary Compensation Table, to *hold Merck Common Stock in*
> *an amount representing a multiple of base salary. For the Chief*
> *Executive Officer, the multiple is ten; for the other executive*
> *officers, the multiple is five.* The Committee further expects that,
> until such multiples are reached, employees covered by the
> guidelines *hold a proportion of shares that may be purchased*
> *with the net gain from the exercise of stock options, after*
> *deducting the exercise price, taxes and transaction costs*.  For the
> Chief Executive Officer, the proportion is *70 percent*; for the other
> executive officers, the proportion is *60 percent*.

393.    The Compensation and Benefits Committee, which controlled the Insider Trading

Defendants' compensation, thus stated publicly to Merck investors that it "expected" the CEO

(defendant Gilmartin) and other members of senior management (including defendants Scolnick, Lewent, Wold-Olsen, Anstice and Kim (who, among others, were listed in the Summary Compensation Tables in the Proxy Statements) to **hold** large percentages of their Merck stock. This restricted these individuals' ability to sell large portions of their shares at any given time. This "expectation" essentially prevented these defendants from selling all of their Merck shares at any one time while they served in senior management positions at the Company, as such a sale would contravene the stated policies of the Committee.[26]

### A.    Defendant Gilmartin

394.    While in possession of material adverse non-public information regarding Merck, defendant Gilmartin personally profited from the sale of Merck stock at artificially-inflated prices during the Class Period.  On February 2, 2004, defendant Gilmartin exercised options to purchase 1,054,990 shares of Merck common stock.  The exercise price of the options was $14.7513 and his cost to exercise all 1,054,990 options was $15,562,473.99.  Defendant Gilmartin then sold in the open market 639,200 of the shares resulting from the exercises of those options at the prices listed below, for proceeds of $30,373,810 and profits of *$20,947,779.04*:

| Date | No. Shares Sold | Price per Share | Sale Proceeds | Cost of Option Exercise | Profit | % Total Shares, Options[27] |
|------|------|------|------|------|------|------|
| | | | | | | |

---

[26] As defendant Reicin was not required to file information with the SEC concerning her transactions in Merck securities during the Class Period, without the benefit of discovery, Plaintiffs are unable to determine whether defendant Reicin, while in possession of material adverse information regarding Merck, profited from the sale of Merck securities at artificially inflated prices.

[27] "% of Total Shares, Options" refers to the percentage of each Insider Trading Defendant's sale in comparison to the total number of common shares and vested, "in the money" stock options (*i.e.*, options whose exercise prices were below the prevailing market price) held at the time of the relevant sale.  In addition to holding exercisable, "in the money" Merck stock options during the Class Period, the Insider Trading Defendants also held Merck stock options that were

179

| Date | No. Shares Sold | Price per Share | Sale Proceeds | Cost of Option Exercise | Profit | % Total Shares, Options[27] |
|---|---|---|---|---|---|---|
| 02/02/04 | 5,700 | $47.71 | $271,947.00 | $84,082.41 | $187,864.59 | 27.67% |
| 02/02/04 | 1,500 | $47.73 | $71,595.00 | $22,126.95 | $49,468.05 | |
| 02/02/04 | 569,900 | $47.50 | $27,070,250.00 | $8,406,765.87 | $18,663,484.13 | |
| 02/02/04 | 22,200 | $47.60 | $1,056,720.00 | $327,478.86 | $729,241.14 | |
| 02/02/04 | 7,300 | $47.61 | $347,553.00 | $107,684.49 | $239,868.51 | |
| 02/02/04 | 5,200 | $47.62 | $247,624.00 | $76,706.76 | $170,917.24 | |
| 02/02/04 | 3,400 | $47.63 | $161,942.00 | $50,154.42 | $111,787.58 | |
| 02/02/04 | 1,100 | $47.65 | $52,415.00 | $13,226.43 | $39,188.57 | |
| 02/02/04 | 2,900 | $47.66 | $138,214.00 | $42,778.77 | $95,435.23 | |
| 02/02/04 | 10,000 | $47.70 | $477,000.00 | $147,513.00 | $329,487.00 | |
| 02/02/04 | 5,000 | $47.81 | $239,050.00 | $73,756.50 | $165,293.50 | |
| 02/02/04 | 5,000 | $47.90 | $239,500.00 | $73,756.50 | $165,743.50 | |
| **Total** | **639,200** | | **$30,373,810** | **$9,426,030.96** | **$20,947,779.04** | |

395.    Defendant Gilmartin's February 2, 2004 insider sales of 639,200 shares of Merck common stock were unusual because: (i) the approximately $20.9 million in profits he made on this transaction is staggering and represented approximately ***thirteen times*** Gilmartin's base salary for 2004 (*i.e.*, $1,600,008); and (ii) the large number of shares sold by Gilmartin represented 27.67% of his combined personal holdings in Merck common stock and exercisable, "in the money" Merck stock options.

396.    Defendant Gilmartin's February 2, 2004 sale of 639,200 shares of Merck common stock was also unusual in scope and timing because: (i) in the approximately five years preceding the Class Period, Gilmartin made no open market sales of Merck common stock and only disposed of 2,640 shares of Merck stock through gifts (including to family members) -- *i.e.*,

---

unexercisable and/or "under water" (*i.e.*, the exercise price was above the then-current market price). The unexercisable and "under water" options are not included in the Insider Trading Defendants' total shareholdings in the above percentage calculations because at the time of the respective sales, the Insider Trading Defendants were unable to sell unexercisable options, and exercising "under water" options would have resulted in the Insider Trading Defendants paying more for Merck common stock than it cost on the open market.

Gilmartin's February 2, 2004 sale of Merck stock was approximately *242 times* greater than all of the Merck stock he disposed of during the five-year time period preceding the Class Period; (ii) during the Class Period, Gilmartin acquired only 10,600 shares of Merck common stock through acquisitions that were not related to stock option exercises, meaning that his February 2, 2004 sale of 639,200 shares of Merck common stock was approximately *60.3 times* his Class Period acquisitions that were not related to stock option grants or exercises; and (iii) in contrast to the *de minimis* number of Merck shares Gilmartin acquired during the Class Period through non-stock option exercises (10,600 shares), Gilmartin had acquired 180,840 shares of Merck common stock in the five years preceding the Class Period in this manner -- *i.e.*, Gilmartin significantly curtailed his open market purchases of Merck common stock during the Class Period.

## B.    Defendant Scolnick

397.    While in possession of material adverse non-public information regarding Merck, defendant Scolnick personally profited from the sale of Merck stock at artificially-inflated prices during the Class Period.  On October 25, 2000, defendant Scolnick exercised options to purchase 381,200 shares of Merck common stock.   The exercise prices of the options were between $16.25 and $21.2805, and Scolnick's cost to exercise all 381,200 options was $7,601,225.10. Scolnick then sold in the open market all 381,200 of the shares resulting from the exercises of those options at the market price of $85.00, for proceeds of $32,402,000.00 and profits of *$24,800,774.90:*

| Date | No. Shares Sold | Price per Share | Sale Proceeds | Exercise Price | Cost of Option Exercise | Profit | % Total Shares, Options |
|---|---|---|---|---|---|---|---|
| 10/25/00 | 600 | $85.00 | $51,000 | $21.2085 | $12,725.10 | $38,274.90 | 58.13% |
| 10/25/00 | 600 | $85.00 | $51,000 | $16.25 | $9,750.00 | $41,250.00 | |
| 10/25/00 | 180,000 | $85.00 | $15,300,000 | $18.5625 | $3,341,250.00 | $11,958,750.00 | |

181

| 10/25/00 | 200,000 | $85.00 | $17,000,000 | $21.1875 | $4,237,500.00 | $12,762,500.00 | |
|---|---|---|---|---|---|---|---|
| **Total** | **381,200** | | **$32,402,000** | | **$7,601,225.10** | **$24,800,774.90** | |

398.    When defendant Scolnick stepped-down from the Company on January 1, 2003 (three years and 226 days into the Class Period), he was no longer subject to public reporting requirements concerning the sale of Merck stock.  Without the benefit of discovery, Plaintiffs are unable to ascertain whether defendant Scolnick sold any additional shares of Merck common stock during the Class Period.

399.    Defendant Scolnick's October 25, 2000 insider sale of 381,200 shares of Merck common stock was unusual in scope because:  (i) the approximately $24.8 million in profits he made on this transaction is staggering and represented approximately *31.4 times* Scolnick's base salary for 2000 (*i.e.*, $790,000); and (ii) the large number of shares sold by Scolnick represented 58.13% of his combined personal holdings in Merck common stock and exercisable, "in the money" Merck stock options at the time, and represented 100% of his holdings in exercisable "in the money" Merck stock options at the time.

400.    Defendant Scolnick's October 25, 2000 sale of 381,200 shares of Merck common stock was also unusual in scope and timing because:  (i) during the Class Period, Scolnick acquired *zero* shares of Merck common stock through acquisitions that were not related to stock option exercises; (ii) in the three years and 226 days preceding the Class Period, Scolnick exercised Merck options and sold Merck common stock on two occasions, in the amounts of 108,000 shares (on June 13, 1997) and 220,000 shares (on February 17 and 19, 1999), meaning that his October 25, 2000 sale of Merck stock was approximately *3.5 times* and *1.73 times* greater, respectively, than each of these prior dispositions of Merck stock; and (iii) Scolnick's approximately $24.8 million in profit he made on his October 25, 2000 transaction was *1.6 times*

greater than the profits he earned on these prior June 1997 and February 1999 stock sales *combined*. With such totals in the millions of dollars, this magnitude of difference is significant.

### C.    Defendant Frazier

401.    While in possession of material adverse non-public information regarding Merck, defendant Frazier personally profited from the sale of Merck stock at artificially inflated prices during the Class Period. On at least four separate occasions during the Class Period, defendant Frazier exercised options to purchase shares of Merck common stock and sold a total of 38,960 shares of Merck common stock. The exercise prices of the options were between $15.4622 and $21.6250, and defendant Frazier's cost to exercise all 38,960 options whose shares were sold was approximately $707,232.26. Defendant Frazier sold those 38,960 shares at market prices ranging from $47.80 to $57.15, for proceeds of $1,967,325.40 and profits of approximately *$1,260,093.14:*

| Date | No. Shares Sold | Price per Share | Sale Proceeds | Exercise Price | Approx. Cost of Option Exercise | Approx. Profit | % Total Shares, Options |
|---|---|---|---|---|---|---|---|
| 08/07/02 | 4,300 | $47.80 | $205,540.00 | $21.625 | $92,987.50 | $112,552.50 | 2.00% |
| 02/11/03 | 4,740 | $54.58 | $258,709.20 | $18.875 | $89,467.50 | $169,241.70 | 2.25% |
| 04/29/03 | 4,660 | $57.09 (3,700), $57.15 (660), $57.14 (300) | $266,094.00 | $16.25 (600), $16.3125 (4060)[28] | $75,978.75 | $190,115.25 | 2.27% |
| 02/04/04 | 25,260 | $48.97 | $1,236,982.20 | $15.4622 (12,660), | $448,798.51 | $788,183.69 | 11.30% |

---

[28]  On April 29, 2003, defendant Frazier exercised a total of 6,600 Merck stock options in two blocks -- one comprised of 600 options at the exercise price of $16.25 and the second comprised of 6,000 options at the price of $16.3125. Defendant Frazier only sold 4,660 of the resulting 6,600 shares on April 29, 2003. To calculate his approximate profit on that day, the above cost figures attribute the exercise price of $16.25 to 600 of those shares and the exercise price of $16.3125 to 4,060 of those shares.

|  |  |  |  | $20.0831 (12,600)[29] |  |  |  |
|---|---|---|---|---|---|---|---|
| **Total** | **38,960** |  | **$1,967,325.40** |  | **$707,232.26** | **$1,260,093.14** |  |

402.   Frazier's Class Period sales of Merck stock were unusual in scope and timing because, among other things, according to publicly-available information, during the approximately five years preceding the Class Period, defendant Frazier made *zero* sales of Merck common stock, demonstrating that Frazier's Class Period sales of 38,960 shares of Merck stock were a significant departure from his prior trading patterns.[30]

### D.   Defendant Henriques

403.   While in possession of material adverse information regarding Merck, defendant Henriques personally profited from the sale of Merck securities at artificially-inflated prices during the Class Period.  During the Class Period, defendant Henriques sold 33,500 shares of Merck stock from his personal holdings, recognizing more than $1.88 million in proceeds and profits of approximately *$1,234,451.69*:

| Date | No. Shares Sold | Price per Share | Sale Proceeds | Exercise Price | Cost of Option Exercise | Approx. Profit | *% Total Shares, Options* |
|---|---|---|---|---|---|---|---|
| 07/31/00 | 600 | $70.862 | $42,517.20 | $21.2085 | $12,725.10 | $29,792.10 | 16.86% |
| 07/31/00 | 2,600 | $70.862 | $184,241.20 | $21.625 | $56,225.00 | $128,016.20 | |
| 07/31/00 | 2,600 | $70.862 | $184,241.20 | $18.875 | $49,075.00 | $135,166.20 | |
| 10/27/00 | 600 | $86.875 | $52,125.00 | $16.25 | $9,750.00 | $42,375.00 | 16.08% |
| 10/27/00 | 4,000 | $86.875 | $347,500.00 | $16.3125 | $65,250.00 | $282,250.00 | |
| 05/07/02 | 2,700 | $55.19 | $149,013.00 | $16.3125 | $44,043.75 | $104,969.25 | 6.25% |

[29]   On February 4, 2004, defendant Frazier exercised a total of 33,760 Merck stock options in two blocks -- one comprised of 12,660 options at the exercise price of $15.4622 and the second comprised of 21,100 options at the price of $20.0831.  Frazier only sold 25,260 of the resulting 33,760 shares on February 4, 2004.  To calculate his approximate profit on that day, the above cost figures attribute the exercise price of $15.4622 to 12,660 of those shares and the exercise price of $20.0831 to 12,600 of those shares.

[30]   Defendant Frazier's salary information during the Class Period is not publicly available, and, as a result, without the benefit of discovery, Plaintiffs are unable to determine how Frazier's Class Period sales of Merck stock compared to his salary.

| 05/07/02 | 300 | $55.15 | $16,545.00 | $16.3125 | $4,893.75 | $11,651.25 | |
| 10/27/03 | 15,000 | $45.21 | $678,150.00 | $20.0831 | $301,246.50 | $376,903.50 | 42.39% |
| 10/27/03 | 1,000 | $45.27 | $45,270.00 | $20.0831 | $102,423.81 | $123,328.19 | |
| 10/27/03 | 4,100 | $44.02 | $180,482.00 | | | | |
| *Total* | *33,500* | | *$1,880,084.60* | | *$645,632.91* | *$1,234,451.69* | |

404.    Defendant Henriques's Class Period sales of Merck stock were unusual in scope and timing because, among other things, Henriques's largest Class Period sales amounting to 20,100 shares of Merck stock in late October 2003 (the "October 2003 Sales") comprised 42.39% of Henriques's total holdings of Merck common stock and vested, "in the money" Merck stock options at that time.

**E.    Defendant Kim**

405.    As detailed herein, defendant Kim was a direct, substantial, and primary participant in the wrongdoing alleged herein.  According to Merck's Class Period SEC filings, defendant Kim, who did not join the Company until February 2001, received substantial performance-based bonuses and other compensation based on, among other things, changes in Merck's earnings per share and sales compared to Merck's competitors during the Class Period, including the following bonus amounts in the following years:  $576,639 (2001); $520,000 (2002); $520,000 (2003); and $520,000 (2004).

**F.    Defendant Lewent**

406.    While in possession of material adverse information regarding Merck, Lewent personally profited from the sale of Merck securities at artificially-inflated prices during the Class Period.  During the Class Period, defendant Lewent sold 267,200 shares of Merck stock from her personal holdings, recognizing more than $16.5 million in proceeds and profits of approximately ***$11,119,756.46***:

| Date | No. Shares Sold | Price per Share | Sale Proceeds | Exercise Price | Cost of Option Exercise | Profit | % Total Shares, Options |
|---|---|---|---|---|---|---|---|
| 07/27/00 | 20,000 | $71.00 | $1,420,000.00 | $13.625 | $272,500.00 | $1,147,500.00 | 2.95% |
| 10/25/00 | 600 | $85.00 | $51,000.00 | $21.2085 | $12,725.10 | $38,274.90 | 5.11% |
| 10/25/00 | 33,000 | $85.00 | $2,805,000.00 | $21.875 | $721,875.00 | $2,083,125.00 | |
| 07/26/01 | 20,000 | $64.3003 | $1,286,006.00 | $21.875 | $437,500.00 | $848,506.00 | 2.65% |
| 02/06/02 | 53,000 | $58.8321 | $3,118,101.30 | $25.9165 | $1,373,574.50 | $1,744,526.80 | 7.22% |
| 05/01/02 | 18,700 | $54.75 | $1,023,825.00 | $18.875 | $352,962.50 | $670,862.50 | 2.43% |
| 05/01/02 | 800 | $54.77 | $43,816.00 | $18.875 | $15,100.00 | $28,716.00 | |
| 05/01/02 | 500 | $54.79 | $27,395.00 | $18.875 | $9,437.50 | $17,957.50 | |
| 10/29/02 | 45,000 | $54.2334 | $2,440,503.00 | $18.875 | $849,375.00 | $1,591,128.00 | 5.61% |
| 02/11/03 | 25,000 | $54.90 | $1,372,500.00 | $18.875 | $471,875.00 | $900,625.00 | 3.30% |
| 04/30/03 | 600 | $58.5121 | $35,107.26 | $16.25 | $9,750.00 | $25,357.26 | 3.50% |
| 04/30/03 | 25,000 | $58.5121 | $1,462,802.50 | $18.5625 | $464,062.50 | $998,740.00 | |
| 05/02/03 | 25,000 | $59.54 | $1,488,500.00 | $18.5625 | $464,062.50 | $1,024,437.50 | 3.54% |
| **Total** | **267,200** | | **$16,574,556.06** | | **$5,454,799.60** | **$11,119,756.46** | |

407.   Lewent's Class Period sales of Merck stock were unusual in scope and timing because:  (i) the total minimum profits from Lewent's Class Period sales of Merck stock (occurring in 2000 through 2003) were approximately *4.6 times* her total salary earned for 2000 through 2003 (*i.e.*, $2,416,672); and (ii) during the approximate five year period preceding the Class Period, Lewent sold a total of only 89,400 shares of Merck stock, meaning that her Class Period sales of 267,200 shares of Merck stock were approximately *three times* larger than her prior sales, and thus a significant departure from her prior trading patterns.

### G.   Defendant Anstice

408.   While in possession of material adverse information regarding Merck, defendant Anstice personally profited from the sale of Merck securities at artificially inflated prices during the Class Period.  During the Class Period, defendant Anstice sold 432,019 shares of Merck stock from his personal holdings, recognizing more than $29.7 million in proceeds and profits of approximately *$20.85 million*:

186

| Date | No. Shares Sold | Price per Share | Sale Proceeds | Exercise Price | Cost of Option Exercise | Profit | % Total Shares, Options |
|---|---|---|---|---|---|---|---|
| 07/28/00 | 5,530 | $72.6875 | $401,961.88 | $13.625 | $75,346.25 | $326,615.63 | 1.04% |
| 08/01/00 | 16,590 | $73.50 | $1,219,365.00 | $13.625 | $226,038.75 | $993,326.25 | 3.15% |
| 10/26/00 | 474 | $87.0338 | $41,254.02 | $21.2085 | $10,052.783 | $31,201.24 | 26.24% |
| 10/26/00 | 67,068 | $87.0338 | $5,837,182.90 | $21.875 | $1,467,112.50 | $4,370,070.40 | |
| 10/26/00 | 67,058 | $87.0338 | $5,836,312.56 | $25.9165 | $1,737,908.66 | $4,098,403.90 | |
| 11/01/00 | 46,000 | $90.00 | $4,140,000.00 | $18.875 | $868,250.00 | $3,271,750.00 | 17.86% |
| 11/01/00 | 600 | $90.00 | $54,000.00 | $16.25 | $9,750.00 | $44,250.00 | |
| 11/01/00 | 21,000 | $90.00 | $1,890,000.00 | $18.5625 | $389,812.50 | $1,500,187.50 | |
| 05/06/03 | 60,000 | $58.81097 | $3,528,658.00 | $18.5625 | $1,113,750.00 | $2,414,908.00 | 9.45% |
| 04/29/04 | 60,000 | $47.35 | $2,841,000.00 | $20.0831 | $1,204,986.00 | $1,636,014.00 | 10.00% |
| 08/04/04 | 4,900 | $44.75 | $219,275.00 | $20.0831 | $1,761,267.79 | $2,167,648.34 | 25.03% |
| 08/04/04 | 2,100 | $44.76 | $93,996.00 | | | | |
| 08/04/04 | 15,500 | $44.77 | $693,935.00 | | | | |
| 08/04/04 | 6,100 | $44.78 | $273,158.00 | | | | |
| 08/04/04 | 6,000 | $44.79 | $268,740.00 | | | | |
| 08/04/04 | 23,000 | $44.80 | $1,030,400.00 | | | | |
| 08/04/04 | 1,900 | $44.81 | $85,139.00 | | | | |
| 08/04/04 | 5,200 | $44.82 | $233,064.00 | | | | |
| 08/04/04 | 12,700 | $44.83 | $569,341.00 | | | | |
| 08/04/04 | 7,600 | $44.84 | $340,784.00 | | | | |
| 08/04/04 | 2,000 | $44.86 | $89,720.00 | | | | |
| 08/04/04 | 699 | $44.87 | $31,364.13 | | | | |
| **Total** | **432,019** | | **$29,718,650.49** | | **$10,040,902.89** | **$20,854,375.26** | |

409.    Defendant Anstice's Class Period sales of Merck stock were unusual in scope and timing because, *inter alia*,  (i) the total approximate profits from his Class Period sales of Merck stock (occurring in 2000, 2003 and 2004) were approximately ***8.9 times*** his total salary earned in 2000, 2003 and 2004 (*i.e.*, $2,346,682); (ii) according to publicly-available information, during the approximately five years preceding the Class Period, defendant Anstice sold only 75,000 shares of Merck common stock, meaning that Anstice's total Class Period sales of 432,019 shares were ***5.76 times*** larger than his prior sales, and thus a significant departure from his prior

trading patterns; and (iii) Anstice acquired zero Merck shares during the Class Period through open market purchases that were not related to exercises of stock options.

### H.    Defendant Clark

410.    Defendant Clark was President of Medco Health, then a wholly-owned subsidiary of Merck, from January 2000 through December 2002; President and CEO of Medco Health Solutions, Inc. from January 2003 through May 2003; and President of Merck Manufacturing Division from June 2003 through the Class Period, which reasonably would have made him privy to information regarding the Officer Defendants' true beliefs concerning the safety of VIOXX and its commercial prospects.  While in possession of material adverse information regarding Merck, Clark personally profited from the sale of Merck securities at artificially inflated prices during the Class Period.  During the Class Period, Clark sold 58,200 shares of Merck stock from his personal holdings, recognizing approximately $3.6 million in proceeds and profits of approximately *$1,884,008.30*:

| Date | No. Shares Sold | Price per Share | Sale Proceeds | Exercise Price | Cost of Option Exercise | Profit | % Total Shares, Options |
|---|---|---|---|---|---|---|---|
| 05/03/00 | 13,000 | $69.3793 | $901,930.90 | $21.1875 | $275,437.50 | $626,493.40 | 71.43% |
| 08/08/00 | 600 | $72.375 | $43,425.00 | $21.2085 | $12,725.10 | $30,699.90 | 23.08% |
| 08/08/00 | 600 | $72.375 | $43,425.00 | $16.25 | $9,750.00 | $33,675.00 | |
| 07/26/01 | 10,000 | $76.58 | $765,800.00 | $32.5625 | $325,625.00 | $440,175.00 | 19.61% |
| 05/02/02 | 1,000 | $54.99 | $54,990.00 | $32.5625 | $32,562.50 | $22,427.50 | 30.63% |
| 05/02/02 | 33,000 | $54.70 | $1,805,100.00 | $32.5625 | $1,074,562.50 | $730,537.50 | |
| **Total** | **58,200** | | **$3,614,670.90** | | **$1,736,662.60** | **$1,884,008.30** | |

411.    Defendant Clark's Class Period sales of Merck stock were unusual in scope and timing because, *inter alia*, (i) his May 5, 2000 sale of 13,000 Merck shares represented 71.43% of his  total common shares and vested "in the money" options as of that date; (ii)  his August 8, 2000 sale of 1,200 shares represented 23.08% of Clark's total common shares and vested "in the

money" options as of that date, and 100% of his total vested "in the money" options as of that date; and (iii) his sale of 34,000 shares on May 2, 2002 represented 30.63% of his total common shares and vested "in the money" options as of that date.

### I.    Defendant Kelley

412.    During the Class Period, defendant Kelley was a senior executive in charge of manufacturing of drugs, which reasonably would have made him privy to information regarding Officer Defendants' true beliefs concerning the safety of VIOXX and its commercial prospects. While in possession of material adverse information regarding Merck, Kelley personally profited from the sale of Merck securities at artificially inflated prices during the Class Period.  During the Class Period, he sold 121,250 shares of Merck stock from his personal holdings, recognizing approximately $10.3 million in proceeds and profits of approximately ***$7,967,243.65***:

| Date | No. Shares Sold | Price per Share | Sale Proceeds | Exercise Price | Cost of Option Exercise | Profit | % Total Shares, Options |
|---|---|---|---|---|---|---|---|
| 02/01/00 | 19,950 | $77.00 | $1,536,150.00 | $13.625 | $271,818.75 | $1,264,331.25 | 9.88% |
| 10/25/00 | 600 | $86.50 | $51,900.00 | $21.2085 | $12,725.10 | $39,174.90 | 37.26% |
| 10/25/00 | 26,700 | $86.50 | $2,309,550.00 | $21.875 | $584,062.50 | $1,725,487.50 | |
| 10/25/00 | 24,000 | $86.50 | $2,076,000.00 | $21.625 | $519,000.00 | $1,557,000.00 | |
| 10/25/00 | 50,000 | $86.50 | $4,325,000.00 | $18.875 | $943,750.00 | $3,381,250.00 | |
| **Total** | **121,250** | | **$10,298,600.00** | | **$2,331,356.35** | **$7,967,243.65** | |

413.    Defendant Kelley's Class Period sales of Merck stock were unusual in scope and timing because, among other things, his October 25, 2000 sale of 101,300 shares represented 37.26% of his total common shares and vested "in the money" options as of that date.

### J.    Defendant Wold-Olsen

414.    Defendant Wold-Olsen was, throughout the Class Period, President of Human Health Europe, Middle East & Africa and was responsible for the Company's prescription drug business in Europe, the Middle East and Africa, which reasonably would have made him privy to

189

the Officer Defendants' true beliefs concerning the safety of VIOXX and its commercial prospects. While in possession of material adverse information regarding Merck, Wold-Olsen personally profited from the sale of Merck securities at artificially inflated prices during the Class Period.  During the Class Period, he sold 178,650 shares of Merck stock from his personal holdings, recognizing approximately $9.4 million in proceeds:

| Date | No. Shares Sold | Price per Share | Sale Proceeds | No. Options Exercised | Exercise Price | Cost of Option Exercise | % Total Shares, Options |
|---|---|---|---|---|---|---|---|
| 08/01/00 | 5,450 | $73.5278 | $400,726.51 | 5,950 | $13.62500 | $81,068.75 | 1.76% |
| 08/01/00 | 600 | $73.5278 | $44,116.68 | | $21.20850 | $12,725.10 | |
| 11/01/00 | 13,550 | $89.87984 | $1,217,871.88 | 19,050 | $21.87500 | $416,718.75 | 4.02% |
| 07/26/01 | 2,450 | $64.36 | $157,682.00 | 9,525 | $25.91650 | $246,854.66 | 2.24% |
| 07/26/01 | 6,800 | $64.35 | $437,580.00 | 9,525 | $25.91650 | $246,854.66 | |
| 02/05/03 | 39,300 | $55.00 | $2,161,500.00 | | | | 7.50% |
| 02/06/03 | | | | 60,000 | $18.87500 | $1,132,500.00 | N/A |
| 07/30/03 | | | | 600 | $16.25000 | $9,750.00 | |
| 11/03/03 | 44,100 | $44.75 | $1,973,475.00 | | | | 11.66% |
| 11/06/03 | | | | 66,464 | $17.59500 | $1,169,434.08 | N/A |
| 08/03/04 | 10,000 | $45.20 | $452,000.00 | 94,949 | $20.08310 | $1,906,870.26 | 19.86% |
| 08/03/04 | 16,400 | $45.03 | $738,492.00 | | | | |
| 08/03/04 | 5,000 | $45.04 | $225,200.00 | | | | |
| 08/03/04 | 7,500 | $45.10 | $338,250.00 | | | | |
| 08/03/04 | 15,000 | $45.13 | $676,950.00 | | | | |
| 08/03/04 | 5,000 | $45.18 | $225,900.00 | | | | |
| 08/03/04 | 7,500 | $45.19 | $338,925.00 | | | | |
| **Total** | **178,650** | | **$9,388,669.07** | **266,663** | | **$5,222,776.27** | |

415.    Defendant Wold-Olsen's Class Period sales of Merck stock were unusual in scope and timing because, *inter alia*, (i) the profits from his Class Period sales of Merck stock (occurring in 2000, 2001, 2003 and 2004) were, at a minimum, approximately ***1.85 times*** his total salary earned in 2000, 2001, 2003 and 2004 (*i.e.*, $2,250,014); (ii) according to publicly-available information, during the approximately five years preceding the Class Period, he sold

only 32,190 shares of Merck common stock, meaning that his total Class Period sales of 178,650

shares of Merck stock were **5.5 times** greater than his prior sales, and thus a significant departure

from his prior trading patterns; and (iii) he failed to acquire any Merck shares during the Class

Period through open market purchases that were not related to exercises of stock options.

## XI.    LOSS CAUSATION

416.    During the Class Period, as detailed herein, Merck and the Officer Defendants

engaged in a course of conduct that artificially inflated the price of Merck securities throughout

the Class Period.  Merck and the Officer Defendants' unlawful conduct directly caused the losses

incurred by Plaintiffs and the other members of the Class.  The materially false and misleading

statements set forth above were widely disseminated to the securities markets, investment

analysts and the investing public.  As a result, Plaintiffs and the other members of the Class

purchased Merck securities at artificially-inflated prices and were damaged when the artificial

inflation gradually dissipated as a result of partial-corrective disclosures entering the market that

revealed Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic

characteristics.

417.    By making contemporaneous misstatements in connection with certain partial

disclosures of October 2003 and September 30, 2004 as alleged herein, Merck and the Officer

Defendants mitigated the impact of those corrective disclosures and prevented the full truth

about VIOXX's safety profile and commercial prospects, including Merck's and the Officer

Defendants' true beliefs concerning the same from being revealed at once.  When the true facts

became known and/or the materialization of the risks that had been fraudulently concealed by

Merck and the Officer Defendants occurred as alleged herein, the price of Merck securities

declined significantly as artificial inflation was removed from the market price of these

securities, causing substantial damage to Plaintiffs and members of the Class. Discovery and expert analysis may reveal further partial disclosures of corrective information.

418.    Between October 22 and October 30, 2003, there was an accumulation of information that partially disclosed the truth concerning the risks that had been misrepresented or fraudulently concealed by Merck and the Officer Defendants concerning VIOXX's actual safety profile and commercial prospects. As set forth above (¶ 195), on October 22, 2003 *Reuters* reported that VIOXX's sales had declined in the third quarter of 2003 due to data "suggesting [VIOXX] might slightly raise the risk of heart attacks, and the growing perception that VIOXX did not have any greater efficacy than traditional NSAIDS." In addition, Credit Suisse First Boston issued an analyst report on October 22, 2003 informing investors to "[w]atch for [the] upcoming A[merican] C[ollege] [of] R[heumatology] Presentation," *i.e.*, the formal presentation of the aforementioned data from the Merck sponsored Brigham Study, which showed an increased risk of heart attack in patients taking VIOXX compared to patients taking Celebrex or placebo. In response to this information, Merck shares fell almost 7%, or more than $3 per share, to close at $45.72 per share on October 22, 2003. Shortly thereafter, on October 30, 2003, *The Wall Street Journal* published an article concerning the adverse findings observed in the Brigham Study, causing Merck stock to fall to $43.94, reflecting a further 2.2% decline in the price of Merck stock. Nevertheless, due to Merck's and the Officer Defendants' vigorous efforts to discredit the Brigham Study, and their subsequent public statements reassuring investors of VIOXX's purported safety and blockbuster commercial viability, the price of Merck stock remained artificially high, and the fraud continued.

419.    On September 30, 2004, Merck shocked investors by announcing the immediate worldwide withdrawal of VIOXX because of "an increased risk of confirmed cardiovascular

events" connected to VIOXX.  As discussed in ¶202, only weeks earlier, Merck and the Officer Defendants had reiterated their purported good faith belief in the naproxen hypothesis (and VIOXX's commercial prospects) by reaffirming the cardiovascular safety of VIOXX.  In response to this second partial disclosure, the Company's stock price dropped from a closing price of $45.07 on September 29, 2004 to close at $33 per share on September 30, 2004, a decline of 27% on exceptionally heavy volume of 145,048,600 shares (which was more than 426% greater than the next highest reported trading volume since January 1990 -- 34,024,200 shares on November 21, 2003 -- and 27 times its normal volume).  As discussed in ¶ 206, following the September 30 announcement, securities analysts also expressed their shock and concern at VIOXX's sudden withdrawal.

420.    Nevertheless, despite the withdrawal of VIOXX, as discussed above in ¶¶ 197, 208, Merck and the Officer Defendants misrepresented to the public that the link between VIOXX and heart attacks was "totally unexpected" and that they had been "stunned" by the APPROVe data.  Accordingly, it was not until *The Wall Street Journal's* November 1, 2004 article, which revealed Merck's and the Officer Defendants' concerted efforts to misrepresent their true beliefs concerning VIOXX's safety, that the artificial inflation resulting from Merck and the Officer Defendants' prior false and misleading statements (including purported statements of their "good faith" opinion and belief) was finally removed from the market price of Merck securities.  As a direct and proximate result of these further disclosures, Merck stock declined $3.03, or about 9.7%, from the previous trading day's closing price, to close at just $28.28 per share on November 1, 2004, on exceptionally heavy trading volume of 66,606,200 shares.  Excluding September 30, 2004, this one-day percentage decline and the trading volume were the greatest that Merck stock had experienced since 1990.

## XII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

421.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pled in this Complaint.  None of the misstatements and omissions complained of herein was a forward-looking statement, nor were any of the statements identified as forward-looking when made. Rather, the false or misleading statements and omissions complained of in this Complaint concerned misstatements and/or omissions of historical and/or current facts and conditions existing at the time the statements were made.

422.    Alternatively, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Furthermore, to the extent the statutory safe harbor would otherwise apply to any statement found by the Court to be forward-looking pleaded herein, the Officer Defendants are liable for those false or misleading statements because at the time those statements were made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Merck who knew that the statement was materially false or misleading when made.

## XIII.    PRESUMPTION OF RELIANCE

423.    Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

424.    In the alternative, Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market

doctrine because, at all relevant times, the market for Merck securities was open, efficient, and

well-developed for the following reasons, among others:

    i.    The market for Merck securities was, at all relevant times, an efficient market that promptly digested current information with respect to the Company from all reliable, publicly-available sources and reflected such information in the price of Merck securities;

    ii.    Merck common and preferred stock met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient market for securities;

    iii.    The Company was consistently followed, before and throughout the Class Period, by the media, which issued over 7,000 news stories regarding Merck during the Class Period. Merck was followed by numerous securities analysts employed by firms including Goldman, Sachs & Co., JP Morgan Securities Inc., Merrill Lynch, and Morgan Stanley, among others, who wrote reports about the Company and the value of its securities that were publicly available and entered the public marketplace. Indeed, there was extensive securities analyst coverage of Merck, with over 1,500 analyst reports published during the Class Period;

    iv.    The price of Merck securities reacted promptly to the dissemination of new information regarding the Company, as set forth above. Merck securities were actively traded throughout the Class Period, with substantial trading volume and average weekly turnover and high institutional investor participation. The average daily trading volume for Merck common stock during the Class Period was 5.5 million shares and the average weekly turnover was 1.2%;

    v.    Merck regularly communicated with public investors through established market communication mechanisms, including through regular press releases, which were carried by national and international news wires, and through other wide ranging public disclosures, such as communications and conferences with investors, the financial press and other similar reporting services;

    vi.    As a public company, Merck filed period public reports with the SEC;

vii.   Merck met the SEC's requirements to register debt and
       equity securities filed on Form S-3; and

viii.  Merck's securities were rated by rating agencies such as
       Moody's, Standard & Poor's, and Fitch Ratings.

425.   As a result of the foregoing, the market for Merck securities promptly digested current information regarding Merck from all reliable, publicly available sources and reflected such information in the price of Merck's securities.  Under these circumstances, purchasers of Merck securities during the Class Period suffered injury through their purchase of Merck securities at artificially-inflated prices and a presumption of reliance applies.

426.   Accordingly, Lead Plaintiffs and the other members of the Class did rely and are entitled to have relied upon the integrity of the market price for Merck securities and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## XIV.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT ONE

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against the Exchange Act Defendants**

427.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

428.   During the Class Period, Defendants Merck, the Officer Defendants and the Insider Trading Defendants (collectively, the "Exchange Act Defendants") carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public regarding Merck's business, operations, management and the intrinsic value of Merck securities; (ii) enable the Exchange Act Defendants to artificially inflate the price of Merck securities; (iii) enable Officer Defendants and the Insider Trading Defendants,

Merck insiders, to sell over $136 million of their privately-held Merck shares during the Class

Period and while in possession of material adverse non-public information about the Company;

and (iv) cause Lead Plaintiffs and other members of the Class to purchase Merck securities at

artificially-inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct,

the Exchange Act Defendants jointly and individually (and each of them) took the actions set

forth herein.

429.   The Exchange Act Defendants (a) employed devices, schemes, and artifices to

defraud; (b) made untrue statements of material fact and/or omitted to state material facts

necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course

of business which operated as a fraud and deceit upon the purchasers of the Company's

securities in an effort to maintain artificially high market prices for Merck's securities in

violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All of the Exchange Act

Defendants are sued either as primary participants in the wrongful and illegal conduct charged

herein or as controlling persons as alleged below.

430.   The Exchange Act Defendants, individually and in concert, directly and

indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails,

engaged and participated in a continuous course of conduct to conceal adverse material

information about the business, operations and future prospects of Merck as specified herein.

431.   These Defendants employed devices, schemes and artifices to defraud, while in

possession of material adverse non-public information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of Merck's value and

performance and continued substantial growth, which included the making of, or the

participation in the making of, untrue statements of material facts and omitting to state material

facts necessary in order to make the statements made about Merck and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Merck securities during the Class Period.

432.    Defendant Merck is liable for all materially false and misleading statements made during the Class Period, as alleged above, including without limitation the false and misleading statements in: the 1999 Form 10-K; the 2000 Form 10-K; the 2001 Form 10-K; the 2002 Form 10-K; the 2003 Form 10-K; the second quarter 1999 Form 10-Q; the third quarter 1999 Form 10-Q; the first quarter 2000 Form 10-Q; the second quarter 2000 Form 10-Q; the third quarter 2000 Form 10-Q; the first quarter 2001 Form 10-Q; the second quarter 2001 Form 10-Q; the third quarter 2001 Form 10-Q; the first quarter 2002; the second quarter 2002 Form 10-Q; the third quarter 2002 Form 10-Q; the first quarter 2003 Form 10-Q; the second quarter 2003 Form 10-Q; the third quarter 2003 Form 10-Q; the first quarter 2004 Form 10-Q; and the second quarter 2004 Form 10-Q.

433.    Merck is also liable for the materially false and misleading statements made in the Registration Statement filed with the SEC dated April 26, 2002 and the prospectuses for the MSIP dated April 30, 2002, and June 10, 2004.

434.    Merck is further liable for the materially false and misleading statements made by Merck officers in press releases and during conference calls and at conferences with investors and analysts, as alleged above, as the makers of such statements and under the principle of respondeat superior.

435.    The Officer Defendants, as top executive officers of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company, each of these Defendants was able to and did control the content of the public statements disseminated by Merck.  These Defendants had direct involvement in the daily business of the Company and participated in the preparation and dissemination of Merck's materially false and misleading statements as set forth above.

436.    In addition, Defendants Gilmartin, Scolnick, Lewent, Frazier, Henriques, Anstice, Wold-Olsen, Kim, and Reicin are liable for, among other material omissions and false and misleading statements, the false and misleading statements they made and/or signed as follows:

Defendant Gilmartin

i.    Defendant Gilmartin signed the 1999 Form 10-K; the 2000 Form 10-K; the 2001 Form 10-K; the 2002 Registration Statement; the 2002 Form 10-K and the 2003 Form 10-K, and certifications pursuant to section 302 of the Sarbanes-Oxley Act attached to all Forms 10-Q and 10-K after that Act became effective in July 2002.

ii.    Defendant Gilmartin made statements during numerous conference calls and other public conferences, and in press releases and annual reports to shareholders during the Class Period, including calls, conferences, press releases and annual reports on January 26, 2000; March 24, 2000; April 24, 2000; July 24, 2000; January 23, 2001; April 20, 2001; July 10, 2001; October 18, 2001; January 22, 2002; April 3, 2002; April 18, 2002; July 19, 2002; October 18, 2002; December 10, 2002; January 28, 2003; March 24, 2003; and September 30, 2004.

iii.    Defendant Gilmartin made statements in and was directly responsible for other statements made in Merck press releases filed with the SEC as attachments to Forms 8-K, including forms filed on October 21, 1999; December 9, 1999; and December 12, 2000.

<u>Defendant Scolnick</u>

    iv.    Defendant Scolnick signed the 1999 Form 10-K; the 2000 Form 10-K; the 2001 Form 10-K; and the 2002 Registration Statement.

    v.    Defendant Scolnick made statements during numerous conference calls and other public conferences, and in press releases and annual reports to shareholders during the Class Period, including calls, conferences, press releases and annual reports on December 9, 1998; March 30, 2001; October 9, 2001; and April 11, 2002.

<u>Defendant Lewent</u>

    vi.    Defendant Lewent signed the 1999 Form 10-K; the 2000 Form 10-K; the 2001 Form 10-K; the 2002 Registration Statement; the second quarter 2002 Form 10-Q; the third quarter 2002 Form 10-Q; the 2002 Form 10-K; the first quarter 2003 Form 10-Q; the second quarter 2003 Form 10-Q; the third quarter 2003 Form 10-Q; the 2003 Form 10-K; the first quarter 2004 Form 10-Q; and the second quarter 2004 Form 10-Q, and certifications pursuant to section 302 of the Sarbanes-Oxley Act attached to all Forms 10-Q and 10-K after that Act became effective in July 2002.

<u>Defendant Frazier</u>

    vii.    Defendant Frazier signed the first quarter 2000 Form 10-Q; the second quarter 2000 Form 10-Q; the third quarter 2000 Form 10-Q; the first quarter 2001 Form 10-Q; the second quarter 2001 Form 10-Q; the third quarter 2001 Form 10-Q; the first quarter 2002 Form 10-Q; the second quarter 2002 Form 10-Q; the third quarter 2002 Form 10-Q; the first quarter 2003 Form 10-Q; the second quarter 2003 Form 10-Q; the third quarter 2003 Form 10-Q; the first quarter 2004 Form 10-Q, and the second quarter 2004 Form 10-Q.

<u>Defendant Henriques</u>

    viii.    Defendant Henriques signed the second quarter 1999 Form 10-Q; the third quarter 1999 Form 10-Q; the 1999 Form 10-K; the first quarter 2000 Form 10-Q; the second quarter 2000 Form 10-Q; the third quarter 2000 Form 10-Q; the 2000 Form 10-K; the first quarter 2001 Form 10-Q; the second quarter 2001 Form 10-Q; the third quarter 2001

Form 10-Q; the 2001 Form 10-K; the first quarter 2002 Form 10-Q; the 2002 Registration Statement; the second quarter 2002 Form 10-Q; the third quarter 2002 Form 10-Q; the 2002 Form 10-K; the first quarter 2003 Form 10-Q; the second quarter 2003 Form 10-Q; the third quarter 2003 form 10-Q; the 2003 Form 10-K; the first quarter 2004 Form 10-Q; and the second quarter 2004 Form 10-Q.

Defendant Anstice

ix.     Defendant Anstice made statements in and was directly responsible for other statements made in Merck press releases filed with the SEC as attachments to Forms 8-K, including forms filed on December16, 1999 and December 12, 2000.

Defendant Wold-Olsen

x.     Defendant Wold-Olsen made statements in and was directly responsible for other statements made in Merck press releases filed with the SEC as attachments to Forms 8-K, including forms filed on December 12, 2000.

Defendant Kim

xi.     Defendant Kim made public statements in numerous press releases during the Class Period, including on November 5, 2003 and August 26, 2004.

Defendant Reicin

xii.     Defendant Reicin made statements in numerous media outlets and press releases, as well as in FDA hearings reported on by analysts including press releases, conferences, and public appearances on February 8, 2001; June 13, 2001; October 31, 2003; and November 2, 2003.

437.     The allegations above establish a strong inference that the Exchange Act Defendants acted with scienter throughout the Class Period in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such Defendants' material misrepresentations and/or omissions were done knowingly or with

recklessness for the purpose and effect of concealing Merck's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the Exchange Act Defendants' material misstatements and omissions throughout the Class Period, if they did not have actual knowledge of the misrepresentations and omissions alleged, the Exchange Act Defendants were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

438.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Merck securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Merck's publicly-traded securities were artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by the Exchange Act Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Exchange Act Defendants but not disclosed in public statements by them during the Class Period, Lead Plaintiffs and the other members of the Class purchased or acquired Merck securities during the Class Period at artificially high prices and were damaged thereby.

439.    At the time of said material misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and the Exchange Act Defendants' material omissions. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth, they would not have purchased or otherwise acquired their Merck securities, or, if they had purchased or acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

440.    By virtue of the foregoing, the Exchange Act Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

441.    As a direct and proximate result of their wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases or acquisitions and sales of the Company's securities during the Class Period.

## COUNT TWO

### Violation of Section 20(a) of the Exchange Act Against
### The Officer Defendants

442.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

443.    The Officer Defendants acted as controlling persons of Merck within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are materially false and misleading.  The Officer Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

444.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

445.     As set forth above, each of the Officer Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, each of the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT THREE

### Violations of Section 10(b) and 20A of the Exchange Act
### And Rule 10b-5 Promulgated Thereunder The Insider Trading Defendants For Insider Trading

446.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

447.     This claim is asserted pursuant to Section 20A of the Exchange Act against the Insider Trading Defendants by Mississippi PERS (the "20A Plaintiff"), on behalf of itself and other Class members who purchased shares of Merck common stock contemporaneously with the sale of Merck common stock by the Insider Trading Defendants while those defendants were in possession of material, non-public information concerning VIOXX as alleged herein.

448.     Certain of the Insider Trading Defendants identified in Counts One and Two above violated Exchange Act Section 10(b), Rule 10b-5 and Section 20(a) for the reasons stated in Counts One and Two above.  Additionally, each of the Insider Trading Defendants further violated Exchange Act Section 10(b) and Rule 10b-5 by selling shares of Merck common stock while in possession of material, nonpublic adverse information concerning VIOXX's

cardiovascular risks, which information they each had a duty to disclose, and which they each failed to disclose in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as more fully alleged herein.

449.    Contemporaneously with the Insider Trading Defendants' insider sales of Merck common stock, the 20A Plaintiff purchased shares of Merck common stock on a national securities exchange, including without limitation on:

a)  August 8, 2000, contemporaneously with the sales on that date of Insider Trading Defendant Clark while Defendant Clark was in possession of material, nonpublic information concerning VIOXX's cardiovascular risks;

b)  October 25, 2000, contemporaneously with the sales on that date of Insider Trading Defendants Lewent, Scolnick, and B. Kelley while each of those defendants was in possession of material, nonpublic information concerning VIOXX's cardiovascular risks;

c)  July 26, 2001, contemporaneously with the sales on that date of Insider Trading Defendants Lewent, Clark, and Wold-Olsen while each of those defendants was in possession of material, nonpublic information concerning VIOXX's cardiovascular risks;

d)  February 12, 2003, contemporaneously with the sales made the day before by Insider Trading Defendants Frazier and Lewent while each of those defendants was in possession of material, nonpublic information concerning VIOXX's cardiovascular risks;

e)  April 30, 2003, contemporaneously with the sales made on that date by Insider Trading Defendant Lewent and the sales made the day before by Insider Trading Defendant Frazier, while each of those defendants was in possession of material, nonpublic information concerning VIOXX's cardiovascular risks;

f)  May 6, 2003 contemporaneously with the sales made on that date by Insider Trading Defendant Anstice while Anstice was in possession of material, nonpublic information concerning VIOXX's cardiovascular risks; and

g)  February 2, 2004, contemporaneously with the sales made on that date by Insider Trading Defendant Gilmartin while Gilmartin was in possession of material, nonpublic information concerning VIOXX's cardiovascular risks.

450.    Other Class members also purchased shares of Merck common stock contemporaneously with the Insider Trading Defendants' insider sales of Merck common stock, including without limitation on: February 1, 2000; May 3, 2000; July 27, 2000; July 28, 2000; August 1, 2000; August 8, 2000; October 25, 2000; October 26, 2000; November 1, 2000; July 26, 2001; February 6, 2002; May 1, 2002; May 2, 2002; August 7, 2002; October 29, 2002; February 5, 2003; February 6, 2003; February 11, 2003; April 29, 2003; April 30, 2003; May 2, 2003; May 6, 2003; July 30, 2003; November 3, 2003; November 6, 2003; December 1, 2003; December 15, 2003; February 2, 2004; February 4, 2004; April 29, 2004; August 3, 2004; and August 4, 2004.

451.    The 20A Plaintiff and other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein.

452.    By reason of their violations of the Exchange Act alleged herein, each Insider Trading Defendant is liable to the 20A Plaintiff and other members of the Class who purchased shares of Merck common stock contemporaneously with that Defendant's sales of Merck common stock during the Class Period.

453.    The 20A Plaintiff and the other members of the Class who purchased contemporaneously with the Insider Trading Defendants' Merck securities sales seek

disgorgement by the Insider Trading Defendants of profits gained (or losses avoided) from those Defendants' transactions in Merck common stock contemporaneous with the 20A plaintiff and other members of the Class.

454.    This action was brought within five years after the date of the last transaction that is the subject of each Insider Trading Defendant's violation of Section 20A, and, with respect to the underlying violations of Section 10(b) of the Exchange Act alleged in this Count and in Count One above, was brought within five years after the date of the last transaction that violated section 20A of the Exchange Act by each Insider Trading Defendant, respectively.

## XV.    <u>SECURITIES ACT ALLEGATIONS</u>

455.    In the allegations and claims set forth in this part of the Complaint, Plaintiffs Kanter and Park East assert a series of strict liability and negligence claims against the Securities Act Defendants -- *i.e.*, Defendants Merck and the Director Defendants -- pursuant to the Securities Act on behalf of themselves and the Class (as defined in ¶ 1 above).

456.    The Securities Act claims are not based on any allegations of knowing or reckless misconduct on behalf of any of the Securities Act Defendants.  The Securities Act claims do not allege, and do not sound in, fraud, and Plaintiffs Kanter and Park East specifically disclaim, pursuant to *In re Suprema Specialties, Inc. Securities Litigation*, 438 F.3d 256 (3d Cir. 2006), any reference to or reliance upon allegations of fraud in these non-fraud claims under the Securities Act.

457.    The Securities Act Defendants conducted securities offerings for the MSIP pursuant to Merck's materially misstated 2002 Registration Statement and the April 2002 Prospectus and the June 2004 Prospectus.  The 2002 Registration Statement, the April 2002 Prospectus and the June 10, 2004 Prospectus are collectively referred to herein as the "Offering Documents."

458.    As discussed in more detail below, the Offering Documents (including the above-listed documents and the documents incorporated by reference therein) contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading because of their failure to disclose, *inter alia*, VIOXX's significant cardiovascular risks.

### A.    The Securities Act Defendants' Liability

459.    As the issuer of the MSIP, Merck is strictly liable under the Securities Act for the material misstatements and omissions in the Offering Documents concerning Merck and VIOXX.

460.    As directors, officers and controlling persons of a publicly-held company whose MSIP was governed by the provisions of the federal securities laws, and who signed the offering Documents, the individual Securities Act Defendants each had a duty to disseminate accurate and truthful information in the Offering Documents with respect to the Company's drug products and drug testing, its business and performance, growth, operations, markets, management, earnings and present and future business prospects, so that the market price of the Company's securities would be based upon truthful and accurate information.  The Offering Documents' material misstatements and omissions violated these specific requirements and obligations.

### B.    Untrue Statements and Omissions of Material Fact Contained in the Offering Documents

461.    The 2002 Registration Statement was materially false and misleading because it incorporated by reference therein the following materially misstated and materially misleading Merck public filings: Merck's 10-Qs dated May 13, 2002; August 13, 2002; November 13, 2002; May 14, 2003; August 13, 2003; November 13, 2003; May 7, 2004 and August 6, 2004, and

Merck's 10-Ks dated March 21, 2002; March 21, 2003; and March 10, 2004. Each of those documents was materially false and misleading, as alleged more fully herein.

462.    Moreover, the 2002 Registration Statement stated as to VIOXX that Merck's "anti-inflammatory/analgesics" product category had sales of $578.5 million, $2,251.7 million, and $2,630.5 million, in each of the years 1999 through 2001, respectively. The 2002 Registration Statement went on to state that "[h]uman health products include therapeutic and preventive agents, generally sold by prescription, for the treatment of human disorders. Among these are … anti-inflammatory/analgesics, of which Vioxx (rofecoxib), an agent that specifically inhibits COX-2, is the largest-selling…" These statements were materially false and misleading for failing to disclose the same undisclosed facts set forth in ¶ 279 above. As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

463.    The 2002 Registration Statement was signed by each of the Director Defendants.

464.    The April 2002 Prospectus incorporated by reference therein the following materially misstated and materially misleading Merck public filings:  Merck's 10-Qs dated May 13, 2002; August 13, 2002; November 13, 2002; May 14, 2003; August 13, 2003; November 13, 2003; May 7, 2004 and August 6, 2004, and Merck's 10-Ks dated March 21, 2002; March 21, 2003; and March 10, 2004.

465.    Moreover, the April 2002 Prospectus stated as to VIOXX that Merck's "anti-inflammatory/analgesics" product category had sales of $578.5 million, $2,251.7 million, and $2,630.5 million, in each of the years 1999 through 2001, respectively. The April 2002

209

Prospectus went on to state that "[h]uman health products include therapeutic and preventive agents, generally sold by prescription, for the treatment of human disorders. Among these are … anti-inflammatory/analgesics, of which Vioxx (rofecoxib), an agent that specifically inhibits COX-2, is the largest-selling…" These statements were materially false and misleading for failing to disclose the same undisclosed facts set forth in ¶ 279 above. As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

466.    The June 2004 Prospectus incorporated by reference therein the following materially misstated and materially misleading Merck public filings: Merck's 10-Qs dated May 7, 2004 and August 6, 2004, and Merck's 10-K dated March 10, 2004.

467.    Moreover, the June 2004 Prospectus stated as to VIOXX that Merck's "anti-inflammatory/analgesics" product category had sales of $2,391.1 million, $2,586.2 million, and $2,677.3 million, in each of the years 2001 through 2003, respectively. The June 2004 Prospectus went on to state that "[h]uman health products include therapeutic and preventive agents, generally sold by prescription, for the treatment of human disorders. Among these are … anti-inflammatory/analgesics, which include Vioxx (rofecoxib) and Arcoxia (etoricoxib), agents that specifically inhibit the COX-2 enzyme, which is responsible for pain and inflammation ("coxibs")…" These statements were materially false and misleading for failing to disclose the same undisclosed facts set forth in ¶ 279. As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or

at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

## XVI.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT FOUR

#### For Violations of Section 11 of the Securities Act, on Behalf of Participants in Merck's MSIP, Against the Securities Act Defendants

468.    Plaintiffs Kanter and Park East repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.  For the purposes of this claim, Plaintiffs Kanter and Park East assert only strict liability and negligence claims and expressly disclaim any allegation of fraud, intentional or knowing misconduct.

469.    This claim is brought against the Securities Act Defendants by Plaintiffs Kanter and Park East pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of themselves and other members of the Class who, during the Class Period, purchased or acquired Merck common stock in the MSIP pursuant and traceable to the Registration Statement, and were damaged by the acts and omissions alleged herein.

470.    Defendant Merck is the registrant for shares sold pursuant to the MSIP.  Each of the Director Defendants signed the Registration Statement and was a Director of Merck at all relevant times.

471.    As alleged more fully herein, the Registration Statement incorporated by reference documents which "contained...untrue statement[s] of...material fact or omitted to state...material fact[s] required to be stated therein or necessary to make the statements therein not misleading" within the meaning of Section 11 of the Securities Act.  The untrue statements were materially incorrect and misleading on the date the Registration Statement became effective and remained incorrect thereafter.

472.    At the times they acquired Merck common stock through the MSIP from Merck, Plaintiffs Kanter and Park East and other members of the Class did not know of the untruths and omissions complained of herein.

473.    Class members who acquired the common stock that is the subject of this Count after Merck had made generally available to its security holders an earning statement covering a period of at least 12 months beginning after the effective date of the Registration Statement acquired such stock relying on: (i) the untrue statements in the Registration Statement or (ii) the Registration Statement and not knowing of the omissions complained of herein.

474.    With respect to the untrue statements and omissions complained of in this Count, the Director Defendants did not conduct "a reasonable investigation" and did not have "reasonable ground to believe at the time such [materially incorrect] part[s] of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading" as required by § 11(b)(3) of the Securities Act.

475.    This action was brought within one year after Plaintiff and members of the Class who acquired shares of Merck common stock through the MSIP discovered, or by the exercise of reasonable diligence should have discovered, the untrue statements and omissions complained in this Count, and no more than three years after the common stock that is the subject of this Count was *bona fide* offered to the public.

476.    As a result of the foregoing, Merck and the Director Defendants have violated § 11 of the Securities Act and Plaintiffs Kanter and Park East and the Class members who acquired shares of Merck common stock through the MSIP have been damaged.

**COUNT FIVE**

**For Violations of Section 12(a)(2) of the Securities Act, on Behalf of
Participants in Merck's MSIP, Against Merck**

477.    Plaintiffs Kanter and Park East repeat and reallege each and every allegation
above relating to the Securities Act claims as if fully set forth herein.  For the purposes of this
claim, Lead Plaintiffs assert only strict liability and negligence claims and expressly disclaim any
claim of fraud, intentional or knowing misconduct.

478.    This Count is brought by Plaintiffs Kanter and Park East pursuant to § 12(a)(2) of
the Securities Act, 15 U.S.C. § 77l(a)(2), against defendant Merck on behalf of themselves and
all Class members who purchased shares of Merck common stock through the MSIP.

479.    The 2002 Registration Statement, the April 2002 Prospectus and the June 2004
Prospectus and documents incorporated therein each constituted a "prospectus" within the
meaning of § 12(a)(2) of the Securities Act. As detailed herein, each of these documents
"included[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary
in order to make the statements [contained therein], in the light of the circumstances under which
they were made, not misleading" within the meaning of § 12(a)(2) of the Securities Act.  As set
forth more fully herein, through the MSIP, and by means of the April 2002 and June 2004
Prospectuses, defendant Merck sold Merck common stock, by the use of means and instruments
of transportation and communication in interstate commerce and the mails to Plaintiffs and the
Class members who participated in the MSIP.

480.    The defendants named in this Count solicited the purchase of Merck common
stock through the MSIP, motivated, at least in part, by a desire to serve their own financial
interests or those of the issuer, Merck.  Defendant Merck sold common stock directly to each
Plaintiff and member of the Class who purchased through the MSIP.

481.     Plaintiffs Kanter and Park East and other members of the Class who purchased shares of Merck common stock through the MSIP did not know of the untruths and omissions complained of this Count when they purchased such shares.

482.     By reason of the foregoing, defendant Merck, the Director Defendants, and the Officer Defendants have violated § 12(a)(2) of the Securities Act.

483.     Plaintiffs Kanter and Park East and members of the Class who purchased shares of Merck common stock through the MSIP are entitled to recover the consideration paid for such shares with interest thereon, less the amount of any income received thereon, and hereby tender such shares. Members of the Class who purchased shares of Merck common stock through the MSIP and who no longer own such shares are entitled to damages, as allowed by § 12(a)(2) of the Securities Act.

484.     This action was brought within one year after Plaintiffs Kanter and Park East and Class members who purchased shares of Merck common stock through the MSIP discovered, or by the exercise of reasonable diligence should have discovered, the untrue statements and omissions complained of in this Count and no more than three years after they purchased such shares.

### COUNT SIX

**For Violations of Section 15 of the Securities Act, on Behalf of All Participants in Merck's MSIP Against the Officer Defendants for Control Person Liability Based on Section 11 Violations by Merck**

485.     Plaintiffs Kanter and Park East repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.  For the purposes of this claim, Lead Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

486.    This claim is brought pursuant to Section 15 of the Securities Act against the Officer Defendants, on behalf of Plaintiffs Kanter and Park East and members of the Class who purchased or acquired registered shares of Merck common stock pursuant and/or traceable to the Offering Documents and were damaged by acts alleged herein.

487.    The Officer Defendants were controlling persons of Merck within the meaning of Section 15 of the Securities Act by reason of their respective management positions in Merck, and/or their membership on Merck's Board of Directors, and/or their stock ownership, and/or their participation throughout the Class Period in the day-to-day affairs of Merck. Because of their positions in the Company and/or their stock ownership, and/or because of their positions on the Merck Board of Directors, these Defendants had the requisite power to directly or indirectly control or influence the specific corporate policy that resulted in the unlawful acts and conduct alleged herein.

488.    By reason of the foregoing, the Officer Defendants have violated Section 15 of the Securities Act, and are liable to Plaintiffs Kanter and Park East and the other members of the Class who purchased Merck common stock during the Class Period through the Merck MSIP.

XVII.  **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding such damages as are proper under Section 11 of the Securities Act;

D.      Awarding those members of the Class who tender their shares pursuant to Count Five above the consideration paid for those shares, and awarding rescissory damages to those Class members who purchased Merck common stock through the MSIP and have sold that stock;

E.      Ordering the disgorgement by the Insider Trading Defendants of all profits gained and losses avoided to those Class members who purchased Merck common stock contemporaneously with the sale by the Insider Trading Defendants of Merck common stock;

F.      Awarding Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

G.      Such other and further relief as the Court may deem just and proper.

## XVIII. JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  February 6, 2009

                                   /s/ James E. Cecchi
                                  James E. Cecchi
                                  CARELLA, BYRNE, BAIN, GILFILLAN,
                                    CECCHI, STEWART & OLSTEIN
                                  5 Becker Farm Road
                                  Roseland, NJ  07068
                                  Tel.:  (973) 994-1700
                                  Fax:  (973) 994-1744


                                  Al Decottiis
                                  DECOTTIIS, FITZPATRICK, COLE & WISLER LLP
                                  Glenpointe Centre West
                                  500 Frank W. Burr Boulevard
                                  Teaneck, NJ 07666
                                  Tel:  (201) 928-1100
                                  Fax: (201) 928-0588


                                  Paul B. Brickfield
                                  BRICKFIELD & DONAHUE
                                  70 Grand Avenue

River Edge, NJ  07661
Tel.:  (201) 258-3984
Fax:  (201) 488-9559

*Co-Liaison Counsel for Plaintiffs*

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
John P. Coffey
William C. Fredericks
Bruce D. Bernstein
Elliott J. Weiss
Boaz A. Weinstein
Lauren A. McMillen
Adam H. Wierzbowski
1285 Avenue of the Americas
New York, NY 10019
Tel.:  (212) 554-1400
Fax:  (212) 554-1444

BROWER PIVEN
  A PROFESSIONAL CORPORATION
David A.P. Brower
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel.:  (212) 501-9000
Fax:  (212) 501-0300

MILBERG LLP
Matthew Gluck
Richard Weiss
Matthew Kupillas
Roland Riggs
One Pennsylvania Plaza
New York, NY  10119-0165
Tel.:  (212) 594-5300
Fax:  (212) 868-1229

STULL, STULL & BRODY
Jules Brody
Mark Levine
6 East 45th Street, 5th Floor
New York, NY 10017
Tel.:  (212) 687-7230
Fax:  (212) 490-2022

*Co-Lead Counsel for Plaintiffs*

217