<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE MERCK & CO., INC. SECURITIES, DERIVATIVE & "ERISA" LITIGATION | : : : : | **MDL No. 1658 (SRC)** |
| | : : | **Civil Action No. 05-1151 (SRC)** **Civil Action No. 05-2367 (SRC)** |
| THIS DOCUMENT RELATES TO: THE CONSOLIDATED SECURITIES ACTION | : : : : : | **OPINION** |
| | : | |

**CHESLER**, District Judge

Defendant Merck & Co., Inc. and the various Individual Defendants[1] to this suit (collectively, "Defendants" or "Merck") have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).[2] [docket entry 322]. This motion pertains to the same Corrected Consolidated Fifth Amended Class Action Complaint (the "Class Action Complaint") that the Court reviewed on Defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Those motions were adjudicated by Order of August 8, 2011, and the Court's rulings and analysis are set forth in its accompanying Opinion of August 8, 2011 (the "August 8 Opinion").

---

[1] Merck brings this motion together with all of the Individual Defendants, including Edward Scolnick, who joins in the motion.

[2] In Civil Action No. 05-1151, the motion is docketed at entry 304. In Civil Action No. 05-2367, the motion is docketed at entry 322.

Merck, and separately Defendant Scolnick, subsequently moved to dismiss a related securities fraud action filed by individual institutional shareholder Stichting Pensioenfonds ABP ("ABP"), a Dutch pension fund.[3]  Given the substantial similarity between the Class Action Complaint and the Complaint filed separately by ABP (the "ABP Complaint"), the parties agreed to be bound in the ABP action by the rulings this Court made in the August 8 Opinion. Thus, Defendants' motions in the ABP action sought to dismiss additional portions of the ABP Complaint based on arguments that were not at issue in the Rule 12(b)(6) motion to dismiss the Class Action Complaint.  The Court ruled on the motions in the ABP action on August 1, 2012.

Merck now brings this Rule 12(c) motion with respect to the Class Action Complaint to mirror the arguments raised in their motions to dismiss the ABP Complaint and to enable the Court to address the viability of similar claims and allegations in this consolidated action. Plaintiffs have opposed the motion.  To the extent the Court's discussions in the August 1, 2012 Opinion in the ABP action are applicable here, the Court incorporates those portions of the opinion by reference.  The Court will therefore provide an abbreviated analysis of the claims and allegations challenged in the instant motion to dismiss.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment on the pleadings "after the pleadings are closed – but early enough not to delay trial."  Fed.R.Civ.P. 12(c).  Federal Rule of Civil Procedure 12(h)(2) provides that a Rule 12(c) motion authorizes a

---

[3] That action is captioned Stichting Pensioenfonds ABP v. Merck & Co., Inc., et al., Civil Action No. 05-5060.  The Court will refer to it as the "ABP action."  It is one of eight individual securities actions brought by foreign plaintiffs asserting claims and allegations that are nearly identical to those at issue in this consolidated securities class action.

party to raise grounds upon which a pleading fails to state a claim upon which relief may be granted.  Unlike defenses covered by Rule 12(b)(2)-(5), the defense that a pleading fails to state a claim will not be waived by a party who fails to raise such grounds in a Rule 12(b)(6) motion. Fed.R.Civ.P. 12(h); Walzer v. Muriel Sibert & Co., 447 F. App'x 377, 384 (3d Cir. 2011).[4]

The Third Circuit has held that a motion brought under Rule 12(c) is governed by the same standard of review applicable to Rule 12(b)(6) motions.  Turbe v. Gov't of the V.I., 938 F.2d 427, 428 (3d Cir. 1991). Thus, to survive a motion for judgment on the pleadings, a complaint must set forth "sufficient factual allegations, accepted as true, to 'state a claim for relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)).  The plausibility standard will be met if the complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556.)

**DISCUSSION**

## I.      **Exchange Act Section 10(b) Claims**: **Non-Actionable Statements**

The Class Action Complaint asserts a claim under Exchange Act § 10(b) based on Merck's alleged violation of SEC Rule 10b-5(b), which prohibits statements or omissions of material fact.  17 C.F.R. § 240.10b-5(b).  Merck identifies various allegations it contends cannot form the basis of a Rule 10b-5(b) violation because they fall into at least one of the following three categories of non-actionable statements: (1) factual recitations of past earnings; (2)

---

[4] The Court does not, therefore, regard this motion as untimely, as Plaintiffs have argued in their opposition papers.

optimism concerning financial growth, i.e., puffery; or (3) forward-looking statements.  The
Court will deal with each category in turn.

    A.    **Past Earnings**

    Plaintiffs recognize that accurate statements of past earnings are not actionable under §
10(b).  See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3d Cir. 1999).  They argue,
however, that even if Merck's statements about the company's and specifically Vioxx's
commercial performance were literally true, "they were misleading because they failed to
disclose that Vioxx's then-current sales were not a reliable metric of its success in view of the
undisclosed adverse information."  (Pl. Br. at 17.)  Plaintiffs maintain that by choosing to put the
commercial success of Vioxx in play, Merck acquired a duty speak fully and truthfully about
Vioxx. See Shapiro v. UJB Fin. Corp., 964 F.2d 272, 282 (3d Cir.1992), rehearing en banc
denied, July 7, 1992.  According to Plaintiffs, Merck breached that duty by omitting known
adverse information regarding Vioxx's CV safety profile, which, Plaintiffs contend, Merck knew
jeopardized and undercut the drug's commercial value and capacity for growth.

    Plaintiffs' theory of liability regarding the past earnings statements distorts governing
securities law so as to make a company's disclosure obligations almost limitless.  Plaintiffs urge
this Court to find that Merck's accurate statements of past earnings can give rise to § 10(b)
liability because Merck allegedly knew that the product driving those earnings was possibly
linked to a higher incidence of adverse CV events in users of the product.  In the Court's view,
this approach to § 10(b)'s prohibition on misleading misrepresentations and omissions would
expose a company to liability every time it reported previous successes without disclosing any
and every reason, established or not, the company had for second-guessing the reported

4

performance, be it a contemplated change in business strategy, dissension among company management or adverse information about a key product.  Third Circuit law does not interpret § 10(b) or Rule 10b-5 to impose such a broad duty of disclosure.  So long as a statement is accurate at the time it is made or does not require further disclosure to render it accurate, individuals or entities may speak about a company generally or some aspect of its business specifically, such as accurate statements about a particular product.  See Oran v. Stafford, 226 F.3d 275, 286 (3d Cir. 2000); Advanta, 180 F.3d at 538-39.  Thus, for example, in Oran, the Third Circuit rejected plaintiffs' argument that the defendant pharmaceutical company assumed an obligation to disclose adverse safety information about a product when it accurately reported that the FDA had found that the product had an "acceptable safety profile."  Oran, 226 F.3d at 283-85.

The earnings statements challenged by Defendants as non-actionable in this motion to dismiss are, overall, even more remote from the topic of Vioxx's safety profile than the accurate statement at issue in Oran was from the alleged material omission in that case.  Plaintiffs highlight in their brief that Merck made assertions about the successful introduction of Vioxx to the market, its unprecedented sales as compared to other Merck products and its creation of a "powerful platform for growth."  (See, e.g., Compl. ¶¶ 237, 316, 273.)   Although Plaintiffs argue that the statements gave the false impression that there were no known impediments to Vioxx's commercial success, these literally true assertions can hardly be said to put "in play" all safety information about Vioxx such that Merck acquired a duty to disclose information indicating the drug's prothrombotic qualities.

Of the past earnings statements at issue, only a small handful are put forth by Plaintiffs as even mentioning that the therapeutic properties or advantages of Vioxx are responsible, at least

in part, for the product's strong commercial performance.  Some statements, made in 2000 and

2002, asserted that Merck's five leading products, which included Vioxx at the time, had

"growth potential" based on the outcome of "key studies" and "clinical trials." (Compl., ¶¶  265,

318, 332.)  These statements, however, fail to put the critical and material topic of Vioxx's CV or

overall safety profile at issue, and make no inaccurate factual assertion about past events.[5]

One statement highlighted by Plaintiffs, made by Merck CEO Raymond Gilmartin in a

July 20, 2001 press release issued by Merck, expressly referred to the safety profile of Vioxx.  In

that statement, Gilmartin touted Vioxx's sales and growth potential, adding the following

comment:

> Since its 1999 launch, Vioxx has become the world's fastest grown [sic]
> branded prescription arthritis medicine, and it is already Merck's second
> largest medicine. In 2001, Vioxx achieved new prescription leadership
> within the coxib market in the United States, demonstrating that
> physicians continue to recognize the medicine's benefits to the patients.
>
> New scientific data supporting the efficacy and overall safety profile of
> Vioxx were presented at medical meetings during the quarter.  These data
> included the results of the ADVANTAGE trial, presented at the Digestive
> Diseases Week conference in May.

(Compl., ¶ 291.)  This statement arguably attributes Vioxx's commercial performance in part to

its "overall safety profile" and thus could be understood by the reasonable investor as going

beyond a mere recitation of past success.  The Court must evaluate the alleged materiality of

Merck's failure to disclose unfavorable information about Vioxx's possible CV risks in the

context of what Merck chose to tell the market about the reason for the product's economic

performance.  See Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. 1309, 1322 (2011) (noting

---

[5] To the extent the statements concern Vioxx's future performance, the statements'
actionability will be discussed below.

6

that "companies can control what they have to disclose under [§ 10(b) and Rule 10b-5(b)] by controlling what they say to the market.").  In an analogous situation, the Eastern District of Pennsylvania found that the defendant's assertions that its past financial success was due to a "customer focused approach" had put the topic of the defendant's business practices in play.  In re Providian Fin. Corp. Sec. Litig., 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001) (citing Shapiro, 964 F.2d at 281-82).  The district court held that the complaint set forth an actionable material omission regarding the undisclosed business practices, reasoning as follows: "Having put the issue in play, Providian is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information." Id.; see also Lapin v. Goldman Sachs Group, Inc., 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (citing Providian and similarly holding that if the defendant "puts the topic of the cause of its financial success at issue," it has a duty to disclose information concerning that topic).  Applying the principle that a company acquires a duty to speak about a topic if it puts that topic at issue, this Court finds that, for purposes of this motion, the Gilmartin statement quoted in Merck's July 20, 2001 press release could be considered to have put the issue of Vioxx's safety in play and thus misled investors by omitting known material facts undermining the assertion of Vioxx's overall safety profile.  This Court, of course, has previously held that the Class Action Complaint fails to allege that Gilmartin, the actual speaker making this statement, was in possession of adverse CV information about Vioxx and had the requisite wrongful state of mind to support a § 10(b) claim.  In re Merck & Co., Inc. Sec. Litig., No. 05-2367, 2011 WL 3444199, at *27-28 (D.N.J. Aug. 8, 2011).  The statement nevertheless gives rise to viable claim against Merck, because liability for the statements of individual defendants can be imputed to the

corporate defendant.  <u>Avaya</u>, 564 F.3d 242, 251-52 (3d Cir. 2009).  The Court has previously found that the allegations of the Class Action Complaint sufficiently give rise to a strong inference of Merck's scienter.  <u>Merck</u>, 2011 WL 3444199, at *29.

Having reviewed the allegations pertaining to the past earnings statements challenged by Merck, the Court finds that, apart from the press release quoted at paragraph 291 of the Class Action Complaint, the statements fail to state a claim under § 10(b) because they do no more than "merely report previous successes and express confidence in [the company's] prospects for future growth.[6] <u>Advanta</u>, 180 F.3d at 538.  Plaintiff's argument that these literally true statements about the commercial performance of Merck and/or Vioxx can be considered false or misleading by their omission of a material fact concerning another subject – the safety profile of Vioxx –  is simply unavailing.

### B.    Puffery

Merck argues that many of the statements reciting prior earnings and commercial successes also contain general statements concerning future performance and must be dismissed as a basis for any alleged Rule 10b-5 violation.   It is well-established in the Third Circuit that puffery, defined as "vague and general statements of optimism," is not actionable under § 10(b) and Rule 10b-5.  <u>Advanta</u>, 180 F.3d at 538.  Plaintiffs argue that Merck's statements regarding Vioxx's future success or growth cannot be downplayed as mere immaterial statements of optimism because the statements are linked to or based on specific statements of fact that do not

---

[6] The "past earnings statements" identified by Merck as non-actionable are set forth in the following paragraphs of the Complaint: ¶¶ 225-29, 232, 235-38, 242-43, 253-56, 261-63, 265-69, 271-74, 278-79, 283-85, 291-94, 305-07, 309, 310-11, 316-19, 327-28, 332-36, 339-52, 354-55, 360-63 and 367-72.  For the reasons discussed, these statements, except for ¶ 291, cannot form the basis of a §10(b) claim.

support such optimistic expressions.  According to Plaintiffs, in the statements Merck attempts to minimize as puffery, Defendants "specifically draw a link between the future success of Merck and Vioxx, or between Vioxx's growth and the drug's product profile."  (Pl. Br. at 25.)  These statements are rendered materially deceptive, Plaintiff maintains, by the omission of information in Merck's possession regarding the serious CV safety risks presented by Vioxx, risks that the certain Defendants knew could "kill the drug," according to the Class Action Complaint. (Compl., ¶ 105-06.)[7]  In other words, Plaintiffs argue that Merck's optimistic projections about Vioxx's growth potential are materially misleading by virtue of the failure to disclose information that renders the implicit premise of the optimistic statement untenable.

The problem with Plaintiffs' argument is that it does not rest on any legal authority.  The cases cited by Plaintiffs in their brief are distinguishable.  For example, in <u>Virginia Bankshares v. Sandberg</u>, the Supreme Court analyzed whether SEC Rule 14a-9, which prohibits the solicitation of proxies by materially false or misleading statements, applied to statements made by corporate directors recommending that shareholders approve a merger "because of its opportunity for the minority shareholders to achieve a 'high' value, which they elsewhere described as a 'fair' price, for their stock."  <u>Va. Bankshares, Inc. v. Sandberg</u>, 501 U.S. 1083, 1088 (1991).  The Court held

---

[7] In the Class Action Complaint, Plaintiffs allege as follows:

> Data from a large scale GI outcomes trial showing that VIOXX users suffered "more thrombotic events" than naproxen users would indeed have likely "kill[ed] the drug" because VIOXX's commercial prospects rested entirely on the claim that it was safer to use than traditional NSAIDs, i.e., on showing both that VIOXX was less likely to cause the GI problems associated with long-term use of traditional NSAIDs and that it did not cause other adverse side effects that outweighed its GI-protective qualities.

(Compl., ¶ 106.)

that the statements were actionable because "such conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." Id. at 1093.  The optimistic statements about Vioxx's projected growth are not assessments by corporate officers or directors of the soundness of a particular decision, assessments which an investor might reasonably understand to be based on facts.  A Third Circuit opinion cited by Plaintiffs, Weiner v. Quaker Oats Co., stands for the inapposite proposition that "[s]tatements of 'soft information' from high-ranking corporate officials can be actionable if they are made without a reasonable basis." Weiner v. Quaker Oats Co., 129 F.3d 310, 320 (3d Cir. 1997).  There, the appeals court was careful to note that the statement at issue, expressing that the speaker was "'confident of achieving at least 7% real earnings growth' in fiscal 1995" was not a general, non-specific statement of optimism, that is, puffery. Id. Here, in contrast to the specificity of the statement at issue in Weiner, the statements challenged by Merck as inactionable puffery express in general terms Merck's confidence in the continued success of Vioxx.  For example, the Class Action Complaint alleges that in a July 24, 2000 conference call, Merck's senior director of investor relations (who is not a party to this suit) made the following statement:

> [T]he VIOXX launch continues to meet the very robust expectations that we've had for the product. We continue to be extremely pleased with this uptake in the marketplace in countries throughout the world. We're extremely pleased with the acceptance by physicians, patients and payors, and we are very bullish on the product's future growth and prospects.

(Compl., ¶ 262.)  As another example, a press release issued that same day stated as follows:

> The five products [including VIOXX] provide a strong platform for growth. . . . Each is a successful . . . medicine, offering a unique competitive advantage in the market, and we are conducting additional

clinical studies that will potentially extend each franchise to even more patients.

(Id., ¶ 261.)

Unlike Weiner, in this case, there is no indication that the general expressions of confidence for Merck's future growth based on Vioxx sales presented concrete information which might lead a reasonable investor to rely on the projection. "The context in which optimistic statements are made is critical to the distinction between misrepresentation and puffery . . . In general, the more the statement diverges from known facts about the entity or the more precise and concrete the statement, the less likely courts have been to dismiss the statement as inactionable puffery. Payne v. Deluca, 433 F. Supp. 2d 547, 562 (W.D.Pa. 2006) (citing In re Lucent Techs., Inc. Sec. Litig., 217 F. Supp. 2d 529, 559 (D.N.J.2002) and Southland Sec. Corp. v. Inspire Ins. Solutions Inc., 365 F.3d 353, 372 (5th Cir.2004)).  Moreover, the expression of such optimism for the future together with accurate statements of present fact or past successes does not render the projections materially misleading.  Advanta, 180 F.3d at 538.

For these reasons, the allegations in the Class Action Complaint containing statements Merck identifies as non-specific and optimistic expressions about the future of Merck and/or Vioxx cannot support a Rule 10b-5(b) claim.[8] To the extent Plaintiffs' securities fraud claim is based on these puffing statements, the claim must be dismissed.

---

[8] The statements challenged as non-actionable puffery are pled in the following paragraphs of the Class Action Complaint: ¶¶ 254-56, 261-63, 266, 268-69, 271-74, 278-79, 283-85, 291-94, 305-07, 310-11, 318-19, 327-28, 332-36, 340-44, 350-52, 354-55, 361-63, 370-72.

C.      **Forward-Looking Statements**

Merck further maintains that several of the puffing statements also fall into the forward-looking statements category and are immune from § 10(b) liability under the Exchange Act's safe harbor provision.[9]  The PSLRA carves out a category of statements that will not be actionable, provided certain conditions are met.  See 15 U.S.C. § 78u-5.  By immunizing certain oral and written statements that "describe, project, or estimate future events," Congress sought to "enhance market efficiency by encouraging companies to disclose forward-looking information" to investors. S. Rep. No. 104-98, at 14-15 (1995).  Plaintiffs, however, take issue with Merck's classification of the statements as "forward-looking."

The threshold question, then, is whether the alleged misrepresentations at issue fall within the statutory definition of "forward-looking statement." The PSLRA's safe harbor provision provides as follows:

> The term "forward-looking statement" means –
>
> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
>
> (D) any statement of the assumptions underlying or relating to any

---

[9] Those 14 statements are set forth in the following paragraphs of the Class Action Complaint: ¶¶ 292, 332-34, 342-45, 350-52, 354-55

statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1)(A)-(F).

The Court has reviewed the statements, which appeared in various press releases or were made during conference calls. To summarize, they all generally communicate the same message: they report on Vioxx's known performance in the market at the time and make assertions about its expected growth potential. One example of a statement identified by Merck as "forward-looking" occurred during a conference call held on July 20, 2001, in which a Merck employee commented as follows:

> Second quarter 2001 sales of VIOXX on a worldwide basis were $725 million, up 53% over second quarter last year and year-to-date Vioxx sales were $1.2 billion, that's up 43% six months year-to-date this year over six months year-to-date last year.
>
> * * *
>
> Vioxx continues to show strong growth. As we talked about many times in the past, it's prescriptions that reflect the true underlying demand of a product and the fundamental business or the prescription trends for Vioxx remain quite healthy. In fact, total prescriptions year-to-date through June for Vioxx are up 41% and new prescriptions are up nearly 25%. All of this is clearly in line with the year-to-date sales growth for the product in the U.S. of +33%. Hoping to fuel this growth in Vioxx are the additional sales reps that I mentioned earlier. We now have 1,000 more voices describing the product's benefits to the marketplace and clearly that's helping to continue to fuel the growth. In terms of future sales of Vioxx, the worldwide growth sales forecast that was provided on June 22nd, of $3 billion to $3.5 billion still holds.

(Compl., ¶ 292.)  Another, appearing in an October 22, 2003 press release, states:

> Merck anticipates reported earnings per share from continuing operations for 2003 of $2.90 to $2.95 as a result of workforce reductions, implementation of the new distribution program for U.S. wholesalers, and product sales trends for its major in-line products. In the aggregate, the major in-line products have not met the company's challenging revenue targets that it believed were achievable. Overall, they are growing and competing well in their respective categories.

(Id., ¶ 354.)

As Plaintiffs argue, the statements regarding projected earnings or growth indeed appear not in isolation but in combination with statements of present or historical fact.  Plaintiffs do not, however, maintain that those statements of present or historical fact are inaccurate.  Rather, they allege in the Class Action Complaint that these statements reporting Vioxx's performance in the marketplace combined with forecasts of continued strong performance or growth misled investors into believing that Vioxx's success would continue into the future, "while failing to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based." (Compl., ¶ 293.)  The Court, for the reasons discussed above, has held that accurate reports of past earnings or other historical facts are simply not actionable under § 10(b) and that statements of Vioxx's commercial performance did not put the topic of its CV safety data in play.  Plaintiffs do not explain how a statement of projected growth or revenue regarding Vioxx – which would appear to fall squarely within the statutory definition of a forward-looking statement – loses its forward-looking character simply because elsewhere in the same conference call or press release accurate information about the product's commercial performance is also communicated to investors.  The cases cited by Plaintiffs urging this Court to find that the 14 statements of future

14

economic performance identified by Merck are not entitled to safe harbor immunity are inapposite.  In addition to their lack of binding authority on this Court, those cases rejected safe harbor protection because the forward-looking statements were linked to or combined with alleged misrepresentations or omissions of present fact. See, e.g., Sgalambo v. McKenzie, 739 F. Supp. 2d 453, 478 (S.D.N.Y. 2010) (holding that safe harbor did not apply where projections were incorporated with alleged *misstatements* of present or historical fact); City of Hialeah Empl. Ret. Sys. & Lab. Presnion Trust Funds for N. Calif. v. Toll Bros., Inc., No. 07-1513, 2008 WL 4058690, at *3 (E.D. Pa. Aug. 29, 2008) (holding that safe harbor did not apply because plaintiffs "alleged that several of Defendants' forward-looking statements at issue also contained *misrepresentations* about then-existing facts, or facts and circumstances having already transpired" (emphasis added)); Marsden v. Select Med. Corp., No. Civ. A. 04-4020, 2006 WL 2928913, at * 6 (E.D. Pa. Apr. 6, 2006) (holding that earnings forecasts in a press release were not entitled to safe harbor protection because plaintiffs had challenged the statements based on omission of present fact regarding the true, rather than the reported source, of profits); In re AOL Time Warner, Inc. Sec. & ERISA Litig., 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004) (rejecting safe harbor protection for a revenue projection about AOL that was combined with statements of present fact about the company and made by a defendant who "knew or recklessly disregarded the true financial condition of AOL").

Having concluded that the 14 statements are indeed forward-looking within the meaning of the PSLRA, the Court turns to the question of whether they are entitled to immunity from § 10(b) liability.  To receive the protection afforded by Exchange Act § 21E's safe harbor, forward-looking statements must be "(1) identified as such, and accompanied by meaningful cautionary

statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading." In re Aetna, Inc. Sec. Litig., 617 F.3d 272, 278-79 (3d Cir. 2010); see also 15 U.S.C. § 78u-5(c).  In this case, Merck invokes the safe harbor on the grounds that the Class Action Complaint fails to allege that the individual making the statements did so with actual knowledge of their falsity.

Merck correctly argues that insofar as the public forward-looking statements are attributed to certain individual defendants,[10] they come within the PSLRA's safe harbor provision because the Court has already held that the Class Action Complaint has fails to plead that these defendants acted with the requisite scienter.  In Institutional Investors Group v. Avaya, the Third Circuit held that the shareholders' Rule 10b-5 claims based on forward-looking statements had properly been dismissed because they had failed to plead "a strong inference that defendants acted with actual knowledge that their projections were false or misleading."  Institutional Investors Grp. v. Avaya, Inc., 564 F.3d 242, 259 (3d Cir. 2009).  The Avaya court found that, regardless of the sufficiency of certain cautionary language accompanying the statements, the lack of allegations which would indicate that the defendants made the statements with actual knowledge of their falsity brought the forward-looking statements within the PSLRA's safe harbor.  Id. at 258-59.  One statement, quoted above, is attributed to a non-party individual,[11] but the Class Action Complaint similarly lacks facts that show that her statements with made with actual knowledge of falsity.  The remainder of the forward-looking statements challenged by

_____

[10] Seven of the 14 statements are attributed to Defendant Gilmartin (¶¶ 332-34, 342-44, 345).  Two statements are attributed to Defendants Frazier and Henriques (¶¶ 334, 352).

[11] The statement made by Laura Jordan, Merck's Senior Director of Investor Relations, is alleged in paragraph 292 of the Class Action Complaint.

Merck as non-actionable are attributed to the "Officer Defendants" generally,[12] making it impossible for Plaintiffs to establish scienter without resorting to group pleading, an approach which the August 8 Opinion rejected as proscribed under Third Circuit law.

As such, the forward-looking statements fall within the PSLRA's safe harbor and are immune from § 10(b) liability. For this additional reason, those statements, identified in footnote 7, do not give rise to a claim under the Exchange Act.

## II.     Control Person Claim Under Section 20(a) of the Exchange Act

In the August 8 Opinion, the Court declined to dismiss Plaintiffs' claim for "control person" liability against certain Individual Defendants, reasoning that the only argument those Defendants raised – that the Class Action Complaint failed to state a predicate violation of § 10(b) by Merck – lacked merit. It noted, however, that it made no finding as to the sufficiency of the control person claim as to the other elements. The three elements of a Section 20(a), or "control person" claim are as follows: (1) the defendant controlled another person or entity; (2) the controlled person or entity committed a primary violation of the securities laws; and (3) the defendant was a culpable participant in the fraud. In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 286 (3d Cir. 2006); Rochez Brothers, Inc. v. Rhoades, 527 F.2d 880, 890 (1975). In this motion for judgment on the pleadings, Defendants move to dismiss the control person claim against Anstice, Frazier, Gilmartin, Henriques, Kim, Lewent and Wold-Olsen on the grounds that the Class Action Complaint fails to plead that these individuals were culpable participants in the alleged fraud.

_____

[12] The "Officer Defendants" consist of Gilmartin, Scolnick, Kim, Reicin, Lewent, Frazier, Henriques, Anstice and Wold-Olsen. The statements attributed to the Officer Defendants as a group are alleged in paragraphs 350-51 and 354-55.

Culpable participation refers to either knowing and substantial participation in the wrongdoing or inaction with the intent to further the fraud or prevent its discovery.  Rochez Bros., 527 F.2d at 890; In re Digital Island Sec. Litig., 223 F.Supp.2d 546, 562 (D.Del. 2002). To prevail on a control person claim, a plaintiff must establish that the defendant's action or inaction "was deliberate and done intentionally to further the fraud." Rochez Bros., 527 F.2d at 890. Plaintiffs do not contest that this is an essential element of a control person claim. They do, however, take the position that facts supporting the existence of culpable participation need not be pled in the first instance in a complaint, relying on various decisions made by other judges in the District of New Jersey. See, e.g., In re Able Labs. Sec. Litig., No. 05-2681 (JAG), 2008 WL 1967509, at *29 (D.N.J. Mar. 24, 2008) (agreeing with several judges who had similarly concluded that Rochez Brothers requires culpable participation to be proven at trial but not pled in a complaint to assert a viable control person claim).  In Lautenberg Foundation v. Madoff, this Court noted the difference of opinion among district court judges concerning what Third Circuit law requires to state a plausible control person claim.  Lautenberg Found. v. Madoff, No. 09-816, 2009 WL 2928913, *14 (D.N.J. Sept. 9., 2009). In that case, however, the Court did not have to reach a definitive conclusion regarding pleading requirements, reasoning that even according to the strictest standard, that is, that a plaintiff must allege culpable participation with particularity to state a claim under § 20(a), the Lautenberg Foundation's complaint against Madoff survived his Rule 12(b)(6) motion. Id.

This Court begins its analysis with a review of the Third Circuit's opinion in Rochez Brothers.  There, the court of appeals clearly held that control person liability requires proof that "the defendant was a culpable participant in the fraud."  Rochez Bros., 527 F.2d at 890.  Those

district court decisions which have concluded that culpable participation need not be pled to state

a control person claim have interpreted <u>Rochez Brothers</u>' holding that culpable participation

must be established by plaintiff at trial to imply that it is not an element for pleading purposes.

<u>Able</u>, 2008 WL 1967509, at *29; <u>Jones v. Intelli-Check, Inc.</u>, 274 F. Supp. 2d 615 (D.N.J. 2003)

(holding that while culpable participation must be proven at trial, in accordance with the <u>Rochez</u>

<u>Brothers</u> decision, it need not be pled to survive a motion to dismiss). The <u>Able</u> court

summarizes this line of reasoning as follows:

> In *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880 (3d Cir.1975), the Third
> Circuit concluded that "Congress intended that the element of culpability
> be proven to impose liability on a securities law violator." *Rochez*, 527
> F.2d at 889–90. The key phrase in this quote is "be proven"—unlike the
> present case which involves a motion to dismiss, the *Rochez* case had been
> tried to conclusion. The district courts in New Jersey have interpreted this
> requirement in varying ways.

<u>Able</u>, 2008 WL 1967509, at *29.  Whatever validity such a view distinguishing the pleading

elements of a claim from its liability elements may have had before <u>Iqbal</u>, it strikes this Court

that it certainly expired when the Supreme Court made clear in that decision that a claim cannot

survive a motion to dismiss unless "the plaintiff pleads *factual content* that allows the court to

draw the reasonable inference that the defendant is *liable* for the misconduct alleged."  <u>Ashcroft</u>

<u>v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009) (emphasis added).

   This Court then turns to the decisions from this district espousing the view that the

culpable participation of a defendant must be pled in order to maintain a § 20(a) claim against

him.  <u>See</u> <u>In re Nice Sys. Ltd. Sec. Litig.</u>, 135 F. Supp. 2d 551, 588 (D.N.J. 2001); <u>In re Cendant</u>

<u>Corp. Sec. Litig.</u>, 81 F. Supp. 2d 550, 558 (D.N.J. 2000).  Those decisions evaluated the

sufficiency of a complaint according to the elements required to establish a <u>prima facie</u> case of

liability under § 20(a)control person claim.  The Court finds that, in light of Iqbal, those decisions, requiring that all elements of a control person claim be pled, represent the more sensible approach.

The next question is whether culpable participation must be pled according to Rule 8(a) or, as Merck argues, is subject to a heightened pleading requirement.  Here, the Court is guided by Lapin v. Goldman Sachs Group, Inc., decided in the Southern District of New York, a jurisdiction which also follows the view that culpable participation is an element of a Section 20(a) claim.  Lapin v. Goldman Sachs Group, Inc., 506 F. Supp. 2d 221 (S.D.N.Y. 2006). The Lapin court espoused the opinion that the burden of pleading culpable participation is "akin to pleading section 10(b) scienter."  Id. at 246.  It drew this conclusion based upon the Second Circuit's observation that determining whether a defendant control person has been a "culpable participant" implies that his individual culpability, or state of mind, must be examined. Id. at 247 (citing Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998).  The Lapin court further cited a First Circuit decision in which that court observed, in dicta, that if culpable participation is an element of a section 20(a) claim, it would imply a culpable state of mind, thus subjecting the element to the PSLRA's heightened requirement for pleading a defendant's state of mind. See In re Stone & Webster, Inc. Sec. Litig., 414 F.3d 187, 196 n. 6 (1st Cir. 2005).

The Court agrees that the term culpable participation, as defined by Rochez Brothers, puts the defendant's state of mind at issue.  The PSLRA clearly requires that to maintain "any private action arising under this chapter," a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §§ 78u-4(b)(2); 15 U.S.C. § 78u-4(b)(3)(2).  Given the Third Circuit's jurisprudence, holding that

culpable participation is an element of a claim under Exchange Act § 20(a), this Court concludes, as the Lapin court did, that to withstand a motion to dismiss, a plaintiff asserting a control person claim "must plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct." Lapin, 506 F. Supp. 2d at 247 (quoting Burstyn v. Worldwide Xceed Group, Inc., No. 01-1125 (GEL), 2002 WL 31191741, at *8 (S.D.N.Y. Sept. 30, 2002))

Against this legal standard for pleading a viable control person claim, the Court must conclude that the section 20(a) claim fails as to Anstice, Frazier, Gilmartin, Henriques, Kim, Lewent and Wold-Olsen for failure to satisfy the culpable participation element. For reasons this Court has discussed in the August 8 Opinion, the Class Action Complaint does not allege sufficient facts establishing a strong inference that these individuals deliberately or recklessly acted to deceive investors about the safety profile of Vioxx, and in particular, its adverse CV properties. Plaintiffs argue that the fact that these individuals held senior positions within Merck, which allowed them access to information about Vioxx, gives rise to a compelling inference that they knew or should have known about the deception perpetrated when Vioxx was promoted as a safe product, particularly in light of the importance of Vioxx to Merck's financial success. As the Court discussed in the August 8 Opinion, however, mere reliance on a person's title or management role within a company will not suffice to establish a strong inference of scienter required to state a section 10(b) claim. Likewise, Plaintiffs' emphasis on the general oversight responsibilities and positions of authority of the control person Defendants identified

above, without some more concrete factual allegation about knowledge they possessed or would have possessed in the course of performing their job duties, does not meet the PSLRA's standard for a wrongful state of mind.  Plaintiffs argue that these Defendants were culpable in their inaction, that is, in their failure to detect and prevent or halt the fraudulent conduct, but they do not allege that individual Defendants Anstice, Gilmartin, Henriques, Lewent and Wold-Olsen were even responsible for the scientific development and testing of Vioxx.  Plaintiffs aver that these Defendants would have learned of the drug's CV risks had they investigated, without providing any factual basis for charging these individuals with the duty to investigate.

Defendant Kim, in the Court's view, might arguably present a closer call, given his role as the head of Merck's research laboratories.  Indeed, as the Plaintiffs point out, Kim, who served in that position from January 1, 2003 through to the time Vioxx was withdrawn from the market, "was responsible for all of Merck's internal drug development activities."  (Compl., ¶ 33.)  Still, there is no allegation in the Class Action Complaint that Kim was in fact aware of the adverse CV data during his time as the president of the research laboratories, or that suggests that he was reckless in failing to discover it.  Instead, Plaintiffs make the conclusory assertion that given his position and expertise, Kim was reckless in failing to discover the fraud.  In the Court's view, this type of conclusion does not establish or even suggest that Kim's failure to act was done with the intent to further the alleged fraud or prevent its discovery.

In short, this Court finds that the Class Action Complaint does not contain sufficient allegations that Anstice, Frazier, Gilmartin, Henriques, Kim, Lewent and Wold-Olsen acted, or failed to act, in a manner intended to further the alleged fraud of concealing Vioxx's harmful CV effects from investors or to prevent investors from learning that such adverse safety information was allegedly being deliberately withheld from the public.  Plaintiffs have failed to plead that the aforementioned individuals were culpable participants in Merck's alleged § 10(b) violations. Accordingly, the control person claim against these Defendants will be dismissed.

### CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Merck's motion for judgment on the pleadings.  The § 10(b) claim will be dismissed insofar as it is based on statements which this Opinion has identified as non-actionable.  The control person claim against Defendants Anstice, Frazier, Gilmartin, Henriques, Kim, Lewent and Wold-Olsen will also be dismissed.

An appropriate form of Order will be filed.


                                          s/Stanley R. Chesler
                                         STANLEY R. CHESLER
                                         United States District Judge

Dated: August 29, 2012

23