# Exhibit G

# In The Matter Of:

## *MERCK & CO., INC., SECURITIES, DERIVATIVE & "ERISA" LITIGATION*

_____

## *DAVID I. TABAK - Vol. 1*
*July 12, 2012*

_____

**MERRILL CORPORATION**
LegaLink, Inc.
225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

## Page 1

```
UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
----------------------------------x
IN RE MERCK & CO., INC., SECURITIES,
DERIVATIVE & "ERISA" LITIGATION

MDL No. 1658 (SRC)

----------------------------------x

THIS DOCUMENT RELATES TO:  THE
CONSOLIDATED SECURITIES ACTION
Case No. 3:05-CV-01151-SRC-MF
Case No. 3:05-CV-02367-SRC-MF

----------------------------------x

            July 12, 2012
            9:36 a.m.

     Videotaped deposition of DAVID I. TABAK,
pursuant to notice, at the offices of Cravath,
Swaine & Moore LLP, Worldwide Plaza, 825 Eighth
Avenue, New York, New York, before Eric J. Finz,
a Shorthand Reporter and Notary Public within
and for the State of New York.
```

## Page 2

```
 1
 2   A P P E A R A N C E S:
 3   BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
       Co-Lead Counsel for Plaintiffs
 4       1285 Avenue of the Americas
         New York, NY 10019
 5
     BY:  SALVATORE J. GRAZIANO, ESQ.
 6        (sgraziano@blbglaw.com)
          WILLIAM C. FREDERICKS, ESQ.
 7        (wfredericks@blbglaw.com)
             -and-
 8        ADAM H. WIERZBOWSKI, ESQ.
          (awierzbowski@blbglaw.com)
 9
10
     STULL, STULL & BRODY
11     Co-Lead Counsel for Plaintiffs
         6 East 45th Street, 5th Floor
12       New York, NY 10017
13   BY:  PATRICK K. SLYNE, ESQ.
          (pkslyne@ssbny.com)
14           -and-
          MARK LEVINE, ESQ. (p.m. only)
15
16
     BROWER PIVEN
17     Co-Lead Counsel for Plaintiffs
         488 Madison Avenue, 8th Floor
18       New York, NY 10022
19   BY:  BRIAN C. KERR, ESQ.
          (kerr@brownpiven.com)
20
21
22
23
24
25
```

## Page 3

```
 1
 2   A P P E A R A N C E S: (Continued)
 3   CRAVATH, SWAINE & MOORE LLP
       Attorneys for all Defendants excluding Dr.
 4   Edward Scolnick
         Worldwide Plaza
 5       825 Eighth Avenue
         New York, NY
 6
     BY:  CHRISTOPHER BELELIEU, ESQ.
 7        (cbelelieu@cravath.com)
          KARIN A. DeMASI, ESQ.
 8        (kdemasi@cravath.com)
             -and-
 9        MATTHEW BOGGESS, ESQ.
          (mboggess@cravath.com)
10
11
     SCHULTE ROTH & ZABEL LLP
12     Attorneys for Defendant Dr. Edward Scolnick
         919 Third Avenue
13       New York, NY 10022
14   BY:  WILLIAM H. GUSSMAN, JR., ESQ.
          (bill.gussman@srz.com)
15
16
     ALSO PRESENT:
17
     IRIS JIANG, Cornerstone Research
18
     MICHAEL MARCO, Summer Associate
19
     WILLIAM PACE, Videographer
20   Merrill Legal Solutions
21
22
23
24
25
```

## Page 4

```
 1            DAVID I. TABAK
09:36:25  2        THE VIDEOGRAPHER:  This is the
09:36:32  3   video operator speaking, William
09:36:40  4   Pace for Merrill Legal Solutions,
09:36:42  5   225 Varick Street, New York, New
09:36:44  6   York.  Today is July 12, 2012, and
09:36:47  7   the time is 9:36 a.m.
09:36:51  8        We are at the offices of
09:36:52  9   Cravath Swaine & Moore LLP, 825
09:36:55 10   Eighth Avenue, New York, New York,
09:36:56 11   to take the videotaped deposition
09:36:57 12   of David Tabak, in the matter of in
09:37:01 13   re Merck & Company, Incorporated
09:37:04 14   Securities, Derivative and ERISA
09:37:06 15   litigation, in the United States
09:37:07 16   District Court, District of New
09:37:09 17   Jersey, MDL No. 1658.
09:37:11 18        Counsel please introduce
09:37:13 19   yourselves and state whom you
09:37:15 20   represent.
09:37:15 21        MR. BELELIEU:  Christopher
09:37:17 22   Belelieu, Cravath Swaine & Moore,
09:37:20 23   for Merck and several individual
09:37:22 24   defendants.
09:37:23 25        MR. BOGGESS:  Matt Boggess,
```

Page 85

```
                    1        DAVID I. TABAK
10:57:03            2    and the work that my staff performs.
10:57:06            3        Q.   What is your hourly rate of
10:57:11            4    compensation related to this matter?
10:57:14            5        A.   It's $690.
10:57:17            6        Q.   Is that standard for you in
10:57:19            7    litigation support services?
10:57:21            8        A.   In 2012, yes.
10:57:23            9        Q.   So your hourly rate changes on
10:57:30           10    an annual basis; is that correct?
10:57:31           11        A.   It can.  I think it actually
10:57:35           12    has changed every year.  But we review
10:57:37           13    the rates annually.
10:57:38           14        Q.   And is that the same hourly
10:57:40           15    rate that you're paid for nonlitigation
10:57:42           16    consulting services?
10:57:43           17        A.   It's the same rate that NERA
10:57:45           18    is paid for my work on nonlitigation
10:57:47           19    consulting services.  The exception of a
10:57:51           20    fixed fee project where we don't bill by
10:57:54           21    the hour.
10:57:55           22        Q.   Have plaintiffs' counsel paid
10:57:56           23    you anything to date?
10:57:57           24        A.   I believe they paid NERA to
10:58:00           25    date.
```

Page 86

```
                    1        DAVID I. TABAK
10:58:01            2        Q.   And do you know how much
10:58:02            3    they've paid NERA to date related to this
10:58:05            4    case?
10:58:05            5        A.   I don't recall.
10:58:07            6        Q.   Do you have people assisting
10:58:10            7    you in this case?
10:58:13            8        A.   I do.
10:58:14            9        Q.   And how many people are
10:58:16           10    assisting you?
10:58:17           11        A.   There probably would have been
10:58:24           12    maybe half a dozen at various points in
10:58:27           13    time.
10:58:27           14        Q.   Can you tell me who those
10:58:28           15    people are?
10:58:29           16        A.   Sure.  Shirim Hashim,
10:58:35           17    S-h-i-r-i-m, last name H-a-s-h-i-m.
10:58:38           18    Margarita Capi, last name C-a-p-i.  Eric
10:58:44           19    Lin.  Stefan Boettrich,
10:58:54           20    B-o-e-t-t-r-i-c-h.  Ronald Miller.  Rex
10:59:03           21    Lam, L-a-m.  Shadman Torofder,
10:59:09           22    S-h-a-d-m-a-n, T-o-r-o-f-d-e-r.
10:59:15           23        I believe that's it, putting
10:59:17           24    aside for example library staff or others
10:59:20           25    who may have just been involved in
```

Page 87

```
                    1        DAVID I. TABAK
10:59:22            2    pulling certain data.
10:59:23            3        Q.   Do all of the people you've
10:59:27            4    just mentioned work at NERA?
10:59:28            5        A.   They either do or did work at
10:59:32            6    NERA.
10:59:35            7        Q.   And can you tell me what the
10:59:37            8    positions are of the people you
10:59:39            9    mentioned?
10:59:40           10        A.   Sure.  Ronald Miller is a vice
10:59:44           11    president.  Stefan Boettrich is a
10:59:47           12    consultant.  And all of the others are or
10:59:50           13    were members of our research staff.
10:59:54           14        Q.   And what does a consultant do
10:59:56           15    in NERA?
10:59:57           16        MR. GRAZIANO:  Objection.
11:00:00           17        THE WITNESS:  Asked and
11:00:00           18    answered?
11:00:01           19        MR. GRAZIANO:  Yeah.
11:00:01           20        A.   As I said, they tend to work
11:00:03           21    on a project under the direction of more
11:00:05           22    senior people.
11:00:11           23        Q.   So are any of these people in
11:00:15           24    charge of the day-to-day assignments
11:00:17           25    related to this case?
```

Page 88

```
                    1        DAVID I. TABAK
11:00:21            2        A.   Ronald Miller and I may have
11:00:25            3    split various of the day-to-day
11:00:27            4    supervision.  I gave broad direction, and
11:00:31            5    then the research staff sometimes
11:00:33            6    reported directly to me, sometimes would
11:00:35            7    check in with him or he would keep track
11:00:37            8    or monitor their day-to-day work.
11:00:39            9        Q.   Do you know how many hours
11:00:40           10    you've worked on this case to date?
11:00:42           11        A.   I do not.
11:00:43           12        Q.   Can you give an estimate?
11:00:45           13        A.   I really don't have a good
11:00:50           14    feel for it.
11:00:51           15        Q.   I mean, have you worked five
11:00:53           16    hours, have you worked a hundred hours?
11:00:55           17        A.   Definitely more than five.
11:00:57           18    Almost certainly more than a hundred.
11:01:00           19        Q.   Do you keep track of the hours
11:01:02           20    that you've worked?
11:01:04           21        A.   We have a time system that
11:01:05           22    does.
11:01:07           23        Q.   So somewhere in NERA that
11:01:10           24    information, you keep that information as
11:01:11           25    to how many hours you've worked on this
```

22 (Pages 85 to 88)

### Page 89

```
           1         DAVID I. TABAK
11:01:14   2    case?
11:01:14   3       A.  Yes.
11:01:14   4       Q.  Have you been retained by
11:01:20   5    counsel, by plaintiffs' counsel for
11:01:24   6    anything other than your declaration
11:01:26   7    related to their motion for class
11:01:28   8    certification?
11:01:28   9           MR. GRAZIANO:  I'm just going
11:01:29  10       to object as beyond the scope of
11:01:31  11       the deposition.  Also, if you could
11:01:34  12       let me know when it's a good time
11:01:36  13       to take a break.
11:01:37  14           MR. BELELIEU:  We'll just
11:01:38  15       finish this line of questioning.
11:01:39  16           MR. GRAZIANO:  You can say yes
11:01:40  17       or no.
11:01:40  18           MR. BELELIEU:  It's a yes or
11:01:41  19       no answer.
11:01:42  20       A.  Yes.  Although it's just one
11:01:44  21    retention.
11:01:47  22       Q.  And is your compensation
11:01:48  23    contingent upon a ruling in favor of
11:01:51  24    plaintiffs on their motion for class
11:01:52  25    certification?
```

### Page 90

```
           1         DAVID I. TABAK
11:01:53   2       A.  Neither mine nor NERA's
11:01:56   3    compensation is contingent on that.
11:01:59   4       Q.  Well, is NERA being paid for
11:02:02   5    your testimony today?
11:02:02   6       A.  NERA is being paid for my time
11:02:04   7    here today.  Or I assume will be.  We
11:02:10   8    haven't been paid for that yet.
11:02:11   9           MR. BELELIEU:  Let's take a
11:02:12  10       break.
11:02:12  11           THE VIDEOGRAPHER:  Going off
11:02:13  12       the record at 11:02 a.m.
11:02:16  13           (A recess was taken.)
11:25:44  14           THE VIDEOGRAPHER:  Returning
11:25:50  15       to the record at 11:25, and this
11:25:53  16       will mark the beginning of tape
11:25:54  17       No. 2.
11:25:56  18    BY MR. BELELIEU:
11:25:57  19       Q.  You understand you're still
11:25:58  20    under oath; correct?
11:25:59  21       A.  I do.
11:26:00  22       Q.  I want to turn back to your
11:26:03  23    declaration now.  Who wrote your
11:26:09  24    declaration?
11:26:09  25       A.  I wrote all of it other than
```

### Page 91

```
           1         DAVID I. TABAK
11:26:11   2    material that's quoted.
11:26:12   3       Q.  So the support staff you
11:26:14   4    mentioned earlier that's working on this
11:26:15   5    case with you from NERA, they didn't
11:26:17   6    draft any of this report; is that
11:26:19   7    correct?
11:26:19   8       A.  They worked on the exhibits
11:26:21   9    and they, you know, created initial
11:26:24  10    exhibits, I may have edited for style.
11:26:27  11    But I think they basically did the drafts
11:26:29  12    on that.  Otherwise they reviewed my
11:26:31  13    work, they checked the numbers on there,
11:26:33  14    and they may have suggested some spelling
11:26:36  15    or grammatical issues or maybe clarity
11:26:39  16    issues.  But it's basically mine.
11:26:41  17       Q.  Were there any drafts of this
11:26:42  18    report?
11:26:43  19       A.  Yes.
11:26:43  20       Q.  And did you write all of those
11:26:44  21    drafts?
11:26:45  22       A.  I did.
11:26:45  23       Q.  How many drafts of this report
11:26:47  24    did you go through?
11:26:48  25       A.  Well, electronically it's hard
```

### Page 92

```
           1         DAVID I. TABAK
11:26:51   2    to say what's a draft.  I open it up,
11:26:54   3    change a word, is it another draft?  I
11:26:56   4    don't know how to answer that really.
11:26:57   5       Q.  Okay.  We can be literal about
11:27:01   6    it.  How many times did you make changes
11:27:02   7    to a draft of this report?
11:27:06   8       A.  Many.  Often I'd open it up
11:27:09   9    and change a word or two when I read a
11:27:11  10    sentence and it wasn't clear.
11:27:13  11       Q.  So can you give me an estimate
11:27:15  12    of how many times you did that?
11:27:16  13       A.  Dozens.  And also writing the
11:27:19  14    first draft, it wasn't in one sitting.
11:27:22  15       Q.  Well, when did you start
11:27:23  16    drafting this report?
11:27:24  17       A.  Probably in January '12 I put
11:27:31  18    together an outline of the report.  So I
11:27:34  19    would have put in things like the scope
11:27:35  20    of the analysis and summary of findings,
11:27:39  21    without the actual findings, obviously,
11:27:41  22    but just a place, for example, I'd say my
11:27:44  23    findings are as follows, and leave a
11:27:47  24    blank.  Qualifications and remuneration
11:27:49  25    would have been there.  Theory of market
```

23 (Pages 89 to 92)

Page 93

```
                    1            DAVID I. TABAK
11:27:51            2    efficiency, I think I actually wrote that
11:27:55            3    after the first draft.
11:27:58            4           But then like section 5, test
11:27:59            5    for market efficiency, I wrote the
11:28:02            6    general outline.  In fact I think I wrote
11:28:04            7    a lot of this report just leaving blanks
11:28:06            8    for what the actual outcome of analysis
11:28:08            9    was and the interpretation.  But in terms
11:28:10           10    of writing, what I would do, I'd often
11:28:14           11    fill that in at the same time as my
11:28:15           12    people were starting to do the work.
11:28:18           13        Q.   So you assigned certain
11:28:22           14    sections or portions of the work for this
11:28:27           15    report to your staff; is that correct?
11:28:28           16        A.   When you say of the report,
11:28:29           17    not the text of the report, but doing the
11:28:31           18    underlying analyses.
11:28:32           19        Q.   Okay.  And did you provide any
11:28:42           20    drafts of your report as you were going
11:28:44           21    through it to plaintiffs' counsel?
11:28:46           22            MR. GRAZIANO:  Just object.
11:28:47           23    It's a yes or no question.
11:28:48           24        A.   Yes.
11:28:49           25        Q.   And again, how many drafts
```

Page 94

```
                    1            DAVID I. TABAK
11:28:53            2    would you have provided to plaintiffs'
11:28:55            3    counsel?
11:28:57            4        A.   Maybe three.
11:29:01            5        Q.   I believe you testified
11:29:02            6    earlier that you said you spent, tell me
11:29:07            7    if I'm wrong, over a hundred hours on
11:29:09            8    this report.  Is that correct?
11:29:12            9        A.   I believe that figure is
11:29:14           10    correct.
11:29:15           11        Q.   So out of those hundred hours
11:29:17           12    or hundred plus hours, how much time did
11:29:19           13    you spend actually drafting the report?
11:29:23           14        A.   I don't know.  I don't think
11:29:28           15    it necessarily would have been that much.
11:29:32           16    I write reasonably quickly.
11:29:34           17        Q.   So again, can you give me an
11:29:36           18    estimate?
11:29:36           19        A.   I really can't.  I just don't
11:29:38           20    know.
11:29:39           21        Q.   Well, did you conduct any
11:29:41           22    research related to this report?
11:29:43           23        A.   When you say research, all of
11:29:48           24    the analyses there are based on data.
11:29:51           25    It's not as if I knew what the answers
```

Page 95

```
                    1            DAVID I. TABAK
11:29:53            2    would be before my staff and I analyzed
11:29:55            3    the data.
11:29:55            4        Q.   Right.  But I believe you told
11:29:56            5    me that your staff conducted the
11:29:58            6    underlying analyses.  I'm asking you did
11:30:00            7    you conduct any of your own underlying
11:30:02            8    analyses related to this report?
11:30:05            9        A.   Oh, well, I often reviewed
11:30:08           10    what my staff did and sometimes would
11:30:10           11    replicate it myself.  I took a look at
11:30:12           12    the data.  I did some research in the
11:30:15           13    academic literature myself to see if I
11:30:19           14    could find academic sources that either
11:30:23           15    supported or contradicted what I wanted
11:30:25           16    to say.
11:30:25           17        Q.   Do you recall what academic
11:30:27           18    sources you reviewed?
11:30:28           19        A.   Those cited over here, for
11:30:30           20    example.  There is one on the use of
11:30:34           21    All-Star analysts that I actually cite
11:30:38           22    again, I believe, for the proposition
11:30:39           23    that traders in the option markets tend
11:30:42           24    to be more sophisticated than traders in
11:30:44           25    the stock market.
```

Page 96

```
                    1            DAVID I. TABAK
11:30:46            2        Q.   And of the underlying analyses
11:30:48            3    that your staff did, which underlying
11:30:50            4    analyses did you actually review?
11:30:53            5        A.   It depends what you mean by
11:30:55            6    review.  I looked obviously at the output
11:30:57            7    for all of them.  I also tended to go
11:31:00            8    through the files.  If you want I can go
11:31:02            9    through the exhibits and tell you what I
11:31:03           10    looked at.
11:31:04           11        Q.   Sure.
11:31:08           12        A.   Okay.  So Exhibit 3 is an
11:31:12           13    analysis of the average weekly trading
11:31:16           14    volume.  And I definitely looked at that
11:31:19           15    file and actually checked the results.
11:31:24           16    Straightforward enough.
11:31:25           17            Exhibit 4-A, discusses the
11:31:29           18    analysts contributing to I/B/E/S, all
11:31:32           19    caps I-/-B-/-E-/-S, to the I/B/E/S
11:31:39           20    consensus earnings estimates.  And I
11:31:40           21    looked at I believe the raw file from
11:31:43           22    I/B/E/S.  And certainly I looked a lot at
11:31:47           23    column 3 to see how to properly describe
11:31:49           24    the results.
11:31:51           25            Exhibit 4-B talks about the
```

24 (Pages 93 to 96)